ACCEPTED
15-25-00028-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
5/27/2025 4:56 PM
CHRISTOPHER A. PRINE
CLERK

NO. 15-25-00028-CV-CV

# IN THE FIFTEENTH COURT OF APPEALS
# AUSTIN, TEXAS

Texas State University and Texas State University System,
Defendants/Appellants

v.

Stuart Patrick Wilkinson, Plaintiff/Appellee

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
5/27/2025 4:56:56 PM
CHRISTOPHER A. PRINE
Clerk

Expedited Appeal from Cause No. 24-1162
in the 22nd Judicial District Court of Hays County, Texas

## APPELLEE'S BRIEF

David Junkin
State Bar No. 11058020
david@mcglothlinlaw.com
133 W. San Antonio Street, Suite 400
San Marcos, TX  78666
Telephone: 512/392-7510
Telecopier: 512/392-7520
Attorney for Appellee, Patrick Wilkinson

# TABLE OF CONTENTS

**Index of Authorities** ...................................................................... iii

**Index to Appendix** ......................................................................... v

**Brief Statement of the Case** ......................................................... 1

**Standard of Review** ...................................................................... 1

**Statement Regarding Oral Argument** ......................................... 3

**Issues Presented** ........................................................................... 3

        A.    Is Appellee's Texas Whistleblower Act claim barred by sovereign immunity and did Appellee pled a viable claim under the Act?

        B.    Appellee pled facts to support a waiver of sovereign immunity for a constitutional free-speech retaliation claim and material adverse personnel actions?

        C.    Is Appellee asserting a generic "tort" claim?

        D.    Is dismissal with prejudice appropriate?

**Summary Statement of Background Facts** .................................. 4

**Summary of the Argument** ........................................................... 7

**Argument** ...................................................................................... 8

A.    Appellee's Texas Whistleblower Act claim is not barred by sovereign immunity -- sovereign immunity is expressly waived under the Act and Appellee pled a viable claim under the Act.. ..……..……….…8

        *i.*     *Sovereign Immunity is Expressly Waived Under the Texas Whistleblower Act*…………………………………..…8

ii.      *Appellee Pled a Viable Claim Under the Texas Whistleblower Act*………………………………………………………......9

iii.     *Appellee's Pleading Alleges Exhaustion of His Administrative Remedies*………………………………………….…11

iv.     *Pleading Specific Dates is Not Required*…………...…………...12

v.     *Appellants Did Not Make the Specific Denial Required Under Rule 54 TRCP*…………………………………………………...13

vi.     *Appellee's Pleading Does Not Establish His Claim is Time-Barred*………………………………………………………14

vii.    *Appellee's Pleading Alleges Material Adverse Personnel Actions*………………...…..………………………......16

B.    Appellee pled facts to support a waiver of sovereign immunity for a constitutional free-speech retaliation claim and material adverse personnel actions..………………………………………..…..18

i.     *Appellants are Not Immune From Appellee's Free-Speech Retaliation Claims*……………………………………….18

ii.     *Appellee Pled a Viable Free-Speech Retaliation Claim*……...19

iii.    *Appellee Pled Adverse Personnel Actions Taken Against Him in Retaliation for Exercising his Free Speech Rights*…….…………..20

iv.    *Suit was Properly Brought Against Entities v. Individuals*…....20

v.     *1983 Claim Issues*…………………………………....……..22

C.    The Appellee is not asserting a generic "tort" claim……………..……..23

D.    Dismissal with prejudice is not appropriate at this stage because if his pleading is found to be insufficient, Appellee must be given an opportunity to amend..…………………………………...………..23

**Prayer for Relief**...........................................................................27

**Certification of Compliance**................................................................ 28

**Certificate of Service** ........................................................................ 28

## INDEX OF AUTHORITIES

**Case Law**                                                                                            **Page(s)**

*Caleb v. Carranza*,
518 S.W.3d 537 (Tex. App.—Houston [1st Dist.] 2017, no pet.) .......................... 19

*City of El Paso v. Heinrich*
284 S.W.3d 366 (Tex. 2009)................................................................. 21, 22

*Haddix v. American Zurich Ins.*,
253 S.W.3d 339 (Tex. App.—Eastland 2008, no pet.)........................................ 24

*Harris County v. Sykes*
136 S.W.3d 635 (Tex. 2004)................................................................. 24, 25

*Klumb v. Houston Municipal Employees Pension System*,
458 S.W.3d 1 (Tex. 2015)...................................................................... 18

*Montgomery County v. Park*
246 S.W.3d 610 (Tex. 2007)................................................................... 17

*Scott v. Godwin*,
147 S.W.3d 609 (Tex. App.—Corpus Christi 2004, no pet.)................................. 19

*Skinny's Inc. v. Hicks Brothers Construction Co.*,
602 S.W.2d 85, (Tex. Civ. App.—Eastland 1980, no writ). .................................. 14

*State v. Lueck*,
290 S.W.3d 876 (Tex. 2009)................................................................. 8, 9

*Texas A&M University System v. Koseoglu*,
233 S.W.3d 835 (Tex. 2007)................................................................. 25, 26

*Texas Dept. of Corrections v. Herring,*
513 S.W.2d 6 (Tex.1974) ........................................................................... 23

*Texas Dep't Crim Justice-Comm. Justice Assistance Div. v. Campos,*
384 S.W.3d 810 (Tex. 2012) ...................................................................... 26

*Texas Department of MHMR v. Rodriguez,*
63 S.W.3d 475 (Tex. App.—San Antonio 2001, pet. denied) ............................. 17

*Texas Dept. Parks and Wildlife v. Miranda,*
133 S.W.3d 217 (Tex. 2004) ................................................................. 2, 14

*Texas Parks & Wildlife Dept. v. RW Trophy Ranch, Ltd.,*
15-24-00112-CV (Tex. App. April 10, 2025, no pet.) .................................... 3

*Truss World, Inc. v, ERJS, Inc,*
284 S.W.3d 393 (Tex. App.—Beaumont 2009, pet. denied) ............................. 14

*University of Texas v. Kearney,*
03-14-00500-CV (Tex. App.—Austin May 3, 2016, pet. denied) (mem. op.).2, 3, 11

*UTMB v. Hohman,*
6 S.W.3d 767 (Tex. App.—Houston [1st Dist.] 1999, pet. dismissed) .................... 17

*Ward v. Lamar University,*
484 S.W.3d 440 (Tex. App.—Houston [14th Dist.] 2016, no pet.) .................. 16, 17

**Statutes**

TEX. GOV'T CODE § 554.0035. ........................................................................ 8, 9

TEX. GOV'T CODE § 554.001. .................................................................... 5, 16, 17

TEX. GOV'T CODE §554.002. .................................................................... 9, 10, 16

TEX. GOV'T CODE §554.005. ........................................................................ 15

TEX. GOV'T CODE §554.006. ........................................................................ 15

iv

**Rules**

TEX. R. CIV. P. 45 .................................................................... 14

TEX. R. CIV. P. 47 .................................................................... 14

TEX. R. CIV. P. 54 ......................................................... 7, 13, 14

## INDEX TO APPENDIX

Statute (Chapter 554, Tex. Gov't Code) ................................. TAB A

Cases ...................................................................................... TAB B

TO THE HONORABLE FIFTEENTH COURT OF APPEALS:

## BRIEF STATEMENT OF THE CASE

1.     This case is fundamentally a Texas Whistleblower Act proceeding arising out of reports by the Appellee to the Federal Bureau of Investigation ("FBI") and to the Appellants and the resulting adverse personnel actions taken against him by Appellants.  A hearing was held on the Appellants' Plea to the Jurisdiction.   The Appellants provided no evidence with their Plea to the Jurisdiction or at the hearing, or with their post-hearing briefing.  The underlying issue before the Trial Court, and this Court, is the sufficiency of the Appellee's petition.

2.     As discussed in more detail below, under the applicable standard of review of his pleadings, the Appellee has pled a viable Texas Whistleblower Act claim and viable free-speech retaliation claim.   The Trial Court denied the Appellants' Plea.   However, if this Court finds that Appellee's pleading is insufficient in some regard, Appellee should be afforded the opportunity to amend in order to meet any such deficiency.

## STANDARD OF REVIEW

3.     In this case, the Appellants offered no evidence whatsoever to support their jurisdictional challenge.   The arguments of counsel and suggestions as to what the evidence would have shown, do not support a challenge to jurisdictional

facts.[1]  Therefore, Defendants cannot properly challenge the evidentiary basis for the Appellee's pleading – as opposed to challenging the sufficiency of the pleading itself. In other words, this appeal is strictly a challenge to the sufficiency of Appellee's pleading.  As the Texas Supreme Court has noted:

> When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause.  We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent. If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend.[2]

The review by this Court is *de novo*.[3]

4.    Accordingly, this Court should look to the Appellee's First Amended Original Petition ("Amended Petition")[4] for Appellee's intent, construe the Amended Petition liberally in favor of jurisdiction, and accept the allegations in the

---

[1] *See e.g., University of Texas v. Kearney*, 03-14-00500-CV, pg. 14 (Tex. App.—Austin May 3, 2016, pet. denied) (mem. op.) ("Instead, the University asserts only arguments as to what the evidence would show had it offered any. However, the arguments of counsel are not evidence. Thus, the University asks us to determine jurisdictional facts in the absence of any record evidence whatsoever. Consequently, there is no evidence of the facts it now urges us to rely on in determining that Kearney cannot show she was treated less favorably than similarly situated employees. We cannot do so.") (citations omitted)

[2] *Texas Dept. Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 226-27 (Tex. 2004) (citations omitted).

[3] *Id.* at 226 and *Kearney* at 5.

[4] Amended Petition, Clerk's Record, page 47.

Amended Petition as true.[5]  Using that standard, this Court should determine if Appellee has alleged facts that affirmatively demonstrate the Court's jurisdiction to hear the case.[6]  If the Amended Petition does not contain sufficient facts to affirmatively demonstrate jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the Appellee should be afforded the opportunity to amend.

## STATEMENT REGARDING ORAL ARGUMENT

5.     Given that essentially the sole issue before the Court is the sufficiency of the Appellee's pleading, Appellee believes that the pleadings will adequately present the facts and legal arguments involved in this appeal and that oral argument would not significantly aid the decisional process of, or review by, this Court.  However, if the Court determines oral argument would be helpful, Appellee intends to participate.

## ISSUES PRESENTED

6.     The trial court properly denied the Appellants' Plea because under the applicable standard of review, the Appellee's Amended Petition does not establish his claims are barred by sovereign immunity, he has pled sufficient facts to support

---

[5] *Kearney* at 5.

[6] *Tex. Parks & Wildlife Dept v. RW Trophy Ranch, Ltd.*, 15-24-00112-CV (Tex. App. April 10, 2025, no pet.).

those claims, he has not pled a generic "tort" claim, any alleged defects are not incurable and therefore dismissal with prejudice at this stage is not appropriate.

## SUMMARY STATEMENT OF BACKGROUND FACTS[7]

7.      The Appellee is a CPA and has been a public employee for more than 40 years.  For virtually all of his career, Appellee was a valued and respected employee and was responsible for high-level projects and consistently received positive evaluations for his work.  More recently, Appellants held training and related events encouraging employees to report suspected wrongdoing.  The Appellants also purported to encourage its employees to report suspected violations of the law and suspected misconduct by Appellants' faculty, staff, and officers.  While at times criticized for his conservative viewpoints by his superiors, the Appellants also appeared to take pride in presenting a public persona of promoting openness, diversity, equity, inclusion, diversity of opinions, etc.

8.      In 2023, the Appellee became aware of issues raised by Quest Software, Inc., a California-based company, about licensing of its database management software product called "Toad" and the Appellants' use of that software without proper licenses.  The issue raised concerned the number of approved licenses for Appellants versus the number of computers using some

---

[7] Taken from the Amended Petition (Clerk's Record, beginning on page 47) and reasonable inferences drawn therefrom.

version of Toad. The Appellee also became aware of the issue through a co-worker who, before an audit was conducted to determine the number of computers with Toad software, was told by the Appellant to have his hard-drive "reformatted" such that if Toad software was on his computer, it would be deleted. This course of conduct raised good faith and legitimate concerns about spoliation, illegal conduct and violations of multiple laws.

9.      The Appellee, in good faith, reported the foregoing facts and potential violation of the law by the Appellants to the FBI. The Appellee, as a CPA, was familiar with criminal charges against CPAs arising out of the "Enron" cases from years ago, particularly as it relates to destruction of evidence. Accordingly, the Appellee reasonably believed the FBI was an "appropriate law enforcement authority," as that term is used in Texas Government Code § 554.001, because he was familiar with its authority to investigate violations of federal criminal laws, interstate matters, spoliation claims, destruction of evidence, etc.[8]

10.     After making the underlying report of suspected criminal activity to the FBI, Appellee also made the report to the Texas State University System's Internal Audit Office for investigation though its Ethics Point online reporting system. However, the Internal Audit "investigation" did not even appropriately

---

[8] It is not lost on Appellee that the Texas Attorney General's Office could be charged with prosecuting the alleged criminal behavior by Appellants and is also defending the Appellants in this related matter creating the strong potential for a conflict of interest.

investigate the matters reported to the FBI and the Appellant failed to take steps to prevent Appellee's supervisors/managers from retaliating against him. Since making the reports, the Appellee pled that Appellants have, among other things: (i) refused to consider promotional opportunities for Appellee, (ii) intentionally deprived Appellee of networking and social interactions that he had enjoyed for years, (iii) created a hostile, demeaning, and restrictive work atmosphere, (iv) fabricated performance reviews with the purpose of creating a pretext to demote and/or terminate Appellee, (v) did not promote Appellee, (vi) reduced Appellee's pay, (vii) denied Appellee pay raises, (viii) denied Appellee promotional opportunities, and (ix) unfairly limited Appellee's employment benefits.

11. As a result of the Appellants' retaliatory conduct the Appellee has suffered and will continue to suffer damages in the form of lost wages, lost future wages, lost future expected pay increases, and/or lost benefits (to also include promotional opportunities). After being subjected to material adverse personnel action because of his reports, Appellee timely instituted the administrative grievance process and, when that process was exhausted, the Appellee filed this suit.

## SUMMARY/OUTLINE OF THE ARGUMENTS

12. As noted above, Appellants offered no evidence to support their Plea to the Jurisdiction or to counter the facts alleged in the Amended Petition. Appellants also did not bring their contest to jurisdiction as a traditional or no-evidence motion for summary judgment. Accordingly, the Trial Court properly denied the Appellants' Plea because:

A. Appellee's Texas Whistleblower Act claim is not barred by sovereign immunity – sovereign immunity is expressly waived under the Act and Appellee pled a viable claim under the Act.

    *i.* *Sovereign Immunity is Expressly Waived Under the Texas Whistleblower Act.*

    *ii.* *Appellee Pled a Viable Claim Under the Texas Whistleblower Act.*

    *iii.* *Appellee's Pleading Alleges Exhaustion of His Administrative Remedies.*

    *iv.* *Pleading Specific Dates is Not Required.*

    *v.* *Appellants Did Not Make the Specific Denial Required Under TRCP 54.*

    *vi.* *Appellee's Pleading Does Not Establish His Claim is Time-Barred.*

    *vii.* *Appellee's Pleading Alleges Material Adverse Personnel Actions.*

B. Appellee pled facts to support a waiver of sovereign immunity for a constitutional free-speech retaliation claim and material adverse personnel actions.

> > i. *Appellants are Not Immune From Appellee's Free-Speech Retaliation Claims.*
>
> > ii. *Appellee Pled a Viable Free-Speech Retaliation Claim.*
>
> > iii. *Appellee Pled Adverse Personnel Actions Taken Against Him in Retaliation for Exercising his Free-Speech Rights.*
>
> > iv. *Suit was Properly Brought Against Entities v. Individuals.*
>
> > v. *1983 Claim Issues.*
>
> C. The Appellee is not asserting a generic "tort" claim.
>
> D. Dismissal with prejudice is not appropriate at this stage because if Appellee's pleading is found to be insufficient, Appellee must be given an opportunity to amend.

## ARGUMENTS

**A. Appellee's Texas Whistleblower Act claim is not barred by sovereign immunity -- sovereign immunity is expressly waived under the Act and Appellee pled a viable claim under the Act.**

*Sovereign Immunity is Expressly Waived Under the Texas Whistleblower Act.*

13. The Texas Whistleblower Act – Texas Government Code Chapter 554 (the "Whistleblower Act") – expressly provides for a waiver of sovereign immunity.[9] In fact, the Texas Supreme Court in *State v. Lueck* found that, fundamentally, in a Whistleblower Act claim, there are two jurisdictional

---

[9] *See* TEX. GOV'T CODE § 554.0035. ("A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter. Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter.").

requirements to be pled to show waiver of governmental immunity under the Act – those requirements are that the plaintiff must plead he was/is a public employee and a violation of the Act. [10] Appellee has done both – he pled he was a public employee[11] and as discussed in more detail below, pled a viable claim under the Act.

*Appellee Pled a Viable Claim Under the Texas Whistleblower Act.*

14.    While noting the two (2) fundamental requirements for a waiver of sovereign immunity, the Texas Supreme Court in *Lueck* also noted that the mere reference to the Whistleblower Act alone is insufficient to confer jurisdiction and that the elements of a violation of the Whistleblower Act must be pled. [12] The Whistleblower Act provides, in part:

> (a)  A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing

---

[10] *State v. Lueck*, 290 S.W.3d 876, 881 (Tex. 2009) ("We agree with Lueck and the court of appeals that there are but two jurisdictional requirements under section 554.0035. For the government's immunity to be waived, the plaintiff must (1) be a public employee, and (2) allege a violation *of this chapter*.") (citation omitted).

[11] *See* Amended Petition, Clerk's Record at 48, paragraph 8.

[12] *Lueck*, 290 S.W.3d at 881 ("But it necessarily follows from this language that Lueck must actually allege a violation of the Act for there to be a waiver from suit. Therefore, the elements under section 554.002(a) must be considered in order to ascertain what constitutes a violation, and whether that violation has actually been alleged. We conclude that the elements of section 554.002(a) can be considered as jurisdictional facts, when it is necessary to resolve whether a defendant has alleged a violation under the Act.").

governmental entity or another public employee to an appropriate law enforcement authority.

(b)   In this section, a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:

>   (1)  regulate under or enforce the law alleged to be violated in the report;  or
>
>   (2)  investigate or prosecute a violation of criminal law.[13]

15.   In this case, in the Amended Petition the Appellee pled that:

a.   the Appellants are governmental entities within the meaning of the Whistleblower Act,[14]

b.   as discussed above, he was a public employee and employed by Appellants,[15]

c.   as encouraged by Appellants and acting in good faith, Appellee reported the violation, or potential violation, of the law by the Appellants to the FBI,[16] and

d.   Appellee believed the FBI is an appropriate law enforcement authority to investigate such violations of the law.[17]

While the Court should construe all of these pled facts in Appellee's Amended Petition as true and in favor of jurisdiction, the Appellants offered no evidence to

---

[13] TEX. GOV'T CODE §554.002.

[14] Amended Petition, Clerk's Record at page 47, paragraphs 4 and 5.

[15] *Id.,* page 48, paragraph 8.

[16] *Id.,* pages 49-50, paragraphs 10-12.

[17] *Id.,* page 50, paragraph 12.

the contrary or tending to challenge any of these jurisdictional facts. Any arguments they make to the contrary are just that – arguments – and are not evidence.[18]

*Appellee's Pleading Alleges Exhaustion of His Administrative Remedies.*

16. Appellants admit Appellee has pled that he submitted his whistleblowing report to the FBI and to the Texas State University System's Office of Internal Audit via an online reporting platform. Appellants also assert, with absolutely no factual basis to support it, that Appellee failed to notify his employers of the alleged retaliatory conduct underlying his current suit against them within the timeframe mandated by the Whistleblower Act and therefore he has failed to exhaust his administrative remedies for his Whistleblower Act claim and the Court lacks jurisdiction.

17. However, despite the Appellants' assertions to the contrary, the Appellee did in fact plead that he timely exhausted his administrative remedies.[19] The Appellants suggest the Amended Petition suggests Appellee only complained to the Appellants about the suspected criminal violations and did not pursue administrative remedies for the retaliatory conduct. Appellants ask this Court to

---

[18] *See Kearney*, footnote 1, supra.

[19] *See e.g.*, Amended Petition, Clerk's Record at page 54, paragraph 18 and at page 56, paragraph 24.

ignore paragraph 24 of the Amended Petition where Appellee states:

> [t]he [Appellee] appropriately initialed [sic - initiated] his administrative remedies. Appellee invoked the Texas State University grievance procedure within 90 days after the ***adverse employment action*** was discovered and timely filed suit.[20]

Even without liberally construing the Amended Petition in Appellee's favor and in favor of jurisdiction, Appellee has alleged reporting the illegal activity to the FBI and Office of Internal Audit **_AND_** then reporting the adverse personnel action resulting from such reports in accordance with the Appellants' grievance procedure. Appellee adequately pled exhaustion of his administrative remedies.

*Pleading Specific Dates is Not Required.*

18. The Appellants assert that the Court lacks jurisdiction because the Appellee did not allege specific dates in his Amended Petition. The Appellants rely on the *University of Texas v. Poindexter* case which is NOT a Whistleblower Act case and does not revolve around an alleged failure to exhaust administrative remedies. Instead, the *Poindexter* case notes that "a charge filed with the EEOC must specify the date(s) on which the allegedly unlawful employment practice(s) occurred" which allows the EEOC "to calculate whether the charge's 180-day filing deadline has passed." The *Poindexter* case even noted that the EEOC charge form has a "Continuing Action" box for discrimination that "manifests itself over

---

[20] *See id.*, page 56, paragraph 24.

time, rather than a series of discrete acts." The Appellants are now asking the Court to conclude that the EEOC form requirement to include dates somehow transfers over to Whistleblower complaints that have no such requirement or form. In the unlikely event that the Court finds it lacks jurisdiction without specific dates, the Appellee respectfully requests the Court identify such dates required to be pled for jurisdictional purposes under the Whistleblower Act and grant him leave to amend to meet such alleged deficiencies.[21]

*Appellants Did Not Make the Specific Denial Required Under TRCP 54.*

19. Further and in the alternative, the Appellee has pled that all conditions precedent to his right to recover have occurred or have been performed under Rule 54 of the Texas Rules of Civil Procedure. As discussed above, Appellee also pled he appropriately initiated his administrative remedies and that he invoked the Texas State University grievance procedure within 90 days after the adverse employment action was discovered and that he timely filed suit. Appellee was then further retaliated against for filing suit. The Appellants offered no evidence to the contrary and the Appellants' answer does not include a ***specific*** affirmative limitations defense or denial. Appellants pled that "Defendants assert the

---

[21] This relief was also requested in the Trial Court. *See e.g.,* Response to Defendants First Amended Plea to the Jurisdiction, Clerk's Record, page 100, paragraph 20.

applicable statute of limitations to Plaintiff's claims, to the extent that it applies."[22]

But those types of generic allegations are not the type of specific denials required by Rule 54. In the *Truss World* case the court found that the defendant must specifically state in what way the claims are barred by limitations.[23] Absent a proper and specific denial by Appellants, the Appellee's Rule 54 pleading eliminates the requirement for Appellee to plead further.

*Appellee's Pleading Does Not Establish His Claim is Time-Barred.*

20. The Appellants also seem to take the position that the jurisdictional pleading requirements include affirmatively pleading any and every specific fact that might be raised by a Defendant by way of an affirmative defense, including the statute of limitations. This is not required under Texas pleading rules.[24] The Appellants did not bring a summary judgment and have offered no evidence to support any alleged affirmative or limitations defense – Appellants just claim that

---

[22] Defendant's Original Answer and Defenses, Clerk's Record, Page 15, paragraph 3.

[23] *See Truss World, Inc. v, ERJS, Inc.*, 284 S.W.3d 393, 396-97 (Tex. App.—Beaumont 2009, pet. denied), *see also*, *Skinny's Inc. v. Hicks Brothers Construction Co.*, 602 S.W.2d 85, 90 (Tex. Civ. App.—Eastland 1980, no writ).

[24] *See e.g., Miranda*, 133 S.W.3d at 230 (in response to the dissent's position that additional supporting facts must be pled, the Texas Supreme Court noted: "The pleading hurdle he seeks to erect would be groundbreaking, indeed, extending beyond current requirements under our rules of civil procedure and case law. Rules 45 and 47 require that the original pleadings give a short statement of the cause of action sufficient to give the opposing party fair notice of the claim involved. Rule 45 does not require that the plaintiff set out in his pleadings the evidence upon which he relies to establish his asserted cause of action.").

the Appellee is required to plead around it or Appellee's claims must be dismissed. The Appellee pled that he timely filed his administrative grievance for the Appellants' retaliatory conduct and that he timely filed suit following the conclusion of that process – which is an internal process for which the Appellants have access to the very information they claim Appellee was required to plead.

21. In addition, the Appellants assert suit was not timely filed emphasizing the complaint to the FBI was made in August of 2023. However, the date the complaint was made is not at all controlling. The Whistleblower Act does provide for a presumption that retaliatory conduct is as a result of the whistleblower complaint if filed within 90 days, but that provision does not control timing of the filing of the petition for limitations purposes. The Whistleblower Act's limitations period runs from when the retaliatory personnel action occurred ***or was discovered***[25] by the plaintiff through reasonable diligence and the time period is also extended by invocation of the grievance process.[26] Despite Appellants' arguments to the contrary, the 90-day limitations period does not begin to run when Appellee's complaint was made to the FBI. The Appellee pled he

---

[25] Appellee is aware that the immediate past President of Texas State University testified in a whistleblower case that she was advised by counsel not to take any action involving the whistleblower until after the 90-day period had expired. Intentionally waiting until after the 90-day period has run before initiating adverse personnel actions, does not absolve Appellants of liability under the Act by creating an automatic limitations defense.

[26] TEX. GOV'T CODE §554.005 and 554.006 (emphasis added).

pursued his administrative remedies and his suit was timely filed – Appellants offered no evidence to the contrary.

*Appellee's Pleading Alleges Material Adverse Personnel Actions.*

22.     Further, the Whistleblower Act also requires the Appellee to plead his employment was "suspended or terminated" **_or_** that Appellants took "other adverse personnel action" against Appellee.[27]  The Appellants argue that the Court lacks jurisdiction because the Appellee is still employed.  This position ignores the plain language of the Whistleblower Act that does not require suspension or termination – only some "other adverse personnel action."  "Personnel action" is expressly defined to mean "an action that affects a public employee's compensation, promotion, demotion, transfer, work assignment, or performance evaluation."[28] The fact that a plaintiff might remain employed is not even remotely dispositive of a Whistleblower Act claim.[29]

23.     For example, adverse personnel action can be any action that affects the Appellee's compensation, promotion, transfer, work assignment or

---

[27]  TEX. GOV'T CODE §554.002 (emphasis added).

[28] *Id.* at 554.001(3).

[29] *See generally, Ward v. Lamar University*, 484 S.W.3d 440 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (finding that evidence that certain job characteristics remained the same after the report is not dispositive and a fact issue was created when Appellee's authority was significantly reduced even though her pay and job title remained the same).

performance evaluation.[30] The Court can also consider effects on prestige, opportunity for advancement, working conditions, income, and the ability to obtain outside employment.[31] Adverse employment action can also include direct or constructive termination, and lesser actions like reprimands, warnings, and missed pay increases.[32]

24. In this case the Appellee has alleged that as a result of his Whistleblower Act complaint, the Appellants:

    a.    created a hostile work environment with the intent to force the Appellee to resign,

    b.    constructively discharged Appellee,

    c.    subjected Appellee to a fabricated performance review with the purpose of creating a pretext to demote or not promote Appellee,

    d.    excluded Appellee from networking opportunities,

    e.    sought to fire Appellee,

    f.    reduced Appellee's pay,

    g.    denied Appellee a pay raise,

---

[30] TEX. GOV'T CODE §554.001(3), *see also*, *Montgomery County v. Park*, 246 S.W.3d 610, 612 (Tex. 2007) ("We hold that a personnel action is adverse within the meaning of the Whistleblower Act if it would be likely to dissuade a reasonable, similarly situated worker from making a report under the Act.").

[31] *See e.g., Ward*, 484 S.W.3d at 446.

[32] *See Texas Department of MHMR v. Rodriguez*, 63 S.W.3d 475 (Tex. App.—San Antonio 2001, pet. denied); *UTMB v. Hohman*, 6 S.W.3d 767 (Tex. App.—Houston [1st Dist.] 1999, pet. dismissed).

h.  denied Appellee promotional opportunities,

i.  concocted poor performance evaluations for Appellee, and

j.  limited Appellee's employment benefits.[33]

Liberally construing the Appellee's petition in favor of jurisdiction and taking the allegations as a whole and as true, Appellee has pled adverse personnel actions were taken against him as a result of his Whistleblower report to the FBI, including, without limitation, pay-related actions. Appellee simply is not required to plead or show he was actually terminated, or that he is no longer employed by Appellants.

25.  Under the proper review criteria, Appellee has pled sufficient facts to support jurisdiction for his Texas Whistleblower Act claims.

**B.  Appellee pled facts to support a waiver of sovereign immunity for a constitutional free-speech retaliation claim and material adverse personnel actions.**

*Appellants are Not Immune From Appellee's Free-Speech Retaliation Claims.*

26.  The Appellants offer no legal support for their apparent contention that they are immune from suit for violations of Appellee's free-speech rights. Sovereign immunity does not bar a suit to vindicate constitutional rights.[34]

---

[33] *See e.g.,* Amended Petition, Clerk's Record, pages 51-53, paragraphs 13 through 16 and page 54, paragraph 20.

[34] *See e.g., Klumb v. Houston Municipal Employees Pension System*, 458 S.W.3d 1, 13

*Appellee Pled a Viable Free-Speech Retaliation Claim.*

27.     To present a valid constitutional free-speech claim, the Appellee was required to plead that:

    a.     he suffered an adverse employment decision;

    b.     his speech involved a matter of public concern;

    c.     his interest in commenting on matters of public concern outweighed the Appellants' interest in promoting efficiency; and

    d.     his speech motivated the adverse employment decision.[35]

In this case, Appellee pled that:

    a.     he suffered adverse employment decisions;[36]

    b.     his speech (complaint of wrongdoing) involved a matter of public concern;[37]

    c.     acting in good faith, he reported the violation or potential violation of the law by the Appellant to the FBI, his interest in commenting on matters of public concern outweighed the Appellants' interest in

---

(Tex. 2015) ("While it is true that sovereign immunity does not bar a suit to vindicate constitutional rights, immunity from suit is not waived if the constitutional claims are facially invalid,") (citation omitted).

[35] *See e.g., Caleb v. Carranza*, 518 S.W.3d 537, 544 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

[36] *See* paragraphs 22 through 24 above.

[37] *See e.g., Scott v. Godwin*, 147 S.W.3d 609, 618 (Tex. App.—Corpus Christi 2004, no pet.) ("Exposure of official misconduct is generally of great consequence to the public. There is perhaps no subset of 'matters of public concern' more important, for purposes of First Amendment protection of speech of public employees, than bringing official misconduct to light.") (citations omitted).

promoting any potential loss of efficiency;[38] and

d.   his speech motivated the adverse employment decisions.[39]

Taking the allegations in the Amended Petition as true and construing it liberally in Appellee's favor and in favor of jurisdiction, Appellee has pled a viable First Amendment Retaliation claim.

*Appellee Pled Adverse Personnel Actions Taken Against Him in Retaliation for Exercising his Free-Speech Rights.*

28.   Taking the allegations in the Amended Petition as true and liberally construing them in favor of jurisdiction, the Appellee has pled adverse personnel actions were taken against him as a result of his exercise of his free-speech rights.[40]

*Suit was Properly Brought Against Entities v. Individuals.*

29.   Again, without waiver of the objection based on this issue being raised in post-hearing briefing, Appellants did not specifically include the arguments in their Plea to the Jurisdiction. The Appellants also seemed to argue that Appellee must bring his claims against individuals as opposed to the governmental entity. In that regard, the Appellants referred the Court to *City of El*

---

[38] *See e.g.,* Amended Petition, Clerk's Record at pages 50 through 53, paragraphs 11 through 15.

[39] *See id.,* 53 and 54, paragraphs 16, 17, 19, and 20.

[40] *See* paragraphs 22 through 24 above.

*Paso v. Heinrich.*[41]  In *Heinrich* the Appellee sued both the governmental entities and individual governmental actors and the Appellants filed a Plea to the Jurisdiction claiming immunity.[42]  *Heinrich* was not a Whistleblower Act case or a free-speech case arising out of a Whistleblower complaint.  In that case, Heinrich conceded that the governmental entities were immune from suit, but argued the Declaratory Judgment Act claims against the individuals were not.[43]  The Court then addressed the following questions to "Proper Parties":

> We have been less than clear regarding the permissible use of a declaratory remedy in this type of ultra vires suit. Must it be brought directly against the state or its subdivisions? Or must it be brought against the relevant government actors in their official capacity?[44]

The Court found that in *ultra vires* cases seeking a declaratory remedy, ". . . it follows that these suits cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity."[45] The Court ultimately found some of the claims against the individual Appellants were barred by sovereign immunity and some were not.

---

[41] *City of El Paso v. Heinrich,* 284 S.W.3d 366 (Tex. 2009).

[42] *Id.* at 370.

[43] *Id.* at 370-72.

[44] *Id.* at 373.

[45] *Id.*

30.     In this case, the Appellants offered no evidence to support a claim that any actions complained of by Appellee were not lawfully authorized or *ultra vires* actions for which they are not responsible and may have immunity. The Appellee did not bring suit under the Texas Declaratory Judgments Act rather, brought suit under the Texas Whistleblower Act where immunity is waived for those claims. Further, the Appellants have not shown how *Heinrich* is directly applicable to this case, offered no evidence to support a claim that the Appellee's claims are *ultra vires* or barred by immunity, have no pleading to support such a position, and have ignored the Appellee's petition.[46] Appellants simply have not shown there is any legal jurisdictional pleading defect in Appellee's petition in this regard justifying dismissal of the Appellees' case in its entirety for lack of jurisdiction.

*1983 Claim Issues*

31.     Without waiver of the objection to presentation of arguments not contained in their Plea to the Jurisdiction, Appellants mentioned immunity issues related to 1983 claims. Appellee has not pled a direct claim under 42 U.S.C. 1983. However, even if Appellee did decide to bring a 1983-based claim, Appellants have not shown a specific pleading defect that would preclude such a claim or one that could not be cured in an amended pleading.

---

[46] Amended Petition, Clerk's Record, pages 54 and 55, paragraphs 19 and 22.

**C.       The Appellee is not asserting a generic "tort" claim.**

32.       The Appellee has stated on the record that any clarification Appellants are seeking on the Amended Petition should be brought by way of special exceptions,[47] and confirmed that Appellee was not making a generic tort claim.[48]

**D.       Dismissal with prejudice is not appropriate at this stage because if Appellee's pleading is found to be insufficient, Appellee must be given an opportunity to amend.**

33.       Lastly, if in the unlikely event the Court finds that the Appellee's pleadings do not contain sufficient facts to affirmatively demonstrate the Court's jurisdiction, but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the Appellee should be afforded the opportunity to amend. Appellee again requests that the Court identify the pleading deficiency(ies), if there are any, and allow Appellee the opportunity to amend.

---

[47] While a plea to the jurisdiction can be used to challenge jurisdiction, a claim that the Appellee has asserted an undetermined tort claim is more appropriately challenged by special exception with the opportunity to amend if sustained. *See e.g., Texas Dept. of Corrections v. Herring*, 513 S.W.2d 6, 9-10 (Tex.1974). "Herring's pleadings were insufficient; that is, they failed to state a cause of action. The Department of Corrections leveled no special exceptions to Herring's pleadings and thus no opportunity to amend his pleadings to state a cause of action was afforded. Had the Department of Corrections filed special exceptions which were sustained by the court, Herring would have had an opportunity to amend as a matter of right. But only after a party has been given an opportunity to amend after special exceptions have been sustained may the case be dismissed for failure to state a cause of action.") (citations omitted)

[48] Reporter's Record, page 32, lines 3 through 11.

34.    Appellants argue that if the Court finds there is a pleading defect, the Appellee should not be allowed the opportunity to amend to meet the defect.  In other words, the Appellants argued that the Appellee had time to amend his petition before the hearing and therefore should not be given an opportunity to amend even **_IF_** this Court finds the pleading is insufficient.  The Appellants referred the Court to *Haddix v. American Zurich Ins*.,[49] for the general proposition that the Appellee waived his opportunity to amend by not amending his petition after the Plea to the Jurisdiction was filed.  However, in *Haddix* the court found that, "Haddix did not amend or request leave to amend his pleadings."[50]  In this case, the Appellee specifically requested leave to amend his petition **_IF_** the Court finds his pleadings are insufficient.[51]

35.    The Appellants also referred the Court to the *Harris County v. Sykes*[52] case where the Texas Supreme Court addressed the issue about whether the dismissal should be with prejudice – the Court found it should have been, but also noted that "[b]efore dismissing the case, the trial court **_allowed Sykes to file an_**

---

[49] *Haddix v. American Zurich Ins*., 253 S.W.3d 339 (Tex. App.—Eastland 2008, no pet.) ("While the general rule expresses a preference for allowing an amendment, a plaintiff can waive this opportunity through inaction.").

[50] *Id.*

[51] *See* Clerk's Record, page 87, Appellee's Response at paragraphs 2(f), 20, and 22.

[52] *Harris County v. Sykes,* 136 S.W.3d 635 (Tex.  2004).

***amended petition***, after which the Court made a final adjudication . . ."[53] The

*Sykes* case does NOT stand for the proposition that Appellee cannot be allowed to

amend his petition if the Court finds it is defective in some respect.

36. More importantly, after *Haddix* and *Sykes*, the Texas Supreme Court,

in *Texas A&M University System v. Koseoglu*,[54] addressed essentially the same

argument Appellants are making in this case. The Supreme Court noted and held:

> It is true that a plaintiff deserves "a reasonable opportunity to amend"
> unless the pleadings affirmatively negate the existence of jurisdiction. Thus,
> the issue is whether Koseoglu has already been afforded that opportunity. If
> not, we agree that he deserves the opportunity if his pleadings can be cured.

> Koseoglu argues a plaintiff is not required to amend his pleadings
> until they are determined by a court to be deficient. Thus, he contends he
> should now be provided an opportunity to amend. Texas A&M, on the other
> hand, argues the plaintiff's opportunity to amend should come after the
> governmental entity files its plea to the jurisdiction, which puts the Appellee
> on notice of alleged defects in his pleadings, but before the trial court takes
> any definitive action. Accordingly, Texas A & M contends, because
> Koseoglu had four months to amend his pleadings after it filed its
> jurisdictional plea, no further opportunity is warranted. Otherwise, Texas
> A&M argues, suits against governmental entities could be appealed at least
> twice before final judgment—once to obtain a reversal and remand, and a
> second time after the remand is ordered.

> The court of appeals sided with Koseoglu, concluding "a plaintiff may
> stand on his pleadings in the face of a plea to the jurisdiction unless and until
> a court determines that the plea is meritorious." Thereafter, the court of
> appeals held, the plaintiff must be given a reasonable opportunity to amend"
> his pleadings to attempt to cure the jurisdictional defects found unless the
> pleadings are incurably defective. Thus, the court of appeals concluded,

---

[53] *Id.* at 639 (emphasis added).

[54] *Texas A&M University System v. Koseoglu*, 233 S.W.3d 835 (Tex. 2007).

Koseoglu has not been given a reasonable opportunity to amend his pleadings because the trial court never found merit in Texas A&M's jurisdictional plea.

On this point, we generally agree with the court of appeals. Texas A&M's proposed rule would essentially allow governmental entities the unjust advantage of being not only a litigant, but also the judge of the plaintiff's pleadings. We decline to adopt such a rule. Thus, we agree that Koseoglu deserves the opportunity to amend his pleadings if the defects can be cured.[55]

37.     The Texas Supreme Court has rejected the very argument Appellants are making.  This Court has not found that Appellee's Amended Petition is insufficient in any particular way, but if it does, it should identify the deficiency and provide Appellee the opportunity to amend to address the issue, unless such would be impossible to do.  The Appellants have not shown that, if the alleged defects are found by this Court, that such defects are incurable by amendment.

---

[55] *Id.* at 839-40 (citations omitted). *But see, Texas Dep't Crim Justice-Comm. Justice Assistance Div. v. Campos*, 384 S.W.3d 810 (Tex. 2012) ("However, if a governmental entity has asserted in the trial court that it is immune and a Appellee fails to allege or show facts demonstrating a waiver of immunity after having a reasonable opportunity to conduct discovery directed to the issue and amend the pleadings, then the case should be dismissed. In this case the Appellees amended their petition three times over a period of nine years after TDCJ filed its first plea to the jurisdiction. Prior to the Appellees' last amendment the court of appeals had noted "it is unclear from the pleadings how the surveillance cameras and rooms in the SATF facility may have been used, as opposed to not used, and thereby caused an injury." The Appellees have had a reasonable opportunity to engage in discovery on the immunity question and amend their pleadings, but nevertheless have not alleged or shown facts demonstrating their injuries were caused by TDCJ's use of tangible property.") (citations omitted).  In the instant case, the Appellants refused to answer discovery, so not only has the Appellee not had a reasonable opportunity to amend, the Appellee has not even been allowed relevant discovery.

**PRAYER FOR RELIEF**

For all of the reasons set out above, Appellee/Plaintiff, Stuart Patrick Wilkinson, respectfully prays that the Court: (i) deny the relief requested by the Appellants/Defendants, Texas State University and Texas State University System, (ii) affirm the Trial Court's ruling, (iii) award Appellee/Plaintiff his reasonable and necessary costs and expenses incurred in responding to this original proceeding, and (iv) award Appellee/Plaintiff all such other and further relief, whether in law or in equity to which Appellee/Plaintiff may show himself to be entitled.

Respectfully submitted,

McGlothlin Junkin & Wilde, PC
133 W. San Antonio, Suite 400
San Marcos, TX 78666
512/392-7510
512/392-7520 (fax)
david@mcglothlinlaw.com

_____
David Junkin
State Bar No. 11058020
Attorney for Appellee/Plaintiff,
Stuart Patrick Wilkinson

## CERTIFICATE OF COMPLIANCE

Based on a word count run in Microsoft Word, this brief contains 7,230 words, including some of the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

_____
David Junkin

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2025, a true and correct copy of the foregoing brief was served by email, through the Texas eFile system, to counsel of record as set forth below:

Rachel L. Behrendt
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Rachel.Behrendt@oag.texas.gov

_____
David Junkin

# TAB
# A

GOVERNMENT CODE

TITLE 5. OPEN GOVERNMENT;  ETHICS

SUBTITLE A. OPEN GOVERNMENT

CHAPTER 554. PROTECTION FOR REPORTING VIOLATIONS OF LAW

Sec. 554.001.  DEFINITIONS.  In this chapter:
(1)  "Law" means:
(A)  a state or federal statute;
(B)  an ordinance of a local governmental entity;  or
(C)  a rule adopted under a statute or ordinance.
(2)  "Local governmental entity" means a political subdivision of the state, including a:
(A)  county;
(B)  municipality;
(C)  public school district;  or
(D)  special-purpose district or authority.
(3)  "Personnel action" means an action that affects a public employee's compensation, promotion, demotion, transfer, work assignment, or performance evaluation.
(4)  "Public employee" means an employee or appointed officer other than an independent contractor who is paid to perform services for a state or local governmental entity.
(5)  "State governmental entity" means:
(A)  a board, commission, department, office, or other agency in the executive branch of state government, created under the constitution or a statute of the state, including an institution of higher education, as defined by Section 61.003, Education Code;
(B)  the legislature or a legislative agency;  or
(C)  the Texas Supreme Court, the Texas Court of Criminal Appeals, a court of appeals, a state judicial agency, or the State Bar of Texas.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.
Amended by Acts 1995, 74th Leg., ch. 721, Sec. 1, eff. June 15, 1995.


Sec. 554.002.  RETALIATION PROHIBITED FOR REPORTING VIOLATION OF LAW.
(a)  A state or local governmental entity may not suspend or terminate the

employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

(b)  In this section, a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:

(1)  regulate under or enforce the law alleged to be violated in the report;  or

(2)  investigate or prosecute a violation of criminal law.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993. Amended by Acts 1995, 74th Leg., ch. 721, Sec. 2, eff. June 15, 1995.


Sec. 554.003.  RELIEF AVAILABLE TO PUBLIC EMPLOYEE.  (a)  A public employee whose employment is suspended or terminated or who is subjected to an adverse personnel action in violation of Section 554.002 is entitled to sue for:

(1)  injunctive relief;

(2)  actual damages;

(3)  court costs;  and

(4)  reasonable attorney fees.

(b)  In addition to relief under Subsection (a), a public employee whose employment is suspended or terminated in violation of this chapter is entitled to:

(1)  reinstatement to the employee's former position or an equivalent position;

(2)  compensation for wages lost during the period of suspension or termination;  and

(3)  reinstatement of fringe benefits and seniority rights lost because of the suspension or termination.

(c)  In a suit under this chapter against an employing state or local governmental entity, a public employee may not recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in an amount that exceeds:

(1)  $50,000, if the employing state or local governmental entity has fewer than 101 employees in each of 20 or more calendar weeks in the calendar year in which the suit is filed or in the preceding year;

(2)  $100,000, if the employing state or local governmental entity has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the calendar year in which the suit is filed or in the preceding year;

(3)  $200,000, if the employing state or local governmental entity has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the calendar year in which the suit is filed or in the preceding year;  and

(4)  $250,000, if the employing state or local governmental entity has more than 500 employees in each of 20 or more calendar weeks in the calendar year in which the suit is filed or in the preceding year.

(d)  If more than one subdivision of Subsection (c) applies to an employing state or local governmental entity, the amount of monetary damages that may be recovered from the entity in a suit brought under this chapter is governed by the applicable provision that provides the highest damage award.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993. Amended by Acts 1995, 74th Leg., ch. 721, Sec. 3, eff. June 15, 1995.


Sec. 554.0035.  WAIVER OF IMMUNITY.  A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter.  Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter.

Added by Acts 1995, 74th Leg., ch. 721, Sec. 4, eff. June 15, 1995.


Sec. 554.004.  BURDEN OF PROOF;  PRESUMPTION;  AFFIRMATIVE DEFENSE. (a)  A public employee who sues under this chapter has the burden of proof, except that if the suspension or termination of, or adverse personnel action against, a public employee occurs not later than the 90th day after the date on which the employee reports a violation of law, the suspension, termination, or adverse personnel action is presumed, subject to rebuttal, to be because the employee made the report.

(b)  It is an affirmative defense to a suit under this chapter that the employing state or local governmental entity would have taken the action against the employee that forms the basis of the suit based solely on information, observation, or evidence that is not related to the fact that the employee made a report protected under this chapter of a violation of law.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.
Amended by Acts 1995, 74th Leg., ch. 721, Sec. 5, eff. June 15, 1995.

Sec. 554.005.  LIMITATION PERIOD.  Except as provided by Section 554.006, a public employee who seeks relief under this chapter must sue not later than the 90th day after the date on which the alleged violation of this chapter:

    (1)  occurred;  or

    (2)  was discovered by the employee through reasonable diligence.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.

Sec. 554.006.  USE OF GRIEVANCE OR APPEAL PROCEDURES.  (a)  A public employee must initiate action under the grievance or appeal procedures of the employing state or local governmental entity relating to suspension or termination of employment or adverse personnel action before suing under this chapter.

(b)  The employee must invoke the applicable grievance or appeal procedures not later than the 90th day after the date on which the alleged violation of this chapter:

    (1)  occurred;  or

    (2)  was discovered by the employee through reasonable diligence.

(c)  Time used by the employee in acting under the grievance or appeal procedures is excluded, except as provided by Subsection (d), from the period established by Section 554.005.

(d)  If a final decision is not rendered before the 61st day after the date procedures are initiated under Subsection (a), the employee may elect to:

    (1)  exhaust the applicable procedures under Subsection (a), in which event the employee must sue not later than the 30th day after the date those procedures are exhausted to obtain relief under this chapter; or

    (2)  terminate procedures under Subsection (a), in which event the employee must sue within the time remaining under Section 554.005 to obtain relief under this chapter.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.
Amended by Acts 1995, 74th Leg., ch. 721, Sec. 6, eff. June 15, 1995.

Sec. 554.007.  WHERE SUIT BROUGHT.  (a)  A public employee of a state governmental entity may sue under this chapter in a district court of the county in which the cause of action arises or in a district court of Travis County.

(b)  A public employee of a local governmental entity may sue under this chapter in a district court of the county in which the cause of action arises or in a district court of any county in the same geographic area that has established with the county in which the cause of action arises a council of governments or other regional commission under Chapter 391, Local Government Code.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.
Amended by Acts 1995, 74th Leg., ch. 721, Sec. 7, eff. June 15, 1995.


Sec. 554.008.  CIVIL PENALTY.  (a)  A supervisor who in violation of this chapter suspends or terminates the employment of a public employee or takes an adverse personnel action against the employee is liable for a civil penalty not to exceed $15,000.

(b)  The attorney general or appropriate prosecuting attorney may sue to collect a civil penalty under this section.

(c)  A civil penalty collected under this section shall be deposited in the state treasury.

(d)  A civil penalty assessed under this section shall be paid by the supervisor and may not be paid by the employing governmental entity.

(e)  The personal liability of a supervisor or other individual under this chapter is limited to the civil penalty that may be assessed under this section.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.
Amended by Acts 1995, 74th Leg., ch. 721, Sec. 8, eff. June 15, 1995.


Sec. 554.009.  NOTICE TO EMPLOYEES.  (a)  A state or local governmental entity shall inform its employees of their rights under this chapter by posting a sign in a prominent location in the workplace.

(b)  The attorney general shall prescribe the design and content of the sign required by this section.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.
Amended by Acts 1995, 74th Leg., ch. 721, Sec. 9, eff. June 15, 1995.

Sec. 554.010.  AUDIT OF STATE GOVERNMENTAL ENTITY AFTER SUIT.  (a)  At the conclusion of a suit that is brought under this chapter against a state governmental entity subject to audit under Section 321.013 and in which the entity is required to pay $10,000 or more under the terms of a settlement agreement or final judgment, the attorney general shall provide to the state auditor's office a brief memorandum describing the facts and disposition of the suit.

(b)  Not later than the 90th day after the date on which the state auditor's office receives the memorandum required by Subsection (a), the auditor may audit or investigate the state governmental entity to determine any changes necessary to correct the problems that gave rise to the whistleblower suit and shall recommend such changes to the Legislative Audit Committee, the Legislative Budget Board, and the governing board or chief executive officer of the entity involved.  In conducting the audit or investigation, the auditor shall have access to all records pertaining to the suit.

Added by Acts 1995, 74th Leg., ch. 721, Sec. 10, eff. June 15, 1995.

# TAB B

ALSO SEE
ATTACHMENTS

**518 S.W.3d 537**

**Mable CALEB, Jackie Anderson, Patrick Cockerham, Diann Banks, and Herbert Lenton, Appellants**
**v.**
**Richard A. CARRANZA, Superintendent of the Houston Independent School District, Appellee**

**NO. 01-15-00285-CV**

**Court of Appeals of Texas, Houston (1st Dist.).**

**Opinion issued March 30, 2017**

Laurence Watts, WATTS & COMPANY LAWYERS, LTD., P.O. Box 2214, Missouri City, TX 77459, for Appellant.

Arturo G. Michel, John M. Hopkins, THOMPSON & HORTON LLP, 3200 Southwest Freeway, Suite 2000, Houston, TX 77027, Holly G. McIntush, 400 West 15th Street, Suite 1430, Austin, TX 78704, for Appellee.

Panel consists of Justices Bland, Massengale, and Lloyd.

**OPINION**

Michael Massengale, Justice

This is an appeal from the dismissal of a lawsuit against the former superintendent of the Houston Independent School District. The appellants, who are former employees of the school district, sought injunctive and declaratory relief stemming from an investigation that culminated in a recommendation to terminate their employment.

The pleadings do not allege a facially valid challenge to any constitutional right, and they are barred by governmental immunity. As such, the trial court properly granted the plea to the jurisdiction. We affirm.

**Background**

We take the appellants' pleadings as true for purposes of this appeal. The dispute arises from an investigation by the Houston Independent School District into allegations of employee misconduct.[1] Mable Caleb was the principal of Key Middle School when, in the summer of 2009, she was appointed principal of Kashmere High School. Caleb was asked to remain as transitional principal at Key until a permanent replacement could be found. After a replacement principal was appointed at Key, Terry Grier became the superintendent of HISD. Grier replaced the newly appointed Key principal with another person, resulting in an outcry and demonstrations from the community.

On October 31, 2009, after being relieved of all responsibilities relating to Key, Caleb moved all of her personal belongings and some school property from Key to Kashmere. She was assisted by appellant

[518 S.W.3d 541]

Herbert Lenton, Key's operations manager, in accordance with HISD procedures. In late November 2009, Grier hired a law firm to investigate the transfer of property, which by then had attracted some media attention. The investigation focused on the transfer of property from Key to Kashmere and on allegations that teachers at Key provided students with actual test problems to practice for standardized tests in order to increase their scores.

The attorney-investigators questioned Caleb and Lenton, as well as others connected to Caleb, including appellants Jackie Anderson, Patrick Cockerham, and Diann Banks. Anderson was a union representative and friend of Caleb who served as the Special Education Department Chair at Key from 2008 to 2009. Cockerham had been an aide to Anderson at Key, and he transferred to Kashmere with Caleb. Banks had been a math teacher at Key from August 2005 through June 2010.

Upon completion of the investigation, the law firm reported its findings to HISD. Grier shared



the findings with the media, the public, and the Texas Education Agency. Based on the report, Grier terminated Caleb in April 2010, and he proposed termination of Cockerham and nonrenewal of the one-year contracts of Anderson and Banks. Upon instruction from Grier, Lenton's supervisor recommended that he be terminated. Administrative hearings cleared Anderson and Cockerham, and the hearing officers recommended that they not be dismissed from employment. Lenton also sought an administrative hearing, but the appellate record does not indicate the results of that hearing. Although Banks was cleared of allegations that she participated in the standardized testing scandal, she resigned due to an unpleasant work environment.

Caleb, Anderson, Cockerham, Banks, and Lenton filed suit against numerous defendants, including Grier in his official capacity. Among the defendants, this appeal pertains only to Grier. The live pleading at the time the claims against Grier were dismissed was the fifth amended petition. That petition alleged that Grier violated various provisions of the Texas Constitution when he "terminated" the appellants "based on a report he commissioned" without giving them "the opportunity to refute the claims contained within before making them public."

The appellants sought a declaration that their constitutional rights were violated by Grier. They requested an injunction preventing Grier from violating their constitutional rights and requiring him to reinstate them "to positions of employment occupied or reasonably comparable to those respectively occupied before November 12, 2009, with all attendant benefits" and to expunge the report from their personnel records. The appellants also sought recovery of attorney's fees and costs.

Grier filed a plea to the jurisdiction. He did not challenge any jurisdictional facts. Instead, he argued that he was immune from the claims. The trial court granted the plea and dismissed the claims against Grier with prejudice. That order was appealed.

While the appeal was pending in this court, Caleb settled her claims against Grier, and she filed an agreed motion to dismiss her appeal, which we now grant. *See* TEX. R. APP. P. 42.1(a)(1). The granting of this motion leaves Anderson, Cockerham, Banks, and Lenton as the remaining appellants. While this appeal has been pending, Grier was replaced by Richard A. Carranza as HISD superintendent, who has been substituted as the appellee. TEX. R. APP. P. 7.2(a).

## Analysis

In a single issue, the appellants argue that Grier was not immune from suit because

[518 S.W.3d 542]

he violated the state constitution, acting outside his legal authority and his lawful discretion as superintendent of HISD. We review de novo the trial court's ruling on a plea to the jurisdiction. *See, e.g.* , *Klumb v. Hous. Mun. Emps. Pension Sys.* , 458 S.W.3d 1, 8 (Tex. 2015).

"Sovereign immunity requires the state's consent before it can be sued." *Hall v. McRaven* , 508 S.W.3d 232, 232 (Tex. 2017). "Governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the State, including counties, cities, and school districts." *Harris Cty. v. Sykes* , 136 S.W.3d 635, 638 (Tex. 2004). "[I]n certain narrow instances, a suit against a state official can proceed even in the absence of a waiver of immunity if the official's actions are *ultra vires*. " *Hall* , 508 S.W.3d at 232. "An *ultra vires* action requires a plaintiff to 'allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.' " *Id.* (quoting *City of El Paso v. Heinrich* , 284 S.W.3d 366, 372 (Tex. 2009) ). "The basic justification for this *ultra vires* exception to sovereign immunity is that *ultra vires* acts—or those acts without authority—should not be considered acts of the state at all." *Id.*

"[A] government officer with some discretion to interpret and apply a law may nonetheless act



'without legal authority,' and thus *ultra vires* , if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hous. Belt & Terminal Ry. Co. v. City of Hous.* , 487 S.W.3d 154, 158 (Tex. 2016). Governmental immunity thus does not bar "suits complaining of *either* an officer's failure to perform a ministerial act *or* an officer's exercise of judgment or *limited* discretion without reference to or in conflict with the constraints of the law authorizing the official to act." *Id.* at 163.

In this case, the appellants alleged that the "termination of their employment" and the commissioning and publication of the investigation report violated their rights under the Texas Constitution. An allegation that a government officer violated the Texas Constitution is an allegation that the officer acted *ultra vires* , that is, in conflict with the law constraining his discretion. *See id.* Nevertheless, when a plaintiff sues to vindicate a constitutional right, "immunity from suit is not waived if the constitutional claims are facially invalid." *Klumb* , 458 S.W.3d at 13 (citing *Andrade v. NAACP of Austin* , 345 S.W.3d 1, 11 (Tex. 2011) ).

The appellants alleged that "the sole reason for the termination of their employment" was their unwillingness to comply with a request by Grier and his investigators to falsely implicate Caleb on various allegations and to implicate another person for cheating on standardized tests. The appellants also complained that their termination was based on a report commissioned by Grier, which he published before giving them an opportunity to refute its contents. The appellants contend that these acts violated the Texas Bill of Rights, Sections 3 (equal rights), 8 (freedom of speech), and 19 (due course of law).[2]

## I. Equal protection

The Texas Constitution provides that all people "have equal rights, and no

[518 S.W.3d 543]

man, or set of men, is entitled to exclusive separate public emoluments, or privileges." TEX. CONST. art. 1, § 3. The appellants contend that Lenton was subjected to "disparate treatment" as compared to other employees who participated in moving property from Key to Kashmere.[3] The appellants' brief contains no argument to support an equal-protection claim by Anderson, Cockerham, or Banks.

To establish a viable equal-protection claim under the Texas Constitution, Lenton would have to prove he was "treated differently from others similarly situated." *Klumb* , 458 S.W.3d at 13. However, there is a fundamental inconsistency between that legal standard and a single public employee's allegation that he has been wrongly terminated from employment. *Cf. Engquist v. Oregon Dept. of Agr.* , 553 U.S. 591, 605, 128 S.Ct. 2146, 2155, 170 L.Ed.2d 975 (2008) (applying federal Equal Protection Clause); *see also Klumb* , 458 S.W.3d at 13 n.8 (acknowledging that federal equal-protection authorities may be persuasive authority in the context of state equal-protection claims). "[E]mployment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Engquist* , 553 U.S. at 604, 128 S.Ct. at 2154. Moreover, "recognition of a class-of-one theory of equal protection in the public employment context—that is, a claim that the State treated an employee differently from others for a bad reason, or for no reason at all—is simply contrary to the concept of at-will employment." *Id.* at 606, 128 S.Ct. at 2156. We therefore conclude the appellants' petition failed to plead a facially valid equal-protection claim by alleging that Lenton, alone, suffered an adverse employment consequence as compared to other employees.

## II. Free speech

The Texas Constitution provides: "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the



press." TEX. CONST. art. I, § 8. The appellants' argument regarding free-speech violations is primarily focused on public statements by Caleb, who has dismissed her appeal. The only free-speech argument relating to the remaining appellants is that they had a constitutionally protected right to refuse to "testify falsely" against other employees.

Other than quoting Section 8 of the Texas Bill of Rights, the appellants offer no legal argument or authority for their contention that they alleged a facially valid free-speech claim. In particular, the appellants offer no arguments based on the text, history, or purpose of Section 8 that it provides them any greater protection in this context than that provided by the First Amendment. As such, we may rely upon persuasive authorities applying free-speech protections under both the federal and Texas constitutions. *See, e.g.* , *Tex. Dept. of Transp. v. Barber* , 111 S.W.3d 86, 106 (Tex. 2003) ; *Davenport v. Garcia* , 834 S.W.2d 4, 40 (Tex. 1992) (Hecht, J., concurring) ("When state and federal provisions overlap or correspond, state law, as well as federal law and the

[518 S.W.3d 544]

law of other states, may be helpful in analyzing their proper application.").

A governmental employee's speech may be entitled to constitutional protections. *See, e.g.* , *Turner v. Perry* , 278 S.W.3d 806, 816 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ; *Price v. Tex. Alcoholic Beverage Com'n* , No. 01-12-01164-CV, 2014 WL 3408696, at *6 (Tex. App.—Houston [1st Dist.] July 10, 2014, pet. denied) (mem. op.). To prevail on a constitutional free-speech retaliation claim, the appellants would be required to establish that: (1) they suffered an adverse employment decision; (2) their "speech" involved a matter of public concern;[4] (3) their interest in commenting on matters of public concern outweighed their employer's interest in promoting efficiency; and (4) their speech motivated the adverse employment decision. *See Beattie v. Madison Cty. Sch. Dist.* , 254 F.3d 595, 601 (5th Cir. 2001).

As public employees, the appellants also would be required to establish that they spoke as citizens, rather than as employees pursuant to their official duties. While "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern," *Garcetti v. Ceballos* , 547 U.S. 410, 417, 126 S.Ct. 1951, 1957, 164 L.Ed.2d 689 (2006), not all speech by public employees is constitutionally protected. When "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. at 1960. However, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks* , ––– U.S. ––––, 134 S.Ct. 2369, 2379, 189 L.Ed.2d 312 (2014). Accordingly, the critical question is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

The appellants' claim for retaliation against their exercise of free-speech rights is facially invalid, because their pleadings establish that the "speech" at issue was made pursuant to their official duties. In their petition, they suggested that they exercised free speech when they refused to "falsely implicate Caleb on various allegations" or to implicate another employee for cheating on standardized tests. But they also alleged that they were ordered by HISD officials to take part in those interviews. Furthermore, the appellants alleged facts that show that these meetings were directly related to their employment. The interviews concerned allegations of cheating on standardized tests and misappropriation of school property. Accordingly, it is undisputed that the speech (or refusal to speak) at issue was made within the chain of command and that it was related to the appellants' jobs, which are both factors that previously have been considered in determining that speech was made as an employee and not as a citizen. *See, e.g.* , *Davis v. McKinney* , 518 F.3d 304, 313 (5th Cir. 2008).



Moreover, assisting in an employer's investigation into workplace theft is ordinarily within the scope of an employee's job duties, and a teacher's duties include ensuring compliance with standardized testing procedures. That the appellants were required to

[518 S.W.3d 545]

speak in the course of their assistance in the investigation did not "mean [their] supervisors were prohibited from evaluating [their] performance." *Garcetti* , 547 U.S. at 422, 126 S.Ct. at 1954. As such, the speech that the appellants alleged as the basis for their employer's retaliation was made pursuant to their official duties. It is therefore outside the ambit of free-speech protection, and they have failed to allege a facially valid constitutional claim. *Accord Caleb v. Grier* , 598 Fed.Appx. 227, 236–37 (5th Cir. 2015), *cert. denied* , ––– U.S. ––––, 135 S.Ct. 2813, 192 L.Ed.2d 849 (2015).

### III. Due course of law

The Texas Constitution provides: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of law of the land." TEX. CONST. art. I, § 19. The appellants have offered no argument that Section 19 has an application to their claims that is substantively different than the due-process protections of the Fourteenth Amendment. As such, our analysis is informed by authorities applying the Fourteenth Amendment. *See, e.g.* , *Univ. of Tex. Med. Sch. at Hous. v. Than* , 901 S.W.2d 926, 929 (Tex. 1995).

"A public employer may unconstitutionally deprive its employee of a liberty interest if it discharges him under stigmatizing circumstances without giving the employee an opportunity to clear his name." *Arrington v. County of Dall.* , 970 F.2d 1441, 1447 (5th Cir. 1992) ; *see Brantley v. Texas Youth Com'n* , 365 S.W.3d 89, 106 (Tex. App.—Austin 2011, no pet.). "To assert a claim for the deprivation of this constitutional right to a name-clearing hearing, a plaintiff must allege that he was a public employee, that he was discharged, that stigmatizing charges were made against him in connection with his discharge, that the charges were false, that the charges were made public, that he requested a name-clearing hearing, and that the hearing was denied." *Arrington* , 970 F.2d at 1447 ; *see Brantley* , 365 S.W.3d at 106. The "public charges must be so stigmatizing that they create a 'badge of infamy' that destroys plaintiffs' ability to obtain other employment." *Arrington* , 970 F.2d at 1447 (quoting *Evans v. City of Dall.* , 861 F.2d 846, 851 (5th Cir. 1988) ); *Brantley* , 365 S.W.3d at 106.

The appellants' petition affirmatively negated an element of their due-course-of-law claim. The appellants all alleged that they requested and received a name-clearing hearing. Cockerham, Anderson, and Banks alleged that they were successful at their hearings and that the hearing officers found that the allegations against them were meritless and recommended that they be retained. Lenton did not allege an outcome of his hearing. In addition, Banks alleged that she was hired by another school district after her resignation, demonstrating that any charges leveled against her were not so stigmatizing as to prevent her from obtaining employment elsewhere. Accordingly, each appellant failed to allege a facially valid due-course-of-law claim.

### Conclusion

There is no facially valid constitutional claim among the appellants' allegations. Accordingly, there is no actionable allegation that Grier's challenged actions were *ultra vires* so as to remove the shield of governmental immunity. We affirm the judgment of the trial court.

--------

Notes:

[1] For a more detailed discussion of the factual background, see *Caleb v. Grier*, No. H-12-0675, 2015 WL 1954678 (S.D. Tex. Apr. 29, 2015), and *Caleb v. Grier*, No. H-12-0675, 2013 WL 2902785 (S.D. Tex. Jun. 13, 2013), *aff'd*, 598 Fed.Appx.



227, 237 (5th Cir. 2015) (per curiam), *cert. denied*, ––– U.S. ––––, 135 S.Ct. 2813, 192 L.Ed.2d 849 (2015).

[2] In addition to sections 3, 8, and 19, in their Fifth Amended Petition the appellants alleged violations of section 1 (freedom and sovereignty of state). In their appellate brief, they suggest an additional violation of section 12 (habeas corpus). We confine our analysis to sections 3, 8, and 19, as these are the only allegations analyzed in the appellants' brief. *See* Tex. R. App. P. 38.1(i).

[3] The appellants' brief also suggests that Lenton was treated differently than two teachers who "suppressed information" about cheating on standardized tests yet were "rewarded with continued employment." These factual allegations were not a basis for the cause of action against Grier pleaded in the trial court, and thus we need not address those allegations, which were not before the trial court and are being made for the first time on appeal.

[4] At least for purposes of the First Amendment, the fact that the appellants in this case have alleged retaliation based on their refusal to speak does not affect the analysis. *See Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796–97, 108 S.Ct. 2667, 2677–78, 101 L.Ed.2d 669 (1988).

--------



**284 S.W.3d 366**
**The CITY OF EL PASO, et al., Petitioners,**
**v.**
**Lilli M. HEINRICH, Respondent.**
**No. 06-0778.**
Supreme Court of Texas.
**Argued November 13, 2007.**
**Decided May 1, 2009.**

[284 S.W.3d 368]

Jennifer F. Callan, Laura P. Gordon, Asst. City Attys., Michele Little Locke, John Lomax Anderson, El Paso, Eric G. Calhoun, Richard J. Pradarits Jr., Travis & Calhoun, P.C., Dallas, Robert D. Klausner, Stuart A. Kaufman, Klausner & Kaufman, P.A., Plantation, FL, for Petitioners.

Stewart W. Forbes, Forbes & Forbes, El Paso, for Respondent.

Philip Durst, Deats Durst Owen & Levy, P.L.L.C., Austin, for Amicus Curiae Texas State Association of Fire Fighters.

Kristofer S. Monson, Asst. Solicitor Gen., Austin, for Amicus Curiae State of Texas.

Chief Justice JEFFERSON delivered the opinion of the Court.

"Sovereign immunity protects the State from lawsuits for money damages." *Tex. Nat. Res. Conservation Comm'n v. IT-Davy,* 74 S.W.3d 849, 853 (Tex.2002). But "an action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars." *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997). Today we examine the intersection of these two rules. We conclude that while governmental immunity

[284 S.W.3d 369]

generally bars suits for retrospective monetary relief, it does not preclude prospective injunctive remedies in official-capacity suits against government actors who violate statutory or constitutional provisions. We affirm in part and reverse in part the court of appeals' judgment and remand this case to the trial court for further proceedings.

**I**
**Background**

Lilli M. Heinrich is the widow of Charles D. Heinrich, a member of the El Paso Police Department who died in August 1985 from wounds received in the line of duty. Shortly after Charles died, the El Paso Firemen & Policemen's Pension Fund began paying Heinrich monthly survivor benefits equal to 100% of the monthly pension her husband had earned.[1] The parties contest how those payments were apportioned. The City of El Paso, the El Paso Firemen & Policemen's Pension Fund ("the Fund"), the Fund's Board of Trustees ("the Board"), and the individual board members contend that the Fund's bylaws assigned only two-thirds of this payment to Heinrich, the other third being paid to her on behalf of her then-minor child. Heinrich, on the other hand, contends that, notwithstanding the bylaws, the Board voted to award her 100% of Charles' pension benefits in her own right, as more fully explained below.

Accordingly, when in 2002 the Board reduced the monthly payments to Heinrich by one-third after Heinrich's son turned 23, Heinrich filed this lawsuit, alleging that petitioners violated the statute governing the Fund by reducing her benefits retroactively. Heinrich sought both declaratory relief and an injunction restoring Heinrich to the "status quo from [the] date of the illegal act." Petitioners filed pleas to the jurisdiction asserting that governmental immunity shielded the governmental entities from suit and that the individual board members enjoyed official immunity. The trial court denied the pleas, and petitioners filed an interlocutory appeal.

The court of appeals affirmed, holding that "a party may bring a suit seeking declaratory relief against state officials who allegedly act without legal or statutory authority and such suit is not a



`suit against the state.'" 198 S.W.3d 400, 406. The court acknowledged that, if successful, Heinrich would be entitled to past and future benefits, but held that Heinrich's suit made a valid claim for her vested right to pension benefits rather than money damages. *Id.* at 407. We granted the petition for review in order to clarify the types of relief that may be sought without legislative consent.[2] 50 Tex. Sup.Ct. J. 910 (June 22, 2007).

## II
## Discussion
## A
### *Ultra Vires* Claims

Petitioners contend that although Heinrich requests declaratory and equitable relief, her claim is essentially for past and future money damages, and that governmental immunity therefore bars her suit. As we said in *Reata Construction Corp. v. City of Dallas,* "`[s]overeign immunity protects the State from lawsuits for money damages.' Political subdivisions of the state ... are entitled to such immunity—

[284 S.W.3d 370]

referred to as governmental immunity— unless it has been waived." *Reata,* 197 S.W.3d 371, 374 (Tex.2006) (citations omitted); *see also Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n. 3 (Tex. 2003). We have said repeatedly that the Legislature is in the best position to waive or abrogate immunity, "because this allows the Legislature to protect its policymaking function." *IT-Davy,* 74 S.W.3d at 854 (citations omitted) (collecting cases).

Heinrich concedes that the City, Fund, and Board enjoy governmental immunity from suit, but argues that because her claim alleges a reduction in her benefits that was unauthorized by law, it is not barred. This is so, she says, because "[p]rivate parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority." *Id.* at 855 (citing *Tex. Educ. Agency v. Leeper,* 893 S.W.2d

432 (Tex.1994) (suit challenging state officials' construction of compulsory school-attendance law)); *see also Fed. Sign.,* 951 S.W.2d at 404 ("A private litigant does not need legislative permission to sue the State for a state official's violations of state law.") (citations omitted). We explained the rationale behind this exception to governmental immunity in *Federal Sign*:

A state official's illegal or unauthorized actions are not acts of the State. Accordingly, an action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars. In other words, we distinguish suits to determine a party's rights against the State from suits seeking damages. A party can maintain a suit to determine its rights without legislative permission.

*Fed. Sign,* 951 S.W.2d at 404 (citations omitted).

On this basis, Heinrich argues that rather than money damages, she seeks only equitable and injunctive relief under the Uniform Declaratory Judgment Act. That Act is a remedial statute designed "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM.CODE § 37.002(b). It provides: "A person ... whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the ... statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* § 37.004(a). The Act, however, does not enlarge a trial court's jurisdiction, and a litigant's request for declaratory relief does not alter a suit's underlying nature.[3] *IT-Davy,* 74 S.W.3d

[284 S.W.3d 371]

at 855; *State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994). It is well settled that "private parties cannot circumvent the State's sovereign immunity



from suit by characterizing a suit for money damages ... as a declaratory-judgment claim." *IT-Davy,* 74 S.W.3d at 856 (citing *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 842 (1958)).

Heinrich relies on *State v. Epperson,* 121 Tex. 80, 42 S.W.2d 228, 231 (1931), in which we held that a suit against a tax collector for the recovery of money (alleged to be due under a contract and withheld unlawfully) was not barred by immunity. There, we noted that the tax collector had no discretion under the governing law to deny payment on Epperson's contract:

By legislative act the state has constituted the tax collector of the county its agent to receive delinquent taxes collected under such contract, and it is the duty of such officer to pay all fees and commissions lawfully incurred in the collection thereof to the various parties who may be entitled thereto. Under such circumstances, the tax collector's duty with reference to money belonging to persons who are entitled under valid contracts to receive the same from him is purely ministerial. If he withholds the payment of such funds when a person is lawfully entitled to receive same, he has failed to discharge a duty imposed upon him by law and his act is a wrongful one.

*Epperson,* 42 S.W.2d at 231. We therefore concluded that although the trial court would "not possess jurisdiction to enforce the specific performance of the contract relied upon by Epperson or to award damages for any breach of said contract," Epperson's suit was "simply an action to compel an officer, as agent of the state, to pay over funds to a party who claims to be lawfully entitled thereto." *Id.*

Thus, the rule arising out of *Epperson* is that while suits for contract damages against the state are generally barred by immunity, where a statute or the constitution requires that government contracts be made or performed in a certain way, leaving no room for discretion, a suit alleging a government official's violation of that law is not barred, even though it necessarily involves a

contract. We explained this distinction in *W.D. Haden Co. v. Dodgen*:

[A]lthough [*Epperson*] ar[ose] out of [ ] contract transaction ... [it] appears to fall into the class of cases projected by *United States v. Lee,* [106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882)].[4] In that class of cases it is held that suits for property alleged to be unlawfully or wrongfully withheld from the rightful owner by officers of the state are not suits against the sovereign itself and may be maintained without permission of the sovereign.

158 Tex. 74, 308 S.W.2d 838, 841 (1958). In other words, where statutory or constitutional provisions create an entitlement to payment, suits seeking to require state officers to comply with the law are not barred by immunity merely because they compel the state to make those payments. This rule is generally consistent with the letter and spirit of our later caselaw. In *IT-Davy,* we distinguished permissible declaratory-judgment suits against state officials

[284 S.W.3d 372]

"allegedly act[ing] without legal or statutory authority" from those barred by immunity: "In contrast [to suits not implicating sovereign immunity], declaratory-judgment suits against state officials seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities are suits against the State. *That is because such suits attempt to control state action by imposing liability on the State.*" 74 S.W.3d at 855-56 (citations omitted) (emphasis added).

From this rationale, it is clear that suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity, even if a declaration to that effect compels the payment of money. To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial



# City of El Paso v. Heinrich, 284 S.W.3d 366 (Tex. 2009)

act. *Compare Epperson,* 42 S.W.2d at 231 ("the tax collector's duty ... is purely ministerial") *with Catalina Dev., Inc. v. County of El Paso,* 121 S.W.3d 704, 706 (Tex.2003) (newly elected commissioners court immune from suit where it "acted within its discretion to protect the perceived interests of the public" in rejecting contract approved by predecessor), *and Dodgen,* 308 S.W.2d at 842 (suit seeking "enforcement of contract rights" barred by immunity in the absence of any "statutory provision governing or limiting the manner of sale"). Thus, *ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state.[5] Stated another way, these suits do not seek to alter government policy but rather to enforce existing policy.

Further, while "[a] lack of immunity may hamper governmental functions by requiring tax resources to be used for defending lawsuits ... rather than using those resources for their intended purposes," *Reata Constr. Corp.,* 197 S.W.3d at 375, this reasoning has not been extended to *ultra vires* suits, *see Fed. Sign,* 951 S.W.2d at 404 (citing *Dir. of the Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.,* 600 S.W.2d 264, 265-66 (Tex.1980) (legislative consent not required for suit for injunctive relief against state agency to halt unauthorized printing equipment and printing activities), *Tex. Highway Comm'n v. Tex. Ass'n of Steel Imps., Inc.,* 372 S.W.2d 525, 530 (Tex.1963) (legislative consent not required for declaratory judgment suit against Highway Commission to determine the parties' rights), and *Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 712 (1945) (legislative consent not required for declaratory judgment suit against State Comptroller to determine parties' rights under tax statute)). Further, extending immunity to officials using state resources in violation of the law would not be an efficient way of ensuring those resources are spent as intended. This is particularly true since, as discussed below, suits that lack merit may be speedily disposed of by a plea to the jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004).

**B**
**Proper Parties**

Nonetheless, as a technical matter, the governmental entities themselves—as opposed to their officers in

[284 S.W.3d 373]

their official capacity—remain immune from suit. We have been less than clear regarding the permissible use of a declaratory remedy in this type of *ultra vires* suit.[6] Must it be brought directly against the state or its subdivisions? Or must it be brought against the relevant government actors in their official capacity? *Compare Fed. Sign,* 951 S.W.2d at 404 ("A private litigant does not need legislative permission to sue the State for a state official's violations of state law.") (citations omitted), *with IT-Davy,* 74 S.W.3d at 855 ("Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority.") (citations omitted). It seems to us, however, that because the rule that *ultra vires* suits are not "suit[s] against the State within the rule of immunity of the State from suit" derives from the premise that the "acts of officials which are not lawfully authorized are not acts of the State," *Cobb,* 190 S.W.2d at 712, it follows that these suits cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity.[7] This is true even though the suit is, for all practical purposes, against the state. *See Brandon v. Holt,* 469 U.S. 464, 471-72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) ("[A] judgment against a public servant `in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond."); *Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 844 (Tex.2007) ("It is fundamental that a suit against a state official is merely `another way of pleading an action against the entity of which [the official] is an agent.'") (quoting *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).

**C**



**Permissible Relief**

But the *ultra vires* rule is subject to important qualifications. Even if such a claim may be brought, the remedy may implicate immunity. *Cf.* 13 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3524.3 (under federal

[284 S.W.3d 374]

immunity law, an *ultra vires* suit may be brought but "if the defendant is a state officer, sovereign immunity bars the recovery of damages from the state treasury in a private suit"). This is a curious situation: the basis for the *ultra vires* rule is that a government official is not following the law, so that immunity is not implicated, but because the suit is, for all practical purposes, against the state, its remedies must be limited. *Cf. Fla. Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 685, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982) ("There is a well-recognized irony in *Ex parte Young*; unconstitutional conduct by a state officer may be `state action' for purposes of the Fourteenth Amendment yet not attributable to the State for purposes of the Eleventh."). We recently held that retired firefighters could not pursue a declaratory judgment action against the City to recover amounts allegedly previously withheld from lump-sum termination payments in violation of the Local Government Code. *City of Houston v. Williams,* 216 S.W.3d 827, 828 (Tex.2007). Without discussing *Epperson,* we applied the rule from *IT-Davy* and *Dodgen* that the declaratory judgment act cannot be used to circumvent immunity, noting that "[t]he only injury the retired firefighters allege has already occurred, leaving them with only one plausible remedy—an award of money damages." *Id.* at 829. *Williams* stands for the proposition, then, that retrospective monetary claims are generally barred by immunity.

We also stated that "in every suit against a governmental entity for money damages, a court must first determine the parties' contract or statutory rights; if the sole purpose of such a declaration is to obtain a money judgment,

immunity is not waived." *Id.* This does not mean, however, that a judgment that involves the payment of money necessarily implicates immunity. Drawing the line at monetary relief is itself problematic, as "[i]t does not take much lawyerly inventiveness to convert a claim for payment of a past due sum (damages) into a prayer for an injunction against refusing to pay the sum, or for a declaration that the sum must be paid, or for an order reversing the agency's decision not to pay." *Bowen v. Massachusetts,* 487 U.S. 879, 915-16, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (Scalia, J., dissenting) (discussing section 702 of the Administrative Procedure Act, which waives sovereign immunity in actions against federal agencies as long as the plaintiff seeks "relief other than money damages") (quoting 5 U.S.C. 702 (2000)).

Parsing categories of permissible relief in cases implicating immunity inevitably involves compromise. *See, e.g.,* DOUGLAS LAYCOCK, MODERN AMERICAN REMEDIES 482 (3d ed. 2002) ("The law of remedies against governments and government officials is a vast and complex body of doctrine, full of technical distinctions, fictional explanations, and contested compromises."). The United States Supreme Court has held that, under federal immunity law, claims for prospective injunctive relief are permissible, while claims for retroactive relief are not, as such an award is "in practical effect indistinguishable in many aspects from an award of damages against the State." *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). This rule originated in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), in which the Court held that an action to restrain a government official from unconstitutional conduct was not barred by immunity. Later, in *Edelman,* the Court recognized that the distinction between prospective and retrospective relief "will not in many instances be that between day and night" and cautioned that a fiscal impact on the

[284 S.W.3d 375]

State did not necessarily implicate immunity:



The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young*. In *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), Arizona and Pennsylvania welfare officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens. In *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), New York City welfare officials were enjoined from following New York State procedures which authorized the termination of benefits paid to welfare recipients without prior hearing. But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young, supra.*

*Id.* at 667-68, 94 S.Ct. 1347 (footnote omitted). The retroactive portion of the *Edelman* district court's decree was different, however, as "[i]t require[d] payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to those whose applications were processed on the slower time schedule at a time when petitioner was under no court-imposed obligation to conform to a different standard." *Id.* at 668, 94 S.Ct. 1347.

While "[t]he line between prospective and retrospective remedies is neither self-evident nor self-executing," LAYCOCK, MODERN AMERICAN REMEDIES at 483, the Supreme Court shed further light on the issue in *Milliken v. Bradley,* 433 U.S. 267, 269, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), a case involving desegregation of the Detroit school system. The Supreme Court upheld a trial court's order requiring state officials to spend $6 million on education to remedy effects of segregation. *Milliken,* 433 U.S. at 290, 97 S.Ct. 2749. The Court held that this relief was permissible under *Edelman:* "That the programs are also `compensatory' in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system." *Id.; see also* 13 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3524.3 (noting that, under *Edelman,* "[i]njunctions requiring expenditure of state funds are acceptable, so long as the order is prospective" but "[r]etroactive relief, including compensatory damages from state funds are barred").

This compromise between prospective and retroactive relief, while imperfect, best balances the government's immunity with the public's right to redress in cases involving *ultra vires* actions, and this distinction "appear[s] in the immunity of the United States, and in the law of most states' immunity from state-law claims." LAYCOCK, MODERN AMERICAN REMEDIES at 482. It also comports with the modern justification for immunity: protecting the public fisc. *Tooke v. City of Mexia,* 197

[284 S.W.3d 376]

S.W.3d 325, 331-32 (Tex.2006) (observing that immunity "shield[s] the public from the costs and consequences of improvident actions of their governments"); *Federal Sign,* 951 S.W.2d at 417 (Enoch, J., dissenting) (noting that suits against the state would deplete treasury resources and tax funds necessary to operate the government). Moreover, it is generally consistent with the way our courts of appeals have interpreted *Williams. See, e.g., City of Round Rock v. Whiteaker,* 241 S.W.3d 609, 633-34 (Tex.App.-Austin 2007, pet. denied) (approving, under *Williams,* dichotomy



between declaratory and injunctive claims regarding past statutory violations and those seeking only to compel the city to follow the law in the future; the government was immune from the former but not the latter); *Bell v. City of Grand Prairie,* 221 S.W.3d 317, 325 (Tex.App.-Dallas 2007, no pet.) (holding that, under *Williams,* firefighters' requested declaration regarding past statutory violation was barred, but to the extent the requested declaration concerned future violations, the claim was not barred, providing the firefighters did not seek an award of money damages). And finally, it ensures that statutes specifically directing payment, like any other statute, can be judicially enforced going forward.

This approach is inconsistent with *Epperson,* however, in which we held that, if successful, Epperson would be entitled to "the sum of $93,000 which belonged to him as his commission for services rendered." *Epperson,* 42 S.W.2d at 229. In that respect, *Epperson* conflicts with *Williams,* in which we implied that prospective remedies might not be barred even though retrospective monetary ones were. *Williams,* 216 S.W.3d at 829 (noting that "[t]he only injury the retired firefighters allege has already occurred, leaving them with only one plausible remedy— an award of money damages" and that "they assert no right to payments from the City in the future"). The best way to resolve this conflict is to follow the rule, outlined above, that a claimant who successfully proves an *ultra vires* claim is entitled to prospective injunctive relief, as measured from the date of injunction. *Cf. Edelman,* 415 U.S. at 669, 94 S.Ct. 1347 (using entry of injunction to distinguish retrospective from prospective relief). Thus, while the *ultra vires* rule remains the law, *see Federal Sign,* 951 S.W.2d at 404, *Epperson's* retrospective remedy does not.

But this rule is not absolute. For example, a claimant who successfully proves a takings claim would be entitled to compensation, and the claim would not be barred by immunity even though the judgment would require the government to pay money for property previously taken. *Gen. Servs.*

*Comm'n v. Little-Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001) (noting that governmental immunity "does not shield the State from an action for compensation under the takings clause"); *cf.* WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 3524.3 ("If the state cannot invoke its immunity, retroactive relief against it is allowed.").

Heinrich has not alleged a takings claim. In the trial court, Heinrich alleged only that "a suit for equitable relief against a governmental entity for violation of a provision of the Texas Bill of Rights is excepted from ... sovereign immunity under Texas Constitution article [I], section 29" without specifying which provision of the Bill of Rights had been violated. In the court of appeals, however, she clarified that her constitutional complaint was a "violation of Article 1, section 16." TEX. CONST. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). Petitioners contend that she waived this argument by failing to

[284 S.W.3d 377]

raise it in the trial court. *See Tex. Dep't of Protective & Regulatory Servs. v. Sherry,* 46 S.W.3d 857, 861 (Tex.2001) ("`[A]s a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal.'") (citations omitted). Even if Heinrich's constitutional argument was properly presented, however, it has no merit. Heinrich does not challenge the governing statute or bylaws, but rather the Board's actions under those provisions. Indeed, Heinrich argues that "[t]he Pension Board and its individual members acted outside their authority and in violation of the Texas Constitution when they reduced [Heinrich's] benefits." Because Heinrich does not allege that any law sanctioned the retroactive reduction in her benefits, her constitutional argument fails.[8]

As we have repeatedly noted, the Legislature is best positioned to waive immunity, and it can authorize retrospective relief if appropriate. *See,*



*e.g.,* TEX. LOCAL GOV'T CODE § 180.006 (enacted after *Williams* and waiving immunity for firefighter and police officer claims for back pay and civil penalties). There are cases in which prospective relief is inadequate to make the plaintiff whole, but the contours of the appropriate remedy must be determined by the Legislature.

Thus, Heinrich's claims for prospective relief may be brought only against the appropriate officials in their official capacity, and her statutory claims for future benefits against the City, Fund, and Board must be dismissed.[9] Heinrich's pleadings are unclear as to the capacity or capacities in which she has sued the individual Board members. The United States Supreme Court has observed that, "[i]n many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both." *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also United States ex rel. Adrian v. Regents of Univ. of Cal.,* 363 F.3d 398, 403 (5th Cir. 2004). In these cases, "`[t]he course of proceedings' in such cases typically will indicate the nature of the liability sought to be imposed." *Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. 3099 (citations omitted). Here, the injunctive relief Heinrich seeks would necessarily come from the Board, rather than the individual members. Considering "the nature of the liability sought to be imposed," *id.,* and construing Heinrich's pleadings liberally, *Miranda,* 133 S.W.3d at 226, we conclude that she has sued the Board members in their official capacities, and her claims are therefore not automatically barred by immunity.[10] To the extent that the court of appeals held that the suit is against the Board members in their individual capacities, we reverse that portion of its judgment.

## D
## Evidence That Petitioners Acted *Ultra Vires*

In their second issue, petitioners argue that governmental immunity prohibits

[284 S.W.3d 378]

Heinrich's suit because Heinrich has offered no evidence that the reduction in her benefits was illegal or unauthorized. We conclude, however, that Heinrich has presented evidence raising a fact question on this issue.

"When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent." *Miranda,* 133 S.W.3d at 226 (citations omitted). Here, Heinrich alleges that petitioners violated article 6243b, section 10A(b) of the Texas Revised Civil Statutes when they reduced her benefits. Thus, if Heinrich's allegations are true, her suit would fall within the *ultra vires* exception to governmental immunity as described above.

This is not the end of our analysis, however: "if a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id.* at 227. If there is no question of fact as to the jurisdictional issue, the trial court must rule on the plea to the jurisdiction as a matter of law. *Id.* at 228. If, however, the jurisdictional evidence creates a fact question, then the trial court cannot grant the plea to the jurisdiction, and the issue must be resolved by the fact finder. *Id.* at 227-28. This standard mirrors our review of summary judgments, and we therefore take as true all evidence favorable to Heinrich, indulging every reasonable inference and resolving any doubts in her favor. *Id.* at 228.

Petitioners argue that, in accordance with the governing bylaws, the payments to Heinrich were reduced when her son ceased to be eligible to receive them, and asserts that the statutory provisions Heinrich relies upon are "inapplicable." Conversely, Heinrich alleges that she was awarded 100% of her husband's pension in accordance with these provisions, and that



petitioners' subsequent retroactive reduction of her benefits violated, among others, article 6243b, section 10A(a)(1) of the Texas Revised Civil Statutes. The relevant portions of article 6243b, section 10A provide:

(a) Notwithstanding anything to the contrary in other parts of this Act and subject to Subsections (b) and (c) of this section, the Board of Trustees may, by majority vote of the whole board, make from time to time one or more of the following changes, or modifications:

(1) modify or change prospectively or retroactively in any manner whatsoever any of the benefits provided by this Act, except that *any retroactive change or modification shall only increase pensions or benefits;*

* * *

(b) None of the changes made under Subsection (a) of this section may be made unless all of the following conditions are sequentially complied with:

(1) the change must be approved by a qualified actuary selected by a four-fifths vote of the Board; the actuary's approval must be based on an actuarial finding that the change is supported by the existing funding status of the fund; the actuary, if an individual, must be a Fellow of the Society of Actuaries or a Fellow of the Conference of Actuaries in Public Practice or a Member of the American Academy of Actuaries; the actuary, if an actuarial consulting firm, must be established in the business of providing actuarial consulting services to pension plans and have experienced personnel able to provide the requested

[284 S.W.3d 379]

services; the findings upon which the properly selected and qualified actuary's approval are based are not subject to judicial review;

(2) the change must be approved by a majority of all persons then making contributions

to the fund as employees of a department to which the change would directly apply, voting by secret ballot at an election held after ten (10) days' notice given by posting at a prominent place in every station or substation of a department to which the change would directly apply and in the city hall;

TEX.REV.CIV. STAT. art. 6243b, § 10A (emphasis added). Under this statute, while benefits may be increased if certain procedures are followed, the Board has no discretion to retroactively lower pensions. Petitioners, however, cite the provisions of the 1980 bylaws, under which the reduction would be proper due to Heinrich's son's age. They therefore suggest that Heinrich erroneously relies on 1985 changes to the bylaws that increased the surviving spouse's share but were prospective only in nature and do not apply to Heinrich.

Heinrich submitted an affidavit from John Batoon, former Assistant City Attorney for El Paso.[11] Batoon's affidavit provided:

I was serving as an Assistant City Attorney for the City of El Paso in 1985. I reviewed and approved the award to Ms. Lilli M. Heinrich of 100% of her deceased husband's, Charles D. Heinrich, benefits from The El Paso Firemen & Policemen's Pension Fund. All procedures were followed according to the Plan and according to law. The membership voted and approved of the benefits awarded Ms. Heinrich as was required by the Plan. Because Mr. Heinrich had been an outstanding police officer for the City of El Paso and because he was killed in the line of duty, the Board of Trustees and the membership voted to award Ms. Heinrich 100% of Mr. Heinrich's benefits.

Consideration of the amount of benefits awarded Ms. Heinrich was not based, in any way, on the fact that she had a minor child at that time. Ms. Heinrich was awarded 100% of the benefits because Mr. Heinrich had been a well-loved officer and his death was a terrible loss for the police department. It was the Board of Trustees



and the membership's way of paying tribute to a fallen officer.

Along with this sworn testimony, the evidence included a pair of October 16, 1985 letters from the chief of police, one signed by the then-Board members, stating that "Mrs. Heinrich will receive 100% of her husband's final pension amount," and one unsigned, stating that 100% would go to "Mrs. Heinrich and her dependent children." The minutes of the November 20, 1985 Board meeting also indicate that the membership had previously voted to change benefits so that surviving spouses' benefits would increase from 66 2/3 to 100% of the pension amount. The Board contends that these bylaw changes do not apply to Heinrich, but even if they do not, Batoon's affidavit and the letters raise a fact question as to whether Heinrich's individual benefits were increased to 100% of her husband's pension payments under the provisions of article 6243b and subsequently reduced in violation thereof. We conclude that the trial court correctly denied that portion of the plea to the jurisdiction

[284 S.W.3d 380]

challenging Heinrich's claims against the individuals in their official capacities. *Miranda,* 133 S.W.3d at 227-28.

### E
### The Individuals' Immunity

In their final issue, petitioners assert that the trial court erred in denying the individual board members' plea to the jurisdiction based on governmental and official immunity. With the limited *ultra vires* exception discussed above, governmental immunity protects government officers sued in their official capacities to the extent that it protects their employers. *See Univ. of Tex. Med. Branch v. Hohman,* 6 S.W.3d 767, 776 (Tex.App.-Houston [1st Dist.] 1999, pet. dism'd w.o.j.). Because of this exception, however, governmental immunity does not bar Heinrich's claims against the individuals in their official capacities. Official immunity, by contrast, is an affirmative defense protecting public officials

from individual liability. *See Telthorster v. Tennell,* 92 S.W.3d 457, 459-60 (Tex.2002). Because we hold that Heinrich has not sued the Board members in their individual capacities, official immunity is inapplicable here.[12]

### III
### Conclusion

In sum, because there is a question of fact as to whether Heinrich's pension payments have been reduced in violation of state law, her claims for prospective declaratory and injunctive relief against the Board members and the mayor in their official capacities may go forward, but we dismiss her retrospective claims against them. All of her claims against the City, Fund, and Board, however, are barred by governmental immunity, and we dismiss them. Finally, we hold that the Board members have not been sued in their individual capacities, and to the extent the court of appeals held otherwise, we reverse its judgment. We affirm in part and reverse in part the court of appeals' judgment and remand this case to the trial court for further proceedings. TEX.R.APP. P. 60.2(a),(d).

---------------

Notes:

1. The City withheld a percentage of Charles's compensation (and that of other officers) to fund the plan.

2. The State of Texas and the Texas State Association of Fire Fighters submitted amicus curiae briefs.

3. We recently dismissed a claim for declaratory and injunctive relief against the Houston Municipal Employees Pension System in which the "plaintiffs ... requested that the trial court issue an injunction directing the pension board to comply with the trial court's interpretation of Article 6243h," the governing statute. *Houston Mun. Employees Pension Sys. v. Ferrell,* 248 S.W.3d 151, 158-59 (Tex.2007). Under Article 6243h, the Houston board's "interpretation of [the] Act [is] final and binding on any interested



party," TEX.REV.CIV. STAT. art. 6243h § 2(y), and we held that this language precluded judicial review. *Ferrell,* 248 S.W.3d at 158 ("There is no right to judicial review of an administrative order unless a statute explicitly provides that right or the order violates a constitutional right.") (citations omitted). Here, however, Article 6243b contains no language similar to that in 6243h granting the Board exclusive authority to interpret the act, *see* TEX.REV.CIV. STAT. art. 6243b, and, in any case, Heinrich does not challenge petitioners' interpretation of 6243b, but rather alleges that they have violated that statute under an undisputed reading thereof. *See Ferrell,* 248 S.W.3d at 160 (Brister, J., concurring) ("A different case might be presented if the plaintiffs alleged the board was clearly violating some provision of the statute. Article 6243h gives the pension board complete discretion to interpret the statute, but not to violate it.").

4. The *Dodgen* Court expressly declined to limit *Epperson* based on changes in federal immunity jurisprudence. *Dodgen,* 308 S.W.2d at 843.

5. Because the policy embodied in the law extends only as far the amount wrongfully withheld, claims for amounts beyond those alleged to be due under the relevant law, such as consequential damages, remain barred by immunity.

6. For claims challenging the validity of ordinances or statutes, however, the Declaratory Judgment Act requires that the relevant governmental entities be made parties, and thereby waives immunity. TEX. CIV. PRAC. & REM. CODE § 37.006(b) ("In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard."); *see Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 697-698 (Tex.2003) ("[I]f the Legislature requires that the State be joined in a lawsuit for which immunity would otherwise attach, the Legislature has intentionally waived the State's sovereign

immunity."); *Tex. Educ. Agency v. Leeper,* 893 S.W.2d 432, 446 (Tex. 1994) ("The DJA expressly provides that persons may challenge ordinances or statutes, and that governmental entities must be joined or notified. Governmental entities joined as parties may be bound by a court's declaration on their ordinances or statutes. The Act thus contemplates that governmental entities may be—indeed, must be—joined in suits to construe their legislative pronouncements."). Here, Heinrich is not challenging the validity of the bylaws or the governing statute, but rather petitioners' actions under them.

7. State officials may, of course, be sued in both their official and individual capacities. Judgments against state officials in their individual capacities will not bind the state. *See Alden v. Maine,* 527 U.S. 706, 757, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally.").

8. Further, although the parties do not address it, we note that the reduction in Heinrich's survivor payments occurred before the effective date of article XVI, section 66 of the Texas Constitution ("Protected Benefits Under Certain Public Retirement Systems"), and we do not consider whether it would otherwise apply in this case.

9. While this case was pending on interlocutory appeal, the Legislature enacted 271.151.160 of the Local Government Code, waiving immunity from suit for certain claims against cities and other governmental entities. Heinrich does not argue that her claims fall within these provisions, and we express no opinion on that subject.

10. Because the mayor of El Paso, who is also a Board member, was named as a defendant in his official capacity, Heinrich may seek liability from the City through that officer, although her claims against the City itself must be dismissed.

11. The Fund, the Board, and the Board members objected to this evidence. The trial court did not



explicitly rule on the objections, and the petitioners do not raise any evidentiary issues on appeal.

12. The court of appeals failed to draw this distinction, instead discussing the protections available to officials from governmental immunity. 198 S.W.3d at 407. This conflict gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c), (e).

---------------



**253 S.W.3d 339**
**Robert HADDIX Jr., Appellant**
**v.**
**AMERICAN ZURICH INSURANCE**
**COMPANY; Chesterfield Services, Inc.;**
**The Salvation Army; and Flahive, Ogden**
**and Latson, P.C., Appellees.**
**No. 11-06-00107-CV.**
**Court of Appeals of Texas, Eastland.**
**April 3, 2008.**

[253 S.W.3d 344]

Robert Haddix Jr., Lufkin, TX, pro se.

Robert D. Stokes, Flahive, Ogden & Latson, Austin, Warren T. McCollum, Fenley & Bate, L.L.P., Lufkin, TX, for appellee.

Panel consists of: WRIGHT, C.J., McCALL, J., and STRANGE, J.

**OPINION**

RICK STRANGE, Justice.

Robert Haddix Jr. filed suit against American Zurich Insurance Company; Chesterfield Services, Inc.; the Salvation Army; and Flahive, Ogden and Latson, P.C. (Flahive), for injuries he claimed in connection with two on-the-job injuries and his subsequent claims for workers' compensation benefits. The trial court granted appellees' pleas to the jurisdiction and dismissed Haddix's suit. We affirm in part and reverse and remand in part.

I. *Background Facts*

Haddix contended that, while in the course and scope of his employment with the Salvation Army, he was injured on November 25, 2004, and that he aggravated his injury on December 16, 2004. Haddix filed workers' compensation claims for both injuries. The Texas Department of Insurance, Division of Workers' Compensation[1] held a contested case hearing on Haddix's December 16 claim and determined that he did not suffer a compensable injury. The appeals panel affirmed.

[253 S.W.3d 345]

The Division conducted a contested case hearing on Haddix's November 25 claim but had not issued a decision when Haddix filed suit. In response to Haddix's suit, the appellees filed pleas to the jurisdiction arguing that Haddix had failed to exhaust his administrative remedies. The trial court conducted a hearing and subsequently granted the pleas and dismissed the litigation.

II. *Analysis*

*A. Was Haddix Improperly Denied a Default Judgment?*

Haddix argues that the trial court erred by failing to impose a default judgment on the defendants. Haddix filed his lawsuit on August 29, 2005. Citations were issued and were mailed by certified mail on September 1. Haddix filed a motion for default judgment on September 20, 2005. Haddix assumes that the appellees' deadline for filing an answer began running when the citations were mailed. This is incorrect. Appellees were not served until they received the citation. *See Milam v. Miller,* 891 S.W.2d 1 (Tex. App.-Amarillo 1994, writ ref'd) (defendant was served by certified mail when he received plaintiff's petition and signed the certified mail receipt).

The officer's returns reveal that Zurich was served on September 23, Chesterfield and Flahive were served on September 26, and the Salvation Army was served on September 28. The Salvation Army's answer was due on October 24. The remaining answers were due October 17. Each party filed an answer on October 7. Because appellees were not in default, the trial court did not err, and Haddix's second issue is overruled.[2]

*B. Did the Trial Court Err by not Making Findings of Fact and Conclusions of Law?*

Haddix contends that the trial court committed misconduct by refusing to file findings of fact and conclusions of law after it granted appellees' pleas to the jurisdiction. A party is



entitled to findings of fact and conclusions of law after a conventional trial on the merits before the court. *IKB Indus. v. Pro-Line Corp.,* 938 S.W.2d 440, 442 (Tex.1997). A case is "tried" when a court holds an evidentiary hearing. *Gen. Elec. Capital Corp. v. ICO, Inc.,* 230 S.W.3d 702, 711 (Tex.App.-Houston [14th Dist.] 2007, pet. denied). In other cases, unless they serve no purpose such as when summary judgment is granted, findings of fact and conclusions of law are proper; however, a party cannot compel their preparation. *Pro-Line Corp.,* 938 S.W.2d at 442-43.[3]

Courts have held that findings of fact are not required every time a plea to the jurisdiction is granted. In *Ford v. City of Lubbock,* 76 S.W.3d 795 (Tex.App.-Amarillo 2002, no pet.), the claimants sued the City of Lubbock for the drowning death of their child. The City filed a plea to the jurisdiction, and the trial court held

[253 S.W.3d 346]

a hearing. No witnesses testified, but the parties attached affidavits and deposition testimony to their pleadings. The trial court granted the City's plea. While the family requested findings of fact and conclusions of law, none were prepared. The Amarillo Court was required to determine if findings were appropriate because of a claim by the City that the family had not timely perfected its appeal. The Amarillo Court reviewed the trial court's comments at the hearing and concluded that it had accepted the family's statements as true. Consequently, there was no disputed fact issue for resolution, and findings of fact would have served no useful purpose. 76 S.W.3d at 797-98.

We believe that the same situation holds true here. Each appellee asserted a plea to the jurisdiction. The pleas were initially unsupported by evidence, but Flahive subsequently filed a brief that included an affidavit from one of its attorneys. Haddix filed responses to the pleas and an appendix of evidence. When the trial court held a hearing on the pleas, no witnesses testified and no evidence was formally received by the trial court. However, both sides referred to a letter from the Texas Workforce Commission (TWC) to Haddix that was included in his appendix of evidence. The parties reach different conclusions regarding the evidence, but the evidence itself is undisputed. The trial court, therefore, was not required to prepare findings of fact. We will assume that the trial court accepted the evidence that Haddix included in his appendix as true and will afford the factual statements in Haddix's petition the deference required by law. *See Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 449 (Tex.1996) (absent an allegation of fraudulent pleadings, the trial court must take the plaintiff's allegations as true and must construe them liberally in the plaintiff's favor when ruling on a plea to the jurisdiction).

Haddix also argues that he was harmed by the trial court's failure to prepare conclusions of law because appellees' pleas consisted of numerous subsections and because he does not know the basis of the trial court's ruling. The trial court's rulings on questions of law are reviewed de novo. *State v. Heal,* 917 S.W.2d 6, 9 (Tex.1996). This requires that we exercise our own judgment and redetermine each issue. *Quick v. City of Austin,* 7 S.W.3d 109, 116 (Tex.1998). Moreover, Haddix is required to attack all independent bases or grounds that fully support a complained-of ruling or judgment. *Britton v. Tex. Dep't of Criminal Justice,* 95 S.W.3d 676, 681 (Tex.App.-Houston [1st Dist.] 2002, no pet.). Consequently, the preparation of conclusions of law would not have altered Haddix's appeal or our analysis. Haddix's third issue is overruled.

*C. Did the Trial Court Err by not Providing Haddix an Opportunity to Amend His Petition?*

Haddix next argues that the trial court erred because it signed an order of dismissal rather than provide him with an opportunity to amend his petition. Texas Courts have signaled a preference for allowing a plaintiff an opportunity to amend before dismissing a suit in response to a plea to the jurisdiction. The general rule is that, if the plaintiff's pleadings do not demonstrate incurable defects, the plaintiff should be given an



opportunity to amend. *See Sepulveda v. County of El Paso,* 170 S.W.3d 605, 616-17 (Tex.App.-El Paso 2005, pet. denied). If, however, the pleadings affirmatively negate the existence of jurisdiction, dismissal is appropriate. *See Harris County v. Sykes,* 136 S.W.3d 635, 639 (Tex.2004).

[253 S.W.3d 347]

While the general rule expresses a preference for allowing an amendment, a plaintiff can waive this opportunity through inaction. *See, e.g., Kassen v. Hatley,* 887 S.W.2d 4, 13-14 n. 10 (Tex.1994) (plaintiffs waived complaint to dismissal by summary judgment aimed solely at their pleadings when they did not request an opportunity to amend their petition); *see also Dahl ex rel. Dahl v. State,* 92 S.W.3d 856, 862 n. 6 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (noting that plaintiffs arguably waived complaint that the trial court failed to provide them with an opportunity to amend their pleadings when they did not seek leave to amend).

Haddix made no effort to amend his petition prior to the hearing. The only prehearing reference to an amended pleading was in Haddix's response to the Salvation Army's plea. The Salvation Army contended that Haddix had not exhausted his administrative remedies for bringing a Payday Law cause of action by not filing a claim with the Department of Labor.[4] Haddix disputed this and then stated: "Plaintiff is glad that Defendant brought this point up. In his Original Petition, Plaintiff did not request damages for this cause of action. Plaintiff now requests leave from the Court to file a supplement to his petition to address this point and other unintentional glitches in his Original Petition." Despite this statement, Haddix did not file an amended or supplemental pleading prior to the hearing.

Haddix made no effort to amend his petition during or after the hearing. The hearing occurred on November 8. The trial court took the pleas under advisement. The trial court notified the parties by correspondence dated December 15

that it was granting defendants' pleas and requested a proposed order. The trial court signed an order on December 22. Haddix objected to this order contending that the trial court erred by not giving him a chance to amend but he did not amend or request leave to amend his pleadings. Haddix filed a motion for new trial and again objected to the failure to grant him an opportunity to amend, but he did not request leave to amend or indicate how he could address his pleading deficiencies with an amended pleading.

Even if we assume that the better practice would have been served by specifically providing Haddix with an opportunity to amend his pleadings, he had the opportunity in response to defendants' pleas to amend but did not do so, and he had over one month following the hearing to amend but did not do so; however, he has never advised either the trial court or this court what he could plead that would address any of the jurisdictional challenges. Accordingly, we cannot say that the trial court erred, and Haddix's fourth issue is overruled.

*D. Did the Trial Court Err by Citing the Wrong Section of the Labor Code?*

The Salvation Army, Zurich, and Chesterfield each pleaded that Haddix's common-law remedies were barred by the exclusive remedy of the Texas Workers' Compensation Act pursuant to "Texas Labor Code Section 406.234." Haddix complains that the trial court erred by granting this challenge because Section 406.234 does not exist. The appellees cited the wrong section of the Labor Code, but they are correct that the recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance for work-related injuries. *See* TEX. LAB.CODE ANN. § 408.001(a) (Vernon 2006). Haddix's fifth issue is overruled.

[253 S.W.3d 348]

*E. Did the Trial Court Err with its Evidentiary Rulings?*



Haddix argues that the trial court erred by refusing to admit, consider, or allow relevant testimony and evidence. He does not, however, identify what evidence he believes was not admitted or considered. In his brief, he repeatedly refers to statements made by him while presenting argument to the trial court and to cases he furnished the trial court. Neither constitutes evidence. We have previously held that we will assume that the trial court accepted all evidence tendered by Haddix as true and that we will consider that evidence in our review. Haddix's seventh, eighth, and twelfth issues, therefore, present nothing for our determination and are overruled.

*F. Did the Trial Court Err by Granting the Pleas to the Jurisdiction?*

In several issues, Haddix challenges the propriety of the trial court's decision to grant the appellees' pleas to the jurisdiction. We will treat these collectively. A plea to the jurisdiction contests a trial court's subject-matter jurisdiction. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999). The purpose of the plea "is not to force the plaintiffs to preview their case on the merits but to establish a reason why the merits of the plaintiffs' claims should never be reached." *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). Whether a court has subject-matter jurisdiction is a matter of law. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004). Accordingly, we review a challenge to the trial court's subject-matter jurisdiction de novo. *Id.* at 228.

Haddix asserted several causes of action against the appellees.[5] Their contention is that in each instance Haddix failed to plead that he had exhausted his administrative remedies and, therefore, that the trial court had no jurisdiction. We believe the appellees' position is not quite a correct statement of the law because, considering a plea to the jurisdiction based on the alleged failure to exhaust administrative remedies, it is ultimately the plaintiff's actions rather than his pleadings that determine whether the trial court has jurisdiction. *Cf. Tex. Dep't of Transp. v.*

*Beckner,* 74 S.W.3d 98, 103 (Tex.App.-Waco 2002, no pet.) (rejecting argument that plaintiff who filed suit seeking judicial review in a workers' compensation case was jurisdictionally required to plead that his suit was an appeal of the appeals panel decision).

*1. The Exhaustion of Administrative Remedies Requirement.*

The exhaustion of administrative remedies requirement represents the legislature's desire that administrative agencies initially determine disputed questions of fact and law in certain situations. *Essenburg v. Dallas County,* 988 S.W.2d 188, 189 (Tex.1998). When an agency has exclusive jurisdiction, courts have no subject-matter jurisdiction until the claimant has exhausted all administrative remedies within the agency. *See In re Entergy Corp.,* 142 S.W.3d 316, 321-22 (Tex.2004).

A plaintiff is required to allege facts affirmatively demonstrating the trial

[253 S.W.3d 349]

court's jurisdiction. *Am. Motorists Ins. Co. v. Fodge,* 63 S.W.3d 801, 803 (Tex. 2001). Courts, however, are not limited to the consideration of those facts but may also consider evidence to prove the jurisdictional issues raised. *Bland I.S.D.,* 34 S.W.3d at 555. Consequently, if a party has not exhausted its administrative remedies but has pleaded that it has, the trial court would not be bound by this allegation but could still dismiss a claim for lack of jurisdiction. The opposite is true as well. If a party exhausts its administrative remedies but fails to properly or adequately plead this, the challenge is not to the trial court's jurisdiction but to the adequacy of the plaintiff's pleading.

Haddix initiated two claims with the Division. Haddix pleaded that he was injured while in the course of his employment for the Salvation Army on November 25, 2004, and that he aggravated his injury on December 16. He alleged that a contested case hearing was



conducted concerning the December 16 injury and that, at this hearing, the hearing officer considered whether Haddix was injured on December 16 and, if so, whether and for what period was he disabled. Haddix alleged that the hearing officer determined that he had no disability and that the appeals panel affirmed. Flahive's evidence corroborated these factual statements.

Haddix's petition does not refer to any administrative proceeding concerning the November 25 injury, but Flahive's evidence indicates that Haddix filed a separate claim for this injury, that the Division assigned it a claim number, and that a benefit review conference and contested case hearing were set. The disputed issues at the second contested case hearing involved whether the Salvation Army was Haddix's employer on November 25, whether Haddix was injured on that date, whether Haddix timely notified his employer of his injury, whether the carrier had waived the right to contest the compensability, and whether Haddix was disabled as the result of any November 25 injury. The hearing officer had not yet released his findings on these disputed issues when Haddix filed suit.

It is clear that the recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance for work-related injuries. *See* Section 408.001(a). It is also clear that an individual claiming an injury while in the course and scope of his employment must exhaust his administrative remedies before filing suit and that this suit is an appeal of the appeals panel. *See* TEX. LAB.CODE ANN. § 410.251 (Vernon 2006).

Even though it is undisputed that Haddix presented a claim for his December 16 injury to the Division and that he contested that claim through the Division's appeals panel, the appellees contend that he has not exhausted his administrative remedies because the November 25 and December 16 injuries are inexorably intertwined. Appellees cite no authority in support of the argument that separate claims must be treated collectively for jurisdictional

purposes, and we have found none ourselves. Thus, the trial court had jurisdiction to consider an appeal of the appeals panel decision. Haddix had not, however, exhausted his administrative remedies for the November 25 injury, and the trial court did not have jurisdiction to consider any claim for benefits in connection with that injury.

Haddix's petition does not state a claim that indisputably constitutes an appeal of the appeals panel decision. Several arguably touch upon that claim, and some are clearly meant to assert an independent cause of action. Whether Haddix is properly

[253 S.W.3d 350]

appealing the appeals panel or whether his causes of action are barred by the Workers' Compensation Act's exclusivity provision, we need not decide today because our review does not concern the merits of Haddix's claims but merely the trial court's jurisdiction. *See Bland ISD,* 34 S.W.3d at 554 (a plea to the jurisdiction is a dilatory plea intended to defeat a cause of action without regard to the merits of the claim).

To the extent that Haddix is attempting to appeal the appeals panel's decision, the trial court's jurisdiction is limited to the December 16 claim. The trial court has jurisdiction over Haddix's causes of action for fraud, conspiracy, libel, intentional infliction of emotional distress, failure to properly investigate, and breach of the covenant of good faith and fair dealing to the extent that Haddix is claiming an independent injury and to the extent those causes of action do not require proof of a compensable injury on November 25. Our holding is limited to the determination that the trial court has jurisdiction and is not a holding that any cause of action is or is not a viable claim.

*2. Retaliation for Filing a Claim.*

Texas law prohibits discrimination by employers against employees for filing a workers' compensation claim in good faith. TEX.



LAB.CODE ANN. § 451.001 (Vernon 2006). The statute does not require that retaliation claims be submitted to the Division before filing suit. When courts have discussed an obligation to exhaust administrative remedies before filing a retaliation claim, they have dealt with employer-provided grievance procedures. *See, e.g., Dallas County v. Gonzales,* 183 S.W.3d 94 (Tex.App.-Dallas 2006, pet. denied). There is no contention that the Salvation Army had a grievance procedure. The trial court, therefore, had jurisdiction over Haddix's retaliation claim.

### 3. Retaliation by Landlord.

Haddix pleaded that the Salvation Army was his landlord and that it retaliated against him for exercising his lawful rights by unlawfully evicting him. TEX. PROP.CODE ANN. § 92.331 (Vernon 2007) prohibits retaliation by a landlord against a tenant for exercising, in good faith, a right granted to the tenant by state law. The statute does not provide an administrative remedy for alleged violations. The trial court, therefore, had jurisdiction over this claim. Haddix also asserts a claim for unlawful eviction and cites TEX. PROP.CODE ANN. § 24.005 (Vernon 2000) in support of this cause of action. Section 24.005 does not create a cause of action but requires certain notice before filing a forcible detainer suit. We are not required to determine the merits of this claim but merely the trial court's jurisdiction. Because the statute does not create an administrative remedy, the trial court has jurisdiction over this claim.

### 4. Discrimination.

Haddix also asserted that he was discriminated against on the basis of his religion, disability, race, and sex. The Texas Commission on Human Rights (TCHR) was created by the legislature to correlate state law with federal law in the area of employment discrimination. *Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 485 (Tex.1991). Before filing an employment discrimination claim, one must comply with the statutory mandates of the TCHR. *El Paso County*

*v. Navarrete,* 194 S.W.3d 677, 682 (Tex.App.-El Paso 2006, pet. denied).

Haddix's appendix included a copy of a letter he received from the TCHR. This letter acknowledged receipt of an inquiry from Haddix regarding possible discrimination but indicated that the TCHR could

[253 S.W.3d 351]

not draft a charge on his behalf because "[t]he information you have provided is not sufficient to file a claim of employment discrimination under the Texas Commission on Human Rights Act, as amended." Haddix argues that this letter proves that he has exhausted his administrative remedies, and he spends considerable time discussing evidence that is not part of our record and discussing whether a right to sue letter is a predicate to filing a discrimination claim. Haddix, however, misunderstands the letter he received and included in the record because it in fact proves that he did not exhaust his administrative remedies.

Individuals are required to first file a complaint with the TCHR so that it can investigate the allegations, informally eliminate any discrimination, and minimize costly litigation. *Id.* at 683. Any subsequent lawsuit is limited to claims made in the complaint and factually related claims that could reasonably be expected to grow out of the TCHR's investigation of the charge. *Thomas v. Clayton Williams Energy, Inc.,* 2 S.W.3d 734, 738 (Tex.App.-Houston [14th Dist.] 1999, no pet.). That purpose is not served if an individual fails to provide sufficient information to the TCHR to support a claim of discrimination. Haddix failed to exhaust his administrative remedies with the TCHR, and the trial court did not have jurisdiction to consider his discrimination claims.

### 5. Failure to Pay Wages.

Haddix's final claim alleges that the Salvation Army illegally failed to pay his wages. An employee seeking unpaid wages from an



employer may pursue a judicial action against the employer or may seek an administrative remedy as provided under the Payday Law. *Holmans v. Transource Polymers, Inc.,* 914 S.W.2d 189, 192 (Tex.App.-Fort Worth 1995, writ denied). Haddix's evidence indicates that he filed a claim with the Texas Workforce Commission and that he was awarded $528 in unpaid wages. Appellees argue that Haddix was required to prosecute an appeal of this award to the TWC appeals panel before filing suit. They contend that, because Haddix did not affirmatively plead that he had prosecuted an administrative appeal, the trial court lacked jurisdiction. This, however, is a pleading rather than a jurisdictional defect. *Cf. Hull v. Davis,* 211 S.W.3d 461, 465 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (trial court lacked jurisdiction over Payday Law claim because record affirmatively established that plaintiff failed to administratively appeal the hearing examiner's decision). Because Haddix presented evidence that an administrative claim was filed and the record is silent on whether an appeal was prosecuted, the trial court had jurisdiction over this cause of action. Our holding does not foreclose further consideration of this issue in response to additional evidence.

Haddix's sixth, ninth, tenth, eleventh, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, and twenty-first issues are sustained in part and overruled in part. This case is remanded for further consideration of those claims over which we have held that the trial court had jurisdiction.

### G. Were Haddix's Due Process Rights Violated?

Haddix contends that the trial court engaged in misconduct that deprived him of his due process protections by operating what he describes as a "kangaroo court." In support of this argument, Haddix has provided this court with an extended, and at times personal, critique of the trial court, the district clerk, the court reporter, and opposing counsel. Haddix extensively relies upon matters not supported

[253 S.W.3d 352]

by the record and on challenges not properly preserved, and he repeatedly displays a fundamental misunderstanding of the legal process.

Our review of the entire record makes clear that his due process rights were not abridged. Haddix was provided the opportunity to respond to the pleas to the jurisdiction with both pleadings and evidence and to present argument to the trial court. When Haddix filed a motion for new trial, the trial court allowed Haddix to argue this motion for new trial for over one hour and fifteen minutes. During that hearing, Haddix accused opposing counsel of lying and fraudulent conduct, called the trial court negligent, sarcastically referred to the trial court's rulings, ridiculed the trial court, and accused the trial court of having a well-known bias and prejudice against unrepresented plaintiffs. During all of this, the trial court showed considerable restraint and patience.

Haddix contends that the clerk's record is missing correspondence and rulings, the reporter's record is incomplete, and the audiotapes from the trial court's hearings have been altered. Earlier, this court abated the appeal in response to Haddix's motion to supplement the reporter's record, directed the trial court to conduct an evidentiary hearing, and asked the court to provide us with findings of fact and conclusions of law in connection with that hearing. This hearing was conducted by a different judge than the one that granted the pleas to the jurisdiction. The judge also listened to the audiotape of the plea to the jurisdiction hearing. The judge found that, except for a typographical error, the reporter's record was accurate and that many of the things Haddix alleges occurred during the jurisdiction hearing simply did not. Haddix has not challenged any of these findings with an issue as required by TEX.R.APP. P. 38.1(e). Those findings are, therefore, binding on him.



Haddix has not established that his due process rights were violated. His first issue is overruled.

### H. Sanctions.

Haddix's twentieth issue complains of the trial court's refusal to grant any of his many requests for sanctions. Haddix has also asked this court to impose sanctions on opposing counsel. Haddix repeated that request during oral argument. Haddix has wholly failed to establish that opposing counsel engaged in improper conduct either before the trial court or this court. Haddix's request for sanctions is denied, and his twentieth issue is overruled.

Appellees have not requested sanctions from Haddix, but we feel it necessary to caution him about his own conduct. His brief contains many personal attacks against the trial court-including allegations of criminal misconduct that lack any credible evidentiary support. His brief contains repeated references to material that he acknowledges is not part of our record. His conspiratorial allegations strain reason and credibility. We have exercised considerable restraint and have largely ignored Haddix's improper behavior in an effort to timely resolve this appeal.

Appellant would be well advised to desist from such behavior in the future. Even though he is proceeding pro se, Haddix is subject to the same standards as licensed attorneys. *Holt v. F.F. Enters.,* 990 S.W.2d 756, 759 (Tex.App.-Amarillo 1998, pet. denied). Similar conduct by counsel has resulted in disciplinary action by this court. *See Burleson v. Sharp Image Energy, Inc.,* No. 11-06-00069-CV, 2007 WL 3298973 (Tex.App.-Eastland November 8, 2007, pet. filed) (mem.op.). We have granted Haddix some relief by partially

[253 S.W.3d 353]

remanding this case for further proceedings. In so doing, we are not holding that either the trial court or opposing counsel have conducted

themselves improperly; and this opinion should not be used to suggest otherwise.

If Haddix elects to file any further pleadings with this court, those pleadings should be restricted to the record, should be devoid of any personal attacks, and should be professional in tone. The failure to do so will be treated accordingly.

### III. *Holding*

The judgment of the trial court is affirmed in part and reversed and remanded in part. The case is remanded to the trial court for further consideration of those matters over which we have held the trial court has jurisdiction.

---------------

Notes:

1. Prior to September 1, 2005, this agency was known as the Texas Workers' Compensation Commission. For clarity, we will refer to it as the Division throughout this opinion.

2. We note also that a default judgment would have been inappropriate until the return of citation had been on file for ten days. TEX.R. CIV. P. 107. The returns for each defendant were filed on October 21-well after each defendant filed its answer.

3. In addition to summary judgments, the court also listed judgment after directed verdict, judgment non obstante veredicto, default judgment awarding liquidated damages, dismissal for want of prosecution without an evidentiary hearing, dismissal for want of jurisdiction without an evidentiary hearing, dismissal based on the pleadings or special exceptions, and any judgment rendered without an evidentiary hearing as examples of instances in which findings and conclusions can have no purpose and should not be requested. *Id.* at 443.

4. TEX. LAB.CODE ANN. §§ 61.001-.095 (Vernon 2006).



5. Haddix pleaded workers' compensation fraud, conspiracy, libel, intentional infliction of severe emotional distress, malicious and/or intentional and deliberately negligent failure to properly and fully investigate, breach of good faith and fair dealing, discrimination by retaliation, retaliation by landlord, unlawful eviction, tax fraud, discrimination based on religion, disability discrimination, racial discrimination, sexual discrimination, and failure to pay wages.

---------------



**136 S.W.3d 635**
**HARRIS COUNTY, Texas and Carl Borchers, Petitioners,**
**v.**
**Faye SYKES, Individually and a/n/f of Trenard Battle, Respondents.**
**No. 02-1014.**
<mark>**Supreme Court of Texas.**</mark>
**Argued November 12, 2003.**
**Decided May 28, 2004.**

[136 S.W.3d 636]

Kevin D. Jewell, Chamberlain Hrdlicka White Williams & Martin, Casey Todd Wallace and Michael A Stafford, Harris County Atty., Michael R. Hull, Harris County Attorney's Office, Houston, for Petitioner.

Okon J. Usoro, Okon J. Usoro, P.C., Houston, for Respondent.

Chief Justice PHILLIPS delivered the opinion of the Court, in which Justice HECHT, Justice OWEN, Justice JEFFERSON, Justice SMITH, and Justice WAINWRIGHT joined.

This case raises two issues. First, we address whether an order granting a governmental

[136 S.W.3d 637]

unit's plea to the jurisdiction should be with or without prejudice when the claimant has failed to state a claim that is cognizable under the Texas Tort Claims Act. Regardless of the answer, we must then decide whether such a dismissal is a judgment for the purposes of section 101.106 of the Texas Tort Claims Act, that would bar a plaintiff from proceeding against governmental agents for claims arising from the same subject matter. *See* Tex. Civ. Prac. & Rem.Code § 101.106. The court of appeals held that a dismissal pursuant to a plea to the jurisdiction is a dismissal without prejudice, and as such, not a judgment under the Texas Tort Claims Act. 89 S.W.3d 661, 670. We hold that such a dismissal is with prejudice because it fully and finally adjudicates whether the claims that were asserted, or that

could have been asserted, come within the Texas Tort Claims Act's waiver of sovereign immunity. We further hold that such a dismissal is a judgment under section 101.106 of the Texas Tort Claims Act. Accordingly, we modify the judgment of the court of appeals to render judgment dismissing the plaintiff's claims with prejudice and render judgment that the plaintiff take nothing.

I

George Sykes and his wife, Faye, brought this suit for injuries Mr. Sykes allegedly sustained in the Harris County jail. While incarcerated there, Mr. Sykes was assigned to a bed next to an inmate who was infected with tuberculosis. The Sykeses claimed that the county was negligent in failing to quarantine the infected inmate and in failing to warn Mr. Sykes of the inmate's infection. Several months after filing suit, Faye Sykes filed a suggestion informing the trial court of her husband's death. At the same time, she filed a motion, on which the trial court apparently never ruled, requesting that Trenard Battle, Mr. Sykes's minor son, be added as a plaintiff and that the estate of George Sykes be substituted in the place of her late husband.

Asserting governmental immunity from suit, Harris County filed a plea to the jurisdiction arguing that the Legislature has not waived immunity from suits like the Sykes's. Sykes responded that immunity was waived by the Texas Tort Claims Act because her husband's injuries arose out of the condition or use of property. Tex. Civ. Prac. & Rem.Code § 101.021. Specifically, Sykes argued that the words "housed," "room," and "sleeping space" in their pleadings all connote use of the tangible personal or real property that caused Mr. Sykes's injury and eventual death.

By amended petition, Sykes added Carl Borchers, the major of the Harris County jail, as a defendant both individually and in his official capacity. The trial court subsequently granted Harris County's plea to the jurisdiction and dismissed Sykes's claims against Harris County



with prejudice. Borchers then moved for summary judgment, urging that the trial court's dismissal of Harris County entitled him to derivative immunity under section 101.106 of the Texas Tort Claims Act. *See id.* § 101.106; *Thomas v. Oldham,* 895 S.W.2d 352, 357 (Tex.1995). The trial court granted Borchers's motion and signed an order that Sykes take nothing.

Sykes appealed, arguing that the trial court erred in granting the plea to the jurisdiction and dismissing her claims against Harris County because the Texas Tort Claims Act waives immunity when a condition or use of tangible personal property causes injury. *See* Tex. Civ. Prac. & Rem.Code § 101.021. Sykes also argued that the trial court further erred in granting Borchers's motion for summary judgment

[136 S.W.3d 638]

because Harris County's dismissal was not a judgment for purposes of section 101.106. *See id.* § 101.106. The court of appeals affirmed the trial court's dismissal of Harris County, holding that Sykes's amended petition did not affirmatively plead facts sufficient to confer jurisdiction on the trial court. 89 S.W.3d at 667. But the court decided that, in granting the plea to the jurisdiction, the trial court could only dismiss the suit without prejudice, which did not qualify as a judgment under section 101.106 of the Texas Tort Claims Act. 89 S.W.3d at 668. Accordingly, the court of appeals reversed Carl Borchers's summary judgment and remanded the case to the trial court. We granted Carl Borchers and Harris County's petition for review.

II

Sovereign immunity from suit defeats a trial court's subject matter jurisdiction unless the state expressly consents to suit. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999). Governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the State, including counties, cities, and school districts. *See Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n. 3

(Tex.2003) (recognizing that sovereign immunity and governmental immunity are distinct concepts although courts often use the terms interchangeably). The Texas Tort Claims Act provides a limited waiver of governmental immunity if certain conditions are met. *See* Tex. Civ. Prac. & Rem.Code §§ 101.021, 101.025.[1]

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). Because governmental immunity from suit defeats a trial court's jurisdiction, it may be raised by such a plea. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225-26 (Tex.2004); *Jones,* 8 S.W.3d at 639. Whether a court has subject matter jurisdiction is a legal question. *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002); *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998). If the trial court denies the governmental entity's claim of no jurisdiction, whether it has been asserted by a plea to the jurisdiction, a motion for summary judgment, or otherwise, the Legislature has provided that an interlocutory appeal may be brought. *See* Tex. Civ. Prac. & Rem.Code § 51.014; *San Antonio State Hosp. v. Cowan,* 128 S.W.3d 244, 245 n. 3 (Tex.2004). However, if the court grants the plea to the jurisdiction, as the trial court did in this case, the plaintiff may take an appeal once that judgment becomes final. *See Cash Am. Int'l Inc. v. Bennett,* 35 S.W.3d 12, 15 (Tex.2000).

[136 S.W.3d 639]

A trial court must grant a plea to the jurisdiction, after providing an appropriate opportunity to amend, when the pleadings do not state a cause of action upon which the trial court has jurisdiction. *See Bybee v. Fireman's Fund Ins. Co.,* 160 Tex. 429, 331 S.W.2d 910, 917 (1960) (citing *Lone Star Fin. Corp. v. Davis,* 77 S.W.2d 711, 715 (Tex.App.-Eastland 1934, no writ)). This was such a case. After Harris County filed its plea to the jurisdiction, Sykes amended her petition to state with greater particularity the theory that Harris County waived governmental immunity by



placing Mr. Sykes in the same room with, and assigning him a bed near, an inmate infected with tuberculosis. The trial court dismissed Sykes's claims, and the court of appeals agreed that "any effect that the room's walls and Sykes's bed had on Sykes's alleged exposure to tuberculosis is too attenuated to constitute a waiver of immunity under the [Texas Tort Claims Act]." 89 S.W.3d at 667 (citing *Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339, 343 (Tex. 1998)).[2]

The court of appeals disagreed with the trial court, however, on whether such a dismissal should be with or without prejudice. In general, a dismissal with prejudice is improper when the plaintiff is capable of remedying the jurisdictional defect. *See Dahl v. State,* 92 S.W.3d 856, 862 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *Thomas v. Skinner,* 54 S.W.3d 845, 847 (Tex.App.-Corpus Christi 2001, pet. denied); *Bell v. State Dep't of Highways & Pub. Transp.,* 945 S.W.2d 292, 295 (Tex. App.-Houston [14th Dist.] 1997, writ denied). The court of appeals in this case relied on *Bell* to hold that Sykes's claims should have been dismissed without prejudice. In so doing, the court ruled contrary to a line of decisions stating that dismissal with prejudice is appropriate when a trial court lacks subject matter jurisdiction because of the sovereign immunity bar. *See Martin v. Tex. Bd. of Criminal Justice,* 60 S.W.3d 226, 231 (Tex.App.-Corpus Christi 2001, no pet.); *City of Midland v. Sullivan,* 33 S.W.3d 1, 6 (Tex.App.-El Paso 2000, pet. dism'd w.o.j.); *City of Cleburne v. Trussell,* 10 S.W.3d 407, 409 (Tex.App.-Waco 2000, no pet.); *Univ. of Tex. Med. Branch v. Hohman,* 6 S.W.3d 767, 771 (Tex.App.-Houston [1st Dist.] 1999, pet. dism'd w.o.j.); *Hampton v. Univ. of Tex.-M.D. Anderson Cancer Ctr.,* 6 S.W.3d 627, 629 (Tex.App.-Houston [1st Dist.] 1999, no pet.); *Lamar Univ. v. Doe,* 971 S.W.2d 191, 197 (Tex.App.-Beaumont 1998, no pet.); *Jones v. City of Stephenville,* 896 S.W.2d 574, 577 (Tex.App.-Eastland 1995, no writ); *Liberty Mut. Ins. Co. v. Sharp,* 874 S.W.2d 736, 740 (Tex.App.-Austin 1994, writ denied). We granted Borchers and Harris County's petition to resolve this conflict.

If a plaintiff has been provided a reasonable opportunity to amend after a governmental entity files its plea to the jurisdiction, and the plaintiff's amended pleading still does not allege facts that would constitute a waiver of immunity, then the trial court should dismiss the plaintiff's action. Such a dismissal is with prejudice because a plaintiff should not be permitted to relitigate jurisdiction once that issue has been finally determined. Before dismissing this case, the trial court allowed Sykes to file an amended petition, after which the court made a final adjudication that the Legislature has not waived governmental immunity under the Texas Tort Claims Act with respect to any claim that Sykes brought against Harris County. Therefore, Sykes is foreclosed from relitigating whether the Texas Tort Claims Act

[136 S.W.3d 640]

waives immunity in this case. Accordingly, the court below erred in reversing the dismissal with prejudice, and we modify the court of appeals' judgment to dismiss Sykes's claims against Harris County with prejudice.

III

Next, we address the court of appeals' holding reversing the summary judgment granted by the trial court in favor of Carl Borchers. The Texas Tort Claims Act states: "A judgment in an action or a settlement of a claim under this chapter bars any action involving the same subject matter by the claimant against the employee of the governmental unit whose act or omission gave rise to the claim." Tex. Civ. Prac. & Rem.Code § 101.106.[3] The purpose of section 101.106 is to protect employees of a governmental unit from liability when a judgment or settlement has been obtained from the government employer pursuant to a claim under Chapter 101 of the Texas Tort Claims Act. *Thomas v. Oldham,* 895 S.W.2d 352, 357 (Tex.1995). Section 101.106 applies not only when there has been a judgment against a governmental entity prior to the suit against the employee, but also when the settlement or judgment against the governmental



entity occurs at any time before or during the pendency of the action against the employee. *Id.* at 355. The bar applies regardless of whether the judgment is favorable or adverse to the governmental unit. *Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339, 343 (Tex.1998).

This Court has never addressed whether a dismissal on a plea to the jurisdiction is a judgment for purposes of section 101.106 of the Texas Tort Claims Act. Several courts of appeals, however, have considered this issue. In *Brown v. Prairie View A & M Univ.,* the Fourteenth Court of Appeals held that dismissing Prairie View A & M pursuant to a plea to the jurisdiction was not a judgment that triggered the bar of the Texas Tort Claims Act. 630 S.W.2d 405, 408 (Tex.App.-Houston [14th Dist.] 1982, writ ref'd n.r.e.). Since *Brown,* however, that court, as well as two other courts of appeals, have held that a dismissal pursuant to a plea to the jurisdiction is a judgment for purposes of section 101.106 of the Texas Tort Claims Act. *Liu v. City of San Antonio,* 88 S.W.3d 737, 744 (Tex.App.-San Antonio 2002, pet. denied); *Dalehite v. Nauta,* 79 S.W.3d 243, 244 (Tex.App.-Houston [14th Dist.] 2002, pet. denied); *Doyal v. Johnson County,* 79 S.W.3d 139, 140 (Tex.App.-Waco 2002, no pet.); *Lowry v. Pearce,* 72 S.W.3d 752, 755 (Tex.App.-Waco 2002, pet. denied).

Sykes argues that a granted plea to the jurisdiction does not qualify as a judgment because it does not dispose of the claims' merits. As we have already held, however, a dismissal constitutes a final determination on the merits of the matter actually decided. *See Ritchey v. Vasquez,* 986 S.W.2d 611, 612 (Tex.1999) (per curiam); *Mossier v. Shields,* 818 S.W.2d 752, 754 (Tex.1991) (per curiam). In this case, there is a final adjudication that the Legislature has not waived Harris County's immunity on the facts of this case. Since the trial court properly dismissed Sykes's claims against Harris County with prejudice, Carl Borchers is entitled to derivative immunity under section 101.106 of the Texas Tort Claims Act.

The court of appeals erred in holding that the claims against Harris County

[136 S.W.3d 641]

should be dismissed without prejudice and that such a dismissal is not a judgment under section 101.106 of the Texas Tort Claims Act. Accordingly, we modify the judgment of the court of appeals and render judgment that the plaintiff's suit is dismissed with prejudice. We also reverse the portion of the court of appeals' judgment reversing Carl Borchers's summary judgment and render judgment that the plaintiff take nothing.

Justice BRISTER, joined by Justice O'NEILL, concurring.

For reasons stated elsewhere, governmental immunity should not be raised in a motion called a "plea to the jurisdiction."[1] This case shows another reason why.

The Court holds dismissal by plea to the jurisdiction on immunity grounds must be with prejudice.[2] While many intermediate appellate court opinions are cited in support, just as many others can be cited to the contrary (and are now impliedly disapproved).[3] How could so many courts have been so confused?

We have recently held dismissal must be *without* prejudice when based on mootness,[4] forum non conveniens,[5] or exclusive jurisdiction.[6] Each of these dilatory matters could be raised in a "plea to the jurisdiction," and presumably changing the motion's name would not change the preclusive effect. Thus, the rule regarding pleas to the jurisdiction appears to be: dismissal is usually without prejudice, but sometimes with prejudice. When? Why?

The conflicting opinions by the courts of appeals give no satisfactory explanation for either result. Of the "with prejudice" courts, only one appears to have made any attempt to explain why dismissal based on sovereign immunity should be preclusive; the explanation in that case was that plaintiffs cannot amend their pleadings or present



evidence on pleas to the jurisdiction[7] —both of which assertions are wrong.[8]

The "without prejudice" courts have explained that dismissal based on lack of

[136 S.W.3d 642]

jurisdiction can never be on the merits, and is improper if the plaintiff can remedy the jurisdictional defect.[9] But courts always have jurisdiction to determine their own subject-matter jurisdiction,[10] and a determination on that matter should not be open to endless relitigation. Further, as plaintiffs must be given an opportunity to remedy defects regarding immunity before any plea to the jurisdiction is granted,[11] it is unclear why that opportunity should be extended in perpetuity.

The Court adopts the "with prejudice" rule because "a plaintiff should not be permitted to relitigate jurisdiction once that issue has been finally determined."[12] This begs the question; when is jurisdiction finally determined? Nothing inherent in pleas to the jurisdiction suggests an answer.

Today's holding can only be explained as another ad hoc effort to modernize an obsolete common-law plea. Because a plea to the jurisdiction is not so much a motion as a category of complaints, it will always be hard to say with particularity or uniformity what rules ought to apply. Wisely, the Texas Rules of Civil Procedure do not even try; we should follow that lead.

There would never have been as much confusion if sovereign immunity had to be raised by summary judgment or special exceptions. The summary judgment rules make clear not only the deadlines and evidentiary rules, but also that any summary judgment granted is preclusive on the issues actually decided.[13] Similarly, if sovereign immunity is raised by special exceptions, claimants know they have one chance to replead and are thereafter barred.[14]

The only valid explanation for today's holding is that changing the motion's name to a "plea to the jurisdiction" should not change the preclusive effect. But rather than holding that a plea to the jurisdiction based on immunity should be dismissed with prejudice because that would be the effect of a summary judgment or dismissal after special exceptions on the same grounds, I would simply hold immunity must be raised by the latter motions. Accordingly, I agree with today's holding in Part II, though on different grounds; I join fully in Part III.

Justice BRISTER filed a concurring opinion, in which Justice O'NEILL joined.

Justice SCHNEIDER did not participate in the decision.

---------------

Notes:

1. The Texas Tort Claims Act states:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

*Id.* § 101.021.

2. Sykes did not petition this Court for review of the court of appeals' judgment.



3. This section was amended by Act of June 11, 2003, 78th Leg., R.S., ch. 204 § 11.05. The amended section became effective on September 1, 2003 and applies to actions filed on or after the effective date.

1. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217 (Tex.2004) (Brister, J., dissenting).

2. 136 S.W.3d at 637.

3. *See, e.g., Mullins v. Estelle High Sec. Unit,* 111 S.W.3d 268, 274 (Tex.App.-Texarkana 2003, no pet.) (holding dismissal of inmate's suit as frivolous due to defendant's immunity should have been without prejudice); *Ab-Tex Beverage Corp. v. Angelo State Univ.,* 96 S.W.3d 683, 686 (Tex.App.-Austin 2003, no pet.); *Prairie View A & M Univ. of Tex. v. Mitchell,* 27 S.W.3d 323, 327 (Tex.App.-Houston [1st Dist.] 2000, pet. denied); *Li v. Univ. of Tex. Health Sci. Ctr. at Houston,* 984 S.W.2d 647, 654 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); see also *Cervantes v. Tyson Foods, Inc.,* 130 S.W.3d 152, 157-58 (Tex.App.-El Paso 2003, pet. filed) (holding order granting plea to the jurisdiction for missing deadline for filing administrative appeal must be without prejudice); *Bell v. State Dep't of Highways & Pub. Transp.,* 945 S.W.2d 292, 295 (Tex.App.-Houston [1st Dist.] 1997, writ denied) (holding sovereign immunity claim raised by special exception could not be dismissed with prejudice).

4. *Ritchey v. Vasquez,* 986 S.W.2d 611, 612 (Tex.1999) (per curiam).

5. *Owens Corning v. Carter,* 997 S.W.2d 560, 580 n. 13 (Tex.1999).

6. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 221 (Tex.2002).

7. *Liberty Mut. Ins. Co. v. Sharp,* 874 S.W.2d 736, 739 (Tex.App.-Austin 1994, writ denied).

8. *See County of Cameron v. Brown,* 80 S.W.3d 549, 558-59 (Tex.2002) (holding plaintiff must be given opportunity to replead before plea to the jurisdiction based on pleadings is granted); *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 555 (Tex.2000) (holding plea to the jurisdiction is not limited to consideration of pleadings).

9. *See, e.g., Mullins,* 111 S.W.3d at 274; *Ab-Tex Beverage,* 96 S.W.3d at 686.

10. *See Camacho v. Samaniego,* 831 S.W.2d 804, 809 (Tex.1992).

11. *Brown,* 80 S.W.3d at 559.

12. 136 S.W.3d at 639.

13. *See Hyundai Motor Co. v. Alvarado,* 892 S.W.2d 853, 854 (Tex.1995) (per curiam) (holding that nonsuit without prejudice nevertheless operates as dismissal with prejudice as to issues decided in earlier partial summary judgment).

14. *See Friesenhahn v. Ryan,* 960 S.W.2d 656, 658 (Tex.1998); *Tex. Dep't of Corr. v. Herring,* 513 S.W.2d 6, 10 (Tex.1974).

---------------



**458 S.W.3d 1**

**John Klumb, Veronica McClelland, Vivian Montejano, John Gonzalez, Anita Robles, and Charmaine Pilgrim, on behalf of themselves and all others similarly situated, and the City of Houston, Petitioners**
**v.**
**Houston Municipal Employees Pension System, Barbara Chelette, David L. Long, Lenard Polk, Roy Sanchez, and Lonnie Vara, Respondents**

**NO. 13–0515**

Supreme Court of Texas.

Argued November 6, 2014
OPINION DELIVERED: March 20, 2015

Katherine D. Mackillop, Reagan M. Brown, Norton Rose Fulbright, 1301 McKinney Street, Suite 5100, Houston TX 77010–3095, for Petitioner John Klumb.

John B. Wallace, Senior Assistant City Attorney, Judith Lee Ramsey, Chief, General Litigation Section, David M. Feldman, Lynette Fons, City of Houston Legal Department, P.O. Box 368, Houston TX 77002–0368, for Petitioner City of Houston.

Adam Milasincic, Ahmad Zavitsanos, Anaipakos, Alavi & Mensing PC, 1221 McKinney, Suite 3460, Houston TX 77010, Michelle Stratton, Thomas R. Phillips, Travis J. Sales, Baker Botts L.L.P., 910 Louisiana Street, One Shell Plaza, Houston TX 77002, for Respondent Houston Municipal Employees Pension System.

**Opinion**

Justice Guzman delivered the opinion of the Court.

The dispute in this case arises in the context of a unique statutory scheme that confers expansive administrative authority and broadly prohibits judicial review. At issue is whether Houston Municipal Employees Pension System (HMEPS) board members violated HMEPS's enabling statute by requiring the petitioners' continued participation in the City of Houston's defined-benefit pension plan. As provided by statute, the pension board has exclusive, final, and binding authority to interpret, construe, and supplement omissions in the statute and to determine all questions pertaining to eligibility for membership, services, and benefits. Tex. Rev. Civ. Stat. Ann. Art . 6243h, § 2(x) -(y). Consistent

[458 S.W.3d 4]

with this legislative mandate, we have held that HMEPS's enabling statute precludes judicial review of such matters. *Houston Mun. Emps. Pension Sys. v. Ferrell,* 248 S.W.3d 151, 158–59 (Tex. 2007). To defeat the presumptive jurisdictional bar, the petitioners assert that subject-matter jurisdiction exists here because the pension-board members acted *ultra vires* and violated the Texas Constitution by augmenting the statute rather than interpreting it.

The underlying dispute arose when the City of Houston attempted to remove a division of employees from the pension system by forming quasi-governmental entities to perform the same governmental functions using the same employees. Contemporaneously with the City's restructuring efforts, the pension board determined that those employees remained under the City's effective control and payroll and therefore fell within the ambit of the statutory definition of "employee," which defines an individual's status as a HMEPS member. *See* Tex. Rev. Civ. Stat. Ann. Art . 6243h, §§ 1(11) (defining "employee"), (13) (defining "member"). The board's decision resulted in otherwise eligible members being denied "retiree" status and further required affected employees to continue making contributions to the pension fund despite being under the immediate employ of a third-party entity. *See id.* §§ 1(22) (defining "retiree"), (24) (defining "separation from service"). The individual petitioners and the City assert that the pension board unlawfully redefined the term



"employee" to capture these employees after they had ceased working for the City. Considering HMEPS and the board members' plea to the jurisdiction, the trial court found jurisdiction to be lacking, and the court of appeals affirmed. 405 S.W.3d 204, 209 (Tex. App.—Houston [1st Dist.] 2013).

We conclude the trial court lacks subject-matter jurisdiction over the claims asserted because (1) the pension board acted within the scope of its broad statutory authority in construing the term "employee" and (2) the individual petitioners have not asserted viable constitutional claims. Accordingly, we affirm the court of appeals' judgment.

## I. Background

HMEPS is organized and operated under Article 6243h of the Texas Revised Civil Statutes, which requires cities with a population of more than 1.5 million to make contributions to an employee pension fund in an amount based in part on the combined salary of the pension system's members.[1] Tex. Rev. Civ. Stat. Ann. Art . 6243h, §§ 1–28 ; *see also id.* § 8(d). The statute defines a "member" of the pension fund as "each active employee included in the pension system," except for statutorily ineligible employees. *Id.* § 1(13). An "employee" is "any [eligible] person ... who holds a municipal position [,] ... whose name appears on a regular full-time payroll of a city[,] ... and who is paid a regular salary for services." *Id.* § 1(11).

HMEPS is governed by a Board of Trustees imbued with broad authority to administer, manage, and operate the pension fund. *See id.* § 2(x). Among other powers, the pension board can (1) adopt written rules and guidelines for the administration of the pension fund; (2) interpret and construe the Act and any summary-plan documents and procedures, provided such construction is consistent with section 401 of the Internal Revenue Code of 1986, as amended (IRC); (3) "correct any defect, supply any omission, and reconcile any

[458 S.W.3d 5]

inconsistency" in the statute in the manner and to the extent the board deems "for the greatest benefit of all members"; and (4) determine all legal and factual questions pertaining to the fund's administration and eligibility for membership, services, and benefits. *Id.* So broad is the board's authority that the statute expressly mandates that "[t]he determination of any fact by the pension board and the pension board's interpretation of [the] Act are final and binding on any interested party, including members, deferred participants, retirees, ... and the city." *Id.* § 2(y). But though the board's authority under the statute is indisputably broad, the allegation in the underlying lawsuit is that the pension board crossed the line between interpreting the statute, which it is expressly authorized to do, and unlawfully altering it by supplementing the statutory definition of "employee" in a manner that encompasses personnel the City has outsourced to a third-party entity.

At the heart of the dispute is the City's effort to reduce its pension-fund contributions by using outsourcing as part of a comprehensive cost-saving initiative. Historically, the City has employed more than 100 people in its Convention and Entertainment Facilities Department (convention department) to operate municipally-owned properties such as theaters, convention centers, and parking lots. In May 2011, however, the City announced plans to remove those employees from the municipal payroll—and thus the pension system—by outsourcing convention and entertainment municipal functions to Houston First Corporation, a City-controlled, tax-funded local government corporation. Among other indicia of control, Houston First's budget is approved by the Houston City Council, and its board is appointed by the mayor and confirmed by the city council.

In response to the City's transition plan, the pension board announced in August 2011 that the definition of "employee" in Article 6243h "includes a full-time employee of a Texas local government corporation ... controlled by the City,



upon a determination by the External Affairs Committee of the Board of Trustees that such [local government corporation]'s employees are Employees for purposes of the [HMEPS] Plan." Thereafter, the board amended the pension-plan documents to incorporate this construction of the term "employee."

Undeterred, the City formed a nonprofit entity named Houston First Foundation and notified the pension board that the newly formed entity would employ all the City employees who had been slated to join Houston First Corporation. Believing Houston First Foundation to be a wholly-owned and controlled subsidiary of Houston First Corporation—and by extension, the City—the pension board adopted a resolution in October 2011 that reiterated the previously adopted construction of the term "employee" and further announced that "employees of any entity controlled, directly or indirectly, by [the City] are considered Employees for purposes of membership in HMEPS, unless the External Affairs Committee expressly determines otherwise."

Subsequently, the City abandoned Houston First Foundation and formed another nonprofit corporation called Convention and Cultural Services, Inc. (CCSI) to operate in conjunction with Houston First to provide convention and entertainment services to the City. Although Houston First would still provide those services to the City, it would not employ the service personnel directly. Instead, CCSI would employ and lease the workforce to Houston First, its only client. By agreement, Houston First was obligated to fully reimburse CCSI for "all internal and external

[458 S.W.3d 6]

costs and expenses associated with" the provision of personnel. CCSI purported to operate independently, but Houston First and CCSI had overlapping executives, some of whom had been City employees.

In a letter to the pension system's executive director, the City Attorney expressly disavowed any right or ability of the City to control CCSI, stating "[n]either the City, the Mayor, nor City Council will have any appointment authority or control over the corporation or its board of directors." Instead, CCSI was described as "a non-governmental, non-profit corporation whose board will be self perpetuating." The letter further explained that "[CCSI] will be contracting for its own employee benefits, including a [401(k) ] plan, and will not participate in any City of Houston benefit programs." The City thus took the position that following transition of convention department employees to CCSI, the employees would no longer be City employees or HMEPS members and, as a result, the City would not be obligated to make contributions to the pension fund based on those employees' salaries.

Despite this maneuver, the pension board's External Affairs Committee issued a resolution in November 2011 to the effect that the leased workers "would be in a control group and would remain as members of the plan." Though directly employed by CCSI, the leased employees (1) performed substantially similar duties as they had when employed directly by the City; (2) operated in the same governmental facilities; (3) were subject to removal from their positions at the City's request; and (4) were compensated using funds furnished by the publicly-funded local government corporation, which was contractually obligated to reimburse CCSI for the employees' services on a dollar-for-dollar basis.

With the exception of a group of City employees who were within a few years of retiring, the City proceeded to transfer convention and entertainment services and employees in accordance with the transition plan. When the transfer of personnel had been consummated, three CCSI employees—John Klumb, Veronica McClelland, and Vivian Montejano—sought full retirement benefits from HMEPS on the basis that their employment with the City had ended when they became CCSI employees and, at that time, they were otherwise eligible to retire. *See id.* §§ 1(22) (defining "retiree"), (1)(24) (defining



"separation from service"), 10(b) (eligibility requirements for retirement benefits); July 2011 Amended & Restated Meet & Confer Agreement Between HMEPS and the City § 14 (July 2011 MCA) (eligibility for retirement pension). Three other CCSI employees—John Gonzalez, Anita Robles, and Charmaine Pilgrim—claimed that, although not yet eligible to retire, they were no longer employed by the City and were therefore entitled to defer retirement status and cease having HMEPS contributions of 5% deducted from their salaries. *See* Tex. Rev. Civ. Stat. Ann. Art . 6243h, §§ 8(a) (requiring employer to deduct pension-fund contributions from members' salaries during employment), 12 (deferred-retirement option); July 2011 MCA § 8. Based on the pension board's interpretation of the term "employee" in Article 6243h, as adopted in the revised pension-plan documents, the External Affairs Committee concluded that the transferred employees remained "employees," and thus "members" of the pension system, and that no separation from municipal service had occurred.

Klumb, McClelland, Montejano, Gonzalez, Robles, and Pilgrim (collectively, the Petitioners) sued HMEPS, alleging violations of the Texas Constitution and breach

[458 S.W.3d 7]

of contract. The Petitioners sought monetary damages and a declaration that they were no longer City employees as that term is defined in Article 6243h. In a plea to the jurisdiction, HMEPS argued that the trial court lacked subject-matter jurisdiction because (1) Article 6243h precludes judicial review of the pension board's decisions interpreting that statute and determining eligibility for membership and benefits and (2) sovereign immunity bars the Petitioners' breach-of-contract and constitutional claims.

Petitioners responded by amending their petition to assert *ultra vires,* equal-protection, and due-course-of-law claims against the five pension-board members (Trustees) who voted to amend the HMEPS pension-plan documents to "illegally change the definition of 'employee' contained in Section 1(11) of Article 6243h." The Petitioners requested declaratory relief and an injunction against the Trustees based on the following alleged *ultra vires* acts: (1) voting to approve a definition of the term "employee" that improperly alters the statutory definition of that term; (2) compounding that unauthorized act by adopting the October 2011 resolution, which did the same; (3) authorizing the External Affairs Committee to determine who qualifies as an "employee" in contravention of a written agreement with the City; (4) construing Article 6243h in a manner inconsistent with section 401 of the IRC ; (5) refusing a non-discretionary duty to pay Klumb, McClelland, and Montejano their retirement benefits following separation of service from the City; and (6) refusing a non-discretionary duty to recognize Gonzalez, Robles, and Pilgrim's separation from service with the City. According to the Petitioners, the pension board's supplemental definition of the term "employee" effected an amendment of the statute, which was neither approved by the City nor adopted in accordance with statutorily mandated procedures and historical practice (what the parties refer to as "meet-and-confer agreements" between HMEPS and the City). *See id.* § 3(n) (authorizing the pension board, "[n]otwithstanding any other law," to "enter into a written agreement with the city regarding pension issues and benefits" that is binding on the City and HMEPS members if approved under procedures specified in the statute). The Petitioners further asserted the pension board had improperly delegated authority to the External Affairs Committee in violation of an existing meet-and-confer agreement, which states that, except for personnel decisions "no committee [of the pension fund] shall have authority to make final approvals, but shall only make recommendations to the full board."

The City intervened, generally aligning itself with the Petitioners and seeking similar injunctive and declaratory relief.

HMEPS and the Trustees (collectively, HMEPS) filed an amended plea to the jurisdiction, arguing



that both the pension board's interpretation of the term "employee" and its application to the factual circumstances presented were "final and binding" with no right of judicial review. *See id.* § 2(x)-(y); *Ferrell,* 248 S.W.3d at 158–59. HMEPS further asserted sovereign immunity bars the Petitioners' breach-of-contract and constitutional claims because (1) violation of a meet-and-confer agreement cannot serve as a basis for an *ultra vires* claim and (2) the constitutional claims are facially invalid. Following a hearing, the trial court granted the plea to the jurisdiction and dismissed the suit for want of jurisdiction.

The court of appeals affirmed, holding that (1) Texas courts have jurisdiction to determine whether the pension board's actions are *ultra vires* ; (2) the pension board's construction of the term "employee" was not an *ultra vires* act because it

[458 S.W.3d 8]

was consistent with the board's exclusive authority to interpret—and supply any omission in—the statute; (3) violation of a meet-and-confer agreement does not support an *ultra vires* claim; (4) the trial court lacks subject-matter jurisdiction to determine whether the board's supplemental definition of "employee" disqualifies the pension plan under the IRC; (5) the Petitioners' equal-protection challenge is meritless because preservation of funding sources for the pension fund provides a rational basis for continuing to treat the transferred employees as employees of the City; (6) the petitioner's due-course-of-law claim fails because the employees lack a vested property interest in the retirement benefits at issue and the funds deducted from their salaries as contributions to the pension fund; and (7) the trial court did not err in striking and refusing to consider an affidavit offered to establish the board's intent to amend, rather than interpret, the statute and, in any event, the exclusion of the evidence was harmless. 405 S.W.3d at 215–27.

On appeal to this Court, the Petitioners and the City raise essentially the same grounds for denying HMEPS's plea to the jurisdiction. In the alternative, they assert that the evidence raises a fact issue concerning the existence of jurisdiction that must be resolved by the trier of fact on remand to the trial court.[2]

## II. Discussion

### A. Standard of Review

Subject-matter jurisdiction is essential to the court's power to decide a case. *Tex. Dep't. of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex. 2004). The existence of subject-matter jurisdiction is a question of law that can be challenged, as it was here, by a plea to the jurisdiction. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex. 2000). We review de novo the trial court's disposition of HMEPS's plea to the jurisdiction. *Miranda,* 133 S.W.3d at 226.

In doing so, we consider the pleadings and factual assertions, as well as any evidence in the record that is relevant to the jurisdictional issue. *City of Elsa v. Gonzalez,* 325 S.W.3d 622, 625 (Tex. 2010). Construing the pleadings liberally in favor of the plaintiffs, we look to the pleaders' intent and determine whether the pleaders have alleged facts affirmatively demonstrating the court's jurisdiction to entertain the matter. *Id.* When a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider whether evidence in the record raises a fact issue, and if it does, the jurisdictional issue must be resolved by the trier of fact. *Miranda,* 133 S.W.3d at 227–28. Conversely, the trial court must rule on the plea as a matter of law if the evidence is undisputed or fails to raise a fact question. *Id.* at 228.

The jurisdictional issue in this case has two aspects. The first is whether courts have authority to review the pension board's actions under an *ultra vires* theory notwithstanding Article 6243h's ban on judicial review. The second is whether sovereign immunity bars the Petitioners' constitutional claims.

[458 S.W.3d 9]

### B. *Ultra vires* Claims



The pension board has broad authority to interpret and apply Article 6243h, to supplement omissions in its terms, to adopt written rules and guidelines for the fund's administration, and to determine all questions of law and fact pertaining to the same. *See* Tex. Rev. Civ. Stat. Ann. Art . 6243h, § (2)(x). The board's actions with respect to these matters are "final and binding," *id.* § 2(y), and therefore not amenable to judicial review, *see Ferrell,* 248 S.W.3d at 158–59 (holding that Article 6243h's "final and binding" language precludes judicial review of the pension board's decision denying police officers service credit for time they spent training as cadets in the Houston Police Academy). Neither the Petitioners nor the City disputes the validity of the foregoing principles.

Rather, they assert those principles simply do not apply when the pension board fundamentally alters the terms of the statute without the City's consent. When viewed in this way, they contend the jurisdictional inquiry is not determined by reference to *Ferrell,* but instead is controlled by *City of El Paso v. Heinrich,* in which we held that sovereign immunity does not prohibit *ultra vires* suits seeking "to require state officials to comply with statutory or constitutional provisions." 284 S.W.3d 366, 372 (Tex. 2009).

Sovereign immunity and the unavailability of judicial review are related, but conceptually distinct concepts. The former serves the pragmatic purpose of "shield[ing] the public from the costs and consequences of improvident actions of their governments." *Tooke v. City of Mexia,* 197 S.W.3d 325, 332 (Tex. 2006). The latter effectuates a legislative prerogative to protect the inviolability of an administrative process while simultaneously recognizing that suits challenging an administrative action necessarily implicate sovereign immunity. Whatever functional differences might exist between these concepts, we will assume for purposes of our analysis that the *ultra vires* doctrine is an exception to Article 6243h's ban on judicial review. *See Ferrell,* 248 S.W.3d at 160 (Brister, J., concurring) (acknowledging that Article 6243h forecloses judicial review of claims

that the pension board misinterpreted the statute but observing that "[a] different case might be presented if the plaintiffs alleged the board was clearly violating some provision of the statute").

As stated in *Heinrich,* the *ultra vires* doctrine applies when a government official's conduct is "without legal or statutory authority." 284 S.W.3d at 372. To trigger the *ultra vires* exception to sovereign immunity, "a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id* . In the present case, the Petitioners and the City allege both categories of *ultra vires* acts. The threshold issue, however, is whether the pension board acted without legal authority by expanding Article 6243h's definition of "employee" without the City's approval and in conflict with the plain language of the statute.[3] With the exception

[458 S.W.3d 10]

of the allegation that the pension board unlawfully delegated decision-making authority to a committee, the validity of the remaining *ultra vires* claims depends on the resolution of this issue. We thus begin our analysis there.

**1. The Board's Construction of the Term "Employee"**

Article 6243h defines the term "employee" as "any [eligible] person ... (A) who holds a municipal position ...; (B) whose name appears on a regular full-time payroll of a city ...; and (C) who is paid a regular salary for services." Tex. Rev. Civ. Stat. Ann. Art . 6243h, § 1(11). The constituent terms "municipal position," "a regular full-time payroll of a city," and "regular salary for services" are not defined. HMEPS therefore maintains that it has the authority to interpret these terms and fill in the interstices of the statute to address newly emerging circumstances affecting the administration of the statute "for the greatest benefit of all members." *See id.* § 2(x)(2), (3). Moreover, because the statute expressly authorizes the pension board to adopt written



rules and guidelines for the administration of the pension fund, HMEPS contends the board had discretion to adopt supplemental language adding contours to the statutory definition and to amend the pension-plan documents accordingly. *See id.* § 2(x)(1).

The Petitioners and the City's contrary position is that no interpretation was required or permitted because, manifestly, personnel employed by CCSI are neither holding municipal positions nor being carried on the City's payroll. Accordingly, they contend that to reach these employees, the Trustees effectively amended and expanded the statutory definition and did so without entering into a section 3(n) meet-and-confer agreement with the City. *See id.* § 3(n) ("Notwithstanding any other law, the pension board may enter into a written agreement with the city regarding pension issues and benefits. The agreement must be approved by the pension board and the governing body and signed by the mayor and by the pension board or the pension board's designee.").

The breadth of the pension board's authority under Article 6243h is inescapable. As it pertains to the matter at hand, the statute expressly authorizes the pension board to construe the statute, add language it deems necessary for the administration of the pension fund, and determine all eligibility questions and all other legal and factual matters pertaining to the fund's administration. Courts may not review the board's actions in doing so absent a manifest conflict with express statutory terms. That is not the case here because (1) the definition of "employee" is composed of essential terms that are undefined and (2) the supplemental language the board adopted neither inherently nor patently conflicts with the terms of the statute.[4] We therefore conclude that, as a

[458 S.W.3d 11]

matter of law, the pension board did not act without legal authority in interpreting the term "employee" to include "a full-time employee of a Texas local government corporation ... controlled by the City, upon a determination by the External

Affairs Committee of the Board of Trustees that such [local government corporation]'s employees are Employees for purposes of the [HMEPS] Plan." The board's additional explication of the definition as including "employees of any entity controlled, directly or indirectly, by [the City]" is also well within the board's discretionary authority. Absent a conspicuous and irreconcilable conflict, any further consideration of the matter would impermissibly encroach on the unreviewable, discretionary authority afforded to the board under Article 6243h.[5] *See Ferrell,* 248 S.W.3d at 158–59 (holding that courts lack jurisdiction to require pension board to comply with a judicial interpretation of Article 6243h ).

Furthermore, there is no requirement that the pension board obtain the City's consent to exercise its discretionary powers. Section 3(n) of the statute authorizes, but does not require, the pension board to enter into a written agreement with the City regarding pension and benefit issues. *See* Tex. Rev. Civ. Stat. Ann. Art . 6243h, § 3(n) ("[T]he pension board *may* enter into a written agreement with the city regarding pension issues and benefits." (emphasis added)). Section 3(n) does not purport to constrain the board's authority under section 2(x) ; it merely provides an alternative mechanism for the board to resolve pension issues. When the pension board and the City agree on a pension issue, the statute allows them to execute an enforceable contract to that effect. When they cannot agree, the statute makes the board's determinations of fact and statutory interpretations "final and binding." *See id.* § 2(y).

Although the pension board has unquestionably broad discretionary authority under section 2(x), we caution that the board may not violate the statute. Though we need not consider the matter here, we do not foreclose the possibility that, in appropriate circumstances, a particular interpretation of the statute could be *ultra vires* . We observe only the absence of such circumstances here, leaving any further dispute regarding the matter to the Legislature, as it evidently intended.[6] *See Ferrell,* 248 S.W.3d at 160 (Brister, J.,



[458 S.W.3d 12]

concurring) (noting, "Our legislators [have] decided they wish to be the final (and frequent) arbiter of disputes about how these pension systems should be run"; consequently, the courts "must leave them to it, as the Texas Constitution expressly allows the Legislature to grant jurisdiction to administrative bodies rather than the courts").

**2. Delegation of Board Authority to a Committee**

The Petitioners and the City also contend the pension board acted *ultra vires* by delegating decision-making authority to the External Affairs Committee in violation of the following provision in a July 2011 meet-and-confer agreement between HMEPS and the City:

> Except for meet and confer decisions and personnel decisions, no committee shall have authority to make final approvals, but shall only make recommendations to the full board.

The pension board's October 2011 resolution nevertheless states that "employees of an entity controlled, directly or indirectly, by the City are considered Employees for purposes of membership in [the Pension Fund], unless the External Affairs Committee expressly determines otherwise; provided, however that nothing in this resolution would apply to ... any otherwise ineligible employee as determined by the External Affairs Committee."

Article 6243h generally permits delegation. *See* Tex. Rev. Civ. Stat. Ann. Art . 6243h, § 3(k) ("The pension board may allocate among the trustees the responsibilities of the pension board under this Act and may designate any person who is not a trustee ... to carry out the responsibilities of the pension board."). Under section 3(k) of the statute, the pension board is permitted to delegate decision-making authority in the manner effectuated by the October 2011 resolution.

The Petitioners and the City contend, however, that the July 2011 meet-and-confer agreement amended the statute and divested the pension board of the power to delegate final decision-making authority to a committee, requiring instead that committees "shall only make recommendations to the full Board." The Petitioners and the City allege that the October 2011 resolution thus violates the terms of the meet-and-confer agreement and is *ultra vires* . We disagree.

Meet-and-confer agreements are written contracts, and regardless of whether the parties deem the provisions of the contract to be an "amendment" of the statute, noncompliance with a contract does not give rise to an *ultra vires* claim. *See City of Houston v. Williams,* 353 S.W.3d 128, 149 (Tex. 2011) ; *Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855–57 (Tex. 2002). Therefore, any claim that the pension board violated the July 2011 meet-and-confer agreement is a breach-of-contract claim that cannot be maintained absent a waiver of sovereign immunity. As we have previously explained, "declaratory-judgment suits against state officials seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities are suits against the State.... Consequently, such suits cannot be maintained without legislative permission." *IT–Davy,* 74 S.W.3d at 855–56. No waiver of immunity is alleged or supported on the record before the Court.[7]

[458 S.W.3d 13]

**C. Equal Protection and Due Course of Law**

In addition to asserting *ultra vires* claims as a basis for subject-matter jurisdiction, the Petitioners further contend that sovereign immunity does not bar relief on their claims under the Texas Constitution. *See, e.g., Tex. Dep't of Transp. v. Sefzik,* 355 S.W.3d 618, 621 (Tex. 2011) (suits to require state officials to comply with constitutional provisions are not prohibited by sovereign immunity); *see also* Tex. Const. Art . I §§ 3 (equal-protection clause), 19 (due-course-



of-law clause). While it is true that sovereign immunity does not bar a suit to vindicate constitutional rights, *Heinrich,* 284 S.W.3d at 372, immunity from suit is not waived if the constitutional claims are facially invalid, *see Andrade v. NAACP of Austin,* 345 S.W.3d 1, 11 (Tex. 2011).

**1. Equal Protection**

The Petitioners allege the pension board treated them differently than former city employees who now work for separate legal entities due to municipal outsourcing. For example, the Petitioners argue the City employees working at the Houston Zoo became employees of Houston Zoo, Inc., and that the pension fund determined a separation of service occurred as a result. According to the Petitioners, the zoo employees were declassified as "employees" and pension-system "members" and some were thereafter permitted to collect their pension benefits while remaining employed in essentially the same jobs. The Petitioners contend they are similarly situated to the zoo employees but are being treated differently. They further assert—as they must to state a valid equal-protection claim—that the pension board's disparate determination that CCSI employees remain members of the pension system is not rationally related to any legitimate governmental objective.

The Texas Constitution provides that all people "have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges." Tex. Const. Art . 1 § 3. The Petitioners contend the pension board's determination that they remain members of HMEPS violated their right to equal protection of the law. To state a viable equal-protection claim under the Texas Constitution, the Petitioners must show they have been "treated differently from others similarly situated." *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 647 (Tex. 2004). Because neither a suspect classification nor a fundamental right is involved, the Petitioners must further demonstrate that the challenged decision is not rationally related to a legitimate governmental purpose. *First Am. Title*

*Ins. Co. v. Combs,* 258 S.W.3d 627, 639 (Tex. 2008). In conducting a rational-basis review, we consider whether the challenged action has a rational basis and whether use of the challenged classification would reasonably promote that purpose. *Id.* These determinations are "not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc* ., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).[8]

Even assuming the pension board has in fact treated similarly situated employees differently, we hold the Petitioners failed

[458 S.W.3d 14]

to plead a viable equal-protection claim because the board's actions are rationally related to at least two legitimate government objectives which are promoted by the challenged classification. First, the pension board has a legitimate interest in preserving sources of pension funding that are adequate to meet the demands on the fund, which it may rationally accomplish by ensuring the City meets its contribution obligations to the pension system. *See* 405 S.W.3d at 225 (citing *U.S.R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 174, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980), which recognizes preservation of pension funds as a legitimate basis for distinguishing among pensioners). Continued depletion of the workforce through nominal privatization of municipal services would undoubtedly restrict or significantly impair the pension system's funding sources. The preservation of funding sources is a legitimate and rational basis for concluding that, under the circumstances presented here, convention department workers performing municipal functions as CCSI employees remain members of the pension system.[9] Given the long-term ramifications of concerted efforts to reduce the City's contributions to the pension fund, any previous failure of the pension board to perceive or acknowledge a threat to pension-funding sources does not change the analysis of this issue. *Cf. McDonald v. Bd. of Election Comm'rs of Chicago,* 394 U.S. 802, 808, 89 S.Ct. 1404, 22



L.Ed.2d 739 (1969) ("[A] legislature traditionally has been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind[ ]'; and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." (internal citation omitted)).

The pension board also has a legitimate interest in policies that lessen the risk of overpaying pensioners or allowing them to "double dip." *See, e.g., Connolly v. McCall,* 254 F.3d 36, 43 (2d Cir. 2001) (per curiam) (recognizing "legitimate interest in saving money by barring pension practices that have the character of 'double-dipping' "). In this case, the pension board has disallowed functional City employees from collecting government-funded HMEPS retirement benefits while also receiving salaries and 401(k) contributions originating in the dollar-for-dollar expense reimbursements CCSI collects from Houston First, the City controlled and tax-funded local government corporation. The pension board's decision to eliminate further demands on the public fisc is rationally related to its interest in preventing employment arrangements that permit forms of "double dipping."

Because we conclude that any differentiation between employees is rationally related to legitimate governmental objectives, the Petitioners' equal-protection claims fail as a matter of law.

**2. Due Course of Law**

In their remaining claims, the Petitioners contend they have been deprived

[458 S.W.3d 15]

of vested property rights without due process. *See* Tex. Const. Art I § 19 ; *see also Univ. of Tex. Med. Sch. v. Than,* 901 S.W.2d 926, 929 (Tex. 1995) (no meaningful distinction exists between the terms "due process" and "due course of law"). Klumb, McClelland, and Montejano allege HMEPS unconstitutionally denied them retirement benefits they would otherwise have been eligible to collect after a separation of service from the City. Gonzalez, Robles, and Pilgrim were not eligible for retirement at the time they became CCSI employees, but they claim a vested property right in funds deducted from their salaries and contributed to the pension fund on their behalf.

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, or privileges or immunities ... except by the due course of the law of the land." Tex. Const. Art . I, § 19. Before any substantive or procedural due-process rights attach, however, the Petitioners must have a liberty or property interest that is entitled to constitutional protection. *Than,* 901 S.W.2d at 929. A constitutionally protected right must be a vested right, which is " 'something more than a mere expectancy based upon an anticipated continuance of an existing law.' " *City of Dallas v. Trammell,* 129 Tex. 150, 101 S.W.2d 1009, 1014 (1937) (quoting *Dodge v. Bd. of Educ. of City of Chicago,* 364 Ill. 547, 5 N.E.2d 84, 86 (1936) ). The court of appeals held, and we agree, that the Petitioners' due-course claims are facially invalid because the Petitioners have no vested property right to the pension-plan contributions and future retirement benefits at issue. 405 S.W.3d at 226–27.

Our decision in the *City of Dallas v. Trammell* is dispositive of the Petitioners' claims to a vested property interest in retirement benefits as of the date they otherwise became eligible but for the pension board's articulated and applied definition of the term "employee" in Article 6243h. In *Trammell,* we considered the constitutionality of a statutory amendment that effected a substantial reduction in the monthly pension benefits payable to a police-department retiree. *Id.* at 1009. The purpose of the contested enactment was to rectify inadequacies in pension-plan funding that threatened the plan's long-term solvency. *Id.* at 1010, 1015–16. In challenging the statutory amendment, the retiree asserted that he had a vested property right in the amount of the monthly pension benefit that was granted to him



on the date of his retirement and that any subsequent reduction of that amount was unconstitutional. *Id.* The question presented was whether, as of the date of retirement, a pensioner has a vested right in future installment payments that could not be altered by subsequent legislative action. *Id.* at 1011.

In analyzing the issue, we adopted

> the rule that the right of a pensioner to receive monthly payments from the pension fund after retirement from service, or after his right to participate in the fund has accrued, is predicated upon the anticipated continuance of existing laws, and is subordinate to the right of the Legislature to abolish the pension system, or diminish the accrued benefits of pensions thereunder....

*Id* . at 1013. Applying this rule, we said there is no vested interest in future pension installments that would preclude the Legislature from repealing or modifying the law on which the pension system is founded, even if doing so would adversely impact or even abolish the right to future payment of unaccrued benefits. *Id* . at 1012, 1014 ; *see also id* . 1013–15. Stated another way, the right to receive benefits under a pension fund "is made subject to

[458 S.W.3d 16]

the reserved power of the Legislature to amend, modify, or repeal the law upon which the pension system is erected, and this necessarily constitutes a qualification upon the anticipated pension and a reserved right to terminate or diminish it." *Id.* at 1014. We concluded *Trammell* with "a direct holding that as to future installments of a pension the pensioner has no vested right," *id.* at 1017, and we have since affirmed *Trammell* 's root analysis on several occasions. *See Ex Parte Abell,* 613 S.W.2d 255, 261–62 (Tex. 1981) ; *Bd. of Managers of Harris Cnty. Hosp. Dist. v. Pension Bd.,* 449 S.W.2d 33, 37 (Tex. 1969) ; *Woods v. Reilly,* 147 Tex. 586, 218 S.W.2d 437, 441 (1949).

Although *Trammell* is directly adverse to the Petitioners' claims, they question *Trammell* 's continued vitality based on a subsequent amendment to the Texas Constitution, citing article XVI, section 67 of the Texas Constitution and *City of Fort Worth v. Howerton,* 149 Tex. 614, 236 S.W.2d 615, 619 (1951). According to the Petitioners, the cited authority negates legislative authority to abolish HMEPS because under section 67(c), if the Legislature were to abolish the pension system (as opposed to merely amending the statute), it would be required to pass a law authorizing the City to elect to establish a pension system for its municipal employees. *See*Tex. Const. Art. Xvi , § 67 (c). Per *Howerton,* if the City so elected, any subsequently established pension fund would no longer be subject to legislative control. *See Howerton,* 236 S.W.2d at 619 (if city adopts a pension fund pursuant to constitutional authority, the Legislature is not authorized to change the plan without the city's consent).

Obviously, certain contingencies must occur before an interest could be said to be fixed and unalterable by the Legislature as contemplated in *Howerton* ; the main ones being that the Legislature would have to abolish the pension system and the City would have to elect to establish a pension fund. Perhaps the City would elect to do so if given the opportunity, but even if the City were to establish its own pension system, the Petitioners cite no limit on the City's authority to amend or abolish any such system. Thus, we are not persuaded the cited authority undermines *Trammell* 's core holding that no vested property right exists when a pension fund can be amended or abolished by the governing authority; it makes no difference whether the authority with the power to abolish the pension system is the Legislature or some other entity. The crux of *Trammell* 's analysis is that any right emanating from a mere expectancy is not vested, and the Petitioners have cited no authority elevating their interests in the pension fund beyond a mere expectancy to a constitutional guarantee. We therefore reject the distinction the Petitioners attempt to draw between *Trammell* and the circumstances presented here.[10]



Approaching the matter from a different angle, the Petitioners embrace *Trammell* to the extent it confirms that interests in pension benefits are fixed, and thus vested, when all contingencies to entitlement have occurred. The Petitioners contend that any contingencies to their entitlement to pension benefits were satisfied when they became eligible to retire, even though no

[458 S.W.3d 17]

separation from service occurred under Article 6243h, as interpreted by the pension board. *Trammell,* however, does not support the Petitioners' contention that their retirement interests became fixed at the time of their eligibility for retirement. In fact, *Trammell* does the opposite, expressly holding that the plaintiff, who had already retired and had actually been receiving pension benefits, had no vested right in future installments of the same. Applying *Trammell* 's "direct holding," we conclude that Klumb, McClelland, and Montejano have no vested property right in the retirement benefits at issue.

With regard to the remaining constitutional claims, we observed in *Trammell* that "[i]t is well settled that the mere circumstance that a part of a pension fund is made up by deductions from the agreed compensation of employees does not in itself give the pensioner a vested right in the fund, and does not make it any less a public fund subject to the control of the Legislature."101 S.W.2d at 1012–13. In *Devon v. City of San Antonio,* we relied on *Trammell* in declining to recognize an employee's claimed interest in contributions to a municipal pension fund even though those contributions had been withheld from his wages. We explained there that

> [t]he deductions withheld from [the employee's] wages and paid into the pension fund never belonged to him, but remained public money used for a public purpose. They were not first segregated from the public funds so as to become [the employee's] private property and then paid into the pension fund; rather the deductions were "set aside from one public fund and turned over to another" and are no less public money after the payment into the pension fund than before.

443 S.W.2d 598, 600 (Tex. App.—Waco 1969, writ ref'd) (quoting *Trammell,* 101 S.W.2d at 1013 ); *see also Jud v. City of San Antonio,* 313 S.W.2d 903, 905 (Tex. Civ. App.—Eastland 1958, writ ref'd) (overruling "appellant's contention that he has a vested right in contributions to the pension fund"). The same is true here. Accordingly, we conclude that Gonzalez, Robles, and Pilgrim lack a vested property right in their pension-fund contributions.

Because the Petitioners have no vested rights in the retirement benefits and pension-plan contributions at issue, we hold their pleadings conclusively negate the existence of subject-matter jurisdiction over their constitutional claims.

### III. Conclusion

The Petitioners and the City failed to plead actionable *ultra vires* and constitutional claims against HMEPS and the Trustees. Subject-matter jurisdiction over those claims is therefore lacking as a matter of law. We therefore affirm the court of appeals' judgment.

--------

Notes:

[1] Presently, only the City of Houston meets Article 6243h's population threshold.

[2] Relatedly, the Petitioners and the City complain that the court of appeals erroneously affirmed the exclusion of affidavit evidence pertaining to the Trustees' subjective intent to amend the definition of "employee." With respect to the *ultra vires* claims, the threshold jurisdictional issue boils down to whether the pension board articulated an interpretation of a statutory term


fastcase
Smarter legal research.

or altered it. This is a matter of statutory construction, which is determined as a matter of law considering the statute's plain language. *See, e.g., State v. Shumake,* 199 S.W.3d 279, 284 (Tex. 2006). Consequently, evidence of the Trustees' subjective intent is irrelevant.

[3] The Petitioners and the City also allege that the pension board's definition of "employee" is *ultra vires* because it does not comply with section 401(a) of the Internal Revenue Code (IRC), as required by section 2(x)(2) of Article 6243h. *See* Tex. Rev. Civ. Stat. Ann. Art. 6243h, § 2(x)(2). This argument, which derives support largely from their interpretation of a notice of "proposed rulemaking" the Internal Revenue Service (IRS) issued in November 2011, merits little analysis. *See* 76 FR 69172–01, 69173 & 69184–86 (2011) (stating that key components of the term "governmental plan" in section 414(d) of the IRC are undefined, observing that no regulations interpreting that provision exist, and proposing a "facts and circumstances" balancing test to define an entity's status as an "agency or instrumentality of a State or political subdivision of a State" for purposes of that section). To date the proposed regulations and interpretive guidance have not been adopted by the IRS. Even assuming the Petitioners and the City have correctly interpreted the "proposed rulemaking," an *ultra vires* claim cannot be premised on an alleged conflict with a regulatory scheme that has never been enacted.

[4] By way of example, the Petitioners complain about the board's definition of employee to the extent it includes "a full-time employee of a Texas local government corporation ... controlled by the City" and "employees of any entity controlled, directly or indirectly" by the City. That definition is not inherently inconsistent with the common understanding of the term "employee" as one who "works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." Black's Law Dictionary639 (10th ed. 2014). Thus, reading the terms that comprise the statutory definition of "employee" through the control prism articulated

by the board does not so clearly conflict with the statute as to be *ultra vires.*

[5] Although we are precluded from opining on the accuracy or reasonableness vel non of the pension board's interpretation of the statute, we observe parenthetically that the statute provides a list of ineligible employees to whom the term "employee" might otherwise apply and, in doing so, suggests that the term is amenable to more precise articulation. *See* Tex. Rev. Civ. Stat. Ann. Art. 6243h, § 4. The City has also acknowledged that terms used in the statute may be susceptible to more than one meaning and that the board has discretion to determine the meaning of those words. In multiple "meet and confer" agreements, the City agreed that all words used in those agreements, which included the word "employee," would have the same meaning provided in Article 6243h "as determined by the Board" unless specially defined in the agreement.

[6] Another remedy available to aggrieved parties is using the elective process to alter HMEPS's governing body. *See* Tex. Rev. Civ. Stat. Ann. Art. 6243h, § 2(c) -(d) ; July 2011 MCA § 4.

[7] Although the Legislature has waived a local governmental entity's sovereign immunity to suit for contracts for goods or services, the waiver does not apply here because the meet-and-confer agreement is not a contract for goods or services. *See Zachry Constr. Corp. v. Port of Houston Auth. of Harris Cnty . ,* 449 S.W.3d 98, 106 (Tex. 2014).

[8] Federal equal-protection cases are instructive with regard to equal-protection challenges under the Texas Constitution. *See First Am. Title Ins. Co. v. Combs,* 258 S.W.3d 627, 638 (Tex. 2008).

[9] Petitioners contend that "the refusal to pay earned pensions to eligible former employees or insisting that former employees pay into a pension fund on which they cannot claim a pension cannot be rationally related to preserving a pension fund which has as its purpose to provide pensions for eligible former employees." This argument presupposes eligibility and separation from service, which are matters



reserved to the board's exclusive determination. It is also based on a faulty premise. The pension fund does not have a singular purpose of paying benefits as each member becomes eligible; rather, its principal purpose is to administer the fund for the greatest benefit of all members. That purpose is imperiled if the work force becomes insufficient to subsidize the pension fund for current or future retirees.

[10] A different scenario might be presented if article XVI, section 66 of the Texas Constitution were applicable. That constitutional provision, which was added by amendment in 2003, expressly protects benefits under certain retirement systems from being reduced or otherwise impaired.*See* Tex. Const. Art.XVI, § 66. The guarantees afforded by section 66 are not implicated here because, by a three-to-one margin, City of Houston voters opted to exercise an exemption authorized by that amendment. *See id*. § 66 (h).

--------



**246 S.W.3d 610**
**MONTGOMERY COUNTY, Texas,**
**Petitioner,**
**v.**
**David PARK, Respondent.**
**No. 05-1023.**
<mark>**Supreme Court of Texas.**</mark>
**Argued March 20, 2007.**
**Decided November 30, 2007.**

[246 S.W.3d 611]

John J. Hightower, Brian J. Begle, Patricia L. Hayden, Scott Bounds, Olson & Olson, L.L.P., Houston, TX, for Petitioner.

Charles B. Frye, Lindeman, Alvarado & Frye, P.C., Houston, TX, for Respondent.

[246 S.W.3d 612]

Ramon G. Viada III, Abrams Scott & Bickley, L.L.P., Houston, TX, for Amicus Curiae Texas Association of School Boards Legal Assistance Fund.

Scott Houston, Texas Municipal League, Austin, TX, for Amicus Curiae the Texas Municipal League and the Texas City Attorneys Assoc.

Ben Taylor, Fulbright & Jaworski L.L.P., Dallas, TX, for Amicus Curiae Zachry Construction Corporation.

Chief Justice JEFFERSON delivered the opinion of the Court.

The Texas Whistleblower Act prohibits state and local government employers from taking adverse personnel actions against employees who, in good faith, report violations of law to an appropriate law enforcement authority. TEX. GOV'T CODE §§ 554.001-554.010.[1] We must determine what qualifies as an "adverse" personnel action, as the Act provides no definition. *See id.* § 554.001. We hold that for a personnel action to be adverse within the meaning of the Act, it must be material, and thus

likely to deter a reasonable, similarly situated employee from reporting a violation of the law. *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Because we conclude that David Park did not suffer an adverse personnel action, we reverse the court of appeals' judgment and render judgment for Montgomery County.

**I**
**Background**

Respondent David Park, a patrol lieutenant with the Montgomery County Sheriff's Department, also served as the security coordinator for Montgomery County convention center events. While Montgomery County owns the convention center, many activities there are privately sponsored. As security coordinator for these private events, Park received event sheets from the convention center's director, Don Carpenter, and arranged the hiring of off-duty deputies to provide security. Park conducted these activities from his office in the sheriff's department during regular business hours. He received no additional compensation from either the County or the convention center for coordinating security for these private events.

In the spring of 2002, during a meeting Park attended with County Commissioner Ed Rinehart and others, Rinehart allegedly spoke in graphic sexual terms about Park's administrative assistant and another administrative assistant. Park informed his administrative assistant of Rinehart's remarks, and another meeting attendee informed the other administrative assistant of the same. The two assistants then relayed numerous instances of Rinehart's alleged sexual harassment that occurred over the preceding months. Park reported Rinehart's remark, as well as the administrative assistants' accounts, to the

[246 S.W.3d 613]

sheriff. The County then undertook an investigation. In the midst of that investigation, Rinehart allegedly ordered Carpenter to relieve



Park of his security coordination duties. Those duties were transferred first to the constable's office and then rotated on a monthly basis between the sheriff's and constable's offices.

On October 30, 2002, Park sued Montgomery County, alleging that the County violated the Whistleblower Act by reassigning the security coordinator duties in retaliation for Park's report of Rinehart's comments. The County filed a plea to the jurisdiction and motion for summary judgment, raising no evidence claims and asserting that Park's whistleblower claim failed as a matter of law.[2] The trial court granted the County's motion for summary judgment, and Park appealed.

The court of appeals reversed and remanded, holding that Montgomery County was not entitled to summary judgment on any of the theories advanced. ____ Ark. App. ____, ____ S.W.3d ____, 2005 WL 2667488. We granted Montgomery County's petition for review.[3] 50 Tex. Sup.Ct. J. 218 (Dec. 15, 2006).

## II
## Discussion

The Texas Whistleblower Act bars state and local governments from retaliating against public employees who report violations of law:

(a) A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

(b) In this section, a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:

(1) regulate under or enforce the law alleged to be violated in the report; or

(2) investigate or prosecute a violation of criminal law.

TEX. GOV'T CODE § 554.002. While the Act defines a "personnel action" as "an action that affects a public employee's compensation, promotion, demotion, transfer, work assignment, or performance evaluation," it does not define "adverse," *id*. § 554.001(3), and we have not previously had occasion to address the issue.[4]

[246 S.W.3d 614]

Defining "adverse" in this context—and thus setting the level of protection provided by the Whistleblower Act—requires a careful balancing. By protecting state and local government employees who in good faith report violations of the law, the Act encourages reporting and thus endeavors to reduce unlawful conduct by government entities and employees. Requiring too high a level of adversity would defeat this important purpose. Conversely, setting the standard too low could, as Montgomery County and amici curiae warn, saddle the public with the cost of defending against unmeritorious claims— in terms of litigation expenses and in chilling innocuous personnel actions that an employee may perceive as subjectively adverse.

The United States Supreme Court recently confronted a similar issue, when it determined how serious the harm from an allegedly retaliatory action must be to sustain a claim under the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Noting the importance of "separat[ing] significant from trivial harms"[5] and of "avoid[ing] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings," the Court crafted an objective materiality standard: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of



discrimination." *Id.* at ____, 126 S.Ct. at 2415 (citations and internal quotation marks omitted).

The anti-retaliation provision of Title VII and the Whistleblower Act serve similar purposes, and we think it is appropriate to require plaintiffs to show objective, material harm under both. We therefore adopt the *Burlington* standard with appropriate modifications. We hold that a personnel action is adverse within the meaning of the Whistleblower Act if it would be likely to dissuade a reasonable, similarly situated worker from making a report under the Act. This objective test strikes an appropriate balance between the need to shield whistleblowers (and thereby encourage the reporting of governmental lawbreaking) and the need to protect government employers from baseless suits, and, in addition, provides lower courts with a judicially manageable standard. *Burlington's* materiality requirement is calibrated to allow claims of retaliatory actions "likely to deter" reporting of governmental violations of the law,[6] but to weed out "petty slights [and] minor annoyances." *Id.* Likewise, the "similarly situated, reasonable employee" element bars

[246 S.W.3d 615]

trivial claims arising from personnel actions asserted to be adverse due to a "plaintiff's unusual subjective feelings" while retaining enough flexibility to allow claims arising from the "particular circumstances" of a challenged action. *Id.* at ____, 126 S.Ct. at 2415 (noting that "an act that would be immaterial in some situations is material in others" and that, for example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children" (citations and internal quotation marks omitted)).[7]

Whether a challenged action is adverse within the meaning of the Act is generally a question of law, and while the fact finder must decide disputed issues of predicate fact, there are no such issues here. Thus, having articulated the standard for an adverse personnel action under the Act, we must now determine whether there is evidence that Park suffered such an action here. While we take as true all evidence favorable to Park, indulging every reasonable inference and resolving any doubts in his favor, *Provident Life & Accident Insurance Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003), it is clear from the record that the changes to Park's security coordinator responsibilities do not constitute an adverse personnel decision within the meaning of the Whistleblower Act.

It is conceivable that, in some instances, the ability to assign extra jobs could be of such importance to a law enforcement officer that the loss of this authority may be materially adverse, but the *Burlington* standard must be applied to the circumstances presented. *See Burlington,* 548 U.S. at ____, 126 S.Ct. at 2416 ("An act that would be immaterial in some situations is material in others." (citations and internal quotation marks omitted)). Park does not argue that the loss of his security coordination responsibilities affected his prestige, opportunity for advancement in the department, or the difficulty of his work conditions.[8] Further, the challenged action neither reduced Park's pay for his core job duties nor generally precluded him from obtaining outside employment. Because the effects of a challenged action must be considered as a whole and in light of all the circumstances, though, the presence or absence of any one of these factors is not dispositive, and Park does argue that as security coordinator he had the ability to assign himself extra jobs at the convention center events, and thus that the bimonthly transfer of those duties adversely affected his compensation. There is, however, no evidence that losing the first choice of extra jobs at the convention center actually reduced Park's earnings.

Park received no extra salary as security coordinator, and he has not shown that the position allowed him to work more extra jobs than he would have without it. Had extra jobs been scarce, the ability to control one source of them might have been the difference between getting extra



[246 S.W.3d 616]

work and not. Here, however, even after losing the first choice of convention center jobs, Park assumed that he would be able to find outside work if he wished. There is, then, no evidence that the ability to assign himself convention center jobs actually increased Park's access to extra work and, thus, indirectly, his compensation.[9] Finally, we note that the loss of Park's coordinating duties stands in stark contrast to the reassignment from forklift operator to track laborer and unpaid thirty-seven day suspension, albeit with subsequent back pay awarded through internal grievance procedures, suffered by the complaining worker in *Burlington. Burlington,* 548 U.S. at ____, 126 S.Ct. at 2416. Therefore, applying the objective standard we announce today, we conclude that Park's loss of the first choice of convention center jobs would not, as a matter of law, be likely to deter a similarly situated, reasonable employee from reporting a violation of the law, and was thus not materially adverse.

### III
### Conclusion

Because we hold that Montgomery County did not violate the Whistleblower Act as a matter of law, the County is entitled to judgment. *See State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993). We reverse the court of appeals' judgment and render judgment for Montgomery County. TEX.R.APP. P. 60.2(c).

---------------

Notes:

1. Instead of creating a general whistleblower law, the Legislature enacted several employee-specific whistleblower statutes. *See, e.g.,* TEX. AGRIC. CODE § 125.013(b) (protecting agricultural laborers from retaliation for reporting violations under the Agricultural Hazard Communication Act); TEX. GOV'T CODE § 554.002(a) (protecting public employees who report government violations of the law from retaliation); TEX.

HEALTH & SAFETY CODE § 242.133(b) (protecting nursing home workers who report the abuse of home residents); *see also Ed Rachal Found. v. D'Unger,* 207 S.W.3d 330, 331 (Tex.2006) (noting the Legislature's decision not to enact a single, comprehensive whistleblower statute); *Austin v. HealthTrust, Inc.—The Hosp. Co.,* 967 S.W.2d 400, 402 (Tex. 1998) (detailing the various whistleblower statutes). We refer to the particular whistleblower statute which protects public employees from government retaliation as "the Whistleblower Act" or "the Act." TEX. GOV'T CODE §§ 554.001-554.010.

2. In its motion for summary judgment, the County also asserted that Park's claim failed because: (1) it was barred due to governmental immunity; (2) there was no evidence that the alleged violation was committed by a public employee or employing governmental entity; and (3) there was no evidence that Park reported a violation of law to an appropriate law enforcement official. Because the Whistleblower Act contains a specific waiver of immunity, Park's claim is not barred. TEX. GOV'T CODE § 554.0035. In light of our holding that Park did not suffer an adverse personnel action within the meaning of the Act, we do not reach Montgomery County's remaining issues.

3. The Texas Municipal League and Texas City Attorneys Association, the Texas Association of School Boards Legal Assistance Fund, and Zachry Construction Corporation and H.B. Zachry Company submitted amicus curiae briefs.

4. The Legislature substituted the phrase "take other adverse personnel action" for "discriminate" as part of a 1995 amendment to the Act. Act of May 25, 1995, 74th Leg., R.S., ch. 721, § 2, 1995 Tex. Gen. Laws 3812.

5. As the Court notes, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at ____, 126 S.Ct. at 2415. The same is true of a government employee's decision to report a violation of law under the Whistleblower Act.



6. We note that the challenged personnel action need not have likely dissuaded a reasonable employee from making the report at issue in a particular case, but rather any report covered by the Whistleblower Act. To interpret the standard otherwise would lead to the odd result that the more serious the violation alleged in the report (and thus the greater the impetus to report), the more severe the retaliatory action an employer could engage in without giving rise to a claim under the Act. *See Burlington,* 548 U.S. at ___, 126 S.Ct. at 2415; *see also id.* at ___, 126 S.Ct. at 2420 (Alito, J., concurring)(arguing that affording complaining employees a degree of protection inverse to the severity of the underlying discrimination would be "perverse").

7. For this reason, we have added "similarly situated" to the language used in *Burlington* to emphasize that while an employee's subjective feelings are not considered, the objective circumstances of his or her case must be taken into account.

8. The summary judgment evidence included the following colloquy regarding the benefits of the security coordinator position from Park's deposition:

[Montgomery County's Attorney]: Let me ask you one more time to make sure I understand. The only benefit that you consider yourself — extra benefit you consider yourself to have had from being the coordinator of security was the right to take first pick of security jobs at the convention center?

[Park]: That would be accurate, yes.

9. Because we hold that Park has not demonstrated a loss of income as a result of the removal of his security coordinator duties, we do not reach the question of whether Park's earnings as a security officer for third parties constitute compensation within the meaning of the Whistleblower Act. Similarly, although Park also alleges that losing the first choice of convention center jobs adversely affected his work assignment, we do not address whether, for the purposes of the Act, work assignment can include

outside employment — assuming without deciding that it can, the loss is nonetheless not materially adverse. Although Park may no longer be able to guarantee himself extra jobs that he personally finds particularly desirable, purely subjective adversity does not satisfy the *Burlington* standard, and there is no evidence that Park has lost access to objectively equivalent extra work.

---------------



**147 S.W.3d 609**
**Wayne SCOTT and Gary Johnson,**
**Appellants,**
**v.**
**Charles GODWIN, Appellee.**
**No. 13-02-096-CV.**
**Court of Appeals of Texas, Corpus Christi-**
**Edinburg.**
**August 31, 2004.**

[147 S.W.3d 613]

Demetri Anastasiadis, Austin, for Appellants.

Kathleen L. Day, Corpus Christi, for Appellee.

Before Justices HINOJOSA, YAÑEZ, and CASTILLO.

**OPINION**

Opinion by Justice YAÑEZ.

Appellants, Wayne Scott and Gary Johnson, bring this interlocutory appeal from the trial court's orders denying their motions for summary judgment. Charles Godwin, appellee and cross-appellant, filed suit against appellants in their individual capacities alleging First Amendment violations under 42 U.S.C. § 1983, and against cross-appellee, the Texas Department of Criminal Justice ("TDCJ"), alleging violation of the Whistleblower Act. Appellants each moved for summary judgment, contending they were protected by qualified immunity. TDCJ filed a plea to the jurisdiction

[147 S.W.3d 614]

in the trial court. The trial court denied both motions for summary judgment and sustained TDCJ's plea to the jurisdiction. We affirm in part and reverse and remand in part.

A. BACKGROUND

Charles Godwin was the Director of Training for the Institutional Division of the Texas Department of Criminal Justice ("TDCJ-ID") from July 1994 to March 2000. In this capacity,

he was responsible for supervising the training of over 125,000 correctional officers.

In the Spring of 1999, Gary Johnson, the Director of TDCJ-ID, Edward Owens, the Deputy Director for Support Services and Godwin's immediate supervisor, and Godwin met to discuss the creation of a committee to overhaul the TDCJ-ID Training Department after: (1) the TDCJ-ID administration determined that the morale in the Training Department was low; (2) the Training Department had difficulty recruiting training sergeants; (3) an internal audit concluded that the Training Academy underutilized its existing staff and recommended a job staffing analysis; and (4) Godwin complained that he did not have enough training staff. The committee, comprised of people from a number of different departments within the agency, examined ways to enhance training to improve the safety of staff, offenders, and the public. The committee issued a draft report that summarized its findings and scheduled a meeting for January 12, 2000 to finalize recommendations to be submitted to the TDCJ-ID administration for review, approval, and possible implementation.

In December 1999, correctional officer Daniel Nagle was killed during an inmate takeover at the McConnell Unit in Beeville, Texas. In response to this incident, TDCJ officials advised the public that there was "no threat to security" and "no threat to officer safety and offender safety." Godwin strongly disagreed with these statements and wrote a letter to then Governor George W. Bush on January 12, 2000, communicating his belief that the incidents at the McConnell Unit were the direct result of dangerous trends in security over the past several years, as a result of misuse of public funds, malfeasance, and corruption. On January 14, 2000, the Corpus Christi Caller Times printed a story with the headline "Prison Officials Should Resign, Training Chief Says." In this article, Godwin called for the resignation of TDCJ's administrators and the members of the Texas Board of Criminal Justice. On February 7, 2000, Godwin wrote a letter reiterating his complaints to Ronnie Earle, the Travis County District



Attorney, and sent copies of this letter to the State Auditor, United States District Judge William Wayne Justice, and Godwin's attorney. On February 28, 2000, Godwin sent a letter to the members of the Texas Legislature outlining his concerns for correctional officer safety.

In March 2000, Mac Stringfellow, the Chairman of the Texas Board of Criminal Justice, requested a performance review of Godwin from Wayne Scott, TDCJ's Executive Director. On March 10, 2000, Scott, based on the recommendations of Gary Johnson and Edward Owens, transferred Godwin from his position as Director of Training to a newly created position of Director of the Job Development Network at TDCJ, with no loss of pay or benefits.

Godwin filed suit against appellants in their individual capacities, alleging First Amendment violations under 42 U.S.C. § 1983. Appellants each moved for summary judgment, contending they were protected by qualified immunity. The trial court denied both motions. Godwin also filed suit against the TDCJ alleging violation

[147 S.W.3d 615]

of the Texas Whistleblower Act. TDCJ filed a Plea to the Jurisdiction which the trial court sustained. From these orders, both appellants and Godwin appeal.

### B. JURISDICTION

Generally, we do not have jurisdiction over appeals from interlocutory orders because under Texas procedure, appeals are allowed only from final orders or judgments. *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992). Unless a statute specifically authorizes an interlocutory appeal, Texas appellate courts have jurisdiction only over final judgments. *Cherokee Water Co. v. Ross,* 698 S.W.2d 363, 365 (Tex.1985) (orig.proceeding).

Section 51.014(a)(5) of the Texas Civil Practice and Remedies Code expressly allows for an appeal from an order that denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(5) (Vernon Supp.2004). Section 51.014(a)(8) allows for an appeal from an order that grants or denies a plea to the jurisdiction by a governmental unit. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(8) (Vernon Supp.2004). Thus, because appellants, TDCJ employees, base their motion for summary judgment on immunity, and the TDCJ is a governmental unit, we have jurisdiction over this interlocutory appeal. *See Mission Consol. Indep. Sch. Dist. v. Flores,* 39 S.W.3d 674, 675 (Tex.App.-Corpus Christi 2001, no pet.); *City of Harlingen v. Vega,* 951 S.W.2d 25, 27 (Tex.App.-Corpus Christi 1997, no writ).

### C. SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

Summary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery, *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997), or pleads and conclusively establishes each element of an affirmative defense. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor. *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997).

When federal claims are litigated in state court, litigants are entitled to the full benefit of federal law. *Lewis v. Guerrero,* 978 S.W.2d 689, 692 (Tex.App.-Corpus Christi 1998, no pet.).

The question of qualified immunity must be addressed as a threshold issue because this issue determines a defendant's immunity from suit, that is, his or her ability to avoid a trial altogether, rather than merely his or her immunity from damages. *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993). Qualified immunity is an immunity from suit available to government



officials sued in their individual capacities under section 1983.[1] *Scott v. Britton,* 16 S.W.3d 173, 180 (Tex.App.-Houston [1st Dist.] 2000, no pet.); *Lewis,* 978 S.W.2d at 693; *see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Government officials performing

[147 S.W.3d 616]

discretionary functions have qualified immunity from liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Scott,* 16 S.W.3d at 180. Once the defendant official pleads good faith and demonstrates that the challenged actions occurred in the context of discretionary authority, the burden shifts to the plaintiff to rebut this defense. *See Carrera v. Yepez,* 6 S.W.3d 654, 661 (Tex.App.-El Paso 1999, pet. dism'd w.o.j.); *see also Haynes v. City of Beaumont,* 35 S.W.3d 166, 176 (Tex.App.-Texarkana 2000, no pet.).

When a defendant has moved for summary judgment based on qualified immunity, a plaintiff must present concrete evidence to support the allegation of retaliation to survive the motion. *Gerhart v. Hayes,* 201 F.3d 646, 650 (5th Cir.2000). In conducting a qualified immunity analysis, the reviewing court first determines whether the plaintiff has alleged a violation of a clearly established constitutional right. *See Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Wooley v. City of Baton Rouge,* 211 F.3d 913, 919 (5th Cir.2000). If the court determines that the plaintiff has alleged a violation of a clearly established constitutional right, the next step is to determine whether the official's conduct was objectively reasonable at the time of the incident. *Sanchez v. Swyden,* 139 F.3d 464, 467 (5th Cir.1998); *Mangieri v. Clifton,* 29 F.3d 1012, 1016 (5th Cir.1994).

In the instant case, both Scott and Johnson asserted the defense of qualified immunity in their respective motions for summary judgment.

It is undisputed that each was a governmental official. The summary judgment evidence established that Johnson's decision to recommend a transfer and Scott's decision to transfer Godwin involved the exercise of discretion. As such, the burden shifts to Godwin to rebut Scott and Johnson's qualified immunity defense.

1. *Clearly Established Right*

Our first inquiry is whether the law was clearly established in 2000 that transferring or demoting an employee following the publication of allegations involving official misconduct would violate the employee's First Amendment rights to free speech." `Clearly established' for purposes of qualified immunity means that [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *United States v. Lanier,* 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). The law in force at the time of the violation must outline the contours of the rights allegedly violated, or else qualified immunity would give public officials little protection. *See Anderson v. Creighton,* 483 U.S. 635, 638-40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). But, "this is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.* at 640.

An employee's First Amendment retaliation claim under 42 U.S.C. § 1983 has four elements: (1) an adverse employment action; (2) speech involving a matter of public concern; (3) the employee's interest in commenting on matters of public concern outweighs the employer's interest in efficiency; and (4) the speech must have motivated the adverse employment action. *Serna v. City of San Antonio,* 244 F.3d 479, 482 (5th Cir.2001).

a. *Adverse Employment Action*

A transfer, even without an accompanying cut in pay or other tangible



[147 S.W.3d 617]

benefits, may constitute an adverse employment action under 42 U.S.C. § 1983. The Fifth Circuit has held that "[i]t is now well established that, for purposes of a § 1983 retaliation claim, an adverse employment action can include a transfer, because it may serve as a demotion." *Sharp v. City of Houston,* 164 F.3d 923, 933 (5th Cir.1999). According to Fifth Circuit caselaw, "to be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Id.* (citing *Forsyth v. City of Dallas,* 91 F.3d 769, 774 (5th Cir.1996); *Click v. Copeland,* 970 F.2d 106, 109 (5th Cir.1992)).

In *Sharp,* the court held that the jury was entitled to find that transferring a police officer from the "elite" mounted patrol division to a teaching position at the academy was an adverse employment action. *Sharp,* 164 F.3d at 933. Although the transfer did not involve a decrease in pay, title, or grade, it could be viewed, objectively, as a demotion because the academy position was "less prestigious" than the position in the "elite" mounted patrol division. *Id.* In *Forsyth,* transferring police officers from positions in the intelligence unit to night patrol positions, with different duties involving less interesting work, less responsibility, and less prestige, was an adverse employment action in light of evidence that the department had transferred officers to night patrol in the past as a form of discipline. *Forsyth,* 91 F.3d at 774. In *Click,* transferring two deputy sheriffs from the county's law enforcement section to positions as jail guards could be considered adverse employment actions, in light of evidence that the jail guard positions were much less desirable. *Click,* 970 F.2d at 110.

This line of cases does not support the proposition that every job transfer without a decrease in salary is necessarily a demotion, simply because it occurs following a plaintiff's exercise of protected speech. A plaintiff's personal

preferences and subjective perception that a demotion has occurred is not enough. *See Forsyth,* 91 F.3d at 774. The employee must show the transfer makes the job "objectively worse." *See Serna,* 244 F.3d at 485.

In the present case, Godwin's summary judgment evidence revealed that the position of Director of Training for the TDCJ-ID was a more responsible, prestigious, and interesting position than the Director of the Job Development Network. The Director of the Job Development Network is not involved in personnel decisions, such as the decision to hire, promote, counsel, and discipline employees. As the Director of Training, Godwin performed all these functions. Godwin no longer has authority to issue internal policies and procedures. The Director of Training has final approval over the Training Department's Standard Operating Procedures Manual. The Director of Training also has varied challenges each day, including overseeing multiple training operations in multiple locations, as well as directing administrative support, curriculum development, and human resources for the department. The Director of the Job Development Network develops action plans to identify employment opportunities for ex-offenders. We conclude the summary judgment evidence, when viewed objectively, raises a material issue of fact regarding whether appellants' actions in transferring Godwin constituted an adverse employment action.

b. *Matter of Public Concern*

Retaliation for an employee's speech is actionable under Section 1983

[147 S.W.3d 618]

only if the speech addressed a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the record as a whole. *Id.* at 147-48, 103 S.Ct. 1684. Whether Godwin spoke on a matter of



public concern is a question of law. *See Rankin v. McPherson,* 483 U.S. 378, 386 n. 9, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

Exposure of official misconduct is generally of great consequence to the public. *Branton v. City of Dallas,* 272 F.3d 730, 740 (5th Cir.2001). "There is perhaps no subset of `matters of public concern' more important, for purposes of First Amendment protection of speech of public employees, than bringing official misconduct to light." *Id.*

Here, Godwin spoke in his capacity as a citizen expressing concerns regarding the dangerous trends in security at prison facilities, as a result of possible misuse of public funds and malfeasance. Godwin explained that the dangerous shortage of correctional officers may be due, in part, to deliberate choices made by TDCJ officials to allow vacant correctional officer positions to remain unfilled, in order to use lapsed salary funds for other purposes. Godwin spoke as an informed citizen at a time when this topic was receiving much media attention following the slaying of officer Nagle. Speech made in the context of ongoing commentary and debate in the press is of concern to the public. *Harris v. Victoria Indep. Sch.Dist.,* 168 F.3d 216, 222-23 (5th Cir.1999). By bringing to light alleged wrongs and abuses by TDCJ officials, Godwin was seeking to improve the quality and safety of the administration. Even though a public employee can make a single statement both as an employee and as a citizen, see *Wilson v. UT Health Ctr.,* 973 F.2d 1263, 1268-70 (5th Cir.1992), Godwin's allegations do not overtly suggest only personal concerns for his job security. Godwin was not under any investigation with regard to officer safety at the detention centers following the death of officer Nagle. Thus, examining the content, context, and form of Godwin's speech, we conclude it involves issues of concern to the public. *See Connick,* 461 U.S. at 147-48, 103 S.Ct. 1684.

c. *Employer's Interest in Efficiency*

In determining the right of a public employee to speak on matters of public concern, the interests that must be balanced are the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In First Amendment cases brought by public employees, the governmental employer has a legitimate interest in terminating employees whose criticisms intrude on workplace harmony that tends to facilitate the efficient operation of government functions. *Warnock v. Pecos County,* 116 F.3d 776, 781 (5th Cir.1997).

In weighing the value of protected speech against the employer's interest in efficiency, the Fifth Circuit generally focuses on three factors: (1) whether the speech was likely to generate controversy and disruption; (2) whether the speech impeded the department's general operation; and (3) whether the speech affected the working relationships necessary to the proper functioning of the administration. *Id.* at 780.

[147 S.W.3d 619]

In the instant case, these factors weigh in favor of a conclusion that Godwin's interest in speaking on matters of public concern outweighs the TDCJ's interest in efficiency because any negative impact that Godwin's speech could have had on the efficiency of the TDCJ was minimal. The summary judgment evidence established no disruption of the training committee. No defense witness testified that Godwin's speech undermined the TDCJ's operations. When asked whether TDCJ continued to operate in a normal fashion, appellant Scott stated, "TDCJ keeps on operating no matter what happens." Further, Godwin's employment relationship with TDCJ is not the kind of close working relationship which requires personal loyalty and confidence for proper functioning. *See, e.g., Sheppard v. Beerman,* 317 F.3d 351, 355 (2d Cir.2003) (relationship between judge and law clerk).



Thus, if the allegations of misconduct are true, such allegations are matters of public concern and outweigh the government's interest in efficiency. *See Teague v. City of Flower Mound,* 179 F.3d 377, 381 (5th Cir.1999); *Brawner v. City of Richardson,* 855 F.2d 187, 191-92 (5th Cir.1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department."); *see also Pickering,* 391 U.S. at 568, 88 S.Ct. 1731 (enforcing code of silence is not legitimate interest because it does not promote efficiency of public services performed by government employees).

#### d. *Protected Speech Motivated Adverse Action*

Godwin's allegations, if believed, support an inference that appellants transferred him in retaliation for publicizing the alleged abuses. Godwin's summary judgment evidence presented favorable employee evaluations. Godwin also points out that he was not being investigated with regard to officer safety at the detention centers following the death of officer Nagle. Whether an employee's protected conduct was a motivating factor in an employer's decision to take action against the employee is a question of fact, ordinarily rendering summary judgment inappropriate. *Branton,* 272 F.3d at 739; *Click,* 970 F.2d at 113.

Thus, indulging every inference in Godwin's favor as the nonmovant, we conclude Godwin's pleadings and summary judgment evidence allege a violation of a clearly established constitutional right. *See Wooley,* 211 F.3d at 919. Godwin has a clearly established right to speak on matters of public concern, *see Denton v. Morgan,* 136 F.3d 1038, 1042 (5th Cir.1998), on matters of public safety, *see Thompson v. City of Starkville,* 901 F.2d 456, 466 (5th Cir.1990), and on matters of official misconduct, *Branton,* 272 F.3d at 740. Further, since 1983, government employers have known that unless their interest in efficiency at the office outweighs the employee's interest in speaking, they cannot take adverse employment

actions against their employees for making statements that relate to the public concern. *Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 377 (5th Cir.2000); *see Connick,* 461 U.S. at 142, 103 S.Ct. 1684. The contours of the right are sufficiently clear that a reasonable public official in March 2000 would have known that retaliating against an employee for exercising his First Amendment rights was prohibited by law. *See Lanier,* 520 U.S. at 270, 117 S.Ct. 1219; *see also Kinney v. Weaver,* 301 F.3d 253, 279 (5th Cir.2002).

[147 S.W.3d 620]

#### 2. *Legal Objectiveness*

The objective reasonableness of the official's conduct is measured by the clearly established right at the time of the incident. *See Sanchez,* 139 F.3d at 467; *Mangieri,* 29 F.3d at 1016. Where reasonable public officials could differ on the lawfulness of the official's actions, the official is entitled to qualified immunity. *Johnston v. City of Houston,* 14 F.3d 1056, 1059 (5th Cir.1994). The objective reasonableness of the public officials' actions is a matter of law for the court to determine; however, the underlying historical facts precipitating the alleged conduct are material to reasonableness. *Mangieri,* 29 F.3d at 1015-16.

Here, Godwin has presented a fact issue sufficient to survive summary judgment as to whether appellants acted in an objectively reasonable manner in light of Godwin's clearly established rights. As discussed above, we have concluded that issues of fact remain regarding whether appellants' action in transferring Godwin constituted an adverse employment action and whether appellants' action was motivated by Godwin's exercise of his right to free speech.

Thus, viewing the facts presented in the light most favorable to Godwin, we conclude he has alleged a violation of a clearly established right and also raised fact issues as to whether appellants acted in an objectively reasonable manner in light of Godwin's clearly established



rights. Therefore, it follows that the trial court properly denied appellants' motions for summary judgment based on qualified immunity. We overrule appellants' issues. Accordingly, we affirm the trial court's orders denying appellants' motions for summary judgment.

## D. PLEA TO THE JURISDICTION

By his cross-appeal, Godwin generally contends the trial court erred in sustaining TDCJ's plea to the jurisdiction and dismissing his whistleblower claim. Specifically, Godwin alleges he was employed by the State and his employment was adversely affected because he made a report of a violation of law, in good faith, to an appropriate law enforcement authority. The trial court sustained TDCJ's plea to the jurisdiction on the basis that Godwin failed to report a violation of law to a proper law enforcement authority.

A plea to the jurisdiction challenges a court's authority to hear a case by alleging that the factual allegations in the plaintiff's pleadings, when taken as true, fail to invoke the court's jurisdiction. *Bybee v. Fireman's Fund Ins. Co.,* 160 Tex. 429, 331 S.W.2d 910, 917 (1960). The plaintiff bears the burden of alleging facts affirmatively demonstrating the trial court's jurisdiction to hear a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993); *Flores,* 39 S.W.3d at 676. To successfully challenge at the pre-trial stage a trial court's subject-matter jurisdiction to hear a plaintiff's claim, the defendant must prove either that (1) the plaintiff's pleadings, taken as true, affirmatively establish that the court does not have subject matter jurisdiction, or (2) the plaintiff has pleaded fraudulently or in bad faith with the purpose of conferring jurisdiction where, under the true facts, the court would not have it. *Flores,* 39 S.W.3d at 676.

### 1. *Standard of Review*

We review a trial court's ruling on a plea to the jurisdiction *de novo* because subject matter jurisdiction is a question of law. *See Mayhew v.*

*Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998). In reviewing a trial court's ruling on a plea

[147 S.W.3d 621]

to the jurisdiction, we do not look to the merits of the plaintiff's case. *Tex. Bd. of Pardons & Paroles v. Feinblatt,* 82 S.W.3d 513, 517 (Tex.App.-Austin 2002, pet. denied). Instead, we construe the pleadings in favor of the plaintiff, look to the plaintiff's intent, and accept the pleadings' factual allegations as true. *See County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002). Pleadings relevant to a review of a plea to the jurisdiction include amended petitions and responses filed in connection with the plea. *Janik v. Lamar Consol. Indep. Sch. Dist.,* 961 S.W.2d 322, 324 (Tex.App.-Houston [1st Dist.] 1997, pet. denied). We may also consider evidence necessary to resolve the jurisdictional issues raised. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 555 (Tex.2000).

When a plaintiff fails to plead facts that establish jurisdiction, but the petition does not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend. *Brown,* 80 S.W.3d at 555. On the other hand, if the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id.*

### 2. *Analysis*

The Texas Whistleblower Act prohibits a state or local governmental entity from suspending, terminating, or taking other adverse personnel action against a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority. Tex. Gov't Code Ann. § 554.002(a)(Vernon Supp.2004). The Whistleblower Act is designed to enhance openness in government and compel the government's compliance with the law by



protecting those who inform authorities of wrongdoing. *Castaneda v. Tex. Dep't of Agriculture,* 831 S.W.2d 501, 503 (Tex.App.-Corpus Christi 1992, writ denied). Because the Whistleblower Act is remedial in nature, it should be liberally construed to effect its purpose. *Id.*

The cause of action created by the Whistleblower Act is purely statutory. Thus, to plead a claim under the Whistleblower Act, Godwin must allege the existence of each of the following elements: (1) he is a public employee; (2) he acted in good faith in making his report; (3) the report involved a violation of law; (4) the report was made to an appropriate law enforcement authority; and (5) he suffered retaliation as a result of making the report. *See* Tex. Gov't Code Ann. § 554.002(a) (Vernon Supp.2004).

In his fourth amended petition, Godwin alleged he was a public employee, employed by the TDCJ, and was demoted within 90 days of reporting to the Governor, the Travis County District Attorney, the State Auditor, and United States District Judge William Wayne Justice what he believed in good faith to be violations of law. The TDCJ contends Godwin did not report a violation of "law" to an "appropriate law enforcement authority."

In his letter to then Governor Bush dated January 12, 2000, Godwin sought to inform Governor Bush of what he believed to be dangerous trends in security in the Texas prison system. Godwin accused TDCJ's administration of deceiving both the Governor and the citizens of Texas by indicating that there was no threat to security in the prison system. According to Godwin, the TDCJ administration placed a low priority on officer training and safety by failing to allocate sufficient resources to the Training Department.

[147 S.W.3d 622]

By subsequent correspondence to the Travis County District Attorney dated February 7, 2000, which was copied to United States District Judge

William Wayne Justice and the State Auditor, Godwin reiterated his concern about the dangerous shortage of correctional officers and its negative effect on existing officer safety. According to Godwin, "[a]vailable documentation indicates the chronic, dangerous shortage of correctional officers may be due, in part, to deliberate choices made by TDCJ officials to allow vacant correctional officer positions to remain unfilled, in order to use lapsed salary funds for other purposes." Godwin explained that he believed the TDCJ administration was intentionally leaving correctional officer positions unfilled, in order to realize a substantial savings from unspent salary money each month. These lapsed salary funds were then used for other departmental needs, such as computer enhancements and payments to counties for housing state prisoners in county jails. This practice, according to Godwin, was a possible violation of the *Ruiz* Final Judgment.[2]

Whether the reported incident was an actual violation of any law is not in issue. We are mindful of our limited role here. Our task is not to determine whether the plaintiff ultimately wins or loses on judicial review; rather, this Court's task is to examine the facts pleaded and to determine whether those facts support jurisdiction in the trial court. *See Univ. of Tex. Med. Branch v. Hohman,* 6 S.W.3d 767, 771 (Tex.App.-Houston [1st Dist.] 1999, pet. dism'd w.o.j.).

Although an employee need not establish an actual violation of law, there must be some law prohibiting the complained of conduct to give rise to a claim under the Whistleblower Act. *Llanes v. Corpus Christi Indep. Sch. Dist.,* 64 S.W.3d 638, 642 (Tex.App.-Corpus Christi 2001, pet. denied). The Whistleblower Act defines "law" to mean: (1) a state or federal statute, (2) an ordinance of a local governmental entity, or (3) a rule adopted under a statute or ordinance. Tex. Gov't Code Ann. § 554.001(1) (Vernon Supp. 2004). Moreover, this Court has interpreted the phrase "reports a violation of the law" to include "any disclosure of information regarding a public servant's employer tending to directly or circumstantially prove the substance of a violation



of criminal or civil law, the State or Federal Constitution, statutes, administrative rules or regulations." *Llanes,* 64 S.W.3d at 642; *Castaneda,* 831 S.W.2d at 503-04.

Here, Godwin's report to the Travis County District Attorney centers on the possible violation of the *Ruiz* Final Judgment, a judicial directive aimed solely at the TDCJ. The *Ruiz* Final Judgment required TDCJ to "employ sufficient trained security and non-security staff to provide for and maintain the security, control, custody, and supervision of prisoners, taking account of the security and custody levels for the prisoner population and the design of [TDCJ]'s facilities." Considering this Court's construction of the phrase "reports a violation of the law," and liberally construing the definition of "law" to effect the remedial purpose of the Whistleblower Act, *see Castaneda,* 831 S.W.2d at 503, we conclude that the *Ruiz* Final Judgment is a law within the meaning of the Whistleblower Act.

Furthermore, a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government

[147 S.W.3d 623]

that the employee in good faith believes is authorized to regulate under or enforce the law alleged to be violated in the report or investigate or prosecute a violation of criminal law. Tex. Gov't Code Ann. § 554.002(b) (Vernon Supp.2004). Judge Justice presided over proceedings resulting in the *Ruiz* Final Judgment. At the time Godwin sent him a copy of the report dated February 7, 2000, Judge Justice had oversight authority to enforce the *Ruiz* Final Judgment. Thus, we conclude Judge Justice is an appropriate law enforcement authority within the meaning of the Whistleblower Act.

Therefore, accepting the factual allegations in Godwin's pleadings as true, we conclude he has pleaded sufficient facts to support jurisdiction in the trial court. Accordingly, Godwin's cross-appeal is sustained.

E. CONCLUSION

We affirm the trial court's orders denying appellants' motions for summary judgment, reverse the trial court's order sustaining TDCJ's plea to the jurisdiction, and remand this cause to the trial court for further proceedings consistent with this opinion.

---------------

Notes:

1. Federal qualified immunity to section 1983 claims is distinct from official immunity to state claims. *See City of Harlingen v. Vega,* 951 S.W.2d 25, 32 (Tex.App.-Corpus Christi 1997, no writ); *see also Robinett v. Carlisle,* 928 S.W.2d 623, 625 (Tex.App.-Fort Worth 1996, writ denied) (trial court erred by applying state law analysis to section 1983 claim).

2. *Ruiz v. Johnson,* 154 F.Supp.2d 975 (S.D.Tex. 2001). Civil Action No. H-78-987, filed in the United States District Court for the Southern District of Texas, Houston Division.

---------------



Page 85

**602 S.W.2d 85**
**30 UCC Rep.Serv. 996**
**SKINNY'S, INC.**
**v.**
**HICKS BROTHERS CONSTRUCTION**
**COMPANY OF ABILENE, INC.**
**No. 5471.**
**Court of Civil Appeals of Texas, Eastland.**
**May 29, 1980.**

Page 87

W. K. Rutledge, Rutledge, Rutledge & Connally, Abilene, for appellant.

William Tippen and Barbara Rollins, Bradbury & Tippen, Paul J. Harris and Lester O. Berg, Abilene, for appellee.

DICKENSON, Justice.

The principal issues are the scope of an oral agreement and the sufficiency of proof as to the amounts due for labor and materials.

The general contractor, Hicks Brothers Construction Company of Abilene, Inc., sued the owner, Skinny's, Inc., for labor and materials furnished plus "contractor's fees" equal to 20% of the actual cost of labor and materials. Hicks Brothers also sought foreclosure of eleven Mechanic's Liens which had been filed in connection with the unpaid, disputed bills. The owner filed a cross-action against the general contractor, and a subcontractor, Binswanger Glass Company, filed a petition in intervention, seeking payment from the general contractor in the sum of $12,546.00 plus attorney fees and also seeking foreclosure on three of the owner's properties in connection with its Mechanic's Liens. Following a nonjury trial, judgment was rendered for the general contractor against the owner for the sum of $176,761.71 plus prejudgment interest of $10,054.76 and attorney fees of $24,000.00; the owner was given an offset of $2,893.00 on its cross-action; the subcontractor was awarded judgment against the

general contractor for the sum of $12,546.00 plus prejudgment interest of $713.58 and attorney fees of $1,000.00; and judgment was rendered against the owner for foreclosure of all fourteen Mechanic's Liens. The owner appeals. We affirm.

The trial court made findings of fact which include the following:

3. On or about April 11, 1978, at Abilene, Taylor County, Texas, Plaintiff and Defendant entered into an oral contract whereby Plaintiff agreed to furnish labor and materials for the construction of improvements upon properties owned by the Defendant.

4. Defendant agreed that Plaintiff was to be paid for the actual cost of the labor used in, subcontracts arranged for and supervised by Plaintiff, and materials purchased for the construction of said improvements and, in addition thereto, 20% of the amount of that cost for contractor's services and overhead.

5. On or about May 10, 1978 Plaintiff began to procure and furnish labor, materials, and subcontractors pursuant to the agreement between the parties and continued performing in accordance with the agreement originally made by the parties until on or about August 16, 1978 when the Defendant refused to pay for such services and asked the Plaintiff to discontinue work.

6. Plaintiff periodically delivered statements to the Defendant showing the actual costs incurred by Plaintiff, plus an amount equal to 20% of said actual costs.

Page 88

7. During the initial period of the performance of the contract, Defendant fully paid the amount shown on the statements so delivered by Plaintiff which included the contractor's services and overhead to that time. On or about August 16, 1978, the Defendant ceased all payment and has since refused to make any payment as demanded by Plaintiff.



8. The improvements that Plaintiff agreed to construct consisted of small grocery stores, generally known as convenience stores, together with attendant retail gasoline pumping facilities. Additionally, Plaintiff was to construct two storage buildings.

9. For use in the construction contract, Plaintiff purchased twenty prefabricated metal buildings which were designed for the purposes of this contract and which are of substantially less value for any purpose other than that contemplated for this contract. Four of these prefabricated metal buildings were erected on the property owned by Defendant. The other sixteen have not been erected. Fourteen are located on the property of Plaintiff. The two for storage buildings are on the property of Defendant.

10. The total cost incurred by Plaintiff for materials purchased under the contract, and for labor used in constructing the improvements, is $407,533.19. Plaintiff is due under the contract an additional $81,506.64, being 20% of the cost of the labor and materials. Plaintiff has received $312,278.12 in payment from the Defendant. The total amount due and owing Plaintiff under the contract is therefore $176,761.71. This amount is just and reasonable and is now due and owing.

11. The paving done on the location at the job site identified as East Highway 80 is defective and Defendant is entitled to a set-off for the repair of such pavement, said set-off being in the amount of $2,893.00.

The owner has briefed eleven points of error, contending first that there is no evidence to support the trial court's finding of an "express contract" for the general contractor to furnish labor and materials for the construction of convenience stores on "numerous properties." In the alternative the owner contends that this finding is against the great weight of the evidence and is manifestly unjust.

The trial court's findings of fact have the same force and dignity as a jury verdict; if supported by any competent evidence, they will not be disturbed on appeal unless they are against the great weight of the evidence. See 4 McDonald, Texas Civil Practice § 16.05 (rev.1971). In testing the court's findings on the complaint that there is no evidence to support them, we will consider only the evidence and inferences which support the findings, disregarding all evidence to the contrary. Brown v. Frontier Theatres, Inc., 369 S.W.2d 299 (Tex.1963). In considering the complaint that these findings are against the great weight of the evidence, we will consider all of the evidence. In re King's Estate, 244 S.W.2d 660 (Tex.1951).

George Hicks, the general contractor's president, testified that he visited Joe Davis, the owner's president, in the early part of 1978 and later submitted a typed proposal to build a 50' X 50' X 12' metal building. The written proposal was not accepted, and Hicks refigured the building, using the dimensions of 40' X 60' X 12'. At this time Hicks said that Davis talked with him about them starting to do the work on a "cost plus 20%" basis. Hicks said there was no change in this arrangement until they quit work. The general contractor worked on seventeen different locations, and it furnished labor and equipment. It also arranged for subcontractors who looked to the general contractor for payment.

Hicks also testified that the first three invoices included the "20% fee for contractor's services." One of the invoices was revised by Charley Guernsey, the owner's treasurer, and he applied the 20% figure to the invoice. The fourth billing was on August

Page 89

14, 1978. The owner paid the actual costs of this billing (except for one disputed item which was postponed by agreement), but the owner deducted the 20% fee for contractor's services. Several metal buildings had been charged to the owner at the actual wholesale cost paid by the general contractor, and a dispute developed as to whether the 20% fee should be added to the cost of these buildings. At this point all work ceased.



On cross-examination Hicks testified that the owner's people "almost daily came up with a new location or a new project that they wanted done." He considered that his company was the general contractor on those jobs, and they did brick work, carpentry, ceiling work, floor tile and glass work at various locations. They also arranged for various subcontractors. Hicks testified that they had a "continual-type agreement" and that they "went from one job to the next with understanding we were to take care of the work for them."

Joe Davis, the owner's president, testified that he employed Hicks Brothers on a basis of "ten and ten, meaning that we would pay them 10% as overhead and 10% as profit." He said that he did not agree to pay 20% extra for the buildings which he ordered. On cross-examination Davis said "they went as I told them to go."

We hold that there is evidence to support the trial court's findings 3, 4, 5, 6, 7 and 8, as quoted above. We also hold that those findings are not against the great weight of the evidence.

Appellant's next contentions are that the trial court erred in the admission of certain "business records" and that the evidence is legally and factually insufficient to support the finding that the owner is indebted to the general contractor in the sum of $176,761.71. These contentions are overruled.

If certain business records were improperly admitted, we must presume that the trial judge considered only the admissible evidence in this nonjury trial. Victory v. State, 158 S.W.2d 760, at 765 (Tex.1942); 4 McDonald, Texas Civil Practice § 16.04 (rev.1971).

George Hicks and Sherry Hicks testified as to the methods which were used by the general contractor in keeping its business records. The "job cost sheets" were based upon the daily "foreman's reports." The job cost sheets were properly admitted under Tex.Rev.Civ.Stat.Ann. art. 3737e (Vernon Supp. 1980). There was

testimony that these records were made in the regular course of business, that the charges were verified by the various job foremen who had personal knowledge of the charges, and that the entries were made near the time of the work or reasonably soon thereafter. While some of the entries were cryptic, the objection goes to the weight of the evidence and not to its admissibility. As our Supreme Court stated in Black Lake Pipe Line Company v. Union Construction Company, Inc., 538 S.W.2d 80, at 93 (Tex.1976):

(I)t is for the trial court in the exercise of its discretion to determine whether the opposing party had an adequate opportunity to examine the records.

The evidence is conflicting as to the opportunity afforded for examining these records prior to trial, and we must defer to the trial court on this point.

Appellant's next contentions concern the thirteen metal buildings which the trial court's judgment states ". . . now in the possession of Plaintiff (general contractor) are the property of the Defendant (owner) and are to be delivered to the Defendant (owner) when this judgment is fully satisfied." One point argues that the trial court erred in allowing the general contractor to retain possession of these buildings until the judgment is satisfied. Another point claims that the general contractor converted these buildings to its own use and that it owes the owner for the value of those buildings. These points are overruled.

Tex.Bus. & Com.Code Ann. § 2.703 (Vernon 1968) provides that where the buyer fails to make a payment due on or before delivery, the seller may withhold delivery of the goods. Consequently, there was no conversion.

Page 90

Appellant's next contentions concern the sufficiency of proof as to the Mechanic's Liens. These points of error are overruled. The objection to the liens at the trial court was that "the



affidavits do not comply with the requirements of the statutes, which requires a statement of the kinds of work done or the materials furnished, which is not in any of those affidavits."

Tex.Rev.Civ.Stat.Ann. art. 5455 (Vernon Supp. 1980), concerning liens for mechanics, contractors and material men, now provides that a general statement of the kind of work done or material furnished is sufficient and that:

It shall not be necessary to set forth the individual items of work done or material furnished or specially fabricated. Any abbreviations or symbols customary in the trade may be used.

These liens were sufficient to comply with Article 5455, supra. See Matthews Construction Company, Inc. v. Jasper Housing Construction Co., 528 S.W.2d 323, at 329 (Tex.Civ.App. Beaumont 1975, writ ref'd n. r. e.).

For the first time on appeal, the owner claims that there was no evidence of mailing copies of the lien affidavits to the owner by certified mail in compliance with Tex.Rev.Civ.Stat.Ann. art. 5453 (Vernon Supp. 1980). This was not the basis of the objection when the liens were introduced into evidence. Tex.R.Civ.P. 324 now requires a motion for new trial to present a complaint which has not otherwise been ruled upon by the trial court. If this objection had been made at trial, the general contractor and the subcontractor would have been afforded the opportunity of proving the notice, as alleged in their pleadings.

The owner relies on Bunch Electric Company v. Tex-Craft Builders, Inc., 480 S.W.2d 42, at 46 (Tex.Civ.App. Tyler 1972, no writ), which stated:

Appellant failed to offer any proof showing the notice of the claim was sent by certified or registered mail. . . . Having failed to offer proof showing the notice was mailed . . . , appellant failed to establish the existence of a cause of action . . . .

While we have been unable to find any case directly in point, and have been cited none, we have concluded that Rule 93(m) has no application to the facts presented here.

Bunch Electric is distinguishable on its facts, for it concerned the requirements of Tex.Rev.Civ.Stat.Ann. art. 5160 (Vernon 1971), rather than Article 5453, supra. We decline to follow its rationale, and we hold that Tex.R.Civ.P. 54 is applicable and that the general contractor and the subcontractor were required to prove only such conditions precedent as were specifically denied by the owner. See Continental Contractors, Inc. v. Thorup, 578 S.W.2d 864, at 866 (Tex.Civ.App. Houston (1st Dist.) 1979, no writ).

The last point of error deals with attorney fees. It has been considered and is overruled.

The judgment of the trial court is affirmed.



**290 S.W.3d 876**
**The STATE of Texas and the Texas Department of Transportation, Petitioners,**
**v.**
**George LUECK, Respondent.**
**No. 06-1034.**
**Supreme Court of Texas.**
**Argued November 12, 2008.**
**Decided June 26, 2009.**
**Rehearing Denied August 28, 2009.**

[290 S.W.3d 878]

Walter C. Brocato, Office of Attorney General, Kristina Weber Silcocks, Office of the Attorney General, Greg W. Abbott, Attorney General of Texas, Kent C. Sullivan, First Assistant Attorney General, Edward D. Burbach, Gardere Wynne Sewell LLP, Rafael Edward Cruz, Office of Attorney General, David S. Morales, Office of the Attorney General, Austin, TX, Ryan D. Clinton, Hankinson Levinger, Dallas, TX, for Petitioner.

Gregory C. Douglass, Gregory C. Douglass, P.C., Austin, TX, for Respondent.

Justice GREEN delivered the opinion of the Court.

Under the Texas Whistleblower Act, sovereign immunity is waived when a public employee alleges a violation of Chapter 554 of the Government Code. TEX. GOV'T CODE § 554.0035. A violation under Chapter 554 occurs when a governmental entity retaliates against a public employee for making a good-faith report of a violation of law to an appropriate law enforcement authority. *Id.* § 554.002(a). George Lueck was fired from the Texas Department of Transportation (TxDOT) after he sent an e-mail to the director of the Transportation Planning and Programming Division, reporting what he believed to be violations of state and federal law. Lueck then sued the State of Texas and TxDOT under the Whistleblower Act, alleging that he "was fired because of his good faith reports of TxDOT's violation of state and federal law." We hold that, because Lueck's e-mail report only

warned of regulatory non-compliance, not a violation of law, and because an agency supervisor is not an appropriate law enforcement authority to whom a report should be made, Lueck's allegation affirmatively negates the court's subject-matter jurisdiction over the cause. The State's sovereign immunity is not waived, and thus, we reverse the court of appeals' judgment and dismiss the case for lack of subject-matter jurisdiction.

[290 S.W.3d 879]

I

A 1995 Federal Highway Administration report concluded that Texas's system for collecting, analyzing, and reporting traffic data violated federal standards. In 1999, the State contracted with a private vendor, Cooper Consulting Company, to upgrade TxDOT's computers and develop software for a replacement system, called the Statewide Traffic Analysis and Reporting System ("STARS"). As the Assistant Director of TxDOT's Traffic Analysis Section, Lueck was responsible for the daily management of the STARS program. Three years into the implementation project, the state auditor began investigating a Cooper invoice that was left undisputed by TxDOT, charging the State $350,783. The charge was initially described by Cooper as both a contingency fee and a "Project Work Plan," but the vice president for Cooper later admitted that a "Project Work Plan" was worth no more than $75,000. TxDOT then requested a cost breakdown of the charge, which Cooper ultimately characterized as "payment smoothing."

Later, James Randall, the Director of the Transportation Planning and Programming Division at TxDOT, suspended all work on the STARS project, and advised Cooper that the State would no longer pay for work that was not previously approved by TxDOT. Cooper's lawyers then sent a demand letter, notifying TxDOT that Cooper would terminate its contract if the state failed to pay the disputed charge within thirty days. A day after the letter was sent, Lueck sent



Randall an e-mail entitled "STARS Contract." In the e-mail, Lueck informed Randall that the Traffic Division urged "an immediate positive response and resolution" of Cooper's demand letter. In numbered format, he outlined five reasons why he believed TxDOT should resolve the dispute with Cooper, rather than cancel the contract. The e-mail warned that without the STARS system, TxDOT "is not capable of handling this data and will, therefore, never be in compliance." Lueck recommended that Randall have the e-mail "readily available" when discussing the implications of the Cooper demand letter with the TxDOT Administration and Contract Services Division. Thereafter, TxDOT informed Cooper that it would not pay the payment smoothing charge and accepted termination of Cooper's contract. TxDOT then fired Lueck on the basis that Lueck's attempt to justify the $350,783 charge, despite his knowledge that the charge was only worth a fraction of that cost, evidenced his own negligence and lack of trustworthiness.

Lueck sued the State and TxDOT (collectively, TxDOT) under the Whistleblower Act, alleging that his e-mail to Randall constituted a report of a violation of law to an appropriate law enforcement authority because it reported that the Department would violate federal and state law if TxDOT did not resolve the dispute with Cooper. The e-mail report, which was attached to Lueck's pleadings, specifically warned that, without the STARS program, TxDOT's existing software was "not capable of handling th[e] data and will, therefore, never be in compliance." TxDOT filed a plea to the jurisdiction, claiming that its immunity was not waived because Lueck did not make a good-faith report of a violation of law to an appropriate law enforcement authority, as required by section 554.002(a) of the Whistleblower Act. Lueck filed a second amended special exceptions and motion to dismiss the plea to the jurisdiction, arguing that his allegations,

[290 S.W.3d 880]

alone, satisfied the unambiguous language of the Act's immunity statute. *See* TEX. GOV'T CODE §

554.0035. In response, TxDOT argued that Lueck's pleadings affirmatively demonstrated that he did not allege a violation under the Act because the e-mail he sent did not report an actual violation of the law, and his supervisor to whom he sent the e-mail report was not a law enforcement authority. TxDOT claimed it was at least entitled to a hearing on its plea to the jurisdiction because the court must consider relevant evidence when necessary to resolve jurisdictional issues. The trial court granted Lueck's motion to dismiss TxDOT's plea to the jurisdiction, and TxDOT appealed. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(8) (permitting appeal from interlocutory order that denies a plea to the jurisdiction by a governmental unit). The court of appeals affirmed, reasoning that "Lueck's pleadings affirmatively demonstrate the district court's jurisdiction to hear the case." 212 S.W.3d 630, 638. We disagree. A "violation under the Act" under section 554.0035 is not alleged if the pleadings affirmatively demonstrate that the plaintiff did not make good-faith report of a violation of law to an appropriate law enforcement authority. *See* TEX. GOV'T CODE § 554.002(a). Lueck's pleadings affirmatively negate the trial court's subject-matter jurisdiction because he did not report a violation of law, and his supervisor is not a "law enforcement authority." *Id.*

II

The State and other state agencies like TxDOT are immune from suit and liability in Texas unless the Legislature expressly waives sovereign immunity. *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 641 (Tex.2004); *see also* TEX. GOV'T CODE § 311.034 ("[A] statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language."). A statute waives immunity from suit, immunity from liability, or both. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 224 (Tex.2004); *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 696-97 (Tex.2003). Immunity from suit is a jurisdictional question of whether the State has expressly consented to suit. *Taylor,*



106 S.W.3d at 696. On the other hand, immunity from liability determines whether the State has accepted liability even after it has consented to suit. *Id.* In some statutes, immunity from suit and liability are co-extensive, whereby immunity from suit is waived to the extent of liability. *See, e.g.,* TEX. CIV. PRAC. & REM.CODE § 101.025(a); *Miranda,* 133 S.W.3d at 224 ("The Tort Claims Act creates a unique statutory scheme in which the two immunities are co-extensive. . . .").

Sovereign immunity from suit is properly asserted when the State files a plea to the jurisdiction. *Miranda,* 133 S.W.3d at 225-26 (citing *Hosner v. DeYoung,* 1 Tex. 764, 769 (1847)). In contrast, immunity from liability is an affirmative defense that cannot be raised by a plea to the jurisdiction. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999) (per curiam). However, when the facts underlying the merits and subject-matter jurisdiction are intertwined, the State may assert sovereign immunity from suit by a plea to the jurisdiction, even when the trial court must consider evidence "necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 555 (Tex.2000); *see also, e.g., Miranda,* 133 S.W.3d at 223-24; *Tex. Dep't of Criminal Justice v. Miller,* 51 S.W.3d 583, 587 (Tex.2001). We have limited the use

[290 S.W.3d 881]

of a plea to the jurisdiction in these circumstances by holding that such a plea may only be used to address jurisdictional facts. *Tex. Dep't of Criminal Justice v. Simons,* 140 S.W.3d 338, 349 (Tex.2004). Lueck, therefore, argues that *Simons* compels dismissal of this appeal because TxDOT has not appealed jurisdictional facts, but rather, facts involving the TxDOT's liability under section 554.002(a), which Lueck claims cannot be asserted by a plea to the jurisdiction. Therefore, as a threshold matter, the first issue is whether the elements of section 554.002(a) constitute jurisdictional facts that can implicate the court's subject-matter jurisdiction.

III

The immunity provision in the Whistleblower Act states:

A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter. Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter.

TEX. GOV'T CODE § 554.0035. The standard for a "violation of this chapter" appears in section 554.002(a), which provides that the governmental entity "may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." *Id.* § 554.002(a). Lueck maintains that section 554.002(a) contains non-jurisdictional elements that speak to the underlying merits of the claim, and therefore, cannot be considered when determining jurisdiction. Lueck argues that requiring his pleadings, alone, to satisfy the elements of section 554.002(a) would unnecessarily compel him to prove up his case before the court assumed jurisdiction. The court of appeals agreed, and held that, while evidence pertaining to elements of section 554.002(a) "may negate [TxDOT's] liability under the Whistleblower Act, it would not, even if true, affect the district court's subject-matter jurisdiction to hear the case." 212 S.W.3d at 637-38.

We agree with Lueck and the court of appeals that there are but two jurisdictional requirements under section 554.0035. For the government's immunity to be waived, the plaintiff must (1) be a public employee, and (2) allege a violation *of this chapter*. TEX. GOV'T CODE § 554.0035 (emphasis added). But it necessarily follows from this language that Lueck must actually allege a violation of the Act for there to be a waiver from suit. Therefore, the elements under section 554.002(a) must be considered in order to ascertain what constitutes a violation, and



whether that violation has actually been alleged. We conclude that the elements of section 554.002(a) can be considered as jurisdictional facts, when it is necessary to resolve whether a plaintiff has alleged a violation under the Act.

Lueck argues that the elements of 554.002(a) can never be considered as jurisdictional facts because we are bound to follow the plain, unambiguous language of the immunity statute, which clearly indicates that the Legislature intended to impose only two jurisdictional requirements on Lueck: that he be a public employee and that he allege a violation under the Whistleblower Act. *Id.* § 554.0035; *see also State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006) ("[W]hen possible, we discern [legislative intent] from the plain

[290 S.W.3d 882]

meaning of the words chosen."). However, the second jurisdictional requirement in section 554.0035 directs the inquiry to section 554.002(a) to determine if the plaintiff has actually alleged a violation, rather than merely referenced the chapter. To hold that elements of section 554.002(a) cannot be considered as part of this inquiry would obfuscate our previous decision in *Miller,* where we held that "[m]ere reference to the . . . Act does not establish the state's consent to be sued and thus is not enough to confer jurisdiction on the trial court." 51 S.W.3d at 587. In *Miranda,* we also considered elements under the Texas Recreational Use statute to determine whether immunity was waived under the Tort Claims Act. 133 S.W.3d at 225; *see also* TEX. CIV. PRAC. & REM.CODE § 101.025(a). We see no reason to depart from these decisions when the elements of section 554.002(a) are equally relevant to the jurisdictional requirement that the plaintiff actually allege a violation of the Whistleblower Act. *Compare* TEX. GOV'T CODE § 554.0035, *with* TEX. CIV. PRAC. & REM.CODE § 101.025(a).

Lueck claims that *Miranda* and *Miller* are not controlling because the Texas Tort Claims Act

imposes a limited waiver of immunity, whereby immunity from suit is only waived to the extent of liability. *See Miranda,* 133 S.W.3d at 224 ("The Tort Claims Act creates a unique statutory scheme in which the two immunities are co-extensive. . . ."). Likewise, the court of appeals declined to follow *Miranda,* finding that the immunities are co-extensive under the Tort Claims Act, but not under the Whistleblower Act. 212 S.W.3d at 637. Because of this distinction, the court of appeals found that the section 554.002(a) elements only resolve the extent of the TxDOT's liability, not the jurisdictional issue concerning the State's consent to suit. *Id.* ("[F]acts pertaining to whether the Department may be found liable under the Whistlebower Act are neither dispositive of, nor relevant to, our jurisdictional inquiry."). TxDOT, on the other hand, argues that *Miranda* and *Miller* are dispositive because the immunity statutes under the Whistleblower Act and Tort Claims Act are substantively identical. *Compare* TEX. GOV'T CODE § 554.0035, *with* TEX. CIV. PRAC. & REM.CODE § 101.025(a). We will consider immunity statutes one-by-one to determine whether immunity has been waived.

In *Wichita State Hospital v. Taylor,* we recognized that the first sentence of the Whistleblower Act waives sovereign immunity from suit. 106 S.W.3d at 697 n. 6. Although we also recognized that the second sentence waives immunity from liability, *id.* at 697 n. 5, this waiver simply limits judgments against the State to "the extent of liability for the relief allowed under this chapter for a violation of this chapter." TEX. GOV'T CODE § 554.0035. Since "[i]mmunity from liability protects the [S]tate from judgment even if the Legislature has expressly consented to the suit," *see Jones,* 8 S.W.3d at 638, this second sentence not only waives immunity from liability, but also confines the scope of the State's consent to suit that was established in the first sentence. Thus, like the Tort Claims Act, the Whistleblower Act imposes a limited waiver of immunity that allows consideration of the section 554.002(a) elements, to the extent necessary in determining whether the claim falls within the jurisdictional confines of section 554.0035.



Lueck also claims that we are precluded from considering the section 554.002(a) elements as jurisdictional facts under *Dubai Petroleum Company v. Kazi,* 12 S.W.3d 71, 76-77 (Tex.2000) (holding that statutory

[290 S.W.3d 883]

prerequisites to suits against a non-governmental entity were not jurisdictional). When we applied *Dubai* to a case involving statutory prerequisites to suit against governmental entities, *see Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 358-59, 362 (Tex.2004), the Legislature responded by passing a statute stating that, "[S]tatutory prerequisites to suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity." TEX. GOV'T CODE § 311.034. This case does not fall under section 311.034 of the Government Code because the elements of section 554.002(a) are not statutory prerequisites to suit, but rather, elements of a statutory cause of action in a suit against a governmental entity.[1] The issue before us today is whether these elements of a statutory cause of action, like statutory prerequisites to suit, are requirements that can implicate the merits of the underlying claim, as well as the jurisdictional inquiry of sovereign immunity from suit as a threshold matter. We hold that the elements of section 554.002(a) can be considered to determine both jurisdiction and liability. For example, we have previously rendered take-nothing judgments against plaintiffs when they failed to prove elements of section 554.002(a). *See Montgomery County v. Park,* 246 S.W.3d 610, 612 (Tex.2007) (holding plaintiff failed to prove that the County took "adverse personnel action" against plaintiff, as required by section 554.002(a)); *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 317 (Tex.2002) (holding that no evidence supported a jury finding that the plaintiff could have good-faith belief that TxDOT was an appropriate law enforcement authority); *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 146 (Tex. 1995) (holding that section 554.002(a) was not satisfied because "as a matter of law, the Whistleblower Act is not implicated merely by reports made to

the press"). Lueck claims that, through these decisions, we implicitly recognized that elements in section 554.002(a) cannot be considered as jurisdictional facts because these cases were decided on the merits and not dismissed for lack of subject-matter jurisdiction. However, the issue of subjectmatter jurisdiction was not before us in any of these cases; indeed, the State did not file a plea to the jurisdiction in *Needham* and *Bouillion. See Needham,* 82 S.W.3d at 317; *Bouillion,* 896 S.W.2d at 145. Likewise, in *Park,* the State filed both a plea to the jurisdiction and motion for summary judgment, then appealed the trial court's denial of the motion for summary judgment. 246 S.W.3d at 613. Similar to this case, we reversed the denial of a plea to the jurisdiction in *City of Waco v. Lopez,* holding that the plaintiff could not bring a valid claim under the Whistleblower Act because a claim under the Commission on Human Rights Act was plaintiff's "exclusive state statutory remedy." 259 S.W.3d 147, 156 (Tex.2008). By reasoning that

[290 S.W.3d 884]

sovereign immunity was not waived because Lopez failed to plead the more specific elements under the Commission on Human Rights Act, we implicitly rejected the argument that simply alleging a violation under the Whistleblower Act is sufficient to confer subject-matter jurisdiction on the trial court in suits against governmental entities. *See id.*

Our holding does not mean that Lueck must prove his claim in order to satisfy the jurisdictional hurdle. Although the section 554.002(a) elements must be included within the pleadings so that the court can determine whether they sufficiently allege a violation under the Act to fall within the section 554.0035 waiver, we have urged that the burden of proof with respect to these jurisdictional facts "does not involve a significant inquiry into the substance of the claims." *Bland,* 34 S.W.3d at 554; *see also Miranda,* 133 S.W.3d at 235 ("[I]f a plea to the jurisdiction requires the trial court to wade deeply into the lawsuit's merits, it is not a valid plea.") (Jefferson, C.J., dissenting). Allowing a plaintiff's



pleadings to stand on bare allegations, alone, without allowing the State to challenge plaintiff's compliance with the immunity statute, would practically eliminate the use of pleas to the jurisdiction, which we have already approved as the proper "procedural vehicle to challenge subject matter jurisdiction in trial courts for over a century and a half." *See Miranda,* 133 S.W.3d at 232. The Legislature has also approved of their use by allowing for an appeal from an interlocutory order denying or granting a plea to the jurisdiction. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(8).

Nor does our holding mean that the State must challenge the plaintiff's pleadings through the use of a plea to the jurisdiction. We have recognized that "[t]he absence of subject-matter jurisdiction may be raised by a plea to the jurisdiction, as well as by other procedural vehicles, such as a motion for summary judgment." *Bland,* 34 S.W.3d at 554. Lueck claims that the TxDOT should have objected to his pleadings through the use of special exceptions, and the court of appeals concluded that "a traditional or no-evidence motion for summary judgment is the proper avenue for raising [TxDOT's] concerns that its evidence would negate two essential elements of Lueck's [W]histleblower claim." 212 S.W.3d at 638 n. 4. While both of these options are available, and certainly not objectionable, we have never held that the State is precluded from challenging pleadings in a plea to the jurisdiction when it could have done so via special exceptions or motions for summary judgment. Since we disapproved of this position in *Miranda,* 133 S.W.3d at 225-26 (citing *Hosner,* 1 Tex. at 769 (1847)), we decline to make an exception for the Whistleblower Act's immunity procedure. Because we have held that the 554.002(a) elements are jurisdictional when necessary to ascertain whether plaintiff has adequately alleged a violation of the chapter, we now turn to Lueck's pleadings to consider whether they sufficiently waive the TxDOT's immunity.

IV

"When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Miranda,* 133 S.W.3d at 226; *see also Lopez,* 259 S.W.3d at 150; *Taylor,* 106 S.W.3d at 696; *Miller,* 51 S.W.3d at 587 (quoting *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993)). "If the pleadings

[290 S.W.3d 885]

affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Miranda,* 133 S.W.3d at 227. TxDOT argues that Lueck's pleadings do not affirmatively demonstrate jurisdiction because they are incurably defective.[2] In other words, TxDOT points to uncontroverted allegations within Lueck's pleadings, claiming that they affirmatively negate jurisdiction because the e-mail sent to Randall did not report a violation of law to an appropriate law enforcement authority. As for the report element, Lueck's pleadings affirmatively negate the existence of a reported violation. Lueck's fifth amended petition states that Lueck "believed and reported in good faith that if the Department did not pursue an immediate and positive resolution to Cooper's October 29, demand[,] the Department would violate federal and state law by failing to remedy non-compliance with the federal and state reporting requirements." This allegation merely recites Lueck's prediction of possible regulatory non-compliance. Such a regulatory non-compliance of this kind does not equate to a violation of law under which a law enforcement authority regulates or enforces within the meaning of the Whistleblower Act. *See* TEX. GOV'T.CODE § 554.002(b). Further, Lueck attached the e-mail report to his pleadings, and the only discernable violation in the report itself states that TxDOT's current system for reporting traffic data "is not capable of handling this data and will, therefore, never be in compliance." This references the violation reported in the 1995 Federal Highway Administration report, which is only intended to call TxDOT's attention to a previous, publicly-



known instance of regulatory non-compliance. At most, this reference to a previous violation of a federal standard expresses disagreement with remedial measures taken by TxDOT after it was already knowingly out of compliance. An internal policy recommendation of this kind is not a report of a violation of law that the Whistleblower Act was designed to protect.

Even if this e-mail did report a violation of law, Lueck's supervisor, Mr. Randall, is not an appropriate law enforcement authority to whom such a report should be made. As the head of a division within TxDOT, Randall could neither regulate nor enforce the law that Lueck alleged had been violated. *See* TEX. GOV'T CODE § 554.002(b)(1), (2) (providing that an appropriate law enforcement authority is "part of a state or local governmental entity . . . that the employee in good faith believes is authorized to: regulate under or enforce the law alleged to be violated in the report or; investigate or prosecute a violation of criminal law"); *Needham,* 82 S.W.3d at 320 (holding that TxDOT was not appropriate law enforcement authority to enforce laws related to driving while

[290 S.W.3d 886]

intoxicated, reasoning that "the particular law the public employee reported violated is critical to the determination"). In fact, Lueck's e-mail report indicates that he knew Randall was not the proper authority within TxDOT to regulate the reported violations because he recommended that Randall have his e-mail "readily available" when discussing the implications of suspending the STARS program with other TxDOT divisions. *Cf. Needham,* 82 S.W.3d at 320-21 (holding that an employer's power to conduct internal investigative or disciplinary procedures does not satisfy standard for appropriate law enforcement authority under the Act). This conclusively establishes that Lueck could not have formed a good-faith belief that Randall was authorized to enforce such violations. *See id.* (holding that claim may fall under Whistleblower Act if employee formed a reasonable, good faith belief that report was made to an appropriate law

enforcement authority, given employee's training and level of experience). Therefore, as a matter of law, Lueck's pleadings affirmatively demonstrate that he did not allege a violation under the Whistleblower Act.[3] For these reasons, we reverse the court of appeals' judgment and dismiss the cause for lack of subject-matter jurisdiction.

---------------

Notes:

1. Lueck also argues that *Igal v. Brightstar Information Technology Group, Inc.* is controlling because we held that elements of a statutory cause of action cannot be considered jurisdictional unless "the language of the provision [or] the statutory scheme indicates" that the Legislature intended to address jurisdiction. 250 S.W.3d 78, 84 (Tex.2008). *Igal* involved the jurisdiction of an administrative agency, not subject-matter jurisdiction in a case where the State asserts a plea to the jurisdiction, claiming that its sovereign immunity is not waived. *See id.* at 81-82. However, even if *Igal* were to control statutes waiving the State's consent to suit, both the immunity provision, section 554.0035, and the statutory scheme of the Whistleblower Act indicate that the Legislature intended for section 554.002(a) to be considered as part of the jurisdictional inquiry because section 554.0035 references a "violation of the chapter," which is found in section 554.002(a).

2. Lueck argues that the TxDOT waived the argument that his pleadings fail to affirmatively demonstrate jurisdiction because it was undisputed before the trial court and court of appeals that Lueck was a public employee and had alleged a violation of the Act. We disagree. In TxDOT's Reply Brief before the court of appeals, TxDOT argued that "Lueck has not alleged a violation of the Texas Whistleblower Act and has not waived the State Defendants' sovereign immunity under section 554.0035. . . ." TxDOT's plea to the jurisdiction before the trial court also stated that one of the problems with Lueck's allegations is that the jurisdictional facts show that Lueck did not make a good-faith report of a



violation of law to an appropriate law enforcement authority. Since both of these arguments made below dispute the proper allegation of a violation, TxDOT did not waive its right to assert that the pleadings negated subject-matter jurisdiction.

3. TxDOT also argues that the court of appeals erred in affirming the trial court's denial of its plea to the jurisdiction because the trial court abused its discretion when it declined to consider the relevant jurisdictional evidence that TxDOT intended to present at its hearing on the plea to the jurisdiction. TxDOT claimed that this evidence proved that Lueck did not allege a violation under the Act. *See Bland,* 34 S.W.3d at 554 (holding that the trial court must consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised). Because we have held that Lueck's pleadings affirmatively negate the trial court's jurisdiction as a matter of law, we need not consider whether the trial court should have considered the TxDOT's evidence at a hearing on its plea to the jurisdiction. *See Miranda,* 133 S.W.3d at 227 ("When the consideration of a trial court's subject matter jurisdiction requires the examination of evidence, the trial court exercises its discretion in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case. . . .").

---------------



**384 S.W.3d 810**
**56 Tex. Sup. Ct. J. 75**

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE–COMMUNITY JUSTICE ASSISTANCE DIVISION, Petitioner,**
**v.**
**Luzelma CAMPOS, Betty Jo Gonzalez, and Misty Valero, Respondents.**

**No. 11–0728.**

**Supreme Court of Texas.**

**Oct. 26, 2012.**

[384 S.W.3d 812]

Daniel T. Hodge, First Asst. Attorney General, David C. Mattax, Director of Defense Litigation, Jonathan F. Mitchell, Solicitor General, Patrick Nicholas Brezik, Philip A. Lionberger, Assistant Solicitor General, William J. "Bill" Cobb III, Office of the Attorney General, Greg W. Abbott, Attorney General of Texas, for Texas Department of Criminal Justice.

David T. Bright, Sico White Hoelscher & Braugh, Corpus Christi, TX, for Luzelma Campos.

**PER CURIAM.**

The Texas Department of Criminal Justice Community Justice Assistance Division (TDCJ) brings this interlocutory appeal from the denial of its plea to the jurisdiction as to claims for damages related to actions of two Nueces County Substance Abuse Treatment Facility (SATF) officers. The claims against TDCJ based on the use of tangible property involved intent to accomplish intentional torts, and its plea to the jurisdiction as to those claims should have been granted. Its plea as to the remaining claims also should have been granted because there was no allegation that those claims resulted from the use of tangible property. We reverse and render judgment dismissing the claims against TDCJ for want of jurisdiction.

Luzelma Campos, Betty Jo Gonzalez, and Misty Valero (collectively, the Plaintiffs) were referred to the SATF for detention. The SATF is operated by the local Community Supervision and Corrections Department (CSCD). *See*Tex. Gov't Code §§ 76.004(b), 76.006(a)-(b). TDCJ furnishes administrative and technical assistance to the SATF, including officer training and certification. *See id.* §§ 509.003–.005, 509.008–.009.

In December 2000, the Plaintiffs sued Nueces County, TDCJ, and two SATF officers, Anthony Allen and Cordell Hayes.

[384 S.W.3d 813]

The Plaintiffs alleged that Allen and Hayes sexually harassed and assaulted them while they were at the SATF. As relevant to this appeal, they asserted claims against TDCJ for violation of 42 U.S.C. § 1983; premises defect; and negligent hiring, training, supervision, and implementation of policy. The Plaintiffs later added CSCD as a defendant.

TDCJ and CSCD filed a joint plea to the jurisdiction based on governmental immunity, which the trial court granted in November 2006.[1] The court of appeals affirmed the dismissal of the § 1983 claims but reversed as to the negligence claims. *Campos v. Tex. Dep't of Criminal Justice (Campos II),* 385 S.W.3d 35, 45, 2009 WL 3385248, at *8 (Tex.App.-Corpus Christi Oct. 22, 2009, no pet.) (mem. op.). The appeals court held that (1) the Plaintiffs' pleadings were sufficient to allege a premises defect claim under the Texas Tort Claims Act (TTCA), *see*Tex. Civ. Prac. & Rem.Code § 101.021(2); and (2) the Plaintiffs should be permitted to replead under their other theories of negligence after being allowed time for additional discovery. *Id.* at 385 S.W.3d, 40–42, 45, 2009 WL 3385248, *3–*5, *8.

After remand, the Plaintiffs filed their fourth amended original petition. In it they alleged that in order to gain exclusive, private, unmonitored,



and unfettered access to them and to wrongfully confine them during the assaults, Allen and Hayes used property such as a laundry room, a laundry cart, and a storage room. TDCJ and CSCD again filed a joint plea to the jurisdiction. This time the trial court denied the plea.

TDCJ and CSCD appealed and the court of appeals affirmed in part, reversed in part, and rendered in part. 387 S.W.3d 735, at 744–45. The court dismissed all of the Plaintiffs' claims against CSCD and the premises liability claims against TDCJ because immunity had not been waived. *Id.* But it held that immunity was waived for the claims against TDCJ for negligent hiring, training, and supervision of employees and negligent implementation of policy because the TTCA waives the State's immunity for "personal injury ... so caused by a condition or use of tangible personal or real property." *Id.* at 741; *see*Tex. Civ. Prac. & Rem.Code § 101.021(2). It further held that the "intentional-torts exception," which excludes waiver for claims "arising out of assault, battery, false imprisonment, or any other intentional tort" did not bar the Plaintiffs' claims "merely because the allegedly negligent conduct was accompanied by intentional torts." 387 S.W.3d at 744;*see*Tex. Civ. Prac. & Rem.Code § 101.057(2).

In this Court TDCJ argues that (1) the relationship between Plaintiffs' theories of liability and TDCJ is "too attenuated to waive immunity" under the TTCA, (2) the Plaintiffs' allegations against it assert a non-use or misuse of information for which the TTCA does not waive immunity, and (3) even assuming immunity is waived under the TTCA based on a misuse of property, the intentional-torts exception under Texas Civil Practice and Remedies Code section 101.057(2) bars the suit. We agree that TDCJ's immunity was not waived.

First we note that appellate courts generally have jurisdiction only over appeals from final judgments. *Bally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 352 (Tex.2001). But a party may appeal from certain interlocutory orders, including the denial of a plea to the jurisdiction by

a governmental unit. Tex. Civ. Prac. & Rem.Code § 51.014(a)(8). While

[384 S.W.3d 814]

the court of appeals' judgment is usually conclusive on interlocutory appeal, we may consider an interlocutory appeal when the court of appeals holds differently from a prior decision of this Court. Tex. Gov't Code §§ 22.001(a)(2), (e); 22.225(c). We have jurisdiction because the holding of the court of appeals conflicts with our decision in *Texas Department of Public Safety v. Petta,* 44 S.W.3d 575 (Tex.2001).

The Plaintiffs urge that TDCJ's immunity has been waived by the TTCA because Allen and Hayes used tangible property in perpetrating the assaults. *See*Tex. Civ. Prac. & Rem.Code § 101.021(2) (waiving immunity when injuries are caused by a condition or use of tangible property). They reference, for example, Allen and Hayes's use of a laundry cart that they rolled in front of the door to the laundry room to block the doorway when they performed the assaults. The court of appeals held that immunity from the negligence claims was waived because of this use or condition of property. We disagree with that conclusion. The Plaintiffs do not assert that Allen and Hayes used the property for any purpose or with any intent other than to effect their intentional assaults of the Plaintiffs. Additionally, the Plaintiffs' claims based on negligent conduct do not involve the use of tangible property. As we explain below, the Plaintiffs' allegations do not present a claim within the TTCA's waiver of immunity for governmental entities.

In *Petta* we addressed negligence claims against a governmental entity where the underlying conduct was intentional in nature. Melinda Petta sued the Texas Department of Public Safety after a trooper allegedly assaulted her. *Petta,* 44 S.W.3d at 576. We held that immunity was not waived for claims based on conduct such as the trooper's hitting Petta's car window and shooting at her tires because those actions were intentional and fell within the exclusion for claims arising out of assault, battery,



and false imprisonment. *Id.* at 580. We also held that immunity was not waived for claims that the Department negligently failed to furnish proper training and instruction to the trooper because information, even if written down, is not tangible property but is only an abstract concept. *Id.* at 580–81.

The court of appeals determined that this case is distinguishable from *Petta* because property such as a laundry room and adjacent storage room, a laundry cart, and keys were used in this case, and such property is tangible and not abstract. 387 S.W.3d at 741–42. But even assuming the Plaintiffs' injuries were caused by a use of tangible property, the Plaintiffs' only allegations regarding this property were that it was used in the course of Allen and Hayes gaining "exclusive, private, unmonitored, and unfettered access to the Plaintiffs, to thwart escape from the assaults, and to wrongfully confine Plaintiffs during the assaults." The property was only used with intent to accomplish the assaults of which the Plaintiffs complain. Thus, the property's use is encompassed within the exclusion of claims arising from intentional torts.[2] Tex. Civ. Prac. & Rem.Code § 101.057(2); *see Petta,* 44 S.W.3d at 580.

[384 S.W.3d 815]

However, even if a claim is based on an intentional tort, a governmental entity may still be liable for negligence if that negligence is distinct from the intentional tort. *Young v. Dimmitt,* 787 S.W.2d 50, 51 (Tex.1990) ("Although a governmental unit is immune from claims arising out of intentional torts, petitioners' negligent employment and entrustment claims arise out of the alleged negligence of the city employees supervising the officer, not out of the officer's intentional tort." (citation omitted)). But a cause of action for negligent supervision or training must satisfy the TTCA's use of tangible property requirement. *Petta,* 44 S.W.3d at 581. The Plaintiffs' claims do not.

The Plaintiffs allege, without elaboration, that TDCJ failed to discipline prior inappropriate

conduct by other employees, failed to properly hire, train, and supervise Allen and Hayes, and failed to screen, educate, train, supervise, investigate, or otherwise direct employees with regard to sexual harassment and assault. The Plaintiffs do not allege that a "use" of tangible property was involved in any of these failures. *See id.* at 580–81 (concluding that claims related to negligent failure to train, instruct, and discipline involved the misuse or non-use of information which is not tangible property). Thus, the TTCA does not waive TDCJ's immunity from the claims.

The Plaintiffs also allege that TDCJ is liable because it made tangible property available to Allen and Hayes. But providing someone with property that is not inherently unsafe is not a "use" under the TTCA. The Plaintiffs do not claim that the property Allen and Hayes used was inherently unsafe, so TDCJ's immunity is not waived for making the property available to them. *San Antonio State Hosp. v. Cowan,* 128 S.W.3d 244, 246 (Tex.2004) ("If all 'use' meant were 'to make available,' the statutory restriction would have very little force.").

Finally, the Plaintiffs claim that TDCJ permitted surveillance cameras to be improperly located. "Use" under the TTCA means "to put or bring into action or service; to employ for or apply to a given purpose." *Id.* Even assuming the truth of the allegations that TDCJ determined improper locations for placement of the cameras, its decisions do not equate to "using" the cameras, that is, putting or bringing them into service or employing or applying them to a given purpose. Using the cameras for surveillance is different from deciding where to place them so they might later be used.

Although the allegations in the Plaintiffs' pleadings do not demonstrate the court's jurisdiction, neither do they affirmatively negate it. The situation is a matter of pleading sufficiency, and in such situations, plaintiffs should generally be given an opportunity to amend the pleadings. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226–27 (Tex.2004). However, if a governmental entity



has asserted in the trial court that it is immune and a plaintiff fails to allege or show facts demonstrating a waiver of immunity after having a reasonable opportunity to conduct discovery directed to the issue and amend the pleadings, then the case should be dismissed. *Rusk State Hosp. v. Black,* ––– S.W.3d ––––, –––– (Tex.2012); *Harris Cnty. v. Sykes,* 136 S.W.3d 635, 639 (Tex.2004). In this case the Plaintiffs amended their petition three times over a period of nine years after

[384 S.W.3d 816]

TDCJ filed its first plea to the jurisdiction. Prior to the Plaintiffs' last amendment the court of appeals had noted "it is unclear from the pleadings how the surveillance cameras and rooms in the SATF facility may have been used, as opposed to not used, and thereby caused an injury." *Campos II,* 385 S.W.3d 35, 41–42, 2009 WL 3385248, at *5. The plaintiffs have had a reasonable opportunity to engage in discovery on the immunity question and amend their pleadings, but nevertheless have not alleged or shown facts demonstrating their injuries were caused by TDCJ's use of tangible property. Accordingly, they have failed to demonstrate a waiver of TDCJ's immunity.

We grant TDCJ's petition for review. Without hearing oral argument, *see*Tex.R.App. P. 59.1, we reverse the judgment of the court of appeals and dismiss the Plaintiffs' claims against TDCJ.

--------

Notes:

[1.] In 2003, the trial court granted Nueces County's plea to the jurisdiction. The court of appeals reversed and remanded. *Campos v. Nueces Cnty.,* 162 S.W.3d 778, 782 (Tex.App.-Corpus Christi 2005, pet. denied). The County was ultimately dismissed from the suit.

[2.] TDCJ asserts that contrary to Plaintiffs' allegations in their pleadings, Allen and Hayes are not State employees but are employees of CSCD. *See Delaney v. Univ. of Houston,* 835 S.W.2d 56, 59 (Tex.1992) (concluding that the intentional tort exception only applies if a governmental employee's conduct is the subject of the complaint). But when reviewing a plea to the jurisdiction, we take as true all evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts in its favor. *See City of El Paso v. Heinrich,* 284 S.W.3d 366, 378 (Tex.2009). Even if Allen and Hayes are not TDCJ employees and the intentional tort exception is inapplicable, our ultimate conclusion would not change because Campos must show a waiver of immunity for her separate negligence claim against TDCJ. *See Delaney,* 835 S.W.2d at 60.



**TEXAS PARKS AND WILDLIFE DEPARTMENT AND JOHN SILOVSKY, WILDLIFE DIVISION DIRECTOR, Appellants**

**v.**

**RW TROPHY RANCH, LTD. AND ROBERT WILLIAMS, Appellees**

**No. 15-24-00112-CV**

**Court of Appeals of Texas, Fifteenth District**

**April 10, 2025**

On Appeal from the County Court at Law No. 2 Kaufman County, Texas Trial Court Cause No. 110299-CC2

Before Chief Justice Brister and Justices Field and Farris.

**OPINION**

Scott A. Brister, Chief Justice

Among the constitutional issues we consider in this interlocutory appeal is whether a Texas deer breeder has a vested, constitutionally protected property interest in these wild animals. We join the other courts that have addressed this issue and hold that deer breeders do not have a vested property right in such animals. We also hold that Appellees failed to plead a viable waiver of sovereign immunity as to any of their claims. We therefore reverse the trial court's order

denying Appellants' plea to the jurisdiction and render a judgment of dismissal.

BACKGROUND

A. The Department works to mitigate the spread of CWD

The Texas Parks and Wildlife Department (the Department) is generally responsible for wildlife management in Texas.[1] As part of its obligation to protect and conserve the state's wildlife resources, the Department has the authority to "manage" wildlife for "disease diagnosis or prevention."[2] One disease it works to contain is Chronic Wasting Disease (CWD), a type of transmissible spongiform encephalopathy (TSE) that affects susceptible cervid species like white-tailed deer.[3] First detected in Texas in 2012, CWD is caused when abnormal prions convert an animal's normal prion proteins to a misfolded shape, leading to "neurodegenerative damage" and an increased risk of death due to other diseases or directly from CWD. CWD can be spread directly (deer to deer) or indirectly (via a contaminated source), can "remain infectious in the environment for a very long period of time," and has an incubation period of 18-24 months, after which an infected animal will show clinical signs of the disease, including severe emaciation, disorientation, excessive salivation, and shaggy coats. Compared to other states, Texas has a lower prevalence of CWD in its free-ranging and captive white-tailed deer populations, but the state implements management strategies to mitigate its spread, including depopulation-the euthanization of an entire herd.[4]

B. CWD at RW Trophy Ranch

Texas generally prohibits the possession of white-tailed deer, but it does permit "breeder deer" to be "held in captivity for propagation" pursuant to a permit issued by TPWD and in compliance with relevant statutes and regulations.[5]Appellant Robert Williams holds such a permit. He breeds white-tailed deer at RW Trophy Ranch, his 68-acre deer breeding facility, surrounded by a 1500-acre release site, located in Hunt and Kaufman Counties.

CWD was first detected in one of Williams's deer in February 2021. To mitigate its spread, the Department offered Williams a number of herd and research plans that did not involve complete



depopulation of the deer in his breeding facility. The Department was willing to consider alternatives to total depopulation because, at the time, the low prevalence of CWD at the facility was capable of being managed through other means. But Williams rejected each of the plans. By February 2022, eight more deer had died with CWD at RW Trophy Ranch. This was followed by an "alarming increase" in the number of CWD-positive mortalities at the facility beginning around the summer of 2022. By the following summer, deer at the facility were dying at four times the rate they were when CWD was first detected. The death rate correlated with the number of CWD-positive mortalities, which jumped from 25% in 2021 to 95% in 2023-figures described by the Department as "unheard of." The rise in CWD at RW Trophy Ranch also corresponded with a change in the Department's approach to managing the outbreak-and the onset of litigation.

C. Trial court proceedings

In early 2022, the Department notified Williams that it would "euthanize and

4

initiate postmortem disease testing of all the deer" in his breeding facility no earlier than February 28, 2022. The notice came soon after Williams and RW Trophy Ranch sued the Department and Wildlife Division Director John Silovsky in Travis County, where they also sought a temporary restraining order (TRO) preventing depopulation.[6] After the trial court denied the TRO request, Williams and RW Trophy Ranch sued the Department and Silovsky in Kaufman County, where they alleged due process and takings claims relating to the depopulation order and again sought a TRO against depopulation.[7] On February 28, 2022, the Kaufman County trial court issued an ex parte order temporarily restraining the Department from depopulating Williams's deer.

The next month saw a flurry of filings. The Department filed a plea to the jurisdiction,

supported by additional briefing, arguing that sovereign immunity barred Williams's due process claim because he has no vested property or liberty interest in his breeder deer and because his takings claim was unripe. The Department again notified Williams by letter on March 18 that it would depopulate the deer at his breeding facility, this time no sooner than April 4, 2022. Williams amended his petition to request an injunction enjoining depopulation, as well as allegations that Section 43.593 of the Parks and Wildlife Code (addressing destruction of breeder deer) violated due course of law for not requiring a pre-depopulation hearing, that he has a constitutionally protected possessory interest in his deer breeding permit, and that the Department violated Article 1, Sections 8 and Section 9 of the Texas Constitution. Regarding the Department's jurisdictional

5

plea, Williams countered that he has a legally protected interest in his deer and a possessory interest in his permit, and that his claims challenging the constitutionality of Section 43.593 were not barred.

After a March 29, 2022 hearing on the Department's plea, the trial court granted Williams a second TRO on April 1, 2022 prohibiting depopulation. Construing the trial court's ruling as an implicit denial of its plea to the jurisdiction, the Department appealed to the Dallas Court of Appeals, but that court disagreed that the trial court had implicitly denied the Department's plea and dismissed the appeal.[8]

When the case returned to the Kaufman County court in 2023, the Department requested a ruling on its plea to the jurisdiction but did not immediately get one. The Department later filed additional briefing in support of its plea-observing that RW Trophy Ranch was now "home to the worst [CWD] outbreak ever seen in Texas"-and sent Williams another letter dated August 3 notifying him that it intended to depopulate his breeding facility no sooner than August 14, 2023. Williams amended his petition to add claims that



the Department violated his rights to hunt and to equal protection. On August 10, the trial court signed a third TRO prohibiting depopulation and set a hearing on Williams's application for a temporary injunction.

The trial court held a two-day evidentiary hearing in late August 2023 on Williams's request for a temporary injunction and the Department's plea to the jurisdiction. Williams's witnesses opined that his deer were in exceptional shape, attributed the sharp rise in deer mortalities at RW Trophy Ranch to Epizootic Hemorrhagic Disease (EHD), and generally discounted the threat posed by CWD

to the health of white-tailed deer. Williams outright denied that deer could die from CWD: "There's lots of things that kill deer, but CWD is not one of them." And his counsel claimed the Department's efforts were aimed at "eliminating deer breeders."

The Department's witnesses opined that depopulating Williams's breeder deer was now necessary to prevent CWD from spreading to, and thus increasing the health risks of, both free-ranging and captive white-tailed deer. They clarified that the Department tests dead deer not to determine whether they died *of* CWD, but rather *with* CWD. This is because animals with CWD are 4.5 times more likely to die than animals without it, and so whether a deer ultimately died of EHD or some cause other than CWD does not mean that the deer did not *have* CWD and was thus capable of spreading it to other deer and reducing their life expectancy. Responding to opposing counsel's question attributing the presence of misfolded prions to scrapie instead of CWD, one Department official explained, "Well, regardless of what you call the disease, it's a TSE and it's having impacts on the deer and the deer herd…. You could call it snuffleupagus disease if you want to, but it's still having an effect on those deer."

The trial court denied the Department's plea to the jurisdiction and granted a temporary injunction enjoining the Department from depopulating Williams's deer.[9]

D. Appellate proceedings

The Department appealed both rulings to the Dallas Court of Appeals. Because the appeal superseded the temporary injunction, Williams filed a Rule 29.3 motion for an order prohibiting the Department from depopulating his deer.[10]

The Dallas Court granted the motion and ordered the Department "not to depopulate appellees' captive-bred whitetail deer pending resolution of th[e] interlocutory appeal."[11]

The Department challenged the Dallas Court's ruling on the Rule 29.3 motion by filing a petition for writ of mandamus in the Texas Supreme Court, along with a motion for temporary relief seeking a stay of the Dallas Court's stay order.[12] On April 5, 2024, the Texas Supreme Court conditionally granted the Department's motion.[13] On May 29, 2024, the Department "completed the total depopulation of the breeder deer in the breeding facility owned and operated by Appellees RW Trophy Ranch Ltd. and Robert Williams."[14]

Soon after receiving notice of the depopulation, the Dallas Court requested supplemental briefing by the parties "addressing th[e] Court's jurisdiction over the present appeal and whether any part of the appeal has become moot."[15] Both sides filed supplemental briefs, but the appeal was transferred to this Court before the Dallas Court issued an opinion.[16] The Dallas Court held oral argument on January 30, 2024.[17]

DISCUSSION

I. Mootness



We first consider whether Williams's claims were mooted by the Department's depopulation of the breeder deer at his facility. The Department took the position in its supplemental briefing in the Dallas Court of Appeals that, except for the takings claim, "Williams's claims related to restraining [the Department's] depopulation of the breeding facility are now moot." Williams responded that his claims seeking equitable relief are not moot and, alternatively, that two exceptions to the mootness doctrine apply-"capable of repetition" and "collateral consequences." We agree with the Department that Williams's claims are moot (save his takings claim), but we also agree with Williams that the capable-of-repetition exception applies.

"A case becomes moot if, since the time of filing, there has ceased to exist a justiciable controversy between the parties-that is, if the issues presented are no longer 'live,' or if the parties lack a legally cognizable interest in the outcome." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012). "Put simply, a case is moot when the court's action on the merits cannot affect the parties' rights or interests." *Id.*; *see Glassdoor, Inc. v. Andra Grp., LP*, 575 S.W.3d 523, 530 (Tex. 2019).

Williams acknowledges that "the majority" of his claims seek equitable injunctive relief aimed at "saving his herd of captive bred deer from senseless slaughter." This includes his due course of law, ultra vires, and equal protection claims, and his claims implicating Article I, Sections 8 and 34 of the Texas Constitution. But the Department depopulated his breeding facility after the Texas

Supreme Court conditionally granted the Department's request to stay the Dallas Court's Rule 29.3 order. Consequently, whatever decision this Court makes in this appeal, the Court cannot save Williams's herd from depopulation, and therefore cannot directly affect the rights or interests that he seeks to protect through those claims. This means they are moot.[18] *See*

*Heckman*, 369 S.W.3d at 162; *Johnson v. Tex. Parks & Wildlife*, 2014 WL 1432177, at *2 (Tex. App.-Austin Apr. 8, 2014, no pet.) ("Because the herd-reconciliation activities Johnson sought to enjoin have already occurred, the subject matter of the application for temporary injunction from which Johnson appeals is moot.").

But we also conclude that this case fits within an exception to mootness.

The capable-of-repetition-yet-evading-review exception applies when "the challenged act is of such short duration that the appellant cannot obtain review before the issue becomes moot." *Tex. A&M Univ.-Kingsville v. Yarbrough*, 347 S.W.3d 289, 290 (Tex. 2011). There must be a "reasonable expectation that the same action will occur again if the issue is not considered," and the plaintiff must show "that the claim is capable of repetition *as to him*." *Heckman*, 369 S.W.3d at 164; *Yarbrough*, 347 S.W.3d at 290.

It is reasonable to expect that Williams will continue to breed white-tailed deer. He has held a deer breeder's permit since it became a requirement many years ago, and he still owns and lives on RW Trophy Ranch with his family. "[O]ne of the oldest deer breeding facilities in Texas," RW Trophy Ranch is a "money-making operation" that Williams claims has no economically viable use

besides breeding deer. At the hearing on the request for a temporary injunction, Williams expressed his belief that deer do not die of CWD.

It is also reasonable to expect that the Department will use depopulation if CWD is detected in Williams's breeder deer in the future-a distinct possibility given that CWD "can remain infectious in the environment for a very long period of time" and Williams failed to take adequate precautions to control its spread when it was first detected at his facility, perhaps due in part to his belief that deer do not die of CWD. Williams was successful in enjoining the



Department from depopulating his deer, but he might not always achieve the same result, nor can he stop the Department from obtaining appellate relief to eliminate an adverse injunction or stay order and proceeding with depopulation. That happened before Williams was able to obtain judicial review of his claims in this case, and it very well could happen again if the parties were to find themselves back in the same place they are now at some point in the future.

On this record, the controversy between the parties over the Department's depopulation mitigation strategy is capable of repetition but evading review. We proceed to the merits.

## II. Plea to the Jurisdiction

The Department argues that the trial court erred by denying its plea to the jurisdiction because Williams failed to plead a legally viable waiver of sovereign immunity as to any of his claims. Williams responds that the trial court has jurisdiction over all of his constitutional claims. We agree with the Department.

### A. Standard of Review

State agencies like the Department are generally entitled to sovereign immunity.[19] Sovereign immunity from suit defeats a trial court's subject-matter jurisdiction and is properly raised in a plea to the jurisdiction.[20] When, as here, a plea to the jurisdiction challenges the pleadings, we determine if the pleader alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case.[21] We construe the pleadings liberally in favor of the plaintiff while looking to the pleader's intent.[22] We review the trial court's order de novo.[23]

### B. Due Course of Law

We first consider whether the Department retains sovereign immunity from Williams's due course of law challenges because he does not have a vested, constitutionally protected property interest in his breeder deer.[24]

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities ... except by the due course of the law of the land."[25] But "[b]efore any substantive or procedural due-process rights attach," a "citizen must have a liberty or property interest that is entitled to constitutional protection."[26] "[T]o be constitutionally protected, a

property interest must be vested."[27] A right is vested, and thus constitutionally protected, when one has a "legitimate claim of entitlement rather than a mere unilateral expectation."[28] Stated otherwise, "[w]hen an interest is predicated upon the anticipated continuance of an existing law and is subordinate to the legislature's right to change the law and abolish the interest, the interest is not vested."[29] If a party lacks a vested interest, its due course of law claim is facially invalid and barred by sovereign immunity.[30]

In Texas, all wild animals-including white-tailed deer-belong to the state, as trustee for the people.[31] It is illegal to possess them "for any purpose not authorized by" the Parks and Wildlife Code.[32] That code authorizes a person to hold live deer captive for only two purposes: breeding and management.[33] Our concern here is with breeding.

The Department's authority to issue hunting and fishing licenses includes

the power to issue a "Deer Breeder's Permit," one of several so-called "Special Licenses and Permits."[34] Contained in Subchapter L to Chapter 43 of the Parks and Wildlife Code, the statutes governing deer breeding in Texas cover a wide range of topics and impose numerous



requirements and conditions on the activity, including the following:

> • Definitions: "deer" means white-tailed deer or mule deer, and "breeder deer" means those two types of deer "legally held under a permit authorized by this subchapter";[35]

> • Permit required: "breeder deer may be held in captivity for propagation ... only after a deer breeder's permit is issued by the department under this subchapter";[36]

> • Permit duration: a permit may issue for one, three, or five years, with the latter two subject to revocation before they expire;[37]

> • Identification: detailed requirements apply for identifying breeder deer;[38]

> • Authorized deer breeder actions: selling, transferring, or holding in captivity live breeder deer "for the purpose of propagation or sale";[39]

> • Rulemaking authority: the Department may make regulations governing deer breeding;[40]

> • Inspection: the Department may "inspect at any time and without a

> warrant" a deer pen and deer breeding records;[41]

> • Records: deer breeders must maintain records and reports regarding breeder deer;[42]

> • Enclosure size: a single enclosure is limited to 100 acres;[43]

> • Release site requirements: "surrounded by a fence not less than seven feet in height that is capable of retaining deer at all times";[44] and importantly

> • Application of other laws: breeder deer "are under the full force of the laws of this state pertaining to deer."[45]

Two "laws of this state pertaining to deer" prohibit the possession of live game animals-defined to include a white-tailed deer-"for any purpose not authorized by this code."[46] Another set of "laws of this state pertaining to deer" permit the Department to take and destroy breeder deer to prevent the spread of disease, discussed more fully below.[47] The Department's deer breeding regulations align with the statutes, prohibiting the possession of live deer without a permit and affording the Department discretion when issuing a permit.[48]

Texas deer breeders like Williams thus enjoy the privilege of possessing and breeding deer in captivity only pursuant to a permit issued by the Department and in compliance with detailed statutes and regulations, several of which authorize the

Department's depopulation efforts in this case.[49] Any interest Williams claims in his breeder deer is subordinate to the Legislature's right to amend the laws governing deer breeding, or to abolish the interest altogether. This is precisely the type of interest that is *not* vested.[50]

Other courts have reached the same conclusion. In *Bailey v. Smith*, the Third Court of Appeals held that "Subchapter L is clear that deer breeders have no vested property interest in their breeder deer."[51] The court rejected the argument that white-tailed deer could be removed from the wild and held in captivity without a permit.[52] It also rejected the notion that a vested property



right in breeder deer could arise via the common law.[53]

The Fifth Circuit has also concluded that Texas deer breeders lack a constitutionally protected property interest in breeder deer.[54] The court described the "provisions regulating the deer breeder industry" as "extensive" and observed that "breeder deer belong to the state, not the permittee," "the deer are only held under a permit," and "[n]owhere do the statutes or regulations state that breeder

16

deer become the property of a permit holder."[55]

Using the common law rule of capture as a backstop, Williams argues that the Parks and Wildlife Code "does not deprive the deer breeder of his common law property interest in the breeder deer through legal captivity and dominion," but instead "simply imposes conditions on how and when deer may be held captive." Williams points to Section 43.357, which says a deer breeder may "sell" and "transfer to another person" live breeder deer. But while breeder deer can be sold and transferred, they may be "purchased" and "received"-the logical consequences of being sold and transferred-"only for the purposes of liberation or holding for propagation."[56] Deer sold or transferred are thus either freed (onto a release site[57]) or continue on as breeder deer. In the latter scenario, the Legislature clarified in the very same provision that deer may be held "for propagation ... only after a deer breeder's permit is issued."[58] William's theory that deer breeders have a vested property interest in breeder deer under some common-law authority running parallel to, but not inconsistent with, Subchapter L is incompatible with the Legislative scheme completely regulating deer breeding.

Approaching the issue from a different common-law angle, Williams argues that deer breeders obtain a vested property right in breeder deer because "wild animals become property when removed from their natural liberty and

made subject to man's dominion."[59] The criminal cases Williams cites relied on that rule in examining whether a wild animal could be the subject of a criminal offense like

17

theft or criminal mischief.[60] But while a deer breeder may have "qualified rights of ownership or possession of white-tailed deer" such that a person is amenable to prosecution for certain crimes involving a breeder deer, that right remains subordinate and subject to the Legislature's authority to regulate the deer breeding industry.[61] In this context, a possessory right does not equate to a vested right.

Williams looks to the bankruptcy context for support, but a similar rationale applies. Although a deer breeder may have a "possessory interest" in the deer and an "expectancy interest in profits derived from those deer" such that the deer may be considered property of a bankruptcy estate, it does not necessarily follow that those interests give rise to a heightened vested property interest entitled to due process protection.[62]

In his last attempt to bypass the Parks and Wildlife Code in favor of the common law, Williams argues that the definition of "game animal" in Section 63.001-and by extension Section 63.002's declaration that white-tailed deer cannot be possessed unless otherwise provided by the Code-"does not control the issue of property rights in wild animals *while in captivity*."[63] But *Wiley* involved a conversion claim between private parties, not a due process-based allegation by a

18

deer breeder.[64] "[G]eneral language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering."[65]



Williams finally contends that he has a protected property interest in his deer breeder's permit, but the Department has not sought to revoke his permit, and so that argument is not ripe for consideration.

We sustain this part of the Department's first issue.

C. Ultra Vires

Williams gave little detail into the specifics of his ultra vires claim, generally averring in his live petition that Silovsky and Department officials "have acted *ultra vires*." But he did state at the outset of the petition that the officials acted ultra vires by planning to "kill[] all of the deer on [his] ranch ... without providing any kind of due process hearing, without probable cause, and without exigent circumstances." Williams did not plead a valid ultra vires claim.

"Plaintiffs who seek to bypass sovereign immunity using an ultra vires claim must plead, and ultimately prove, that the defendant government official acted without legal authority or failed to perform a ministerial duty."[66] Williams alleged the former.[67] "An officer acts without legal authority if he exceeds the bounds of his granted authority or if his acts conflict with the law itself."[68] But if "the actions alleged to be ultra vires were not truly outside the officer's authority or in conflict

with the law, the plaintiff has not stated a valid ultra vires claim and therefore has not bypassed sovereign immunity."[69]

The Department's depopulation efforts are governed by several statutes contained in the Parks and Wildlife Code. The first is Section 12.013. As explained, the Department's responsibility to manage Texas wildlife includes the authority to "take" deer for "disease diagnosis or prevention."[70] The Legislature defined "take" to mean "*collect*, hook, hunt, net, *shoot*, or snare, by *any* means or device."[71] The Department's

power to take deer for disease diagnosis or prevention expressly applies to deer held in captivity pursuant to a permit issued under Subchapter L.[72]

The other guiding statutes are found in the same chapter that governs deer breeder permits. Section 43.953, entitled, "Destruction of Deer," contains three limitations on the Department's authority to take deer for disease diagnosis or prevention:

> • before deer may be destroyed, the Department "must consider the results of" an epidemiological assessment conducted by a TAHC agent, if one is conducted;
>
> • to "control or prevent the spread of disease," deer subject to the subchapter "may be destroyed only if the department determines that the deer pose a threat to the health of other deer or other species, including humans"; and
>
> • the Department "shall carry out an order to destroy deer after notice

has been provided to the permit holder under Section 43.954."[73]

Section 43.954 requires the written notice to contain the "date of destruction," which cannot be "sooner than the 10th day after the date of the notice," and "an explanation of the reasons for the destruction, including the results of any epidemiological assessment conducted under Section 43.953(a)," among other things.[74]

None of these provisions require the Department to conduct a hearing, possess probable cause, or establish exigent circumstances before destroying breeder deer. By failing to allege that Silovsky or some other Department official acted without authority or



contrary to controlling law, Williams failed to plead a viable ultra vires claim.[75]

Williams now argues on appeal that Silovsky "ignore[d] the statutory standard in section 43.953 of 'threat to the health of other deer or other species, including humans.'" As support, he points to his own evidence presented at the hearing on the temporary injunction vigorously disputing that CWD is a threat to other deer. Section 43.953(a), however, plainly requires *the Department* to determine that the deer identified for destruction pose a threat. The Department's August 3, 2023 letter notifying Williams of its intent to depopulate his breeder deer reflects that determination. Williams disagrees with the Department's determination, but Section 43.953 as written does not "allow third parties to second-guess the [Department's] decision in this way."[76] Williams directs us to

21

potentially conflicting statements made by the Department regarding the health impacts of CWD on *humans*, but that does not mean the Department did not determine that CWD poses a threat to other *deer*. Williams lastly contends that the Department did not meet Section 43.953(a)'s epidemiological-study requirement, but the Department's letter contained a paragraph devoted precisely to that requirement.

We sustain this part of the Department's first issue.

### D. Regulatory Taking

Williams also alleged that the Department's efforts to depopulate his breeder deer amounted to a regulatory taking of his breeding facility in violation of Article I, Section 17 of the Texas Constitution.[77] Williams averred that he has made improvements to the 68-acre breeding facility and that the property cannot be easily converted to another use. In a supplement to his petition, Williams claimed that the Department took his real property by prohibiting him from doing anything with his land unless he agreed to "an exaction in the form of a 'herd plan.'"

"[I]t is well settled that a governmental entity may be sued for inverse condemnation, by either a public or private landowner, for taking the owner's property without paying just compensation."[78] But a plaintiff must "establish a viable takings claim" for sovereign immunity to be waived.[79] A regulatory taking "is a condition of use so onerous that its effect is tantamount to a direct

22

appropriation or ouster."[80] Regulatory takings can take several different forms, but Williams's pleadings implicate two: a *Penn Central* taking and an exaction taking.[81] We address each one in turn.

A *Penn Central* taking occurs when a government regulation unreasonably interferes with a landowner's use and enjoyment of his property.[82] This is an ad-hoc, fact-intensive inquiry in which all surrounding circumstances must be considered-an inquiry that "requires a careful analysis of how the regulation affects the balance between the public's interest and that of private landowners."[83]Guiding considerations include (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action.[84] The ultimate question is whether the regulation has gone "too far" so as to constitute a taking.[85]

Williams did not allege a viable regulatory takings claim premised upon the Department's depopulation efforts. To begin, we have a difficult time understanding how euthanizing breeder deer represents a restriction on the use of Williams's land.[86] It is a physical act aimed at mitigating the spread of CWD, not a

23

restriction on how Williams uses his property.



Insofar as a connection can be made between depopulation and property use, the Department made the difficult decision to destroy Williams's deer in compliance with an express statutory mandate to prevent the spread of disease in the state's deer-deer that Williams possessed only because the State allowed him to do so. If not for this important responsibility, the Department would have no reason to set foot onto his land. When it does, the interference is limited in both duration and scope. The interference to the land is similarly limited after depopulation, as Williams still has a deer breeding permit and may continue to operate his breeding facility and produce income. We also cannot ignore that Williams rejected the Department's early efforts to mitigate the spread of CWD without using total depopulation. We are not insensitive to the frustration and disappointment that comes with depopulation, including the potential financial impact resulting from depopulation, but our task is to weigh the public interest against the private ones, and the former significantly outweighs the latter, especially considering the Department's representations that the CWD outbreak at RW Trophy Ranch was the worst in Texas history. Giving due consideration to all relevant considerations and circumstances, the Department's depopulation efforts did not go "too far" so as to rise to a regulatory taking.[87]

In a supplemental petition, Williams claimed that the Department took his land by "prohibiting [him] from doing anything with the land unless he agree[d] to an exaction in the form of a 'herd plan' that would convey to the State an interest in land akin to a restrictive covenant for which the state would pay nothing." In an exaction takings case, "the landowner is not simply denied or restricted in some

desired use of his property," but rather "some action ... is required of the landowner as a condition to obtaining government approval."[88]

The herd plan attached to Williams's original petition sought to mitigate the spread of CWD in the breeder deer at RW Trophy Ranch. It contained all the provisions one would expect to see in such a document-movement restrictions for infected deer, facility standards, record keeping, and protocols for releasing deer, among other things. The herd plan did authorize the Department to enter onto Williams's property, but only to perform its responsibilities relating to CWD. There is nothing in the herd plan (or the record) to support a claim that the Department limited Williams's land ownership or financial interests other than breeding deer in conditions that threatened the State's interest in wildlife management. Williams would have preferred to release his bucks to be hunted by individuals participating in the "wounded heroes" program, but that was a personal preference related to the disposition of his breeder deer, not his land.[89]

We sustain this part of the Department's first issue.

E. Right to Hunt

Williams alleged that the Department's depopulation efforts under Section 43.953 of the Parks and Wildlife code cannot be squared with, and are thus violative of, Article I, Section 34 of the Texas Constitution, which provides that "[h]unting and fishing are preferred methods of managing and controlling

wildlife." Tex. Const. art. 1, § 34(b). According to Williams, the Department "should be called to task to explain why the alternative of harvest is not considered, even for deer that test positive for or are exposed to CWD."

Sovereign immunity does not bar a suit for equitable relief based upon an alleged violation of the Texas Constitution, *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007), but immunity is waived only insofar as the plaintiff pleads a viable constitutional claim. *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015); *Eriksen v. Nelson*, 2025 WL 351632, at *4 (Tex. App.- 15th Dist. Jan 30, 2025, no pet.). "To satisfy



this showing, plaintiffs must do more than merely name a cause of action and assert the existence of a constitutional violation." *Hughs v. Dikeman*, 631 S.W.3d 362, 373 (Tex. App.-Houston [14th Dist.] 2020, no pet.).

The constitutional right to hunt is subject "to laws or regulations to conserve and manage wildlife and preserve the future of hunting and fishing." Tex. Const. art. 1, § 34(a). Section 43.953, which authorizes the Department to destroy deer to "control or prevent the spread of disease," is one such law.[90] Williams did not plead a viable constitutional claim because the Constitution expressly contemplates the very action that forms the basis of his complaint.

We sustain this part of the Department's first issue.

F. Free Speech

Williams alleged that the Department violated his free speech rights as guaranteed by Article 1, Section 8 of the Texas Constitution[91] by stating in its

26

August 3, 2023 notice that it would exclude him from his property during the deer depopulation. Williams objected that doing so would "effectively prohibit[] him from videotaping the kill event."

The Department's letter stated that its personnel would "establish a restricted access zone on the property while conducting [the depopulation] operation to maintain a safe working environment." The Department included the statement to comply with Section 43.954(b) of the Parks and Wildlife Code, which requires a notice of deer destruction to explain "any access restrictions imposed on the facility or acreage covered by the permit during the destruction of the deer."[92]Williams does not dispute the Department's claim that restricting access to the facility while wild deer are being shot was necessary to protect the safety of Williams and others, not a prior restraint or other restriction on

free speech rights. Nor does he offer any argument or explanation how the Department's compliance with Section 43.954(b)(2) is capable of having anything other than an "incidental impact" on his speech, which is "not sufficient to bring the First Amendment into play."[93]

We sustain this part of the Department's first issue.

G. Equal Protection

To state a viable equal-protection claim under the Texas Constitution, *see* Tex. Const. art. 1, § 3, a plaintiff must show that he was "treated differently from others similarly situated." *Klumb*, 458 S.W.3d at 13. And when "neither a suspect classification nor a fundamental right is involved," the plaintiff "must further demonstrate that the challenged decision is not rationally related to a legitimate governmental purpose." *Id.* Williams made neither showing. He alleged that the

27

Department treats deer breeding facilities with low fences differently than deer breeding facilities with higher fences, but the relevant inquiry for purposes of waiving sovereign immunity here is whether the Department treated other facilities with high rates of CWD differently than RW Trophy Ranch.[94] Williams made no such allegations. Nor has he made any showing that depopulation is not somehow rationally related to a legitimate government purpose.

We sustain the remainder of the Department's first issue.

III. Temporary Injunction

The Department also challenges the trial court's order issuing the temporary injunction. A court lacking jurisdiction cannot award injunctive relief, not "even temporarily."[95] Because the Department's sovereign immunity remains intact, and the trial court lacks subject-matter



jurisdiction, we also reverse the injunction against it.

CONCLUSION

Having sustained the Department's issues, we reverse the trial court's orders denying the plea to the jurisdiction and issuing the temporary injunction and render a judgment of dismissal in favor of the Department and Silovsky.

---------

Notes:

[1] Tex. Parks & Wildlife Code § 12.001.

[2] *Id.* § 12.013(a).

[3] A transmissible spongiform encephalopathy (TSE) is an infectious condition that "causes holes in the brain." Other examples include mad cow disease (Bovine Spongiform Encephalopathy) and scrapie in sheep.

[4] *See* Tex. Parks & Wildlife Code §§ 12.013(a) (authorizing TPWD to "take" deer for disease diagnosis or prevention), 43.953(b) (authorizing destruction of deer to "control or prevent the spread of disease").

[5] *Id.* §§ 43.364, 43.351-.369, 63.001(a)-.002. "Breeder deer" means "a white-tailed deer or mule deer legally held under a permit authorized by this subchapter." *Id.* § 43.351(1).

[6] Williams and RW Trophy Ranch also sued the Texas Animal Health Commission (TAHC) and Executive Director Andy Schwartz relating to a quarantine order issued by TAHC.

[7] Rebuffing the Department's charge of forum shopping, Williams asserted that he had nonsuited (by amended petition) the claims in the Travis County suit regarding "the constitutionality of the TPWD kill statute and its threatened effect on Plaintiffs' business and land, in favor of refiling in Kaufman County."

[8] *See Tex. Parks & Wildlife Dep't v. RW Trophy Ranch, Ltd.*, 2022 WL 1314692, at *2 (Tex. App.-Dallas May 3, 2022, pet. denied).

[9] The trial court noted, "I think that a lot of this science was quite frankly unscientific."

[10] Appellees' Motion for Interim Order Under TRAP 29.3, *Tex. Parks & Wildlife Dep't v. RW Trophy Ranch, Ltd.*, No. 05-23-00906-CV (Tex. App.-Dallas Sept. 18, 2023).

[11] Order, No. 05-23-00906-CV (Tex. App.-Dallas October 9, 2023).

[12] Petition for Writ of Mandamus & Emergency Motion for Temporary Relief, *In re Tex. Parks & Wildlife Dep't*, No. 23-0966 (Tex. Nov. 30, 2023).

[13] Order, *In re Tex. Parks & Wildlife Dep't*, No. 23-0966 (Tex. April 5, 2024).

[14] Appellants' Advisory Regarding Depopulation of Appellees' Deer Breeding Facility, No. 05-23-00906-CV (Tex. App.-Dallas June 6, 2024).

[15] Order, No. 05-23-00906-CV (Tex. App.-Dallas June 11, 2024).

[16] *See Transfer of Case From the Fifth Court of Appeals to the Fifteenth Court of Appeals*, Misc. Docket No. 24-9089 (Tex. Oct. 21, 2024).

[17] The Department moved to dismiss its mandamus petition in the Texas Supreme Court, stating that although its "jurisdictional challenge remains pending at Texas's Fifth Court of Appeals, there is no remaining issue for the Court in this case." Relators' Motion to Dismiss for Mootness, *In re Tex. Parks & Wildlife Dep't*, No. 23-0966 (Tex. July 12, 2024). The petition remains pending.

[18] Williams argues that he "continues to have a viable interest in the equitable relief he seeks" because the Department may enter upon and kill deer located on his 1500-acre release site that surrounds his breeding facility, but there is no record support for this contention. Indeed, each of the letters issued by the Department noticing its intent to depopulate has been directed at the



deer held in Williams's breeding facility (Facility 170B), not at any deer in his release site (Facility 170R).

[19] *Matzen v. McLane*, 659 S.W.3d 381, 387 (Tex. 2021); *see* Tex. Parks & Wildlife Code § 11.011.

[20] *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004).

[21] *Id.* at 226.

[22] *Id.*

[23] *Matzen*, 659 S.W.3d at 388.

[24] Williams alleged that Section 43.953 of the Parks and Wildlife Code violates procedural due process, both facially and as applied, because it does not require a hearing before depopulation. Citing *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69 (Tex. 2015), Williams also alleged that the "summary seizure and destruction of breeder deer" violates substantive due process because it is an "unreasonable regulation in light of the facts related to CWD."

[25] Tex. Const. art. I, § 19. There is no meaningful distinction between Texas's due course of law guarantee and the federal due process clause. *See Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995).

[26] *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018). Our focus here is on a property interest.

[27] *Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 655 (Tex. 2022).

[28] *Honors Acad.*, 555 S.W.3d at 61; *see City of Grapevine v. Muns*, 651 S.W.3d 317, 345 (Tex. App.-Fort Worth 2021, pet. denied) (stating right is vested when it "has some definitive, rather than merely potential existence"); *Vested*, Black's Law Dictionary (11th ed. 2019) ("Having become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute").

[29] *Crown Distrib. LLC*, 647 S.W.3d at 655; *see Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (explaining that interest is not protected by due process "if government officials may grant or deny it in their discretion").

[30] *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 17 (Tex. 2015).

[31] Tex. Parks & Wildlife Code §§ 1.011(a), 1.101(4) ("'Wild' when used in reference to an animal, means a species, including each individual of a species, that normally lives in a state of nature and is not ordinarily domesticated"); *See Crowder v. USDA*, 2023 WL 4824931, at *1 (W.D. Tex. July 27, 2023).

[32] Tex. Parks & Wildlife Code §§ 63.001(a), 63.002; *see also id.* § 43.353.

[33] *Id.* §§ 43.351-.369, 43.601-.607.

[34] *Id.* §§ 43.351-.369.

[35] *Id.* § 43.351(1), (4).

[36] *Id.* § 43.364; *see id.* § 43.352(a) ("The department shall issue a permit to a qualified person to possess live breeder deer in captivity.").

[37] *Id.* § 43.352(b)-(d).

[38] *Id.* § 43.3561.

[39] *Id.* §§ 43.357(a)(2), 43.362.

[40] *Id.* § 43.357(b).

[41] *Id.* § 43.358.

[42] *Id.* § 43.359.

[43] *Id.* § 43.360.

[44] *Id.* § 43.361(a).

[45] *Id.* § 43.364; *see id.* § 43.366(a) (breeder deer "are subject to all laws and regulations of this state pertaining to deer).

[46] *Id.* §§ 63.001, .002.

[47] *Id.* §§ 12.013(a), 43.953.



[48] *See, e.g.*, 31 Tex. Admin. Code §§ 65.602(a), 65.603(c), (d).

[49] Williams expressly agreed to comply with the statutes and regulations governing deer breeding when he submitted his application for a permit.

[50] *See Crown Distrib. LLC,* 647 S.W.3d at 655.

[51] 581 S.W.3d 374, 394 (Tex. App.-Austin 2019, pet. denied).

[52] *Id.* at 390-92 (reasoning that public trust doctrine-codified in Parks and Wildlife Code Section 1.011(a)-requires an animal to be "legally removed" from the wild before property rights could attach to it, but the Legislature foreclosed that occurrence by prohibiting a person from possessing deer without a permit).

[53] *Id.* at 393 (reasoning that Sections 43.364 and 43.366, which make breeder deer subject to the "laws" of this state, refer not to the common law, but to the law relating to wild animals and their status as public property, and that "allowing private property rights to arise in breeder deer is incompatible with the Legislature's direction that breeder deer are 'held under a permit'").

[54] *Anderton v. Tex. Parks & Wildlife Dep't*, 605 Fed.Appx. 339, 346-47 (5th Cir. 2015) ("If government officials may grant or deny the interest in their discretion, the interest is not protected by due process.").

[55] *Id.* at 344, 348.

[56] Tex. Parks & Wildlife Code § 43.364.

[57] *Id.* § 43.361(a).

[58] *Id.* § 43.364. A permit is even needed to "purchase" or "obtain" or "accept" live breeder deer. *Id.* § 43.362.

[59] *See Runnels v. State*, 213 S.W.2d 545, 547 (Tex. Crim. App. 1948).

[60] *Id.* ("Wild animals are not subject to theft until they become the property of an owner."); *Jones v. State*, 45 S.W.2d 612, 614 (Tex. Crim. App. 1931);

*State v. Bartee*, 894 S.W.2d 34, 43 (Tex. App.-San Antonio 1994, no pet.) ("A white-tailed deer in its natural state of liberty cannot be the subject of the theft and criminal mischief statutes.").

[61] *Bartee*, 894 S.W.2d at 43 ("The State, as trustee, has the power to regulate the taking and acquisition of property in wild animals by individuals by imposing such restrictions and conditions as the legislature may see fit.").

[62] *In re Wheeler*, 431 B.R. 158, 160, 162 (N.D. Tex. 2005).

[63] *See Wiley v. Baker*, 597 S.W.2d 3, 5 (Tex. Civ. App.-Tyler 1980, no writ) (reasoning that the "statutory definition of 'game animal'" was "not applicable" to "whether appellant had a property right in the elk at the time appellee shot it").

[64] *Id.* at 4.

[65] *Turkiye Halk Bankasi A.S v. United States*, 598 U.S. 264, 278 (2023).

[66] *Matzen*, 659 S.W.3d at 388.

[67] *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) (confirming that ultra vires suits proceed against government actors in their official capacity).

[68] *Matzen*, 659 S.W.3d at 388.

[69] *Id.*

[70] Tex. Parks & Wildlife Code § 12.013(a).

[71] *Id.* § 1.101(5) (emphasis added).

[72] *Id.* §§ 43.366(a) ("breeder deer held under a deer breeder's permit are subject to all laws and regulations of this state pertaining to deer except as specifically provided in this subchapter"); 43.951(1).

[73] *Id.* § 43.953.

[74] *Id.* § 43.954(b).

[75] We do not mean to suggest that a deer breeder could *never* plead a viable ultra vires claim, but



on this record and with these arguments, Williams did not do so.

[76] *See Schroeder v. Escalera Ranch Owners' Ass'n, Inc.*, 646 S.W.3d 329, 335 (Tex. 2022) (holding that zoning and planning commission did not act ultra vires by complying with legal duty to determine whether plat conformed to law).

[77] Unlike with breeder deer, it is well established that property owners have a vested interest in their land. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972).

[78] *Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1*, 669 S.W.3d 178, 187 (Tex. 2023).

[79] *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013).

[80] *City of Houston v. Carlson*, 451 S.W.3d 828, 831 (Tex. 2014); *see Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (stating regulatory taking occurs "when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs").

[81] *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 548 (2005) (identifying a "physical taking," a "*Lucas*-type total regulatory taking," a "*Penn Central*" taking, and a "land-use exaction"); *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 671-72 (Tex. 2004).

[82] *Sheffield*, 140 S.W.3d at 671-72.

[83] *Id.* at 672.

[84] *Id.*

[85] *Id.* at 670 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

[86] *See City of Houston*, 451 S.W.3d at 831 ("Yet the respondents do not contest any of Houston's property-use restrictions.").

[87] *Sheffield*, 140 S.W.3d at 670.

[88] *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 71 S.W.3d 18, 30 (Tex. App.- Fort Worth 2002) (citing *Dolan v. City of Tigard*, 512 U.S. 374 (1994)), *aff'd* 135 S.W.3d 620 (Tex. 2004)).

[89] Insofar as Williams's petition can be construed to raise a physical type of regulatory taking, the trial court properly rejected that theory because there is no allegation or indication that depopulation would cause a "permanent physical occupation" of Williams's land. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982); *Sheffield*, 140 S.W.3d at 671.

[90] Tex. Parks & Wildlife Code § 43.953(b).

[91] "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." Tex. Const. art. 1, § 8.

[92] Tex. Parks & Wildlife Code § 43.954(b)(2).

[93] *Tex. Dep't of Ins. v. Stonewater Roofing, Ltd.*, 696 S.W.3d 646, 658 (Tex. 2024).

[94] *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998) (requiring others to be similarly situated in a relevant way).

[95] *In re Abbott*, 601 S.W.3d 802, 805 (Tex. 2020) (orig. proceeding).

---------



**233 S.W.3d 835**
**TEXAS A & M UNIVERSITY SYSTEM,**
**Texas Engineering Experiment Station,**
**and Dr. Mark McLellan, Petitioners,**
**v.**
**Dr. Sefa KOSEOGLU, Respondent.**
**No. 05-0321.**
**Supreme Court of Texas.**
**Argued November 14, 2006.**
**Delivered September 7, 2007.**

[233 S.W.3d 836]

Greg Abbott, Atty. Gen., Barry Ross McBee, Edward D. Burbach, Office of Atty. Gen., Jeffrey L. Rose, Atty. Gen., Robert Francis Johnson, Assistant Atty. Gen., Don Wayne Cruse Jr., Assistant Solicitor Gen., and Rafael Edward Cruz, Office of Atty. Gen., Austin, for Petitioner.

[233 S.W.3d 837]

Wayne T. Rife, Law Offices of Wayne T. Rife, P.C., College Station, TX, for Respondent.

Justice GREEN delivered the opinion of the Court.

In this case we consider whether a plaintiff who, on appeal, loses a plea to the jurisdiction based on sovereign immunity is entitled to a remand for an opportunity to cure the jurisdictional pleading defect. We conclude that when a pleading cannot be cured of its jurisdictional defect, a plaintiff is not entitled to amend. Additionally, we must interpret section 51.014(a) of the Texas Civil Practice and Remedies Code to determine whether appellate courts have jurisdiction to consider a government official's appeal of a trial court's denial of a plea to the jurisdiction based on sovereign immunity. We conclude that Section 51.014(a)(8) vests appellate courts with such jurisdiction.

Sefa Koseoglu worked as a contract employee at the Texas Engineering Experiment Station, which is a division of the Texas A & M University System. Koseoglu sued the Texas A & M University System, the Texas Engineering

Experiment Station ("Texas A & M," collectively), and Mark McLellan, his supervisor, for allegedly breaching his employment contract. Both Texas A & M and McLellan filed pleas to the jurisdiction asserting sovereign immunity and challenging the trial court's jurisdiction to hear Koseoglu's claims. The trial court denied the pleas to the jurisdiction, and Texas A & M and McLellan appealed. The court of appeals reversed the trial court's judgment with respect to Texas A & M's appeal, holding Texas A & M's sovereign immunity from suit barred Koseoglu's breach of contract claim. 167 S.W.3d 374, 384 (Tex.App.-Waco 2005, pet. granted). Rather than dismiss Koseoglu's claim against Texas A & M, the court of appeals concluded Koseoglu deserved an opportunity to amend his pleadings and therefore remanded the matter to the trial court. *Id.* With respect to McLellan's appeal, the court of appeals held it was without jurisdiction to decide the appeal because, as a state official, McLellan had no statutory right under section 51.014(a)(8) of the Texas Civil Practice and Remedies Code to appeal the trial court's denial of a plea to the jurisdiction premised on sovereign immunity. *Id.* We affirm the court of appeals' judgment with respect to Texas A & M's appeal, but reverse its remand order and dismiss Koseoglu's claim against Texas A & M. With respect to McLellan's appeal, we reverse the court of appeals' judgment and, rendering the judgment the court of appeals should have rendered, we dismiss Koseoglu's claim against McLellan.

## I. Background

In 1999, while still employed by Texas A & M, Koseoglu began moonlighting for a private business enterprise he partially owned. In early 2002, soon after McLellan became Koseoglu's supervisor, Koseoglu requested permission to continue his outside employment. McLellan denied Koseoglu's request. Koseoglu nevertheless continued the outside employment and, in October 2002, McLellan informed Koseoglu that his employment would be terminated at the end of the following month. Seeking to negotiate the terms of his dismissal, Koseoglu sent a letter to the general counsel of the Texas A & M University



System on December 19, 2002. In the letter, Koseoglu proposed that he be permitted to remain in his position until August 2003 and receive certain other financial and non-financial benefits. The letter included a blank signature line, under the word "AGREED," which was then signed by an attorney in the Texas A & M general counsel's office. On January 14,

[233 S.W.3d 838]

2003, Koseoglu's counsel sent a proposed draft of the final agreement to the Texas A & M general counsel's office. The final agreement was never signed. Koseoglu's counsel later wrote to the Texas A & M general counsel's office that, by refusing to execute the January 14 settlement documents, the Texas A & M University System was in breach of the December 19 "agreement."

In April 2003, Koseoglu sued McLellan and Texas A & M for breach of contract, asserting they breached the alleged December 19 agreement between Koseoglu and Texas A & M. Texas A & M and McLellan each pled the affirmative defense of sovereign immunity and filed pleas to the jurisdiction. Koseoglu filed a motion for summary judgment, contending in part that Texas A & M's and McLellan's sovereign immunity had been waived for his breach of contract action because it had been waived for an underlying action under 42 U.S.C. § 1983 in which Koseoglu asserted a denial of due process with respect to his employment contract with Texas A & M. Four months after Texas A & M and McLellan filed their pleas to the jurisdiction, the trial court denied them. Before the trial court ruled on Koseoglu's motion for summary judgment, Texas A & M and McLellan each filed an interlocutory appeal. The court of appeals reversed the trial court's denial of Texas A & M's plea to the jurisdiction and dismissed McLellan's interlocutory appeal for want of jurisdiction. 167 S.W.3d at 384. The court of appeals concluded that governmental entities do not waive their immunity from suit in Texas by accepting benefits under a contract, and that Koseoglu's pleadings against Texas A & M did not fit the narrow exception suggested by the plurality in *Texas A &*

*M University—Kingsville v. Lawson,* 87 S.W.3d 518 (Tex.2002), because Koseoglu's underlying Section 1983 claim was not one for which sovereign immunity had been waived. 167 S.W.3d at 380. Thus, the court of appeals held Koseoglu's breach of contract claim was barred by Texas A & M's sovereign immunity from suit and remanded the case to the trial court, suggesting it might be possible for Koseoglu to state some entirely different claim for which sovereign immunity might have been waived "with respect to the termination of the employer-employee relationship." *Id.* at 383. With respect to McLellan's appeal, the court of appeals held that, while section 51.014(a)(8) of the Texas Civil Practice and Remedies Code vested it with interlocutory appellate jurisdiction over a jurisdictional plea filed by state officials whose positions are derived from the Texas Constitution, the statute did not give it authority to review interlocutory orders on jurisdictional pleas filed by all other state officials, such as McLellan. *Id.* at 377-79. Both Texas A & M and McLellan then timely appealed the court of appeals' decision to this Court.

Texas A & M and McLellan argue the court of appeals erred on dual grounds. First, they contend the court of appeals erred in concluding it was without interlocutory appellate jurisdiction to review the jurisdictional plea filed by McLellan, a state official acting in his official capacity. Second, they argue the court of appeals should have dismissed Koseoglu's breach of contract claim after it concluded it was barred by sovereign immunity, rather than remand it to the trial court. We first consider Texas A & M's and McLellan's second issue.

## II. Koseoglu's Suit Against Texas A & M

Koseoglu argues Texas A & M waived its sovereign immunity from suit on his Section 1983 due process claims and therefore, under *Lawson,* 87 S.W.3d at

[233 S.W.3d 839]



519-23, Texas A & M's immunity has been waived in this breach of contract case as well. In *Lawson,* a plurality of this Court held a plaintiff's claim for breach of an agreement settling his underlying Whistleblower Act claim was encompassed within the Legislature's decision to waive immunity for Whistleblower Act claims. *Id.* at 522-23. But the court of appeals correctly held that the State and its officials sued in their official capacities are immune from money damages sought in a Section 1983 claim unless they waive their immunity. 167 S.W.3d at 380 (citing *Will v. Mich. Dep't of St. Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). It is up to the Legislature to institute such a waiver, and to date it has not seen fit to do so. *See Tex. Natural Res. Conservation Comm'n v. IT-Davy,* 74 S.W.3d 849, 857 (Tex.2002). Thus, as the court of appeals held, Koseoglu never had an actionable Section 1983 claim against Texas A & M and, therefore, his pleadings are deficient in the sense that *Lawson* is not implicated.

However, rather than dismiss Koseoglu's lawsuit against Texas A & M, the court of appeals reversed the trial court's denial of Texas A & M's plea to the jurisdiction and remanded the cause to the trial court so that Koseoglu could amend his pleadings. 167 S.W.3d at 383-84. It is true that a plaintiff deserves "a reasonable opportunity to amend" unless the pleadings affirmatively negate the existence of jurisdiction. *Harris County v. Sykes,* 136 S.W.3d 635, 639 (Tex.2004); *Tex. Dep't of Parks and Wildlife v. Miranda,* 133 S.W.3d 217, 226-27 (Tex.2004); *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002). Thus, the issue is whether Koseoglu has already been afforded that opportunity. If not, we agree that he deserves the opportunity if his pleadings can be cured.

Koseoglu argues a plaintiff is not required to amend his pleadings until they are determined by a court to be deficient. Thus, he contends he should now be provided an opportunity to amend. Texas A & M, on the other hand, argues the plaintiff's opportunity to amend should come after the governmental entity files its plea to the jurisdiction, which puts the plaintiff on notice of alleged defects in his pleadings, but before the trial court takes any definitive action. Accordingly, Texas A & M contends, because Koseoglu had four months to amend his pleadings after it filed its jurisdictional plea, no further opportunity is warranted. Otherwise, Texas A & M argues, suits against governmental entities could be appealed at least twice before final judgment—once to obtain a reversal and remand, and a second time after the remand is ordered.

The court of appeals sided with Koseoglu, concluding "a plaintiff may stand on his pleadings in the face of a plea to the jurisdiction unless and until a court determines that the plea is meritorious." 167 S.W.3d at 383 (citing *County of Cameron,* 80 S.W.3d at 559). Thereafter, the court of appeals held, the plaintiff must be given "`a reasonable opportunity to amend' his pleadings to attempt to cure the jurisdictional defects found" unless the pleadings are incurably defective. *Id.* (citing *Sykes,* 136 S.W.3d at 639; *Tex. Dep't Of Transp. v. Ramirez,* 74 S.W.3d 864, 867-68 (Tex. 2002)). Thus, the court of appeals concluded, Koseoglu has not been given a reasonable opportunity to amend his pleadings because the trial court never found merit in Texas A & M's jurisdictional plea. *Id.*

On this point, we generally agree with the court of appeals. Texas A & M's proposed rule would essentially allow governmental entities the unjust advantage of being not only a litigant, but also the judge

[233 S.W.3d 840]

of the plaintiff's pleadings. We decline to adopt such a rule. Thus, we agree that Koseoglu deserves the opportunity to amend his pleadings if the defects can be cured.

But Koseoglu's pleading defects cannot be cured, and he has made no suggestion as to how to cure the jurisdictional defect. As is the case with special exceptions, a pleader must be given an opportunity to amend in response to a plea to the jurisdiction only if it is possible to cure the pleading defect. *See Baylor Univ. v. Sonnichsen,*



221 S.W.3d 632, 635 (Tex.2007) ("Generally, when the trial court sustains special exceptions, it must give the pleader an opportunity to amend the pleading, unless the pleading defect is of a type that amendment cannot cure."). Remanding this case would serve no legitimate purpose because Koseoglu's underlying claim is a breach of contract claim. Merely pleading more facts in support of the breach of contract claim will not overcome Texas A & M's immunity from suit. Koseoglu advances a waiver-by-conduct argument (i.e., that Texas A & M waived its immunity from suit by accepting benefits under its alleged contract with Koseoglu), but we have consistently rejected that position and held that "the State does not waive its immunity from a breach-of-contract action by accepting the benefits of a contract." *Gen. Servs. Comm'n v. Little-Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001); *see, e.g., Catalina Dev. Co. v. County of El Paso,* 121 S.W.3d 704, 705-06 (Tex.2003); *Travis County v. Pelzel & Assocs., Inc.,* 77 S.W.3d 246, 248 (Tex.2002); *IT-Davy,* 74 S.W.3d at 860; *Federal Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 408 (Tex. 1997). And absent special statutory permission, a party cannot pursue a breach of contract action against the State without first obtaining consent from the Legislature under chapter 107 of the Texas Civil Practice and Remedies Code. *Little-Tex,* 39 S.W.3d at 597 (concluding that "there is but one route to the courthouse for breach-of-contract claims against the State, and that route is through the Legislature."). Accordingly, the court of appeals erred when it concluded Koseoglu, who has not obtained legislative consent to sue, may be able to state a cause of action for which sovereign immunity has been waived and remanded the cause to give Koseoglu an opportunity to amend. *See Miranda,* 133 S.W.3d at 228 (instructing that a plaintiff's suit should be dismissed when either the pleadings alone or the jurisdictional evidence demonstrates that the plaintiff's suit incurably falls outside any waiver of sovereign immunity).

## III. Appellate Jurisdiction Over McLellan's Interlocutory Appeal

Absent the State's consent to suit, a trial court has no jurisdiction over claims against the State. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638-39 (Tex.1999). Appellate courts have jurisdiction to consider immediate appeals of interlocutory orders only if a statute explicitly provides such jurisdiction. *Stary v. DeBord,* 967 S.W.2d 352, 352-53 (Tex. 1998). In this case, the court of appeals held it was without jurisdiction to hear McLellan's appeal pursuant to section 51.014(a)(8) of the Texas Civil Practice and Remedies Code. 167 S.W.3d at 379. This question of jurisdiction is a question of law, which we review de novo. *State v. Holland,* 221 S.W.3d 639, 642 (Tex.2007).

Our sole objective in construing Section 51.014(a)(8) is to give effect to the Legislature's intent. *Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939 (Tex.1993). In determining the Legislature's intent, we begin by looking to the plain meaning of the statute's

[233 S.W.3d 841]

words. *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 484 (Tex.1998). Section 51.014(a) contains two provisions that could arguably be relevant to interlocutory appeals of jurisdictional decisions relating to sovereign immunity:

A person may appeal from an interlocutory order of a district court, county court at law, or county court that:

. . . .

(5) denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state;

. . . .

(8) grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001;



. . . .

Section 101.001(3) of the Civil Practice and Remedies Code defines "governmental unit" as:

(A) this state and all the several agencies of government that collectively constitute the government of this state, including other agencies bearing different designations, and all departments, bureaus, boards, commissions, offices, agencies, councils, and courts;

(B) a political subdivision of this state, including any city, county, school district, junior college district, levee improvement district, drainage district, irrigation district, water improvement district, water control and improvement district, water control and preservation district, freshwater supply district, navigation district, conservation and reclamation district, soil conservation district, communication district, public health district, and river authority;

(C) an emergency service organization; and

(D) any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution.

We strictly construe Section 51.014(a) as "a narrow exception to the general rule that only final judgments are appealable." *Bally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 355 (Tex.2001).

Had McLellan filed a motion for summary judgment based on an assertion of official immunity, he clearly would be permitted under Section 51.014(a)(5) to appeal an interlocutory denial of his motion for summary judgment. But McLellan did not file such a motion in the trial court and instead asserts a right under Section 51.014(a)(8) to appeal the trial court's interlocutory denial of his plea to the jurisdiction. While it is clear that the Legislature intended only a few and distinct classes of "persons" to be permitted to bring interlocutory appeals in only a few narrowly drawn situations, there is considerable conflict among the courts of appeals about when state officials qualify to do so. Some courts of appeals have concluded interlocutory review of a plea to the jurisdiction is not available under Section 51.014(a)(8) when state officials are sued in their official capacities because a state official is an individual rather than "a governmental unit." *See, e.g., Castleberry Indep. Sch. Dist. v. Doe,* 35 S.W.3d 777, 780 (Tex. App.-Fort Worth 2001, pet. dism'd w.o.j.); *Dallas County Cmty. Coll. Dist. v. Bolton,* 990 S.W.2d 465, 467 (Tex.App.-Dallas 1999, no pet.); *Univ. of Houston v. Elthon,* 9 S.W.3d 351, 354 (Tex.App.-Houston [14th Dist.] 1999, pet. dism'd w.o.j.). A second group has held all state officials are entitled under Section 51.014(a)(8) to appeal a trial court's interlocutory ruling on a jurisdictional plea because a state official qualifies

[233 S.W.3d 842]

as a "governmental unit" in the sense that he stands in the shoes of the State. *See, e.g., De Mino v. Sheridan,* 176 S.W.3d 359, 365 (Tex.App.-Houston [1st Dist.] 2004, no pet.); *Smith v. Lutz,* 149 S.W.3d 752, 756 (Tex.App.-Austin 2004, no pet.); *Potter County Attorney's Office v. Stars & Stripes Sweepstakes, L.L.C.,* 121 S.W.3d 460, 464 (Tex.App.-Amarillo 2003, no pet.); *Nueces County v. Ferguson,* 97 S.W.3d 205, 214-15 (Tex.App.-Corpus Christi 2002, no pet.). Straddling that split is the court of appeals in this case, which held some state officials, such as a county sheriff, are entitled to appeal a trial court's interlocutory order on a plea to the jurisdiction because their positions are governmental units by virtue of the fact that they are derived from the Texas Constitution. 167 S.W.3d at 377-79 (citing TEX. CONST. art. V, § 23; TEX. GOV'T CODE § 101.001(3)(D)). Those officials who are not so situated must rely instead, under the court's holding, on a motion for summary judgment under Section 51.014(a)(5) because they are considered individuals rather than governmental units. *Id.*

In arguing Section 51.014(a)(8) does not permit state officials to appeal the trial court's



denial of his plea to the jurisdiction, Koseoglu contrasts the language of Section 51.014(a)(8) with the language in Section 51.014(a)(5). Whereas Section 51.014(a)(8) permits interlocutory appeals of a trial court's grant or denial of a "plea to the jurisdiction" by a "governmental unit," Section 51.014(a)(5) permits interlocutory appeals of a trial court's denial of a "motion for summary judgment" by an "individual who is an officer or employee of the state or a political subdivision of the state." The Legislature, Koseoglu asserts, should be presumed to have understood the difference between an "individual who is an officer or employee of the state," on the one hand, and "a governmental unit" on the other, when specifying the categories of persons that are permitted to employ the narrow exception to the general rule. Likewise, Koseoglu argues, the Legislature should be presumed to have understood the difference between a "motion for summary judgment" as it is used in Section 51.014(a)(5) and a "plea to the jurisdiction" as it is used in Section 51.014(a)(8).

But Koseoglu's premise that the class of persons to which Section 51.014(a)(8) applies is confined by the term "governmental unit" is incorrect. This becomes clear when one considers which terms or phrases in Section 51.014(a) specify "what" can be appealed and "who" is entitled to pursue an appeal. Koseoglu argues the "what" applicable to Section 51.014(a)(5) is "a motion for summary judgment" and the "who" is "an individual who is an officer or employee of the state." Likewise, he argues the "what" in Section 51.014(a)(8) is "a plea to the jurisdiction" and the "who" is "a governmental unit." We disagree. The text of Section 51.014(a) makes it clear that the "who" applicable to each subsection is the term "person" that appears at the beginning of the statute. There is no indication that the phrases "an individual who is an officer or employee of the state" or "a governmental unit" in Sections 51.014(a)(5) and 51.014(a)(8), respectively, are intended to modify the term "person." Instead, those phrases and others in the various subsections of the statute describe exactly "what" may be appealed from an interlocutory order.

For example, Texas A & M and McLellan cite Sections 51.014(a)(5) and 51.014(a)(6) as support for their proposition that only one class of "person" may appeal the orders described in Section 51.014(a). Section 51.014(a)(6) permits a person to appeal from an interlocutory order that:

[233 S.W.3d 843]

denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73.

Thus, Section 51.014(a)(6) limits interlocutory appeals to "members of the electronic or print media" in certain instances involving the "free speech or free press clause of the First Amendment to the United States Constitution." It can only be read as allowing appeals by members of the media "or a person whose communication appears in or is published by" the media. No other person would typically have standing to appeal a denial of "a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media . . . or a person whose communication appears in or is published by the electronic or print media." Similarly, there is no other way to read Section 51.014(a)(5) than to conclude that only an "individual who is an officer or employee of the state or a political subdivision of the state" may appeal an interlocutory order denying a motion for summary judgment. The only other entity that would generally have standing to file such an appeal would be a governmental body, but the words of Section 51.014(a)(5) offer no indication or suggestion that it applies to any entity other than a state official, the only entity which it describes. This stands to reason because an official sued in his individual capacity would assert official immunity as a defense to personal



monetary liability, which is well suited for resolution in a motion for summary judgment. *See City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994) (discussing summary judgment resolution of official immunity considerations such as whether the official acted in bad faith). But an official sued in his official capacity would assert sovereign immunity. To challenge a trial court's jurisdiction on the grounds of sovereign immunity, a party may file a plea to the jurisdiction. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999). Pleas to the jurisdiction asserting sovereign immunity are the subject of Section 51.014(a)(8).

Section 51.014(a)(8) differs from Sections 51.014(a)(5) and 51.014(a)(6) because, by its plain language allowing for interlocutory appeals of orders granting or denying pleas to the jurisdiction, it cannot be read as applying solely to a governmental unit, the entity which it describes. Interpreting "governmental unit" to modify the term "persons," as Koseoglu would have us do, would preclude an aggrieved plaintiff, who is plainly not a governmental unit, from bringing an interlocutory appeal to challenge the grant of a jurisdictional plea. This would be inconsistent with the express language of Section 51.014(a)(8). It would be irrational for the Legislature to have intended that a governmental unit be the only "person" who may appeal from an interlocutory order because a governmental unit would have no reason to appeal the grant of a plea to the jurisdiction. For the entire phrase "grants or denies" to be given effect, the statute must allow an appeal to be filed by both a non-governmental plaintiff challenging the grant of a plea to the jurisdiction and a governmental defendant challenging the denial of one.[1]

[233 S.W.3d 844]

Given that Section 51.014(a)(8) necessarily applies to entities other than governmental units, there is no basis for construing it to exclude state officials. Whereas the Legislature intentionally restricted the application of Sections 51.014(a)(5) and 51.014(a)(6) by allowing interlocutory appeals only from a denial of a motion for summary judgment, Section 51.014(a)(8) is deliberately made more generous in its application. There is no reason to believe the Legislature intended the statute to apply to all parties who ordinarily would have standing to appeal an interlocutory order granting or denying a jurisdictional plea with the sole exception of state officials. First, such an interpretation would not comport with the text of the statute because, just as Section 51.014(a)(8) gives no indication it excludes non-governmental plaintiffs, it also gives no indication it excludes state officials. Second, construing Section 51.014(a)(8) to exclude state officials would draw an artificial distinction between pleas filed by governmental entities and pleas filed by state officials asserting the entities' sovereign immunity from suit, a distinction we believe the Legislature could not have intended. When a state official files a plea to the jurisdiction, the official is invoking the sovereign immunity from suit held by the government itself. It is fundamental that a suit against a state official is merely "another way of pleading an action against the entity of which [the official] is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. Dep't of Social Servs. of City of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Tex. Dep't of Pub. Safety v. Petta,* 44 S.W.3d 575, 581 (Tex.2001). A suit against a state official in his official capacity "is *not* a suit against the official personally, for the real party in interest is the entity." *Graham,* 473 U.S. at 166, 105 S.Ct. 3099 (emphasis in original). Such a suit actually seeks to impose liability against the governmental unit rather than on the individual specifically named and "is, in all respects other than name, . . . a suit against the entity." *Id.; see also Tex. Natural Res. Conservation Comm'n v. IT-Davy,* 74 S.W.3d 849, 855-56 (Tex.2002).

[233 S.W.3d 845]

Thus, we conclude McLellan's appeal fits squarely into those appeals permitted by Section 51.014(a)(8). Read in whole, the statute provides that "a person," in this instance McLellan, "may appeal from an interlocutory order . . . that . . .



grants or denies a plea to the jurisdiction by a governmental unit," such as Texas A & M, "as that term is defined in Section 101.001." TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8). This construction is supported not only by the plain language of Section 51.014(a), but also by its logical application. A person sued in an official capacity should be able to appeal the denial of a jurisdictional plea in the same way as his employing governmental unit because both defendants' interests in pleading sovereign immunity are identical. We are aware of no sound rationale for distinguishing one from the other.

To the contrary, there are sound reasons to treat the state official sued in his official capacity and his employing governmental entity equally under Section 51.014(a)(8). Construing Section 51.014(a)(8) to exclude state officials sued in their official capacity would make appellate jurisdiction in a case such as this turn on the same kind of technical distinctions about the form of pleadings that we rejected in *Department of Criminal Justice v. Simons,* 140 S.W.3d 338, 349 (Tex.2004). In *Simons,* we held the term "plea to the jurisdiction" in Section 51.014(a)(8) refers to the substance of the immunity argument rather than "to a particular procedural vehicle." *Id.* This case demonstrates the type of inefficiencies that would otherwise result. Here, the court of appeals held it could consider Texas A & M's plea on interlocutory appeal but not McLellan's. 167 S.W.3d at 384. If McLellan were to now go back to the trial court to file a motion for summary judgment based on sovereign immunity, and if his motion were denied, he would then file what would be his second interlocutory appeal in this case seeking substantively identical relief. This situation could be expected to all too often repeat itself in other cases because a trial court's orders on a jurisdictional plea and a motion for summary judgment often occur across too broad a spectrum of time to be appealed as part of the defendant's same interlocutory appeal. *See* TEX. R. APP. P. 26.1(b), 28.1 (requiring a notice of interlocutory appeal to be filed within twenty days of a particular order being challenged). The legislative history of Section 51.014(a) underscores the Legislature's concern with preventing such

inefficiency. For example, Section 51.014(a)(8) was designed to reduce litigation expenses for all parties involved in suits against state entities by resolving the question of sovereign immunity prior to suit rather than after a full trial on the merits.[2] These cost savings apply equally regardless of whether the plaintiff chooses to style his petition against a governmental entity or a state official. Likewise, the purpose of the provision was to allow state agencies to more quickly ascertain whether or not a trial court could assert jurisdiction over a dispute. *See* Debate on Tex. S.B. 453 Before the House Comm. on Civil Practices, 75th Leg., R.S. (1997) (statement of Representative Pete Gallego). That concern too is equally justified regardless of whether a plaintiff has chosen to style his petition against a state official or the governmental entity itself.

As may typically occur, an official sued in both his official and individual capacities

[233 S.W.3d 846]

can file a plea to the jurisdiction in defense of the official capacity claims against him and at the same time file a motion for summary judgment on official immunity grounds on the individual capacity claims against him. If either is denied, he may immediately appeal under Section 51.014(a)(8) or 51.014(a)(5), whichever applies. In this case, McLellan filed a plea to the jurisdiction in defense of claims against him in his official capacity[3] Accordingly, Section 51.014(a)(8) vests the appellate courts with jurisdiction to hear McLellan's interlocutory appeal.

Alternatively, Koseoglu suggests the availability of interlocutory appeal under Section 51.014(a)(8) turns not on the capacity in which the state official is sued, but on whether the official serves a legislative, judicial, or administrative function. But Koseoglu offers no authority for the proposition that this distinction is relevant to Section 51.014(a)(8), and we are aware of none. Thus, the court of appeals erred in concluding it was without jurisdiction to hear McLellan's appeal.



## IV. Conclusion

With respect to the trial court's denial of Texas A & M's plea to the jurisdiction, we affirm the portion of the court of appeals' judgment holding that Koseoglu's breach of contract claims against Texas A & M were barred by sovereign immunity. But because Koseoglu's pleadings are incurably defective, remanding the cause to the trial court will serve no legitimate purpose. Therefore, we reverse the court of appeals' remand order and dismiss Koseoglu's claims against Texas A & M with prejudice. *See Harris County v. Sykes,* 136 S.W.3d 635, 636 (Tex.2004) (holding that dismissal pursuant to a plea to the jurisdiction based on sovereign immunity is with prejudice). With respect to McLellan's appeal, having examined the plain language of Section 51.014(a)(8), its logical application, and the legislative history, we hold a state official may seek interlocutory appellate review from the denial of a jurisdictional plea. Accordingly, we reverse that portion of the court of appeals' judgment that it was without jurisdiction to decide McLellan's appeal of the trial court's denial of his jurisdictional plea and, under Rule 60.2(c) of the Texas Rules of Appellate Procedure, we render the judgment the court of appeals should have rendered. Like Koseoglu's pleadings against Texas A & M, his pleadings against McLellan were deficient in the sense that he never had an actionable Section 1983 claim. In both instances, Koseoglu deserves the opportunity to amend his pleadings if they can be cured, but in both instances, because Koseoglu's underlying claim is one for breach of contract, the defects cannot be cured. Accordingly, just as we dismissed Koseoglu's claim against Texas A & M with prejudice, we likewise dismiss with prejudice the claim against McLellan in his official capacity.

---------------

Notes:

1. Section 51.014(a) references section 101.001(3) of the Tort Claims Act in articulating its meaning of the term "governmental unit." Koseoglu contends this reference eliminates all doubt as to whether the Legislature intended individual state officials to be permitted to bring a challenge by way of a plea to the jurisdiction. Government employees are not included in the definition of "governmental unit" under the Tort Claims Act. *See* TEX. CIV. PRAC. & REM. CODE § 101.001(3) (defining "governmental unit"). Texas A & M, however, argues that under the Tort Claims Act officials sued in their official capacities have been treated by several of the courts of appeals as the equivalent of governmental entities. *See, e.g., Harrison v. Tex. Dep't of Criminal Justice-TDCJID,* No. 07-03-0239-CV, 2005 WL 1397415, at *2 (Tex.App.-Amarillo June 14, 2005, no pet.) (mem.op.); *Tex. State Auditor's Office v. Mora-Nichols,* No. 03-03-00113-CV, 2003 WL 22453830, at *4 (Tex.App.-Austin Oct.30, 2003, no pet.) (mem.op.); *Madox v. Thomas,* No. 11-02-00042-CV, 2003 WL 21757477, at *2 (Tex. App.-Eastland July 31, 2003, no pet.) (mem. op.); *Klein & Assocs. Political Relations v. Port Arthur Indep. Sch. Dist.,* 92 S.W.3d 889, 896 (Tex.App.-Beaumont 2002, pet. denied); *Univ. of Tex. Med. Branch at Galveston v. Hohman,* 6 S.W.3d 767, 777-78 (Tex.App.-Houston [1st Dist.] 1999, pet. dism'd w.o.j.); *Bates v. Dallas Indep. Sch. Dist.,* 952 S.W.2d 543, 551 (Tex.App.-Dallas 1997, writ denied); *Dear v. City of Irving,* 902 S.W.2d 731, 735 n. 4 (Tex.App.-Austin 1995, writ denied). Because we concluded in *Department of Criminal Justice v. Simons,* 140 S.W.3d 338, 349 (Tex.2004), that the term "governmental unit," as it is used in Section 51.014(a)(8), merely describes the substance of allowable pleas and conclude today that Section 51.014(a)(8)'s use of "governmental unit" does not define the class of persons who can appeal under that section, we need not address the meaning of the term in Section 101.001(3).

2. Supporters of the provision believed "incorrect rulings on [jurisdictional pleas] needlessly waste the time of the courts and can cost litigants hundreds of thousands of dollars as they defend cases which should have been dismissed." *See* HOUSE COMM. ON CIVIL PRACTICES, BILL ANALYSIS, Tex. S.B. 453, 75th Leg., R.S. (1997).



3. The parties disagree about whether Koseoglu brought claims against McLellan in his individual capacity. Any such claims are not at issue in this appeal because McLellan's plea to the jurisdiction, whose denial gave rise to this appeal, invoked sovereign immunity only "to the extent [McLellan was] sued in his official capacity." Therefore, any claims against McLellan in his individual capacity remain pending before the trial court. *See, e.g., Smith v. Lutz,* 149 S.W.3d 752, 756 n. 3 (Tex.App.-Austin 2004, no pet.).

---------------





Page 475

**63 S.W.3d 475 (Tex.App.-San Antonio 2001)**
**TEXAS DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION, Appellant**
**v.**
**Diana RODRIGUEZ, Appellee**
**No. 04-99-00603-CV**
**Court of Appeals of Texas, San Antonio**
**October 31, 2001**

From the 49th Judicial District Court, Webb County, Texas Trial Court No. 96-CVQ-01466-D1 Honorable Solomon Casseb, Jr., Judge Presiding

The motion for rehearing en banc filed by Diana Rodriguez on May 30, 2001, is granted. The panel's opinions and judgment of May 16, 2001, are withdrawn, and these opinions and judgment are substituted.

Page 476

[Copyrighted Material Omitted]

Page 477

Sitting en banc: Phil Hardberger, Chief Justice, Tom Rickhoff, Justice, Alma L. Lopez, Justice, Catherine Stone, Justice, Paul W. Green, Justice, Sarah B. Duncan, Justice (concurring in the judgment only), Karen Angelini, Justice

Angelini, Justice

The Texas Department of Mental Health and Mental Retardation of the State of Texas ("MHMR") appeals a judgment awarding damages to Diana Rodriguez ("Rodriguez") in a whistle blower action. MHMR asserts six points of error, contending that the evidence is legally and factually insufficient to support several of the jury's findings, and that the trial court erred in failing to apply the statutory damages cap to damages for past mental anguish and to the award of pre-judgment interest.

Background

Rodriguez was hired as a case worker at the Laredo State Center ("LSC"), a program operated under MHMR supervision. Shortly thereafter, Rodriguez returned to school and obtained a masters degree in counseling psychology. She then returned to LSC in 1991 as an associate psychologist.

In 1995, Rodriguez was named as program administrator of LSC's Crisis Intervention Unit ("CIU"). During this time, Rodriguez was appointed to a Mental Health Task Force, consisting of health care and political representatives. Some of the task force members, including Rodriguez, went to Starr County in April 1996 to educate officials regarding civil commitment procedures. Upon their return, Rodriguez and two other LSC employees reported their findings to LSC administrators, including Javier Ramirez, LSC's chief executive. The report noted that Starr County officials did not have a clear understanding of the Mental Health Code and possibly were abusing the civil commitment process.

Ramirez responded to the report in writing, complimenting the employees on their efforts and requesting that more specific proposed solutions be developed. Ramirez

Page 478

noted that any allegations regarding civil rights violations would be taken seriously. Despite the continued efforts of LSC employees, however, Starr County officials apparently made no changes in their civil commitment procedures.

In September of 1996, Rodriguez and Dr. Jose G. Garcia, LSC's consultant psychiatrist, again went to Starr County to provide technical assistance in commitment procedures. At Ramirez's request, they prepared a memorandum reporting that the county attorney's office was resisting any modification in procedures to properly handle the legal requirements for involuntary commitment. The report stated that



the due process of proposed patients is rarely protected. The report strongly recommended intensive training on mental health issues for all staff handling intake evaluation in Starr County. The report concluded that the concerns had been discussed with Barbara Owens from the office of legal counsel of MHMR in Austin, who indicated she would address the issue from the state level. Rodriguez testified that she distributed the memorandum to Ramirez and several others at LSC around 10:00 a.m. on September 26, 1996.

Approximately one month earlier, Ramirez had issued a memorandum to all staff in which he noted that some staff might not be pulling their weight or complying with their tasks as defined in their job descriptions. In keeping with his management style, Ramirez stated that the memo was to serve as official notice that failure to comply with a job description, violation of departmental rules and regulations, commission of insubordination or acts of consumer abuse/neglect, or failure to provide services to consumers would not be tolerated.

Also, during September 1996, Ramirez implemented a mandatory staff training program. Rodriguez attended the training on September 24, 1996, but failed to show up for training on September 25. Shortly after the training session commenced, the staff development director went to Rodriguez's office and inquired about her absence from the training session. At the time, Rodriguez was in a meeting with a representative from the Texas Department of Protective and Regulatory Services ("TPRS"). Ramirez testified that if a TPRS investigator is present at LSC conducting an investigation, Rodriguez is required by law to cooperate with him. Nevertheless, Sanchez insisted that Rodriguez attend the training. Sanchez testified that Rodriguez refused.

Sanchez reported Rodriguez's failure to attend the training to Ramirez. Ramirez went to Rodriguez's office, directed her to attend and instructed a human resources employee to escort Rodriguez to the training. Rodriguez testified that another employee, a department manager, was

also absent from the training; however, Ramirez testified that department managers were not required to attend. Rodriguez went to the training after she finished her report for the TPRS.

On September 26, 1996, Ramirez prepared a Thurston letter, which is the first step in LSC's disciplinary process, regarding the incident. Ramirez testified that when he prepared the Thurston letter, he intended to terminate Rodriguez. He further testified that he had not seen Rodriguez's September 26, 1996 report regarding Starr County when he prepared the Thurston letter. Rodriguez received the Thurston letter on September 27, 1996 at 4:00 p.m. Rodriguez testified that personnel policies required that her immediate supervisor, not Ramirez, prepare the Thurston letter. Ramirez, however, testified that he had prepared the Thurston letter himself because he was directly involved in the confrontation.

Page 479

On September 28, 1996, Rodriguez filed a rebuttal to the Thurston letter, stating that she had not been notified that attendance on September 25, 1996, was mandatory. She subsequently filed an official complaint against Ramirez, with Ramirez's supervisor, Sam Wilson. Wilson determined that the Thurston letter should be removed from Rodriguez's file; however, the letter was not removed until January 9, 1997, after Rodriguez filed her lawsuit.

On October 14, 1996, Lillian Dickinson, Rodriguez's immediate supervisor, wrote a memorandum to Ramirez regarding an incident involving the CIU dispensing medication to an outpatient. Rodriguez had informed Dickinson that dispensing medication to an outpatient violated the Code. Dickinson reported Rodriguez for questioning her authority. Dickinson noted that Rodriguez was written up because of her attitude and behavior, and not because she was wrong with regard to what the Code required.

Two days later, on October 16, Rodriguez was given a performance counseling and review.



At the meeting, Ramirez read Rodriguez's job description and instructed her to complete a number of assignments and to report directly to Dickinson about important issues. Rodriguez testified that she was not demoted nor were her wages affected by the performance counseling. Further, the performance counseling did not cause any change or loss in job duties or responsibilities.

In November of 1996, Rodriguez received a performance evaluation. Although her overall evaluation was "meets standards," Rodriguez received a "below standards" evaluation for "comply[ing] with applicable Center, TXMHMR, and unit rules, policies and procedures for the Laredo State Center 100% of the time." Dickinson testified that the "below standards" rating had to do with following unit rules, policies, and procedures, including the Code. Specifically, Rodriguez had not attended the mandatory training and had behaved in an insubordinate manner to Dickinson. Rodriguez testified that she believed the "below standards" evaluation precluded her from receiving a raise; however, her testimony was rebutted by several LSC managers, who testified that one "below standards" rating in a single category would not preclude Rodriguez from receiving a raise.

On December 6, 1996, Rodriguez filed suit, alleging that she had been subjected to adverse personnel actions as a result of reporting violations of the law in Starr County.

Late in 1997, Rodriguez became concerned that patients were not receiving appropriate treatment in the CIU. Rodriguez began collecting documentation which she gave to Dickinson. A technical assistance team was sent to investigate and, as a result of the investigation, the team recommended that the CIU switch to a nurse manager model of management. MHMR followed this recommendation.

Because this change in management style required a nurse to manage the unit, Rodriguez was transferred to Club Primavera, a rehabilitation program that was considerably smaller than CIU. When she was transferred, Rodriguez was given one hour to vacate her office and, according to Rodriguez, four people watched as she cleared her office.

Rodriguez filed a formal complaint regarding the transfer, expressing concern that Club Primavera was soon to be shut down. Ramirez responded that, although he had considered closing Club Primavera at one point, he eventually had decided to maintain the program. Although there was evidence that working in the CIU was considered more prestigious than working

Page 480

in the rehabilitation program, Rodriguez admitted that the transfer offered her a new challenge and an opportunity to restructure and reorganize. Rodriguez stated that she enjoyed working in the program and admitted that the transfer did not involve a change in her title or salary. There was testimony from Rodriguez's co-workers that she was professional and competent, but that after the September Starr County report, the attitude at LSC toward Rodriguez became hostile.

Rodriguez testified that she generally received a 3% raise if she was ranked as "exceeding standards" on her performance evaluation. However, Rodriguez, since 1996, has not received any raises. Rodriguez did receive a promotion in January of 1996 from Program Administrator I to Program Administrator II. And, in the fall of 1997, Rodriguez received the $100 across the board raise given to each employee of the facility.

Yvonne Lopez, who was special assistant and assistant director for support services of LSC, testified that because Rodriguez was promoted from Program Administrator I to Program Administrator II in January of 1996, she was precluded by MHMR policies from receiving a merit increase within the following 12-month period. Lopez further testified that she participated in the decision to transfer Rodriguez to the rehabilitation program. The decision to



transfer was based on the CIU's conversion to a nurse manager model and the existence of a vacancy at Club Primavera for which Rodriguez was qualified. Lopez stated that Rodriguez's report regarding the violations in Starr County did not factor into the transfer decision.

Discussion

A. Legal and Factual Sufficiency

MHMR's first four points of error challenge the legal and factual sufficiency of the evidence to support various jury findings. In reviewing the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the finding, and we disregard all evidence and inferences to the contrary. See Vickery v. Vickery, 999 S.W.2d 342, 375-76 (Tex. 1999). If there is a scintilla of evidence to support the finding, the finding will be upheld. See id. In reviewing a factual sufficiency point, we are required to weigh all of the evidence in the record. See Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. See id. The jury, as trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. See Knox v. Taylor, 992 S.W.2d 40, 50 (Tex. App.--Houston [14th Dist.] 1999, no pet.). Because the appellate court is not the fact finder, it may not substitute its own judgment for that of the trier of fact, even if a different answer could be reached on the evidence. See Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).

1. Adverse Personnel Action and Causation

In its first issue, MHMR challenges the legal and factual sufficiency of the evidence to support the jury's finding that Rodriguez suffered adverse personnel actions that would not have occurred absent her reporting of Starr County's legal violations. The three adverse personnel actions Rodriguez contends were taken against her are: (1) the Thurston letter; (2) the "below standards" performance evaluation ranking; and (3) her

transfer from CIU to the rehabilitation program. Section 554.001(3) of the Texas Government Code defines "personnel action" as an action that affects a public employee's

Page 481

compensation, promotion, demotion, transfer, work assignment, or performance evaluation. See Tex. Gov't Code Ann. §554.001(3) (Vernon Supp. 2000). MHMR asserts, however, that we must interpret the meaning of "adverse personnel action" in view of the federal court cases holding that only "ultimate employment decisions" are prohibited, which do not include reprimands, warnings, and missed pay increases which lack significant consequence. See Mattern v. Eastman Kodak Co., 104 F.3d 702, 709 (5th Cir. 1997). We disagree with MHMR's narrow reading of the term "personnel action."

The statutory definition specifically includes actions affecting transfer, work assignment, or performance evaluation, not just ultimate employment decisions. And, although there appears to be little in the way of actual adverse consequences to Rodriguez as a result of the three actions of which she complains, there is evidence from which the jury could conclude that they had an adverse impact on Rodriguez. The Thurston letter was a step toward taking disciplinary action, the "below standard" evaluation was an unfavorable reflection of her performance, and some witnesses perceived the rehabilitation unit to which Rodriguez was transferred to be a less desirable place to work.

MHMR also challenges the causation aspect of Rodriguez's claim. [1] The Texas Supreme Court has recently clarified the causation standard that was first announced in Texas Department of Human Services v. Hinds, 904 S.W.2d 629 (Tex. 1995). See City of Fort Worth v. Zimlich, 29 S.W.3d 62, 67 (Tex. 2000). To show causation, Rodriguez must demonstrate that after she reported the violation, she suffered discriminatory conduct that would not have occurred when it did if she had not reported the illegal conduct. See id. Causation may not be



inferred without some evidence to support the finding. See id. Circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct. Id. Such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. Id. Evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. Id.

(A) The Thurston Letter

On September 25, Rodriguez did not attend a mandatory training session until she was reminded to attend by the staff development director, directed to attend by Ramirez, and then, eventually, escorted by a human resources employee. According to Rodriguez, she distributed the memorandum regarding the commitment procedures in Starr County the following day, on September 26, at about 10:00 a.m. Also, on September 26, Ramirez prepared the Thurston letter regarding the training incident as a disciplinary procedure

Page 482

against Rodriguez. Rodriguez received it on September 27, at 4:00 p.m. Although the timing of events is such that Ramirez might have seen the report before preparing the Thurston letter, Ramirez testified that when he prepared the Thurston letter, he had not seen Rodriguez's September 26 report. Thus, there is no evidence that Ramirez saw Rodriguez's report before he issued the Thurston letter.

Likewise, there is no evidence that Ramirez expressed a negative attitude toward Rodriguez's report concerning Starr County procedures. In

fact, Ramirez had complimented Rodriguez and others for their efforts in preparing a similar report and had indicated he would give serious consideration to civil rights violations in Starr County.

With regard to adherence to established policy, Rodriguez testified that established policy required her immediate supervisor, Dickinson, to have prepared the Thurston letter instead of Ramirez. However, Ramirez explained that he prepared it himself because he was directly involved in the confrontation with Rodriguez. Furthermore, Dickinson had only been Rodriguez's supervisor for a short period of time.

Rodriguez attempted to show she was treated in a discriminatory manner in comparison to similarly situated employees by testifying that another supervisor who did not attend the training session was not disciplined; however, Ramirez explained that the other supervisor was a department head and, therefore, was not required to attend.

Although Rodriguez apparently did not initially receive notice of the training session, she was directed to attend after it began. However, she, at first, refused because she was in a meeting with a TPRS investigator and only went to the training session after finishing her report for the investigator and receiving an escort from the human resources department. Although it was eventually determined that the Thurston letter should be removed from Rodriguez's file, this does not show that Ramirez's stated reason for preparing the letter was false or that the Starr County report was the actual reason for the Thurston letter.

(B) The October 16, 1996 Performance Evaluation

Although Rodriguez received an overall "meets standards" evaluation, she received one "below standards" ranking. It is undisputed that Ramirez had knowledge of Rodriguez's Starr County report by the time she received her October 16th performance review. However, as



stated above, there is no evidence that Ramirez ever reacted negatively toward the report and, in fact, had reacted favorably to Rodriguez's work in Starr County.

Further, there is no evidence that in giving Rodriguez one "below standards" ranking, established policies were not followed or that she was treated differently from similarly situated employees. And, according to Dickinson, the "below standards" rating concerned unit rules, policies, and procedures. Specifically, she referred to Rodriguez's failure to attend the training session and her insubordination on other matters. Furthermore, there is no evidence that these stated reasons were false.

(C) Transfer to the Rehabilitation Program

Again, it is undisputed Ramirez knew of the Starr County report when Rodriguez was transferred to the rehabilitation program. But, although the process by which she was transferred was unusual, there is no evidence the decision to transfer was made without adhering to established policy. In fact, it is undisputed that when the CIU converted to a nurse manager model, it was no longer feasible to keep Rodriguez as program manager.

Page 483

Further, there is no evidence Rodriguez was treated differently from similarly situated employees or that the stated reasons for transferring her to another unit were false. Rodriguez reported problems in the unit, so a team was called in to address the problems. After conducting a study, the team recommended a change to a nurse manager model. This necessarily required a nurse to manage the unit. Rodriguez was transferred to the rehabilitation unit with no reduction in pay.

In summary, Rodriguez complains of only three adverse employment actions taken against her. With regard to the Thurston letter, there is no evidence that Ramirez was aware of Rodriguez's report when he issued it and,

moreover, it related to his perception at the time he issued it that Rodriguez had refused to attend mandatory training. With regard to the performance evaluation and the transfer to the rehabilitation unit, Ramirez was clearly aware of Rodriguez's report regarding Starr County; however, the evidence shows he never reacted negatively to the report and, in fact, had reacted favorably to Rodriguez's efforts in Starr County. Furthermore, established policy was generally followed except for minor deviations, which were explained. And, there is no evidence Rodriguez was treated any differently from similarly situated employees or that the stated reasons for taking the actions were false. Thus, the types of circumstantial evidence set forth by the Supreme Court in Zimlich do not exist in this case. The evidence is legally insufficient to show that the three adverse employment actions of which Rodriguez complains would not have been taken if Rodriguez had not made her Starr County Report. As stated in Zimlich, there is no evidence "from which a fact finder could reasonably infer that discrimination was a factor in the decision process." City of Fort Worth v. Zimlich, 29 S.W.3d 62, 69 (Tex. 2000). Without evidence supporting such an inference, "a finding of liability rests only on speculation." Id. at 70.

Because we find there is no evidence of causation to support the jury's finding, we need not address Rodriguez's remaining issues.

Conclusion

We hold there is no evidence of causation to support the jury's finding. We, therefore, reverse and render the judgment in MHMR's favor.

Concurring opinion by: Tom Rickhoff, Justice

Dissenting opinion by: Phil Hardberger, Chief Justice (joined by Justice Lopez and Justice Stone)

---------------

Notes:



[1](#). Section 554.004 of the Texas Government Code states that causation is presumed if the adverse personnel action occurs not later than the 90th day after the date the employee reports the violation. See Tex. Gov't Code Ann. §554.004(a) (Vernon Supp. 2000). The presumption is subject to rebuttal. See id. Once MHMR offered sufficient evidence to suggest no connection between Rodriguez's report and the adverse personnel actions, the presumption was rebutted and Rodriguez was required to prove a causal connection. See Texas Natural Resource Conservation Com'n v. McDill, 914 S.W.2d 718, 724 (Tex. App.--Austin 1996, no writ).

---------------

RICKHOFF, Justice, concurring.

In my opinion, the adverse employment action must be taken based on the contents of the "whistle-blower" report. In this case, none of the appellee's superiors were critical of the content of her report; her supervisors agreed that Starr County officials were abusing the requisite legal procedures in the methods they were using for mental health commitments. The adverse employment action was related to the manner in which the appellee acted subsequent to the report that caused her to be viewed as an uncompromising non-team player. The appellee was forceful, difficult, and opinionated at a time when a new supervisor had a yen for team players. The adverse employment action is not linked to her criticism of Starr County but with her attitude in the workplace. Because the majority reaches the same result, I concur.

HARDBERGER, Chief Justice, dissents

To prove causation, Rodriguez was required to demonstrate that after she reported

Page 484

Starr County's violations of the Mental Health Code, she suffered adverse personnel actions that would not have occurred when they did if she had not reported the illegal conduct. City of Fort

Worth v. Zimlich, 29 S.W.3d 62, 67 (Tex. 2000). I agree with the majority that the Thurston letter and the performance evaluation were adverse personnel actions. However, I disagree that there was no evidence to support the jury's finding that Rodriguez suffered these adverse personnel actions because she reported the illegal conduct.

Circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct. Id. Such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. Id.

(1) Knowledge of the Report

The majority concedes that "the timing of the events is such that Ramirez might have seen [Rodriguez's] report before preparing the Thurston letter." However, the majority rejects this possible inference because Ramirez testified that he did not see the report before he prepared the Thurston letter. In doing so, the majority ignores the applicable standard of review.

When considering a legal sufficiency complaint, we consider only the evidence and inferences that tend to support the jury's finding, disregarding all evidence and inferences to the contrary. Lewelling v. Lewelling, 796 S.W.2d 164, 166 (Tex. 1990). "The court of appeals is not a fact finder. Accordingly, the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the jury." Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998).

The jury could have disbelieved Ramirez's testimony that he had not seen the report when he prepared the Thurston letter. In any event, our standard of review requires us to disregard



Ramirez's testimony because it is contrary to the jury's finding. Considering only the evidence and inferences that tend to support the jury's finding, as we are required to do, the jury could have inferred from the timing of the events that Ramirez had seen the report before preparing the Thurston letter. The evidence is undisputed that Ramirez had knowledge of the report before the performance evaluation.

(2) Expression of a Negative Attitude Toward the Employee's Report

Although Ramirez had praised a previous report by Rodriguez and others regarding the Starr County violations, that report did not circulate to staff outside the LSC. During the performance evaluation, Ramirez instructed Rodriguez that she was to report directly to her immediate supervisor, Dickinson. Ramirez rejected Rodriguez's reply that she was precluded from reporting to Dickinson regarding certain matters, instructing Rodriguez that her unit was not an island. From this evidence, the jury could infer that Ramirez had a negative attitude toward Rodriguez's report because she sent it to supervisors outside the LSC.

(3) Failure to Adhere to Established Company Policies Regarding Employment Decisions

Under the established policies, Rodriguez's immediate supervisor, Dickinson, should have written the Thurston letter and conducted the performance counseling. Ramirez failed to adhere to those policies by taking those employment actions himself.

Page 485

Ramirez even told Dickinson that he was in charge of the performance counseling when she attempted to interject a comment at the meeting, precluding her from any participation. The majority discounts this evidence based on Ramirez's testimony that he took the actions because he was directly involved and Dickinson had only been Rodriguez's supervisor for a short period of time. However, as an appellate court, we are not to reconsider the credibility of the witnesses who testify. See id. Whether Ramirez's excuses were credible was an issue for the jury, and the jury chose to disbelieve him.

(4) Discriminatory Treatment in Comparison to Similarly Situated Employees

Rodriguez testified that another supervisor who was absent from the training session was not disciplined. Rodriguez further testified that the Thurston letter was issued despite her explanation that she was preparing a report for TPRS and despite Ramirez's admission that the LSC was required to cooperate with TPRS by law. The majority discounts the evidence that the other supervisor was not disciplined based on Ramirez's testimony that the other supervisor was a department head and not required to attend. However, whether Ramirez's explanation was credible was a decision to be made by the jury not by this court on appellate review. See id.

(5) Evidence that the Stated Reason for the Adverse Employment Action was False

Ramirez refused to consider Rodriguez's explanation regarding the lack of advance notice of the training and her need to work with the TPRS. However, Wilson, Ramirez's supervisor, decided that Ramirez had overreacted and that the Thurston letter should be removed from Rodriguez's file. The jury could infer from Ramirez's refusal to consider what Wilson determined to be a reasonable explanation that the reason Ramirez gave for issuing the Thurston letter was a pretense and that the letter was really issued in response to Rodriguez's report of the illegal conduct. In addition, Rodriguez subsequently was ranked below standards on her performance evaluation for failing to attend the training; however, Wilson had determined that the reason she gave for refusing to attend the training was valid in requiring the Thurston letter to be removed. As a result, the jury also could infer that the reason given for the below standards performance evaluations was a pretense.



Rodriguez introduced sufficient circumstantial evidence to support the jury's finding that the Thurston letter and the below standards performance evaluation would not have occurred when they did if she had not reported the illegal conduct. Because the majority holds to the contrary, I respectfully dissent.



Page 6

**513 S.W.2d 6**
**TEXAS DEPARTMENT OF CORRECTIONS,**
**Petitioner,**
**v.**
**James W. HERRING, Respondent.**
**No. B--4341.**
<mark>**Supreme Court of Texas.**</mark>
**July 24, 1974.**
**Rehearing Denied Sept. 24, 1974.**

John L. Hill, Atty. Gen., Jack Sparks, Asst. Atty. Gen., Austin, for petitioner.

Moore, Morris & Payne, Louis M. Moore, Houston, for respondent.

SAM D. JOHNSON, Justice.

Suit for damages brought under the Texas Tort Claims Act. [1] James W. Herring brought this action for personal injuries against the Texas Department of Corrections. The trial court held that, as a matter of law, Herring did not have a cause of action under the Texas Tort Claims Act and rendered a take-nothing summary judgment with prejudice. The court of civil appeals reversed and remanded. 500 S.W.2d 718. We affirm the judgment of the court of civil appeals.

Plaintiff Herring, a prisoner of the Texas Department of Corrections at Huntsville, received an accidental injury to the right side of his face in a basketball game. He received medical treatment at the prison hospital and later at The University of Texas Medical Branch Hospital in Galveston. Despite such treatment Herring lost all vision in his right eye. Herring's petition did not allege specific acts of negligence; rather, his petition contained only a general allegation of negligence which was 'negligence in failing to provide adequate medical care and treatment.'

Herring served written interrogatories on '(t)he Department of Corrections, Defendant herein, by and through its Attorney of Record, John L. Hill, Attorney General of Texas, . . .' These interrogatories, among other things, sought the basic information needed to assert specific allegations of negligence: the names of doctors, nurses and paraprofessionals who treated the plaintiff, details of his injury and the medical treatment administered to him. The Department of Corrections moved to strike the interrogatories on the ground that Rule 168, Texas Rules of Civil Procedure, is not applicable to the State. The record contains no ruling on this motion. The trial court nevertheless proceeded to grant the Department of Correction's motion for summary judgment. As a result, the plaintiff's written interrogatories were not answered. In remanding the case, the court of civil appeals said it perceived no reason why the State should be exempt from Rule 168. This court agrees with the court of civil appeals.

As a general rule, the State litigates as any other party in Texas courts 'When the state becomes a litigant in the courts it must observe and is bound by the same rules of procedure that bind all other litigants, except where special provision is made to the contrary.' Texas Company v. State, 154 Tex. 494, 281 S.W.2d 83, 90 (1955). See also State v. Jasco Aluminum

Page 8

Products Corporation, 421 S.W.2d 409 (Tex.Civ.App.--Austin 1967, no writ). Laws and rules governing evidence, burden of proof, cross complaints, pleadings, instructed verdicts and summary judgments bind the State and other litigants uniformly. See State v. Humble Oil & Refining Co., 141 Tex. 40, 169 S.W.2d 707 (1943); Bednarz v. State, 142 Tex. 138, 176 S.W.2d 562 (1943); and Note, 43 Tex.L.Rev. 979, 982 (1965).

Under Federal Rule 33, Federal Rules of Civil Procedure, the Federal government has long been required to respond to interrogatories. United States v. Shubert, 11 F.R.D. 528 (S.D.N.Y.1951); United States v. General Motors Corporation, 2 F.R.D. 528 (N.D.Ill.1942). The purpose of the Federal rule is to give '(m)utual knowledge of all the relevant facts gathered by both parties . . ..' Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947). Texas Rule 168 is



derived from and is an almost exact copy of Federal Rule 33. As under the Federal rule, interrogatories in this State are designed to elicit the basic facts of the case. See Comment, Written Interrogatories and Requests for Admissions, 19 Baylor L. Rev. 133 (1967).

Despite this similarity in purpose, there is one Texas case which would seem to run contra to Federal authority. Harrington v. State, 385 S.W.2d 411 (Tex.Civ.App.--Austin 1964, reversed on other grounds, 407 S.W.2d 467 (Tex.1966), cert. denied, 386 U.S. 944, 87 S.Ct. 977, 17 L.Ed.2d 874 (1967). In Harrington the court of civil appeals specifically exempted the State from answering interrogatories. The intermediate appellate court relied on Article 4411, V.A.C.S., which recites, '(n)o admission, agreement or waiver, made by the Attorney General, in any action or suit in which the State is a party, shall prejudice the rights of the State.' [2] From this language the court of civil appeals reasoned that '(i)t would be futile for the Attorney General to answer interrogatories for the State when his answers could not prejudice the rights of the State.' 385 S.W.2d 411 at 417. The Harrington case was then reversed by this court on other grounds. 407 S.W.2d 467 (Tex.1966).

After review of Harrington in connection with the instant case, we are of the opinion that the court of civil appeals in Harrington was in error in excluding the State from the ambit of Rule 168. Article 4411, the statute relied on by the court of civil appeals in Harrington, prohibits the Attorney General from making any 'admission, agreement or waiver' that prejudices the State; yet, Rule 168 operates only to clarify Facts. This court does not believe that the State will be in any way prejudiced by a full revelation of the Facts involved in a case; the Attorney General will not be called upon to make admissions, agreements and waivers. The Department of Corrections argues that Rule 168 does not refer specifically to the State. However, other rules of civil procedure referring only to 'parties' have been applied to the State. Bednarz v. State, Supra. Extensive authority supports the proposition that the State is bound by the rules of civil procedure Unless special

provisions provide otherwise. See Texas Company v. State, Supra, and the cases cited Infra; and 43 Tex.L.Rev. 979, Supra, and the cases cited Infra.

The plaintiff here, Herring, followed the procedure outlined in Rule 168 in every respect. Rule 168 provides that interrogatories must be directed at a party, but delivered

Page 9

to that party's attorney unless delivery to the party himself is ordered by the court. The Texas Tort Claims Act provides, '(t)he Attorney General of Texas shall defend all actions brought under the provisions of this Act against any unit of government whose authority and jurisdiction is coextensive with the geographical limits of the State of Texas.' Art. 6252--19, Sec. 9. Herring therefore served his interrogatories on the Department of Corrections through the Attorney General.

Aside from the preliminary question relative to interrogatories, the only issue to be resolved is whether the Department of Corrections was entitled to a summary judgment. The Texas Tort Claims Act, Article 6252--19, Section 3, reads:

'Sec. 3. Each unit of government in the state shall be liable for money damages for personal injuries or death when proximately caused by the negligence or wrongful act or omission of any officer or employee acting within the scope of his employment or office arising from the operation or use of a motor-driven vehicle and motor-driven equipment, other than motor-driven equipment used in connection with the operation of floodgates or water release equipment by river authorities created under the laws of this state, under circumstances where such officer or employee would be personally liable to the claimant in accordance with the law of this state, or death or personal injuries so caused from some condition or some use of tangible property, real or personal, under circumstances where such unit of government, if a private person, would be liable to the claimant in accordance with the law of this state. . . .'



Herring relies on the State's liability for 'use of tangible property.' In the plaintiff's petition, containing the very general allegation of negligence, he asserted that the Texas Department of Corrections and its agents and/or employees were negligent in 'failing to provide adequate medical care and treatment.' The Department of Corrections, without anything more than its motion to strike interrogatories, moved for summary judgment, asserting that 'Plaintiff's allegations fail to bring him within the requirements of the Texas Tort Claims Act and there is no legal authority for an action such as alleged by Plaintiff against this Defendant.' Although not pointed out specifically in the motion, the Department of Corrections argues here that a failure to give medical care cannot involve the use of tangible property, citing Beggs v. Texas Dep't of Mental Health & Mental Ret., 496 S.W.2d 252 (Tex.Civ.App.--San Antonio 1973, writ ref'd). This court agrees that Herring's pleadings failed to state a cause of action since no 'use of tangible property' was alleged as required by the Texas Tort Claims Act.

However, the question to be resolved is whether Herring, under the instant circumstances, may be denied the opportunity to amend his pleadings because they were attacked via a summary judgment motion instead of a special exception. It is recognized that a party may plead himself out of court; E.g., the plaintiff may plead facts which affirmatively negate his cause of action. See for example Morris v. Hargrove, 351 S.W.2d 666 (Tex.Civ.App.--Austin 1961, writ ref'd n.r.e.), and Schroeder v. Texas & Pacific Ry. Co., 243 S.W.2d 261 (Tex.Civ.App.--Dallas 1951, no writ). In such instance it is proper to grant the defendant's motion for summary judgment. The instant case is clearly distinguishable however. Here, as we have held, Herring's pleadings were insufficient; that is, they failed to state a cause of action. The Department of Corrections leveled no special exceptions to Herring's pleadings and thus no opportunity to amend his pleadings to state a cause of action was afforded.

Had the Department of Corrections filed special exceptions which were sustained by the court, Herring would have had an opportunity to amend as a matter of right. McCamey v. Kinnear, 484 S.W.2d 150

Page 10

(Tex.Civ.App.--Beaumont 1972, writ ref'd n.r.e.). But only after a party has been given an opportunity to amend after special exceptions have been sustained may the case be dismissed for failure to state a cause of action.

In the instant case Herring was precluded opportunity to amend his pleadings once the trial court had granted the motion for summary judgment. This court believes that the protective features of special exception procedure should not be circumvented by a motion for summary judgment on the pleadings where plaintiff's pleadings, as here, fail to state a cause of action. To do so would revive the general demurrer discarded by Rule 90, Texas Rules of Civil Procedure. McDonald, Summary Judgments, 30 Tex.L.Rev. 285, 297 (1951); Suggs and Stumberg, Summary Judgment Procedure, 22 Tex.L.Rev. 433, 439--40 (1944); 2 McDonald, Texas Civil Practice § 7.18 at 205.

We agree with the court of civil appeals that the instant motion for summary judgment alleging that the plaintiff's pleadings fail to state a cause of action cannot take the place of a special exception. Accordingly, this case must be returned to the trial court. If the Department of Corrections files a special exception which is sustained and Herring still fails to state a cause of action, [3] then the case may properly be dismissed.

The judgment of the court of civil appeals is affirmed.

Dissenting opinion by WALKER, J., in which GREENHILL, C.J., joins.

WALKER, Justice (dissenting).



Rule 168 was amended effective February 1, 1973. At that time we eliminated the language that formerly authorized interrogatories to be answered by the attorney of the party interrogated. When the interrogatories in the present case were served, the rule required, as it does now, that the interrogatories be answered 'by the party served, or, if the party served is a public or private corporation or a partnership or association, by an officer or agent.' Rule 168 is quite similar to Federal Rule 33, but there is one important difference. Federal Rule 33 specifically provides that if the party served is a 'governmental agency,' the interrogatories may be answered by any officer or agent. There is no similar provision in Rule 168. Under our statutes and rules, information in the possession of public officials and employees is subject to discovery by deposition, but neither the Attorney General nor any other official or employee is authorized to answer interrogatories for and in the name of the State of Texas. Until we further amend Rule 168 or until the Legislature authorizes someone to answer interrogatories on behalf of the State, it is my opinion that the State may not be required to respond to interrogatories propounded under Rule 168.

GREENHILL, C.J., joins in this dissent.

---------------

1 Art. 6252--19, Vernon's Ann.Civ.Stat. (as amended in 1973).

2 The Harrington court focused on the Attorney General's power to answer interrogatories because at the time the case was decided Rule 168 authorized the answering party's Attorney to sign the interrogatories. Effective February 1973 the Party answering must sign. In the instant case Herring correctly directed his interrogatories to the Department of Corrections 'by and through its Attorney of Record, John H. Hill, Attorney General of Texas.' The essential issue in Harrington and the instant case is the same despite the rule change: must the State answer interrogatories?

3 Under Rule 166--A(f), Texas Rules of Civil Procedure, Herring is entitled to pursue discovery measures.



**133 S.W.3d 217**
**TEXAS DEPARTMENT OF PARKS AND**
**WILDLIFE, Petitioner,**
**v.**
**Maria MIRANDA and Ray Miranda,**
**Respondents.**
**No. 01-0619.**
Supreme Court of Texas.
**Argued October 30, 2002.**
**April 2, 2004.**

[133 S.W.3d 220]

Howard G. Baldwin, First Asst. Atty. Gen., Jeffrey S. Boyd, Thompson & Knight, Harry W. Deckard, Office of Attorney General, Nelly R. Herrera, Office of Attorney General, Julie Caruthers Parsley, Public Utility Com'n, and Lisa Royce Eskow, Attorney General's Office, Austin, for Petitioner.

Emmett R. Harris, Law Office of R. Emmett Harris, Jerry Don Evans, Uvalde, TX, for Respondent.

Justice WAINWRIGHT delivered the opinion of the Court with respect to parts I., II., III.A., III.B., III.C.2., III.C.3., III.D., and IV., in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, and Justice SMITH joined, and a plurality opinion with respect to Part III.C.1., in which Chief Justice PHILLIPS, Justice HECHT, and Justice SMITH joined.

Maria Miranda sustained injuries after a tree limb fell on her at Garner State Park in Uvalde County. Maria and her husband Ray sued the Texas Parks and Wildlife Department,[1] alleging negligence and

[133 S.W.3d 221]

gross negligence. The Department filed a plea to the jurisdiction, to which it attached supporting evidence, and argued that sovereign immunity barred the Mirandas' claims. The trial court denied the plea to the jurisdiction and a unanimous court of appeals affirmed, holding that the trial court could not consider evidence in

support of the plea because the Department did not allege that the Mirandas' pleadings were a sham for the purpose of wrongfully obtaining jurisdiction. 55 S.W.3d 648, 652.

In accord with our decision in *Bland Independent School District v. Blue,* 34 S.W.3d 547 (Tex.2000), we hold that the trial court in this case was required to examine the evidence on which the parties relied to determine if a fact issue existed regarding the alleged gross negligence of the Department. Due to the unusual confluence of standards erected by the Legislature for waiver of sovereign immunity in the Texas Tort Claims Act and the recreational use statute, plaintiffs must plead gross negligence to establish subject matter jurisdiction. Further, if the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction. Because the Mirandas failed to raise a genuine issue of material fact regarding the alleged gross negligence of the Department, we conclude that the trial court lacked subject matter jurisdiction over this lawsuit. Therefore, we reverse the judgment of the court of appeals and render judgment dismissing the case.

### I. Factual and Procedural Background

The Mirandas' third amended petition contains the following allegations: In April 1998, the Mirandas and their family were camping and picnicking as paying guests at Garner State Park, owned and operated by the Texas Parks and Wildlife Department. The Mirandas asked a park ranger to recommend a campsite that would be safe for children. While standing next to a picnic table at the recommended campsite, a falling tree branch approximately twelve inches in diameter and fifteen feet long struck Maria on the head. As a result of the incident, Maria suffered extensive injuries to her head, neck, and spine. Ray suffered mental anguish and other damages related to his wife's injuries.



On May 7, 1999, the Mirandas filed suit against the Department, alleging negligence and later amended their suit to add gross negligence claims. With respect to the gross negligence claims, the Mirandas alleged that the Department "knew of the dangers of its falling tree branches, failed to inspect, failed to prune, failed to alleviate or remove the danger, and consciously and deliberately failed to warn Plaintiffs of the extremely dangerous condition," "knew that its property contained hidden, dangerous defect [sic] in that its tree branches which have not been inspected or pruned regularly fall," failed "to make safe the dangerous condition of its campsite trees," and "failed to warn or make reasonably safe the dangerous condition of which it was aware." In addition, the Mirandas alleged that the Department's conduct was "willful, wanton, or grossly negligent."

Over a year after the Mirandas filed suit and after the parties conducted discovery, the Department filed a plea to the jurisdiction

[133 S.W.3d 222]

and motion to dismiss, arguing that the Mirandas' allegations were insufficient to invoke a waiver of the Department's sovereign immunity under the standard established in the Tort Claims Act and the recreational use statute.[2] Tex. Civ. Prac. & Rem. Code §§ 101.001-.109; *id.* §§ 75.001.004. The Department attached evidence in support of its plea. The Mirandas filed a response to the Department's plea and their third amended original petition. In their response, the Mirandas stated that they relied on evidence attached to the Department's plea, including written discovery responses from the Department and the deposition the Mirandas took of assistant park manager Craig VanBaarle. At the trial court's hearing on the Department's plea, the parties addressed the allegations in the Mirandas' third amended original petition. The next day, the trial court denied the plea. The Department filed this interlocutory appeal claiming that the trial court erroneously denied its plea to the jurisdiction and motion to dismiss. *Id.* § 51.014(a)(8). The court of appeals affirmed the trial court's denial of the plea, stating that the Mirandas pled a premises defect cause of action based on gross negligence under the recreational use statute. 55 S.W.3d at 652. The court of appeals rejected the Department's argument that there was no evidence to support gross negligence, holding that "the trial court was not authorized to inquire into the substance of the claims because the Department did not specifically allege that the Mirandas' allegations were pled merely as a sham for the purpose of wrongfully obtaining jurisdiction." *Id.* (citing Bland, 34 S.W.3d at 554 and *Rylander v. Caldwell,* 23 S.W.3d 132, 135 (Tex.App.-BAustin 2000, no pet.)).

The Department contends that the court of appeals erred in relying solely upon the conclusory allegations found in the Mirandas' petition to affirm the trial courts denial of the Department's plea to the jurisdiction and in disregarding the Department's evidence submitted with its plea. Specifically, the Department contends that gross negligence is a jurisdictional prerequisite to the Mirandas' claims and that its evidence affirmatively negates gross negligence. The Department further argues that because the Mirandas failed to plead specific facts alleging gross negligence in their petition or introduce evidence to controvert the evidence in the Department's plea, they failed to establish subject matter jurisdiction to proceed with the litigation.

After originally dismissing the petition for want of jurisdiction, we granted the Department's petition on motion for rehearing. Before we consider the substantive issues presented, we first determine whether we have jurisdiction over this interlocutory appeal.

## II. Conflicts Jurisdiction

When there is no dissent in the court of appeals, this Court has jurisdiction over interlocutory appeals only if the court of appeals' decision "holds differently" or conflicts with "a prior decision of another court of appeals or of the supreme court on a question of law material to a



decision of the case." Tex. Gov't Code 22.001(a)(2);[3] *Schein v. Stromboe,* 102

[133 S.W.3d 223]

S.W.3d 675, 687 (Tex.2002); *Tex. Natural Res. Conservation Comm'n v. White,* 46 S.W.3d 864, 867 (Tex.2001). Two decisions conflict for purposes of establishing our jurisdiction under section 22.001(a)(2) when the two cases are so similar that the decision in one case is necessarily conclusive of the decision in the other. *Schein,* 102 S.W.3d at 687-88; *White,* 46 S.W.3d at 867. "The conflict must be on the very question of law actually involved and determined, in respect of an issue in both cases, the test being whether one would operate to overrule the other in case they were both rendered by the same court." *Christy v. Williams,* 156 Tex. 555, 298 S.W.2d 565, 568-69 (1957) (citation omitted).

The Department contends that this Court has jurisdiction over its interlocutory appeal because the court of appeals' decision here conflicts with our opinion in *Bland.* In *Bland,* we held that a trial court "may consider evidence *and must do so when necessary to resolve the jurisdictional issues raised."* 34 S.W.3d at 555 (emphasis added). While recognizing that "a dilatory plea does not authorize an inquiry so far into the substance of the claims presented that plaintiffs are required to put on their case simply to establish jurisdiction," we explained that "because a court must not act without determining that it has subject-matter jurisdiction to do so, it should hear evidence as necessary to determine the issue before proceeding with the case." *Id.* at 554. "The court should, of course, confine itself to the evidence relevant to the jurisdictional issue." *Id.* at 555.

In *Bland,* we included examples of when relevant evidence may be considered in determining whether jurisdiction has been established. *See id.* at 554. We also observed that when the defendant contends that the amount in controversy falls below the trial court's jurisdictional limit, the trial court should limit its inquiry to the pleadings. *Id.* In that situation, we

concluded, "the plaintiff's pleadings are determinative unless the defendant specifically alleges that the amount was pleaded merely as a sham for the purpose of wrongfully obtaining jurisdiction." *Id.*

In this case, the court of appeals inaccurately stated and then misapplied *Bland's* holding. 55 S.W.3d at 650-52. The court of appeals held that an inquiry behind the factual allegations pled in support of subject matter jurisdiction was improper unless the Department specifically alleged that the Mirandas' allegations were pled merely as a sham to wrongfully obtain jurisdiction. *Id.* at 652. This conflicts with our holding in *Bland* that a court must consider evidence when necessary to resolve the jurisdictional issues raised. 34 S.W.3d at 555; *see also County of Cameron v. Brown,* 80 S.W.3d 549, 556-57 (Tex.2002) (considering pleadings and limited jurisdictional evidence in evaluating forseeability element of premises defect claim under the Tort Claims Act); *Tex. Dep't of Criminal Justice v. Miller,* 51 S.W.3d 583, 587 (Tex.2001) (examining pleadings and limited jurisdictional evidence to determine whether plaintiff affirmatively demonstrated waiver of sovereign immunity); *White,* 46 S.W.3d at 868 (analyzing the facts alleged by the plaintiff and to the extent relevant, evidence submitted by the parties, in considering whether plaintiff stated a claim for injuries caused by "motor-driven equipment" under the Tort Claims Act).

[133 S.W.3d 224]

In *Bland,* our preclusion of a trial court's inquiry behind the facts pled in determining subject matter jurisdiction was limited to the jurisdictional amount. 34 S.W.3d at 554. Even this bar could be lifted, and evidence of the jurisdictional amount considered, in circumstances in which an adverse party asserts that the amount in controversy was pled as a sham to obtain jurisdiction.[4] *Id.* That circumstance is not at issue here. Thus, the court of appeals' holding conflicts with the same question of law that we decided in Bland, and the opinions cannot stand together. *Schein,* 102



S.W.3d at 689. This conflict provides the basis for our jurisdiction to consider the merits of the plea. See Tex. Gov't Code § 22.001(a)(2).

### III. The Department's Plea to the Jurisdiction
### A. Sovereign Immunity

In Texas, sovereign immunity deprives a trial court of subject matter jurisdiction for lawsuits in which the state or certain governmental units have been sued unless the state consents to suit. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999); *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997), *superseded by statute on other grounds as stated in Little-Tex Insulation Co.,* 39 S.W.3d at 593; *Duhart v. State,* 610 S.W.2d 740, 741 (Tex.1980); *Hosner v. DeYoung,* 1 Tex. 764, 769 (1847). The Texas Tort Claims Act provides a limited waiver of sovereign immunity. TEX. CIV. PRAC. & REM.CODE §§ 101.001-.109. Sovereign immunity includes two distinct principles, immunity from suit and immunity from liability. *Jones,* 8 S.W.3d at 638; *Fed. Sign,* 951 S.W.2d at 405. Immunity from liability is an affirmative defense, while immunity from suit deprives a court of subject matter jurisdiction. *Jones,* 8 S.W.3d at 638; *Fed. Sign,* 951 S.W.2d at 405. The Tort Claims Act creates a unique statutory scheme in which the two immunities are co-extensive: "Sovereign immunity to suit is waived and abolished to the extent of liability created by this chapter." Tex. Civ. Prac. & Rem.Code § 101.025(a); *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 326 (Tex.2002); *Miller,* 51 S.W.3d at 587. Thus, the Department is immune from suit unless the Tort Claims

[133 S.W.3d 225]

Act expressly waives immunity. *See* TEX. CIV. PRAC. & REM.CODE §§ 101.001(3)(A) (defining a governmental unit to include "all departments" of the state), 101.021, 101.025; *White,* 46 S.W.3d at 868.

The Tort Claims Act expressly waives sovereign immunity in three areas: "`use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property.'" *Brown,* 80 S.W.3d at 554 (quoting *Tex. Dep't of Transp. v. Able,* 35 S.W.3d 608, 611 (Tex.2000)); *see* Tex. Civ. Prac. & Rem Code § 101.021. Section 101.058 of the Tort Claims Act further modifies a governmental unit's waiver of immunity from suit by imposing the limitations of liability articulated in the recreational use statute. TEX. CIV. PRAC. & REM.CODE § 101.058 ("To the extent that Chapter 75 limits the liability of a governmental unit under circumstances in which the governmental unit would be liable under [the Tort Claims Act], Chapter 75 controls.").

The recreational use statute provides:

If an owner, lessee, or occupant of real property other than agricultural land gives permission to another to enter the premises for recreation, the owner, lessee, or occupant, by giving the permission, does not:

(1) assure that the premises are safe for that purpose;

(2) owe to the person to whom permission is granted a greater degree of care than is owed to a trespasser on the premises; or

(3) assume responsibility or incur liability for any injury to any individual or property caused by any act of the person to whom permission is granted.

*Id.* § 75.002(c)(1)-(3). Recreational use includes camping and picnicking, the activities in which the Mirandas were engaged at the state park when Maria was injured. *Id.* § 75.001(3). As applied to a governmental unit, the recreational use statute limits liability even if the person pays to enter the premises. *Id.* § 75.003(c) (excepting governmental units from the chapter's exclusion of landowners who charge a fee for recreational use of land).

The recreational use statute limits the Department's duty for premises defects to that which is owed a trespasser.[5] *Id.* The limited duty



owed a trespasser is not to injure that person willfully, wantonly, or through gross negligence. *Tex. Utils. Elec. Co. v. Timmons,* 947 S.W.2d 191, 193 (Tex.1997). Therefore, a governmental unit waives sovereign immunity under the recreational use statute and the Tort Claims Act only if it is grossly negligent. Tex. Civ. Prac. & Rem.Code § 75.002(c)-(d); *City of Bellmead v. Torres,* 89 S.W.3d 611, 613 (Tex.2002); *Timmons,* 947 S.W.2d at 193. "[G]ross negligence involves two components: (1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others." *Louisiana-Pacific Corp. v. Andrade,* 19 S.W.3d 245, 246 (Tex.1999) (citing *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994)).

### B. Standard of Review

Sovereign immunity from suit defeats a trial court's subject matter jurisdiction

[133 S.W.3d 226]

and thus is properly asserted in a plea to the jurisdiction. *Jones,* 8 S.W.3d at 637; *see also Hosner,* 1 Tex. at 769 (recognizing as appropriate procedure the challenge of a courts subject matter jurisdiction through a plea to the jurisdiction). The trial court must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed. *Austin & N.W.R. Co. v. Cluck,* 97 Tex. 172, 77 S.W. 403, 405 (1903) ("[T]here can be no doubt that the courts of Texas must look to the Constitution of this state, the enactments of the Legislature, and the common law for their authority to proceed ....);" *see also State Bar of Tex. v. Gomez,* 891 S.W.2d 243, 245 (Tex.1994) ("As a general proposition, before a court may address the merits of any case, the court must have jurisdiction over the party or the property subject to the suit, jurisdiction over the subject matter,

jurisdiction to enter the particular judgment, and capacity to act as a court.)"; *Gentry v. Bowser,* 2 Tex.Civ.App. 388, 21 S.W. 569, 570 (Fort Worth 1893, no writ) ("Certainly the court has the right to hear the necessary evidence to enable it to decide as to whether or not it has power to try the case it is sought to have it adjudicate, whether the allegations disclosing such want of jurisdiction appear in the petition of the plaintiff, or in the plea to the jurisdiction by the defendant.").

Whether a court has subject matter jurisdiction is a question of law. *Tex. Natural Res. Conservation Comm'n v. IT-Davy,* 74 S.W.3d 849, 855 (Tex.2002). Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed *de novo.* Likewise, whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction is also a question of law. However, in some cases, disputed evidence of jurisdictional facts that also implicate the merits of the case may require resolution by the finder of fact. *See Gates v. Pitts,* 291 S.W. 948, 949 (Tex.Civ.App.-Amarillo 1927, no writ); *Gentry,* 21 S.W. at 570; *see also Valentin v. Hosp. Bella Vista,* 254 F.3d 358, 363 n. 3 (1st Cir.2001) (observing that in certain situations, the predicate facts can be so inextricably linked to the merits of the controversy that the district court may "defer resolution of the jurisdictional issue until the time of trial"); *Cameron v. Children's Hosp. Med. Ctr.,* 131 F.3d 1167, 1170 (6th Cir.1997) ("[W]hether a district court has subject matter jurisdiction is a question for the court, not a jury, to decide, even if the determination requires making factual findings, unless the jurisdictional issue is inextricably bound to the merits of the case."); *Williamson v. Tucker,* 645 F.2d 404, 413 n. 6, 416 n. 10 (5th Cir.1981) (suggesting that a federal district court's role in determining jurisdictional facts may be more limited in cases in which the jurisdictional attack implicates the merits of plaintiff's cause of action). In this case, we address a plea to the jurisdiction in which undisputed evidence implicates both the subject matter jurisdiction of the court and the merits of the case.



When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993). We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent. *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial courts jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs

[133 S.W.3d 227]

should be afforded the opportunity to amend. *Brown,* 80 S.W.3d at 555. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Id.*

However, if a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *See Bland,* 34 S.W.3d at 555 (confining the evidentiary review to evidence that is relevant to the jurisdictional issue). When the consideration of a trial court's subject matter jurisdiction requires the examination of evidence, the trial court exercises its discretion in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case, mindful that this determination must be made as soon as practicable. *Id.* at 554. Then, in a case in which the jurisdictional challenge implicates the merits of the plaintiffs' cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists. The United States Supreme Court and all of the federal circuits have authorized federal district courts to consider evidence in deciding motions to dismiss for lack of subject matter jurisdiction. *See* Fed.R.Civ.P. 12(b)(1); *Land v. Dollar,* 330 U.S. 731, 735 & n. 4,

67 S.Ct. 1009, 91 L.Ed. 1209, (1947), *overruled by implication on other grounds by Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) (observing that as a general rule, district courts have authority to inquire "into the facts as they exist" "by affidavits or otherwise" as well as the pleadings when determining whether the court has subject matter jurisdiction).[6] If the evidence

[133 S.W.3d 228]

creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder. However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law.

We acknowledge that this standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c). We adhere to the fundamental precept that a court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided. This standard accomplishes this goal and more. It also protects the interests of the state and the injured claimants in cases like this one, in which the determination of the subject matter jurisdiction of the court implicates the merits of the parties' cause of action. The standard allows the state in a timely manner to extricate itself from litigation if it is truly immune. However, by reserving for the fact finder the resolution of disputed jurisdictional facts that implicate the merits of the claim or defense, we preserve the parties' right to present the merits of their case at trial. Similar to the purpose of a plea to the jurisdiction, which is to defeat a cause of action for which the state has not waived sovereign immunity (usually before the state has incurred the full costs of litigation), the purpose of summary judgments in Texas is "`to eliminate patently unmeritorious claims and untenable defenses.' "*Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989) (quoting *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 n. 5



(Tex.1979)). By requiring the state to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to "put on their case simply to establish jurisdiction." *Bland,* 34 S.W.3d at 554. Instead, after the state asserts and supports with evidence that the trial court lacks subject matter jurisdiction, we simply require the plaintiffs, when the facts underlying the merits and subject matter jurisdiction are intertwined, to show that there is a disputed material fact regarding the jurisdictional issue. *See Huckabee v. Time Warner Entm't Co. L.P.,* 19 S.W.3d 413, 420 (Tex.2000); *Phan Son Van v. Pena,* 990 S.W.2d 751, 753 (Tex.1999).

Appellate courts reviewing a challenge to a trial court's subject matter jurisdiction review the trial court's ruling *de novo. IT-Davy,* 74 S.W.3d at 855. When reviewing a plea to the jurisdiction in which the pleading requirement has been met and evidence has been submitted to support the plea that implicates the merits of the case, we take as true all evidence favorable to the nonmovant. *See Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.*

In his dissent Justice Jefferson criticizes this standard of review as depriving plaintiffs responding to a plea of the procedural protections of a motion for summary judgment, including a twenty-one

[133 S.W.3d 229]

day notice period or an adequate time to conduct discovery. Tex.R. Civ. P. 166a(c), 166a(i). However, the scheduling of a hearing of a plea to the jurisdiction is left to the discretion of the trial court, which is in the best position to evaluate the appropriate time frame for hearing a plea in any particular case. This procedure does not dramatically differ from that outlined in Texas Rule of Civil Procedure 120a governing special appearances. Although Rule 120a requires any affidavits to be used at a hearing on a special appearance to be served at least seven days before

the hearing, it does not specify the length of a notice period and is therefore presumably subject to the three-day notice period of Rule 21. Tex.R. Civ. P. 21. Rule 120a allows the trial court to order a continuance and allow time for discovery if the development of the case requires it. Nothing prevents a trial court from doing the same with a plea to the jurisdiction where evidence is necessary.

Many other procedures in Texas practice ranging from a trial court's rulings on motions to strike intervention to the timing of a class certification decision to even the alteration of the summary judgment notice periods—also "depend[] ... upon the wise exercise of discretion by the trial court." *Union Carbide Corp. v. B.D. Moye,* 798 S.W.2d 792, 794 (Tex.1990) (Hecht, J., concurring); *see, e.g.,* TEX.R. CIV. P. 42(c)(1)(A) (directing a trial court to determine whether a suit may be maintained as a class action "at an early practicable time"); Tex.R. Civ. P. 166a(c) ("*Except on leave of court,* with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing.") (emphasis added); *Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 657 (Tex.1990) (observing that the trial court has broad discretion in ruling on a motion to strike intervention, even though Rule 60 does not provide explicit guidelines for the scheduling of a hearing or the evaluation of evidence). Thus, the Texas civil procedural scheme entrusts many scheduling and procedural issues to the sound discretion of the trial court, subject to appellate review. Of course, Texas practice and rules also allow the parties to request additional time to prepare for certain hearings or to conduct discovery upon a showing of sufficient cause, and the court's ruling on such a motion is reviewed for an abuse of discretion. *See, e.g.,* TEX.R. CIV. P. 166a(g), 247, 251, 252. We note, also, that federal practice does not prescribe a procedure for the consideration of jurisdictional evidence but instead allows the district courts to tailor a method to suit the requirements of the cases before them. *Land,* 330 U.S. at 735 n. 4, 67 S.Ct. 1009; *Moran,* 27 F.3d at 172. In any event, the



Mirandas do not complain that they had an inadequate opportunity to conduct sufficient discovery, nor did they request a continuance to do so.

### C. Waiver of Immunity Based on Premises Defects
### 1. The Mirandas' Pleadings

The Mirandas contend that their pleadings fall within the Tort Claims Act's waiver of immunity for both premises defects and injuries arising out of conditions or use of property. The Act provides that a state agency is liable for injury and death caused by "a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem.Code § 101.021(2). The Mirandas' pleadings allege injuries caused by a falling tree limb, which falls under the definition of real property *i.e.,* "`land, and generally whatever is erected or growing upon or affixed

[133 S.W.3d 230]

to land.'" *San Antonio Area Found. v. Lang,* 35 S.W.3d 636, 640 (Tex.2000) (quoting *Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985) (Gonzalez, J., concurring)). The Mirandas' allegation of an injury caused by a tree limb falling on Maria Miranda constitutes an allegation of a condition or use of real property and is an allegation of a premises defect.

To state a claim under the recreational use statute, the Mirandas must allege sufficient facts to establish that the Department was grossly negligent. *See* TEX. CIV. PRAC. & REM.CODE §§ 75.002(c)-(d), 101.021, 101.025, 101.058. The Mirandas contend that both their allegations and the evidence presented on the plea establish claims of gross negligence. Looking first to the relevant factual allegations in the third amended petition, the Mirandas claim that (1) they specifically asked the Department's employee for a recommendation of a safe camping location; (2) at the campsite, Maria was struck by a falling tree

branch that severely injured her; (3) the unpruned, uninspected tree branches created a dangerous, defective condition on the premises of which the Department was aware; (4) the Department knew of the dangers of its falling tree branches but failed to inspect, prune, alleviate the dangers, or otherwise make safe the dangerous conditions of its trees; (5) the Department consciously and deliberately failed to warn the Mirandas of the extremely dangerous condition; and (6) the Department's conduct was willful, wanton, or grossly negligent. A liberal construction of these allegations, as required, demonstrates that the Mirandas stated a claim against the Department for gross negligence. This conclusion should not be read as a suggestion that the Department has a duty to inspect every tree in each of the many parks that the Department manages. Instead, in this case, the Mirandas alleged sufficient facts to survive a plea to the jurisdiction based solely on the pleadings.

Justice Jefferson's dissent contends that the Mirandas' third amended petition does not state a claim for gross negligence because the allegations are conclusory and do not assert enough specific facts alleging that the Department had "actual subjective awareness of the risk involved and proceeded, nevertheless, with conscious indifference. He suggests that to state a claim the Mirandas should have pled that the Department had actual knowledge that the branch would fall yet nevertheless instructed Maria to camp beneath it." 133 S.W.3d at 242. The pleading hurdle he seeks to erect would be groundbreaking, indeed, extending beyond current requirements under our rules of civil procedure and case law. Rules 45 and 47 require that the original pleadings give a short statement of the cause of action sufficient to give the opposing party fair notice of the claim involved. Tex.R. Civ. P. 45, 47; *Paramount Pipe & Supply Co., Inc. v. Muhr,* 749 S.W.2d 491, 494 (Tex.1988); *Castleberry v. Goolsby Bldg. Corp.,* 617 S.W.2d 665, 666 (Tex.1981). Rule 45 does not require that the plaintiff set out in his pleadings the evidence upon which he relies to establish his asserted cause of action. *Muhr,* 749 S.W.2d at 494-95. While it is clear that "[t]he party suing



the governmental entity must establish the state's consent, which may be alleged either by reference to a statute or to express legislative permission," *Jones,* 8 S.W.3d at 638, and that "[m]ere reference to the Tort Claims Act does not establish the state's consent to be sued and thus is not enough to confer jurisdiction on the trial court," *Miller,* 51 S.W.3d at 587, the Mirandas' pleadings allege sufficient facts to bring their claims under the recreational use statute and the Tort Claims Act.

[133 S.W.3d 231]

Although facts alleged in a petition should not be improperly stretched to state a claim for gross negligence, Justice Jefferson's pleading standard for gross negligence would be virtually impossible to meet, even when grossly negligent conduct occurred, absent an admission of liability. His standard requires specific factual allegations in an original petition of what the defendant knew and thought *i.e.,* its state of mind. His pleading hurdle would require discovery into the very extrinsic facts which he bemoans consideration of in the plea to the jurisdiction. The Mirandas' third amended petition provided sufficient notice to ascertain the nature and basic issues of the controversy and the evidence that probably would be relevant.

JUSTICE JEFFERSON also contends that the Mirandas are entitled to replead. As a practical matter, the Mirandas have already repled to try to cure the "defects" that Justice Jefferson raises. The Mirandas no doubt filed their third amended petition, in which allegations of gross negligence were raised for the first time in this lawsuit, in response to the Department's plea to the jurisdiction. However, because the Mirandas' third amended petition satisfies the notice pleading requirements of our procedural rules, the Mirandas do not need, nor are they entitled to, an opportunity to replead. *See* Tex.R. Civ. P. 47.

**2. The Department's Evidence**

The Department challenged the Mirandas' pleadings and also submitted evidence to controvert the factual allegations supporting jurisdiction. We consider the relevant evidence submitted to decide this jurisdictional challenge. *See Bland,* 34 S.W.3d at 555. The Department attached the deposition testimony of Craig VanBaarle, the assistant park manager for Garner State Park, to its plea to the jurisdiction. VanBaarle testified that while the park normally inspects and maintains its trees, tree limbs are only pruned or trimmed if they appear to be dead. According to VanBaarle, the tree limb that fell on Maria was living. He testified that both dead and living tree limbs have fallen at various locations in the park. He testified that the park knows that tree limbs can fall and have fallen on approximately twenty occasions. However, no one had ever been injured by falling tree limbs. He also testified that the tree limb that injured Maria Miranda fell from fifty feet above the campsite and that the park employees would not have been able to see the limb clearly without climbing the tree even if the limb had been dead.

In addition, the Department attached the affidavit of Roy B. Inks, operations and maintenance specialist at Garner State Park. Inks' responsibilities included supervision of park maintenance including preservation and maintenance of trees at campsites. According to his affidavit, Inks inspected the campsite after the accident. His examination of the tree and the fallen branch failed to reveal any indication that the branch was dead, decaying, or in need of pruning. Inks opined that there was no reason to conclude that the tree presented a dangerous or hazardous condition. Inks further opined that the branch that struck Maria "broke away from the tree as a result of an unpredictable and unforseeable phenomenon known as `sudden branch drop syndrome.'" Inks explained that "[i]t would be rare for anyone to be able to predict which branches will fall and which ones will not" as a result of this phenomenon. The Mirandas cite the Department's evidence as proof that the Department knew about sudden branch drop syndrome and did nothing about it, thus establishing gross negligence. The Mirandas did



not cite any controverting evidence in their response to the Department's plea.

[133 S.W.3d 232]

We first examine this evidence to determine whether it establishes that the Department was grossly negligent. We have observed that with regard to the subjective component of gross negligence, it is the defendant's state of mind whether the defendant knew about a peril but nevertheless acted in a way that demonstrated that he did not care about the consequences that separates ordinary negligence from gross negligence. *Louisiana-Pacific,* 19 S.W.3d at 246-47. We search the record for evidence that the Department's acts or omissions demonstrate that it did not care about the consequences to the Mirandas of a known extreme risk of danger. The Mirandas fail to point to any evidence, and the record contains no evidence, that shows that sudden branch drop syndrome constitutes an extreme risk of danger or that the Department had actual, subjective knowledge of that risk but nevertheless proceeded in conscious disregard for the safety of others. Nor is there any evidence that the Department could have taken any reasonable steps to minimize the dangers of an "unforseeable" and "unpredictable" phenomenon. We conclude that the evidence in the record establishes that the Department was not grossly negligent and that the Mirandas have failed to raise a fact question regarding the Department's alleged gross negligence. The Mirandas fall short of satisfying the requirements for the Legislature's limited grant of a waiver of sovereign immunity from suit under the applicable statutes. Therefore, the trial court lacked subject matter jurisdiction.

### 3. Dissent

In his dissent, Justice Brister takes the view that all pleas to jurisdiction based on immunity must take the form of two "standard" or "established" motions—either special exceptions or motions for summary judgment. 133 S.W.3d at 239-40. This approach might be appropriate, if we were starting from scratch. Given that we are not writing on a blank slate, that pleas have been

a useful procedural vehicle in Texas for over 150 years, and that use of its counterpart (Federal Rule of Civil Procedure 12(b)(1)) to challenge subject matter jurisdiction in the federal judicial system when evidence is involved has been authorized by every federal circuit court, the Court declines to abolish by written opinion such pleas to the jurisdiction.

The plea to the jurisdiction was included in procedural rules promulgated by this Court in 1877 and has been used as a procedural vehicle to challenge subject matter jurisdiction in trial courts for over a century and a half. *See* TEX.R.CIV. P. 85; Tex. Dist. Ct. R. 7, 47 Tex. 597, 617 (1877); *Hosner,* 1 Tex. at 769. In fact, as early as 1893, Texas courts indicated that evidentiary challenges to subject matter jurisdiction raised in pleas to the jurisdiction should be considered by trial courts. *See, e.g., Gates,* 291 S.W. at 949; *Gentry,* 21 S.W. at 570. With such a long lineage, one wonders why a plea to jurisdiction does not qualify as a "standard" or "established" motion. Perhaps a second mention in the Texas Rules of Civil Procedure would suffice.

We decide that refining the rules for considering a plea supported by evidence is a better approach than eliminating the motion. This approach is consistent with precedent, is not disruptive to civil practice going back more than a century, and furthers the legislative purpose of timely adjudicating subject matter jurisdiction when the immunity and liability facts are the same.

There is a suggestion in the dissents that confirming in this opinion the authority of trial courts to consider evidence in a plea to the jurisdiction is unfair to the

[133 S.W.3d 233]

parties in this case. The facts undercut this assertion. At the trial court, both parties relied on extrinsic evidence in briefing the plea, and both parties had extrinsic evidence on file with the court. Furthermore, plaintiffs expressly stated in their response to the plea that they were relying



on "Defendants' responses to discovery requests, and upon the deposition of Craig VanBaarle [the Department's assistant park manager]." In fact, the Mirandas deposed VanBaarle months before the Department filed its plea. There is good reason why Plaintiffs have not argued unfair surprise. Given Texas precedents and the actions of the parties, there was none.

### D. Waiver of Immunity Based on Condition or Use of Tangible Property

The Mirandas assert that their pleadings also state a cause of action for injuries resulting from a condition or use of tangible property. The allegations' in the Mirandas third amended petition concern only the Department's failure to act to reduce risks of falling tree limbs and failure to warn the Mirandas of the risk of falling tree limbs. These allegations comprise the elements of their premises defect claim. The Tort Claims Act's scheme of a limited waiver of immunity from suit does not allow plaintiffs to circumvent the heightened standards of a premises defect claim contained in section 101.022 by re-casting the same acts as a claim relating to the negligent condition or use of tangible property. *See State v. Tennison,* 509 S.W.2d 560, 562 (Tex.1974) (rejecting the argument that the Tort Claims Act "creates two entirely separate grounds of liability" for negligent use or condition of real property and premise defect, but instead interpreting the premises defect provision to further limit the waiver of immunity for negligent use or condition of real property). Other Texas courts have recognized that to allow plaintiffs to characterize premises defect claims as claims caused by the negligent condition or use of personal or real property would render the Legislature's heightened requirements for premises defect claims meaningless. *See, e.g., State v. Estate of Horton,* 4 S.W.3d 53, 54 (Tex.App.-Tyler 1999, no pet.) (stating that once a claim is determined to be a premises defect, the claimant is limited to the provisions delineated by the section on premises defects and may not assert a general negligence theory); *accord Laman v. Big Spring State Hosp.,* 970 S.W.2d 670, 671-72 (Tex.App.-Eastland 1998, pet. denied); *Univ. of Texas Pan Am. v. Valdez,* 869 S.W.2d 446, 450 (Tex.App.-Corpus Christi 1993, writ denied); *Hawley v. State Dep't of Highways and Pub. Transp.,* 830 S.W.2d 278, 281 (Tex.App.-Amarillo 1992, no writ). Accordingly, we conclude that the Mirandas have not established a cause of action under the Tort Claims Act for condition or use of tangible property separate from their premises defect claim.

### IV. Conclusion

Trial courts should decide dilatory pleas early at the pleading stage of litigation if possible. Here, the Legislature's mandate is not so simple. By statute, waiver of sovereign immunity for recreational use of the Department's premises can only be effected by a showing that it acted with gross negligence. Due to the standard erected (gross negligence), the determination of whether immunity was waived may require consideration of extrinsic facts after reasonable opportunity for targeted discovery. To preclude consideration of extrinsic facts when necessary to decide a plea to the jurisdiction would require a trial on the merits for many cases that do not need it, waste the resources of the courts and the parties in the case, and

[133 S.W.3d 234]

involve state courts in rulings on the merits in cases over which they have no jurisdiction.

For the reasons explained, we conclude that the Department established that it was not grossly negligent and that the Mirandas failed to raise a fact issue on that point. Thus, the trial court lacked subject matter jurisdiction over the action. The judgment of the court of appeals is reversed and the Mirandas' action dismissed for lack of subject matter jurisdiction.

Justice JEFFERSON filed a dissenting opinion.

Justice BRISTER filed a dissenting opinion, in which Justice O'NEILL and Justice SCHNEIDER joined.



Justice JEFFERSON, dissenting.

I dissent on two grounds. First, I do not agree that our precedent requires the Mirandas to produce evidence on all essential elements of their cause of action to establish the trial court's jurisdiction. The Court's holding is inconsistent with the distinction *Bland* draws between requiring the plaintiff to prove preliminary facts as a predicate to the trial court's power to entertain the merits, and requiring her to present the merits themselves on pain of dismissal. *Bland Indep. School Dist. v. Blue,* 34 S.W.3d 547 (Tex.2000).[1]

Second, I cannot agree that the Mirandas' pleading has alleged sufficient facts to confer jurisdiction on the trial court. The Mirandas assert that the Department was aware that branches fall from trees, but consciously chose not to post warnings. Is that gross negligence? *No. Texas law does not impose on landowners a duty to warn trespassers about all conceivable dangers inherent in nature.* What if you add the allegation that the Department did not inspect or prune trees in Garner State Park? *The Court today makes clear that the Department has no duty to inspect trees in state parks.* 133 S.W.3d 242. *If there is no duty, a complaint about the failure to inspect or prune cannot possibly constitute a gross negligence pleading sufficient to invoke the courts jurisdiction.* But the Mirandas used the words "gross negligence." *Not enough. The Mirandas pleaded no facts even remotely suggesting the Department was aware the limb was about to fall, much less that it would injure Maria.*

## I
## *Bland,* in Proper Context

In deciding a plea to the jurisdiction, the trial court must consider evidence "when necessary to resolve the jurisdictional issues raised." *Bland,* 34 S.W.3d at 555. That quote must be read in context. We noted that when a defendant challenges an organization's standing to sue, the organization must present evidence of its nature and purpose before it can pursue its claims—a

burden that "does not involve a significant inquiry into the substance of the claims." *Id.* at 554. Similarly, we

[133 S.W.3d 235]

observed that a challenge to personal jurisdiction may "touch on the merits of the case," but is not aimed at "whether the defendant may be liable as alleged." *Id.* at 555. That theme—that a plaintiff is not required to litigate the merits to establish jurisdiction—was emphasized throughout our opinion. *Id.* at 554. We cautioned that "the proper function of a dilatory plea does not authorize an inquiry so far into the substance of the claims presented that plaintiffs are required to put on their case simply to establish jurisdiction." *Id.*

I interpret *Bland* to mean that if a plea to the jurisdiction requires the trial court to wade deeply into the lawsuit's merits, it is not a valid plea. Yet today the Court immerses itself in the merits by reaching and deciding the ultimate issue in the case: "*... the evidence in the record establishes that the Department was not grossly negligent and that the Mirandas have failed to raise a fact question regarding the Department's alleged gross negligence.*" 133 S.W.3d at 221 (emphasis added). This holding misapplies *Bland* because it permits a defendant, on painfully short notice and before evidence has been developed, to force the plaintiff either to present evidence on the ultimate issue in the lawsuit, or lose the right to a jury trial on the merits.

The Court asserts that its standard "mirrors that of a summary judgment...." 133 S.W.3d 228. It is a poor reflection. Our summary judgment rule, unlike the Court's standard, contains procedural safeguards to ensure that the merits are not determined before the nonmovant has had an adequate time for discovery and an opportunity to respond. Tex.R. Civ. P. 166a(c) ("Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing



may file and serve opposing affidavits or other written response."); 166a(i) ("After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense....)". As a uniform rule of procedure, the summary judgment rule leaves little to the imagination. A party whose claim is subject to adjudication on the merits is entitled to advance notice that it must present evidence and has an adequate opportunity to respond.[2] The procedure the Court adopts today, in contrast, will vary from county to county and from judge to judge.

The Court cites a number of federal decisions holding that when jurisdictional facts are intertwined with the merits, the trial court, in considering evidence, should either employ the standard applicable to a summary judgment or leave the jurisdictional

[133 S.W.3d 236]

determination to trial. 133 S.W.3d 228; *see also* 2 James Wm. Moore Et al., Moore's Federal Practice § 12.30[3], at 12-37 to 12-38 (3d ed.2003). I do not disagree with that proposition, but it does not answer a fundamental question. This Court must decide what procedure governs *in Texas* when a plea to the jurisdiction is treated like a motion for summary judgment.

As Justice Brister observes, no procedural rule currently requires a trial court to advise the plaintiff that evidence may or must be presented in opposition to a plea to the jurisdiction, and no rule requires an adequate time for discovery before the court dismisses a case on the merits. 133 S.W.3d at 237. By default, then, trial courts will turn to Rule 21. Tex.R. Civ. P. 21. Presumably, if a trial court's ruling comports with Rule 21's minimum procedural requirements, a dismissal on the merits will survive any challenge based on an abuse of discretion standard. We should ask ourselves, then, whether the Rule's minimum requirements are adequate when the stakes are no

less than a party's ability to present its case on the merits.

Under Rule 21, a plea to the jurisdiction may be served "three days before the time specified for the hearing unless otherwise provided by these rules or shortened by the court." *Id.* The rule does not mention an adverse party's right to present opposing evidence, which may explain why the Mirandas did not controvert the Department's plea with their own evidence. Compiling evidence of simple negligence on three days' notice—evidence that typically requires months of discovery—would be daunting in itself; but where, as here, a plaintiff must prove *gross negligence,* her ability to contest the Department's jurisdictional plea could be essentially non-existent.

The Mirandas had no reason to suspect that a summary judgment standard applied, requiring them to controvert the Department's evidence, because the Department's plea to the jurisdiction was subject to *Bland.* 34 S.W.3d at 554-55 (trial court not authorized to inquire so far into the substance of the claims presented that plaintiffs are required to put on their case simply to establish jurisdiction). At a minimum, I would hold that if a summary judgment standard applies, the trial court must so advise the parties and employ Rule 166a procedures.

## II
## Pleading Requirements Under Recreational Use Statute

Rather than dismiss the case on the merits under a summary judgment standard, I would examine the pleadings to determine whether the Mirandas alleged facts sufficient to invoke the trial court's jurisdiction. *See Tex. Ass'n Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993) (plaintiff has burden to allege facts affirmatively demonstrating that the trial court has subject matter jurisdiction). In my view, the Mirandas' pleading falls short. Just as the Department owes no duty to warn trespassers that rattlesnakes may strike, it owes no duty to advise statutory trespassers that tree limbs fall in



state parks. The Mirandas did not allege that the Department had so much as an inkling that the branch in question would fall. *See* Tex. Civ. Prac. & Rem Code § 41.001(7); *see also Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 21-22 (Tex.1994) (explaining that gross negligence requires at a minimum that the defendant subjectively "have actual awareness of the extreme risk created by his or her conduct"). Rather, she alleges that the Department is generally aware that tree limbs fall, just as it must know of countless other natural

[133 S.W.3d 237]

perils in state parks. Because the Department owes no duty to warn trespassers that forces of nature may cause random harm, I would hold, contrary to the Courts conclusion, that the Mirandas pleading does not invoke the trial courts jurisdiction.

The Mirandas did not allege that the Department was subjectively aware of any specific risk of injury. *See id.* Instead, they alleged:

Defendant knew of the dangers of its falling tree branches, failed to inspect, failed to prune, failed to alleviate or remove the danger, and consciously and deliberately failed to warn Plaintiffs of the extremely dangerous condition. Plaintiffs paid a campsite rental fee and specifically asked defendant to assign them a safe campsite. Defendant knew that its property contained hidden, dangerous defect (sic) in that its tree branches which have not been inspected or pruned regularly fall. Defendant did not warn Plaintiffs of the hidden danger. * * *

Plaintiffs would show the court that the occurrence made the basis of this suit and the resulting damages set out below were a direct and proximate result of Defendants negligence and its agents, servants, and officers, both of commission or omission, or both separately and collectively, in failing to properly maintain and inspect the campsite where Plaintiffs were injured, in failing to properly maintain the campsite in a safe condition and/or in failing to exercise ordinary care to protect Plaintiffs from the danger.

The Mirandas' gross negligence allegations stated:

Plaintiffs would show the court that the occurrences made the basis of this suit and the resulting injuries and damages set out below were a direct and proximate result of Defendants negligence in failing to make safe the dangerous condition of its campsite trees. Defendant's conduct was willful, wanton, or grossly negligent. Defendant failed to warn or make reasonably safe the dangerous condition of which it was aware and which Plaintiffs were unaware.

We can accept as true the Mirandas' allegation that the Department knew "its tree branches which have not been inspected or pruned regularly fall" and did not warn them about that contingency. That pleading, however, is of neutral value in a suit against the Department, which would owe no duty to warn unless it had actual knowledge that the branch would fall yet nevertheless instructed Maria to camp beneath it. *See id.; see also Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 785 (Tex.2001) (reiterating that gross negligence requires that "the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others."). Indeed, nowhere in their pleadings do the Mirandas assert that the Department was aware of any risk associated with either the tree or the campsite below. Instead, they simply recast allegations of simple negligence into a claim for gross negligence.

We are bound, however, to analyze their claims in light of the policies underlying the recreational use statute. The statute exists to encourage landowners to allow the public to enjoy outdoor recreation on their property by limiting their liability for personal injury. *City of Bellmead v. Torres,* 89 S.W.3d 611, 617 (Tex.2002) (Hankinson, J. dissenting). To accomplish that objective, the Legislature has placed stringent parameters around the duty landowners owe "trespassers." *See* TEX. CIV. PRAC. & REM.



CODE § 75.002. The duty implicit in the Mirandas pleading, however, would require

[133 S.W.3d 238]

the Department to warn all visitors of all perils commonly confronted by human interaction with nature. The scope of that proposed duty— obligating the Department to post warnings about all naturally occurring dangers—would create such an insurmountable practical and economic burden as to frustrate the legislatures intent to encourage landowners to make property available for recreational use.

Without allegations that the Department was aware that the limb would fall and nevertheless instructed Maria to camp below it, the Mirandas have not pleaded facts sufficient to proceed on their claim under the recreational use statute. I do not mean to suggest that merely because the injury is alleged to have resulted from a natural condition, the trial court is *thereby* deprived of jurisdiction. For example, the trial courts jurisdiction would be properly invoked by a pleading that the Department told the plaintiff it was safe to dive into waters the Department knew were so shallow that the dive posed a likelihood of serious injury, and that the plaintiff was severely injured diving in reliance on that assurance. Here, by contrast, the Mirandas did not plead that the Department directed Maria to a campsite knowing that an overhanging tree branch would likely fall on her and cause serious injury.

I understand fully the Courts holding that the Mirandas gave "fair notice" that they were pursuing a gross negligence claim. Fair-notice pleadings, however, must be viewed in this case through the prism of sovereign immunity, which deprives a court of jurisdiction unless the State has expressly waived immunity. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999). The plaintiffs' pleadings against the State must affirmatively establish jurisdiction to overcome the contrary presumption. *Tex. Dep't of Crim. Justice v. Miller,* 51 S.W.3d 583, 587 (Tex.2001)(quoting *Tex. Assn. Bus.,* 852 S.W.2d at 446). The plaintiff must plead facts that, if true,

would establish that the claims come within an express waiver of sovereign immunity before the trial court has jurisdiction to proceed. Just as mere reference to the Texas Tort Claims Act is insufficient to confer jurisdiction, *Miller,* 51 S.W.3d at 587, the trial court's jurisdiction is not satisfied by mere notice that the plaintiff is pursuing a gross negligence claim. The Mirandas have failed to affirmatively establish the court's jurisdiction because, even if all of the facts alleged in their pleading were true, those facts would not amount to gross negligence and therefore would not establish a waiver of sovereign immunity under the recreational use statute.

When a plaintiff fails to plead facts establishing jurisdiction, the issue is ordinarily one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002). A court may grant a plea to the jurisdiction without affording an opportunity to amend only when the pleadings "affirmatively negate" the existence of jurisdiction, a circumstance not presented here. *Id.* In this case, however, the trial court overruled the Departments plea to the jurisdiction, concluding implicitly that the Mirandas pleadings were sufficient to confer jurisdiction, and the court of appeals affirmed. Consequently, the Mirandas have never been placed on notice that they must cure the jurisdictional defect. It may well be that the facts will not lend themselves to a pleading that would confer jurisdiction, but we are not equipped to make that determination at this stage of the proceedings.

### III
### Conclusion

We need not and should not inquire into the ultimate merits of this case. I would

[133 S.W.3d 239]

remand the cause to the trial court to give the Mirandas an opportunity to amend their petition to plead facts establishing jurisdiction.



Justice BRISTER, joined by Justice O'NEILL and Justice SCHNEIDER, dissenting.

The Legislature has provided that state park visitors are owed the same duty of care as trespassers;[1] thus, the plaintiffs in this case had to prove the Parks and Wildlife Department caused deliberate, wilful, or malicious injury.[2] All members of the Court agree that either their petition or their summary judgment evidence fails to do so, though we disagree which.

The Mirandas alleged Maria suffered severe injuries caused by the Department's gross negligence; specifically, they alleged the Department knew tree limbs could fall, and failed to warn them of that fact or assign them a campsite where none would. I have grave doubts whether such facts could possibly constitute gross negligence—natural conditions usually cannot be unreasonably dangerous (much less wanton),[3] and trespassers do not have to be warned of what everyone should know.[4] Nor does the Parks Department appear to have a duty to provide campsites safely away from trees;[5] indeed, one has to ask whether anyone would want to use such "parks" if it did.[6]

Faced with what appears to be an insupportable allegation like the gross-negligence pleading here, litigants normally have two options: (1) demand more specific facts by special exception, or (2) demand more specific facts by motion for summary judgment. Instead, the Department filed three motions, including a "plea to the jurisdiction"—the white elephant[7] of current Texas motion practice. By use of this plea, the Department was able to force the trial judge (and ultimately this Court) to make an ad hoc decision whether our jurisdiction should be determined by reference to pleadings or evidence. Because it should be litigants rather than judges making that choice, I respectfully dissent.

Pleas to the jurisdiction are nothing new. In his *Commentaries on the Laws of England,* Blackstone lists them as a category of dilatory pleas that (along with pleas of disability and abatement) deny the

[133 S.W.3d 240]

propriety of the remedy rather than the injury.[8] One hundred years ago, this Court addressed a variety of matters as pleas to the jurisdiction, including objections based on personal jurisdiction,[9] subject-matter jurisdiction,[10] dominant jurisdiction,[11] venue,[12] capacity,[13] and conflict of laws.[14]

Since then, there has been a steady shift away from the common-law forms of pleading to the more specific motion practice set out in the rules of civil procedure. For example, a defendant objecting to venue today must file a motion to transfer that complies with the form requirements of Rule 86 and the deadlines of Rule 87.[15] Similarly, a nonresident objecting to personal jurisdiction must file a special appearance that meets the requirements of Rule 120a.[16] In substance, these motions could still be categorized as "pleas to the jurisdiction;" but in form, they must comply with the current rules of civil procedure.

Case law as well as rule amendments have contributed to the trend away from the common-law plea to the jurisdiction. For example, we have held that a complaint based on dominant jurisdiction in another court must be raised by plea in abatement in the second court, or it is waived.[17] Again, though this complaint could be characterized as a plea to the jurisdiction, a more specific motion and procedure has rendered the common-law term obsolete.

But pleas to the jurisdiction have enjoyed a recent resurgence in the field of governmental immunity. For many years, governmental units were not very particular about the vehicle for asserting immunity, raising it sometimes by—

• general demurrer;[18]

• special demurrer;[19]

[133 S.W.3d 241]

• special exception;[20]



• plea to the jurisdiction;[21]

• plea in abatement;[22] or

• summary judgment.[23]

In 1997, the Legislature amended the Civil Practices and Remedies Code to allow interlocutory appeals "from an interlocutory order ... [that] grants or denies a plea to the jurisdiction by a governmental unit."[24] We have held this section must be strictly construed, as it is an exception to the general rule that interlocutory orders are not appealable.[25]

As a result, almost overnight a "plea to the jurisdiction" became the motion of choice for asserting immunity;[26] indeed, some appellate courts have refused to consider any other.[27] This development exalts form over substance. For example, before the Legislature's amendment, one governmental entity unsuccessfully asserted immunity by means of a summary judgment and special exceptions; immediately after the effective date, the entity filed the same objection as a "plea to jurisdiction"—and prevailed.[28]

For several reasons, we should put a stop to this resurgence of common-law pleadings in immunity cases. First, it is fraught with uncertainty. Despite hundreds of haphazardly-numbered rules, only once do the Texas Rules of Civil Procedure mention pleas to the jurisdiction, and then only in a rule regarding permissible parts of an *answer* rather than permissible motions.[29]

[133 S.W.3d 242]

There is *no* rule—no case and no code—that specifies the form, deadlines, or evidentiary requirements for pleas to the jurisdiction generally.

In *Bland Independent School District v. Blue,*[30] we attempted to bring some order to this resurgence by setting guidelines for handling such pleas. But due to the broad range of issues a plea to the jurisdiction might address, that was not

easy to do. As we pointed out in several examples, consideration of some pleas should not go beyond the pleadings, but consideration of others must.[31] When necessary, trial courts must consider evidence relating to the jurisdictional facts, but should not consider evidence relating to the merits,[32] even though the two are sometimes the same. Nor could we be specific about when pleas should be decided, leaving it to the trial court's discretion whether to address the issue at a preliminary hearing or after fuller development of the merits.[33]

The examples given in *Bland* certainly provided more procedural guidance than existed before. But without considering all possible pleas to the jurisdiction, we could not prescribe more definitive rules; until all those disputes come before us, we should probably not try. In the meantime, it will often be unclear *what* the trial court should consider, or *when* it should do so, until the plea is decided (or perhaps even later on appeal). To some observers, this may appear to be drawing up the rules after the game has been played.[34]

From almost any vantage point, the resurgence of pleas to the jurisdiction creates problems in immunity cases. For governmental entities, it results in unnecessary repetition. In this case, the Parks and Wildlife Department could not be sure whether the trial court would consider evidence necessary, so it filed three motions—a no-evidence motion for summary judgment, a traditional motion for summary judgment, and a plea to the jurisdiction. But as counsel for the Department admitted at the hearing, "all three relate to the same set of issues."

Such repetition is unnecessary for interlocutory review. Nothing in the Civil Practice and Remedies Code suggests the Legislature intended to specify a *form* motions had to take for that purpose, rather than their *substance*. Indeed, the opposite is suggested by the Legislature's selection of a common-law term applicable to a broad category of motions, rather than a term pointing to any particular motion in the current



rules of civil procedure. It has long been our practice to consider the substance of motions rather than their form;[35] nothing in the legislative history

[133 S.W.3d 243]

suggests the interlocutory appeal statute was intended to be an exception to that rule.

For plaintiffs, the problems created by the resurgence of pleas to the jurisdiction are even more acute. Defendants uncertain about how to present an immunity defense can simply try a little of everything; plaintiffs, by contrast, may lose their case if they guess wrong. In this case, for example, the Mirandas did not attach any evidence to their responses to the various motions. The lower courts agreed they did not need to, but if we hold otherwise, then the Mirandas will learn three years too late that they should have presented evidence at the jurisdictional hearing.

From a trial judge's vantage point, pleas to the jurisdiction create uncertainty, not just about the rules to be applied but about the role of the judge. This case is one of many in which immunity from suit under the Texas Tort Claims Act is coextensive with immunity from liability.[36] As a result, deciding the jurisdictional question bears a strong resemblance to deciding the merits.

In these circumstances, it is difficult for Texas judges to detect the line between jurisdictional questions they *must* decide before going further and liability questions they *cannot* decide without usurping the function of the jury. Here, the Mirandas convinced the lower courts that whether their pleadings were supported by any evidence was a question solely for the jury. But that is not true if they raised no material facts that could establish a waiver of immunity.[37]

By contrast, returning to standard motions as the vehicles for asserting governmental immunity would clarify what the jurisdictional hearing will be like and simplify many procedural questions.

For decades, governmental units have asserted immunity by special exceptions[38] or motions for summary judgment.[39] In many cases (including this one), they still do so today.[40] Relying on standard procedural

[133 S.W.3d 244]

motions would eliminate many questions about deadlines, forms, and evidence. It would make government entities rather than trial judges decide whether the jurisdictional challenge is directed to the plaintiff's pleadings or the underlying facts. If a governmental unit chooses wrong,[41] it may always try again. But the plaintiff is not required to guess what rules or procedures the trial judge might apply.

Returning to pre-resurgence practice would not change the incidence of governmental immunity. As we recently held, if a plea to the jurisdiction is directed only to the plaintiff's pleadings, we construe them in the plaintiff's favor and allow an opportunity to amend unless they affirmatively negate jurisdiction.[42] This is, of course, identical to the rules governing special exceptions.[43] And when governmental entities wish to rely on evidence, any questions of fact that affect jurisdictional issues must be settled by the jury,[44] the same standard that applies to summary judgments.

Nor can it be argued that courts exceed their jurisdiction by requiring immunity pleas to be brought in standard motions according to settled rules of procedure. As we stated shortly after the rules of civil procedure were enacted:

Since [the trial court] had the power to sustain the demurrers and grant the motions, it had the power to overrule them. The jurisdiction of a court must be determined, not upon the court's action in deciding the questions presented in a case, but upon the character of the case itself. Jurisdiction is the power to decide, and not merely the power to decide correctly.[45]

Of course, returning to established procedural motions will not remove all difficulties



with issues of governmental immunity. Judges of goodwill and intellect will still disagree about whether a particular pleading is sufficiently specific, as Justices Jefferson and Wainwright do here. Governmental units may incur unnecessary discovery costs and delays unless judges agree to hear summary judgment motions on jurisdictional matters as early in the case as they might hear a plea to the jurisdiction. And appellate courts must still distinguish between immunity from suit (as to which an interlocutory appeal will lie) and immunity from liability (as to which it will not).[46] But simplification of our procedures should not be rejected because we cannot simplify everything.

If the Texas Legislature mandated interlocutory review of "pleas in bar asserting limitations" (a development devoutly to be wished against), few would suggest such review was available only for motions entitled "Plea in Bar" instead of the summary judgment or special exception forms that have long been used to raise such issues.[47] We should stop making the assumption

[133 S.W.3d 245]

that the Legislature intended something different for pleas of governmental immunity.

Accordingly, I would reverse and remand for (1) the Parks and Wildlife Department to specify whether its plea to the jurisdiction is a challenge to the pleadings (by special exception) or the evidence (by summary judgment), (2) the Mirandas to respond in compliance with the rules of civil procedure, and (3) the lower courts to address the governmental immunity issue in accordance with the usual rules governing disposition and review of those motions.

---------------

Notes:

1. The Mirandas originally named the "Texas Department of Parks and Wildlife" as defendant but corrected the name to the "Texas Parks and Wildlife Department" in their third amended petition. Because the parties and lower courts retained the original style of the case, we retain that style but in our opinion refer to the Department by its correct name.

2. The Department also moved for summary judgment under Texas Rule of Civil Procedure 166a(b)-(c)and 166a(I). The trial court denied both motions, but the Department does not appeal the trial court's denial of either motion.

3. The Legislature amended section 22.001 of the Government Code, effective September 1, 2003. Act of June 11, 2003, 78th Leg., R.S., Ch. 204 (codified as section 22.001(e) of the Texas Government Code). The amendment, which applies to actions filed on or after September 1, 2003 and does not govern our jurisdiction in this case, provides that "one court holds differently from another when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants."

4. The plaintiff's allegations in the petition of the amount in controversy control for jurisdictional purposes unless the party challenging jurisdiction pleads and proves that the plaintiff's allegations of the amount in controversy were made fraudulently for the purpose of obtaining jurisdiction. See *Bland,* 34 S.W.3d at 554; *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 449 (Tex.1996); *Tidball v. Eichoff,* 66 Tex. 58, 17 S.W. 263, 263 (1886). We disapprove of courts of appeals' holdings that require a party to allege that pleadings, other than the jurisdictional amount, are fraudulent in order for the trial court to consider evidence, when otherwise necessary, of whether it has jurisdiction over a case. *See, e.g., Sullivan v. Wilmer Hutchins Indep. Sch. Dist.,* 47 S.W.3d 529, 531 (Tex.App.-Dallas 2000), rev'd on other grounds, 51 S.W.3d 293 (Tex.2001); *Denton County v. Howard,* 22 S.W.3d 113, 117-18 (Tex.App.-Fort Worth 2000, no pet.); *Tex. Dep't of Mental Health & Mental Retardation v. Pearce,* 16 S.W.3d 456, 460 (Tex.App.-Waco 2000, pet. dism'd w.o.j.); *Tex. State Employees Union/CWA Local 6184 v. Tex. Workforce*



*Comm'n,* 16 S.W.3d 61, 65, 66 (Tex.App.-Austin 2000, no pet.); *DalMac Constr. Co. v. Tex. A & M Univ.,* 35 S.W.3d 654, 655 n. 1 (Tex.App.-Austin 1999), rev'd on other grounds, sub nom. *Gen. Servs. Comm'n v. Little-Tex Insulation Co., Inc.,* 39 S.W.3d 591 (Tex.2001); *Univ. of Houston v. Elthon,* 9 S.W.3d 351, 356 (Tex.App.-Houston [14th Dist.] 1999, pet. dism'd w.o.j.); *Curbo v. State, Office of the Governor,* 998 S.W.2d 337, 341-42 (Tex.App.-Austin 1999, no pet.); *City of Saginaw v. Carter,* 996 S.W.2d 1, 3 (Tex.App.-Fort Worth 1999, pet. dism-d w.o.j.); *Bland Indep. Sch. Dist. v. Blue,* 989 S.W.2d 441, 447 (Tex.App.-Dallas 1999), rev'd, 34 S.W.3d 547 (Tex.2000).

5. The recreational use statute does not limit the liability of an owner, lessee, or occupant "who has been grossly negligent or has acted with malicious intent or in bad faith." Tex. Civ. Prac. & Rem.Code 75.002(d).

6. *See, e.g., Harris v. P.A.M. Transp., Inc.,* 339 F.3d 635, 637 n. 4 (8th Cir.2003) (acknowledging district court's authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1)); *Johnson v. Apna Ghar, Inc.,* 330 F.3d 999, 1001 (7th Cir.2003) (observing that when considering a motion for dismissal for lack of subject matter jurisdiction, "`[t]he district court may properly ... view whatever evidence has been submitted on the issue'" (quoting *Long v. Shorebank Dev. Corp.,* 182 F.3d 548, 554 (7th Cir.1999))); *Sizova v. Nat'l Inst. of Standards & Tech.,* 282 F.3d 1320, 1324 (10th Cir.2002) (noting district court's "`wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)'" (quoting *Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir.1995))); *Valentin,* 254 F.3d at 363 (district court has "broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearings in order to determine its own jurisdiction"); *Ass'n of Am. Med. Colls. v. United States,* 217 F.3d 770, 778 (9th Cir.2000) ("`district court obviously does not abuse its discretion by looking to ... extra-pleading material'" in deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction (quoting *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.1989))); *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (allowing district court to "refer to evidence outside the pleadings" to resolve a Rule 12(b)(1) motion); *Williams v. United States,* 50 F.3d 299, 304 (4th Cir.1995) ("In ruling on a Rule 12(b)(1) motion, the court may consider exhibits outside the pleadings."); *Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 172 (5th Cir.1994) (acknowledging a trial court's "authority to consider evidence presented beyond the pleadings ... which may include considering affidavits, allowing further discovery, hearing oral testimony, conducting an evidentiary hearing"); *Herbert v. Nat'l Acad. of Sci.,* 974 F.2d 192, 197 (D.C.Cir.1992) ("[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."); *Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir.1990) (noting that "substantial authority" acknowledges the trial court's freedom to consider disputed evidence when deciding a Rule 12(b)(1) motion) (citations omitted); *Gould, Inc. v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 451 (6th Cir.1988) ("[T]he district court may consider affidavits, allow discovery, hear oral testimony, order an evidentiary hearing, or even postpone its determination if the question of jurisdiction is intertwined with the merits."); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977) (acknowledging that "substantial authority" allows trial courts to weigh the evidence of disputed facts when considering a Rule 12(b)(1) motion); see also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1364, at 468-469 (2d ed.1990).

1. I agree that the court of appeals' holding conflicts with *Bland* to the extent it holds that the trial court was prohibited from inquiring into the merits *because* "... the Department did not specifically allege that the Mirandas allegations were pled merely as a sham for the purpose of wrongfully obtaining jurisdiction." 55 S.W.3d 648, 652. *Bland* does not require that form of defensive pleading as the sole gateway through



which the trial court may consider evidence. If that were so, we could not have held that there are limited circumstances in which, even in the absence of a defendant's pleading that the plaintiff's pleadings were a sham, the trial court is required to consider evidence. I depart from the Courts holding, however, that this is such a case.

2. The prevailing view appears to be that the timeline is strictly enforced. *See Luna v. Estate of Rodriguez,* 906 S.W.2d 576, 582 (Tex.App.-Austin 1995, no writ) ("Because summary judgment is a harsh remedy, we strictly construe the twenty-one day time limit."). *Accord Burns Motors, Inc. v. Gulf Ins. Co.,* 975 S.W.2d 810, 812 (Tex.App.-Corpus Christi 1998) *rev'd on other grounds,* 22 S.W.3d 417 (Tex.2000); *Martin v. Martin, Martin & Richards, Inc.,* 991 S.W.2d 1, 11 (Tex.App.-Fort Worth 1997) *rev'd on other grounds,* 989 S.W.2d 357 (Tex.1998); *Bell v. Showa Denko K.K.,* 899 S.W.2d 749, 759 (Tex.App.-Amarillo 1995, writ denied); *Stephens v. Turtle Creek Apartments, Ltd.,* 875 S.W.2d 25, 27 (Tex.App.-Houston [14th Dist.] 1994, no writ); *Wavell v. Caller-Times Pub. Co.,* 809 S.W.2d 633, 637 (Tex.App.-Corpus Christi 1991, writ denied); *Williams v. City of Angleton,* 724 S.W.2d 414, 417 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.) *disapproved of on other grounds,* 876 S.W.2d 314 (Tex.1994).

1. TEX. CIV. PRAC. & REM.CODE §§ 75.002(c)(2), 75.003(g).

2. *Id.* §§ 75.002(a)(2), 75.003, 101.022, 101.058.

3. *See Johnson County Sheriff's Posse, Inc. v. Endsley,* 926 S.W.2d 284, 287 (Tex.1996) (holding rock in dirt arena did not create unreasonably dangerous condition).

4. *Cf. County of Cameron v. Brown,* 80 S.W.3d 549, 558 (Tex.2002) (holding darkness caused by failed streetlights was not open and obvious hazard precluding recovery by licensee because it could not be seen from entrance to causeway).

5. *See* TEX. CIV. PRAC. & REM.CODE § 75.002(c)(1) (providing landowners who grant permission for recreational use do not assure that the premises are safe for that purpose).

6. *See Tex. Home Mgmt., Inc. v. Peavy,* 89 S.W.3d 30, 33 (Tex.2002) (holding question of legal duty is question of law requiring balance of factors such as risk, utility, consequences of the duty, and other relevant individual and social interests).

7. The Oxford English Dictionary (1989) defines "white elephant" as:

    a. A rare albino variety of elephant which is highly venerated in some Asian countries. b. *fig.* A burdensome or costly possession (from the story that the kings of Siam were accustomed to make a present of one of these animals to courtiers who had rendered themselves obnoxious, in order to ruin the recipient by the cost of its maintenance). Also, an object, scheme, etc., considered to be without use or value.

8. 3 William Blackstone, Commentaries on the Laws of England 301-03 (1768).

9. *See, e.g., Rice v. Peteet,* 66 Tex. 568, 1 S.W. 657, 657 (1886).

10. *See, e.g., McIlhenny Co. v. Todd,* 71 Tex. 400, 9 S.W. 445, 446 (1888) (objecting that amount at issue fell below court's jurisdictional limits); *Juneman v. Franklin,* 67 Tex. 411, 3 S.W. 562, 562 (1887) (objecting that forcible entry and detainer action was not filed in justice court).

11. *See, e.g., Cleveland v. Ward,* 116 Tex. 1, 285 S.W. 1063, 1072 (1926), *disapproved on other grounds, Walker v. Packer,* 827 S.W.2d 833, 842 (Tex.1992); *Grathaus v. Witte,* 72 Tex. 124, 11 S.W. 1032, 1032 (1888).

12. *See, e.g., Pecos & N.T. Ry. Co. v. Thompson,* 106 Tex. 456, 167 S.W. 801, 801 (1914); *Baines v. Jemison,* 86 Tex. 118, 23 S.W. 639, 640 (1893); *Watson v. Baker,* 67 Tex. 48, 2 S.W. 375, 375-76 (1886).

13. *See, e.g., Brown v. Gay,* 76 Tex. 444, 13 S.W. 472, 472-73 (1890).



14. *See, e.g., Tex. & P. Ry. Co. v. Richards,* 68 Tex. 375, 4 S.W. 627, 629 (1887).

15. Tex.R. Civ. Proc. 86 (requiring unverified motion that is filed first and states counties of improper, proper, or mandatory venue); Tex.R. Civ. Proc. 87 (requiring 45-days' notice of hearing, 30-days' notice of respondents affidavits, and 7-days' notice of movants affidavits).

16. Tex.R. Civ. Proc. 120a (requiring sworn motion that is filed and heard before any other matter, with affidavits served seven days before the hearing).

17. *Mower v. Boyer,* 811 S.W.2d 560, 563 n. 2 (Tex.1991); *Wyatt v. Shaw Plumbing Co.,* 760 S.W.2d 245, 247 (Tex.1988).

18. *See, e.g., State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 735 (1941); *Herring v. Houston Nat'l Exch. Bank,* 113 Tex. 264, 253 S.W. 813, 814 (1923); *Stephens v. Tex. & P. Ry. Co.,* 100 Tex. 177, 97 S.W. 309, 310 (1906); *Thomson v. Baker,* 90 Tex. 163, 38 S.W. 21, 22 (1896).

19. *See, e.g., Thomson,* 38 S.W. at 22.

20. *See, e.g., Duhart v. State,* 610 S.W.2d 740, 741 (Tex.1980); *Dir. of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.,* 600 S.W.2d 264, 265 (Tex.1980); *Stephens,* 97 S.W. at 310.

21. *See, e.g., Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 403 (Tex.1997), *superseded by statute on other grounds as stated in Gen. Servs. Comm'n v. Little-Tex Insulation Co., Inc.,* 39 S.W.3d 591, 593 (Tex.2001); *Lowe v. Tex. Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976); *State v. Lain,* 162 Tex. 549, 349 S.W.2d 579, 580 (1961); *Griffin v. Hawn,* 161 Tex. 422, 341 S.W.2d 151, 152 (1960); *Short v. W.T. Carter & Bro.,* 133 Tex. 202, 126 S.W.2d 953, 955 (1938).

22. *See, e.g., Duhart v. State,* 610 S.W.2d 740, 741 (Tex.1980); *Lowe,* 540 S.W.2d at 298; *Griffin v. Hawn,* 161 Tex. 422, 341 S.W.2d 151, 152 (1960); *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 838 (1958); *Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 710 (1945); *Short v. W.T. Carter & Bro.,* 133 Tex. 202, 126 S.W.2d 953, 955 (1938).

23. *See, e.g., Overton Mem'l Hosp. v. McGuire,* 518 S.W.2d 528, 528 (Tex.1975) (per curiam); *Tex. Dept. of Corr. v. Herring,* 513 S.W.2d 6, 7 (Tex.1974).

24. TEX. CIV. PRAC. & REM.CODE § 51.014(a)(8).

25. *Bally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 355 (Tex.2001).

26. *See, e.g., Texas Natural Res. Conservation Comm'n v. IT-Davy,* 74 S.W.3d 849, 852 (Tex.2002); *Little-Tex Insulation Co., Inc.,* 39 S.W.3d at 594; *McClain v. Univ. of Tex. Health Ctr. at Tyler,* 119 S.W.3d 4, 5 (Tex.App.-Tyler 2000, pet. denied); *Dallas County Cmty. Coll. Dist. v. Bolton,* 990 S.W.2d 465, 466 (Tex.App.-Dallas 1999, no pet.); *Alamo Cmty. Coll. Dist. v. Obayashi Corp.,* 980 S.W.2d 745, 746 (Tex.App.-San Antonio 1998, pet. denied); *Tex. Parks & Wildlife Dept. v. Garrett Place, Inc.,* 972 S.W.2d 140, 142 (Tex.App.-Dallas 1998, no pet.); *Tex. Parks & Wildlife Dep't v. Callaway,* 971 S.W.2d 145, 147 (Tex.App.-Austin 1998, no pet.).

27. *See, e.g., Thomas v. Long,* 97 S.W.3d 300, 302-03 (Tex. App.-Houston [14th Dist.] 2003, pet. granted) (refusing interlocutory appeal of denial of summary judgment based on lack of subject matter jurisdiction as no order granted or denied a plea to the jurisdiction); *Baylor Coll. of Med. v. Tate,* 77 S.W.3d 467, 472 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (refusing interlocutory appeal because trial court's order was summary judgment based on immunity from liability rather than plea to the jurisdiction based on immunity from suit).

28. *Lamar Univ. v. Doe,* 971 S.W.2d 191, 193 (Tex.App.-Beaumont 1998, no pet.).

29. TEX.R. CIV. PROC. 85:

The original answer may consist of motions to transfer venue, *pleas to the jurisdiction,* in abatement, or any other dilatory pleas; of special



exceptions, of general denial, and any defense by way of avoidance or estoppel, and it may present a cross-action, which to that extent will place defendant in the attitude of a plaintiff. Matters in avoidance and estoppel may be stated together, or in several special pleas, each presenting a distinct defense, and numbered so as to admit of separate issues to be formed on them.

(Emphasis added).

30. 34 S.W.3d 547 (Tex.2000).

31. *Id.* at 555.

32. *Id.*

33. *Id.* at 554.

34. *See id.* at 555 (rejecting plaintiffs' demand for remand for full evidentiary hearing because they did not contest evidence at original plea to the jurisdiction hearing).

35. *See, e.g., Speer v. Stover,* 685 S.W.2d 22, 23 (Tex.1985) (per curiam) (considering plea to jurisdiction even though misnamed plea in abatement); *see also* TEX.R. CIV. PROC. 71 (stating "[w]hen a party has mistakenly designated any plea or pleading, the court, if justice so requires, shall treat the plea or pleading as if it had been properly designated"). Some courts themselves appear to use the possible terms for immunity motions interchangeably. *See, e.g., State v. Executive Condos., Inc.,* 673 S.W.2d 330, 331-32 (Tex.App.-Corpus Christi 1984, writ refused n.r.e.) (referring to immunity motion as "plea to the jurisdiction" when it was filed, "plea in abatement" when it was denied, and "motion to dismiss" when it was reversed).

36. *See* TEX. CIV. PRAC. & REM.CODE § 101.025(a) (waiving immunity to suit to the extent of liability under chapter 101), § 101.021 (creating governmental liability for specified acts resulting from negligence, premises conditions, and use of property to the extent private persons would be liable).

37. *See* Tex.R. Civ. Proc. 166a(c).

38. *See, e.g., John G. & Marie Stella Kenedy Mem'l Found. v. Mauro,* 921 S.W.2d 278, 281 (Tex.App.-Corpus Christi 1995, writ denied); *Tex. Dep't of Corr. v. Winters,* 765 S.W.2d 531, 532 (Tex.App.-Beaumont 1989, writ denied); *Martine v. Bd. of Regents, State Senior Colleges of Tex.,* 578 S.W.2d 465, 469 (Tex.Civ.App.-Tyler 1979, no writ); *Harrison v. Bunnell,* 420 S.W.2d 777, 778 (Tex.Civ.App.-Austin 1967, no writ); *State v. McDonald,* 220 S.W.2d 732, 732 (Tex.Civ.App.-Texarkana 1949, writ refused); *Porter v. Langley,* 155 S.W. 1042, 1043 (Tex.Civ.App.-Dallas 1913, writ refused).

39. *See, e.g., Ho v. Univ. of Tex. at Arlington,* 984 S.W.2d 672, 681-83 (Tex.App.-Amarillo 1998, pet. denied); *Russell v. Tex. Dep't of Human Res.,* 746 S.W.2d 510, 513 (Tex.App.-Texarkana 1988, writ denied); *Gay v. State,* 730 S.W.2d 154, 159 (Tex.App.-Amarillo 1987, no writ).

40. *See, e.g., Dallas Area Rapid Transit v. Whitley,* 104 S.W.3d 540, 542 (Tex.2003) (sovereign immunity asserted by plea to the jurisdiction and motion for summary judgment); *County of Cameron v. Brown,* 80 S.W.3d 549, 553 (Tex.2002) (sovereign immunity asserted by plea to the jurisdiction and special exceptions).

41. *See, e.g., Tex. Dep't of Corr. v. Herring,* 513 S.W.2d 6, 9-10 (Tex.1974) (reversing summary judgment based on immunity as plaintiff was not allowed opportunity to replead).

42. *Cameron,* 80 S.W.3d at 555; *Tex. Dep't of Transp. v. Ramirez,* 74 S.W.3d 864, 867 (Tex.2002).

43. *See Brown,* 80 S.W.3d at 559; *Herring,* 513 S.W.2d at 9-10.

44. *See, e.g., Brown,* 80 S.W.3d at 556 (holding foreseeability issue raised by plea to the jurisdiction presented fact question for jury).

45. *Martin v. Sheppard,* 145 Tex. 639, 201 S.W.2d 810, 812-13 (1947).

46. *See Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638-39 (Tex.1999).



47. *See Baker v. Monsanto Co.,* 111 S.W.3d 158, 159 (Tex.2003) (per curiam) (asserting limitations by summary judgment); *City of Port Arthur v. Tillman,* 398 S.W.2d 750, 751 (Tex.1965) (asserting limitations by special exception).

\---------------



**284 S.W.3d 393**
**TRUSS WORLD, INC. and All Tex**
**Financial, Inc., Appellants**
**v.**
**ERJS, INC. f/k/a America's Great Homes,**
**Inc., America's Great Homes, Ltd., and**
**Suretec Insurance Company, Appellees.**
**No. 09-07-00432-CV.**
**Court of Appeals of Texas, Beaumont.**
**Submitted on September 8, 2008.**
**Decided February 12, 2009.**

[284 S.W.3d 394]

David M. Medearis, Sullins, Johnston, Rohrbach & Magers, Houston, for appellants.

George D. Gordon, Richard S. Browne, Baggett, Gordon & Deison, Conroe, for appellees.

Before GAULTNEY, KREGER, and HORTON, JJ.

**OPINION**

DAVID GAULTNEY, Justice.

Truss World, Inc. designed and sold trusses, used in residential construction, for ERJS, f/k/a America's Great Homes, Inc. and America's Great Homes, Ltd. (AGH). AGH did not pay for some of the trusses, and Truss World filed materialman's liens. AGH filed a summary motion to remove the liens. *See* TEX. PROP.CODE ANN. § 53.160 (Vernon 2007). Bonds to indemnify against the liens were filed, naming Suretec Insurance Company as the surety. *See* TEX. PROP.CODE ANN. §§ 53.171-53.175 (Vernon 2007).

Truss World filed a countersuit against AGH for breach of contract, enforcement of the liens, and estoppel, and also sued Suretec, the surety on the bonds. All Tex Financial, Inc., an assignee of Truss World's claims and causes of action, and of accounts receivable owed by AGH, intervened and also sued AGH for fraud and negligent misrepresentation.

Following a bench trial, a money judgment was rendered against AGH based on the breach of contract claim. The court concluded Truss World "provided specially fabricated items/trusses to [AGH]." The trial court found that "Truss World did not send notice to [AGH] for specially fabricated items as required by the Texas Property Code prior to filing the Affidavits for Mechanic's and Materialman's Liens." The trial court concluded that Truss World failed to perfect the liens, and ordered that Truss World and All Tex take nothing on the bonds. Truss World and All Tex, Inc. appeal that take-nothing judgment. No other party filed a notice of appeal. No cross-points are presented by Suretec or AGH.

[284 S.W.3d 395]

The trial court erred in finding that Truss World failed to properly perfect the liens. We therefore reverse the part of the judgment that provides appellants take nothing from Suretec, and remand the case to the trial court to render judgment in favor of appellants on the bonds. *See* TEX.R.APP. P. 43.3(a).

ORIGINAL CONTRACTOR OR DERIVATIVE CLAIMANT?

Appellants argue the notice requirements of section 53.055 apply to an original contractor. *See* TEX. PROP.CODE ANN. § 53.055 (Vernon 2007). Appellants contend the trial court erred in not presuming, pursuant to Texas Rules of Civil Procedure 54, that Truss World gave AGH the required notice under section 53.055 because notice and filing were pled and not specifically denied. *See* TEX.R. CIV. P. 54.

Appellants argue Truss World was not required to comply with section 53.058 of the Texas Property Code, a provision applicable to derivative claimants. Generally, section 53.058 entitled "Derivative Claimant: Notice for Specially Fabricated Items," states that—for a lien to be valid for non-delivered specially fabricated items—a claimant who specially fabricates material must give the owner notice not later than the 15th day of the second month after the month



in which the claimant receives and accepts the order for the material. *See* TEX. PROP.CODE ANN. § 53.058(a),(b) (Vernon 2007); *see also* § 53.253 (Vernon 2007) (applicable to residential construction projects). A subcontractor is a derivative claimant; an original contractor is not. *See First Nat'l Bank v. Sledge,* 653 S.W.2d 283, 285 (Tex.1983). Truss World asserts it is an original contractor.

For the purposes of mechanic or materialman liens, an "original contractor" is "a person contracting with an owner either directly or through the owner's agent." TEX. PROP.CODE ANN. § 53.001(7) (Vernon 2007). A subcontractor is "a person who has furnished labor or materials to fulfill an obligation to an original contractor or to a subcontractor to perform all or part of the work required by an original contract." *Id.* § 53.001(13). Truss World contracted directly with the owner of the real property, AGH, to provide trusses to AGH.

AGH and Suretec argue, nevertheless, that Truss World's statement in the lien affidavits filed with the county clerk, identifying Truss World as a subcontractor, constitutes a judicial admission that Truss World was in fact AGH's subcontractor. Form requirements for materialmen's lien affidavits are to be liberally construed; substantial compliance with the mechanic's and materialmen's lien statute authorizing the lien is sufficient. *See generally Gill Sav. Ass'n v. Int'l Supply,* 759 S.W.2d 697, 700-01 (Tex.App.-Dallas 1988, writ denied) ("The mechanic's and materialmen's lien statutes are to be liberally construed for the purpose of protecting laborers and materialmen."). We decline to treat the statement in the lien affidavits as a binding judicial admission, but instead look at the actual relationship of the parties and the purpose of the statute.

Truss World contracted directly with AGH and was an original contractor, not a subcontractor or derivative claimant. *See* TEX. PROP.CODE ANN. § 53.001(7),(13). As an original contractor, Truss World was not required to serve additional notices required of a

subcontractor or derivative claimant to perfect a lien claim.

SECTION 53.055

An original contractor must provide the owner notice pursuant to section 53.055 of the Texas Property Code when filing a lien affidavit. *See* TEX. PROP.CODE ANN. § 53.055 (Vernon 2007). Section 53.055

[284 S.W.3d 396]

states in part that "[a] person who files [a lien] affidavit must send a copy of the affidavit by registered or certified mail to the owner or reputed owner at the owner's last known business or residence address not later than the fifth day after the date the affidavit is filed with the county clerk." *Id.*

Requiring a lien affiant to give actual notice to the property owner of the lien ensures that a property owner will not be ambushed by recorded liens of which he is unaware. *New AAA Apartment Plumbers, Inc. v. DPMC-Briarcliff, L.P.,* 145 S.W.3d 728, 730 (Tex.App.-Corpus Christi 2004, no pet.). Although section 53.055 requires that notice of a mechanic's and materialman's lien must be given to the property owner no later than five days after the affidavit is filed, the statute does not prohibit giving notice before the lien affidavit is filed. *See Overseas Enters. USA, Inc. v. Whatley,* No. 09-07-565 CV, 2008 WL 3928377, at *3, 2008 Tex.App. LEXIS 8523, at *8 (Tex.App.-Beaumont Aug.28, 2008, no pet.)(mem.op.); *Arias v. Brookstone,* 265 S.W.3d 459, 465 (Tex. App.-Houston [1st Dist.] 2007, pet. denied)("[T]he owner ... can hardly claim to be hurt when ... notified in advance of the actual filing of the lien affidavit."); *New AAA Apartment Plumbers, Inc.,* 145 S.W.3d at 730 (citing *Hammons v. Texas Pride Landscape,* No. 05-99-980-CV, 2000 Tex.App. LEXIS 3025, 2000 WL 567108, at *4 (Tex.App.-Dallas May 10, 2000, pet. denied) (mem.op.)); *see also* TEX. PROP.CODE ANN. § 53.055. Substantial compliance with the statute is sufficient to perfect the lien. *See First Nat'l Bank v. Sledge,* 653



S.W.2d 283, 285 (Tex.1983) (predecessor statute).

RULE 54

Truss World alleged it would show it "filed and perfected" the liens. Truss World pled in its petition that, "On or about November 25, 2002, Truss World mailed lien affidavits, certified mail, return receipt requested, informing AGH of its intent to file liens on the property to secure its claim on the delinquent payments. And on December 3, 2002 Truss World filed lien affidavits on the properties." When a party pleads the performance or occurrence of conditions precedent, the party pleading the conditions precedent is only required to prove at trial those performances or occurrences that were specifically denied by the opposing party. TEX.R. CIV. P. 54. Essentially, Truss World's pleading asserted compliance with its notice obligations. *See* TEX. PROP.CODE ANN. § 53.055; *see also Arias,* 265 S.W.3d at 465. Appellants were not required to prove notice unless AGH and Suretec specifically denied appellants gave the notice as pled, or otherwise specifically denied compliance with section 53.055. *See* TEX.R. CIV. P. 54.

AGH and Suretec alleged in their answers that appellants' "failure to properly give notice as required by the Texas Property Code for specially fabricated items" precluded the claims, and they asserted appellants did not properly perfect the liens. AGH and Suretec alleged that the notice did not comply with sections 53.058 and 53.253. Contrary to the trial court's finding, however, the Property Code provisions dealing with "specially fabricated items" are inapplicable here, because the Property Code notice requirements for "specially fabricated items" apply to derivative claimants, not original contractors. *See* TEX. PROP.CODE ANN. § 53.058. The denial by AGH and Suretec was not a specific denial of notice under section 53.055. Furthermore, AGH's and Suretec's broad denial in their answers, that appellants "fail[ed] to properly perfect its liens, pursuant to the Texas Property Code[,]" failed to specifically state in what

[284 S.W.3d 397]

way the liens were not "properly perfected." The assertion did not specifically deny that appellants gave notice as pled by appellants of the filing of the liens. *See generally Wade & Sons, Inc. v. Am. Std. Inc.,* 127 S.W.3d 814, 825-26 (Tex.App.-San Antonio 2003, pet. denied)(A pleading "specifically denying that all conditions precedent" to plaintiff's right to recover have "been performed" or "waived" was insufficient under Rule 54.).

Appellants also argue Rule 93(12) of the Texas Rules of Civil Procedure requires that a plea "[t]hat notice and proof of loss or claim for damage has not been given as alleged" must be verified by affidavit and that "denial of such notice or such proof shall be made specifically and with particularity." *See* TEX.R. CIV. P. 93(12). AGH and Suretec cite *Bunch Electric Company v. Tex-Craft Builders, Inc.,* 480 S.W.2d 42 (Tex.Civ.App.-Tyler 1972, no writ) in arguing that verification under Rule 93(12) is inapplicable here. In *Bunch Electric* the court held that Rule 93(m), the prior version of Rule 93(12), did not apply to the procedure applicable under Article 5160 of the Texas Revised Civil Statutes. *See Bunch Electric,* 480 S.W.2d at 46. The court held article 5160 provided the procedure and remedy for presenting a claim against a payment bond on a public contract. *See id.* at 45-46.

In *Skinny's Inc. v. Hicks Brothers Construction Company,* 602 S.W.2d 85, 90 (Tex.Civ.App.-Eastland 1980, no writ), the court declined to follow the reasoning in *Bunch Electric.* The court applied the Rules of Civil Procedure, specifically Rule 54, and held that the claimants were required to prove only the conditions precedent specifically denied by the owner. *See id.* The owner could not assert, for the first time on appeal, that there was no evidence of mailing copies of the lien affidavits to the owner by certified mail. The court explained that "the general contractor and the subcontractor were required to prove only such conditions precedent as were specifically denied by the owner." *Id.*



In *City of Houston v. Flanagan,* 446 S.W.2d 348, 349-50 (Tex.Civ.App.-Houston [1st Dist.] 1969, writ ref'd n.r.e.), a personal injury lawsuit, the court held that Rule 54 and Rule 93(12)'s predecessor, Rule 93(m), applied to all civil actions. *See id.* at 350. Although it seems arguable Rule 93(12) is also applicable to the notice pleading here, we need not reach that specific issue. The Rules of Civil Procedure, including Rule 54, apply to pleading requirements in civil actions like this one. *See Skinny's, Inc.,* 602 S.W.2d at 90; *Flanagan,* 446 S.W.2d at 349-50. Pursuant to Rule 54, appellants were required to prove only the performances or occurrences of conditions precedent pled that were specifically denied. *See* TEX.R. CIV. P. 54; *Skinny's, Inc.,* 602 S.W.2d at 90.

Truss World specifically pled performances or occurrences that were conditions precedent to establish the liens: notice and filing. AGH's and Suretec's denials did not specifically address the "performances or occurrences" as pled. Appellants were entitled to rely on their pleadings in the absence of a specific denial of the performances or occurrences pled. Under the circumstances, notice as pled should have been presumed by the trial court. *See* TEX.R. CIV P. 54. Appellants' issue is sustained.

CONCLUSION

The trial court concluded that Truss World provided the trusses and fully performed its obligations. The court entered judgment for damages based on breach of contract. No party contests those conclusions or appeals that award. We reverse only that part of the judgment providing

[284 S.W.3d 398]

appellants take nothing from the surety, Suretec. The case is remanded for the trial court to render judgment on the surety bonds.

REVERSED AND REMANDED.



**The University of Texas at Austin,
Appellant
v.
Beverly Kearney, Appellee**

**NO. 03-14-00500-CV**

**TEXAS COURT OF APPEALS, THIRD
DISTRICT, AT AUSTIN**

**May 3, 2016**

**FROM THE DISTRICT COURT OF TRAVIS
COUNTY**, **126TH JUDICIAL DISTRICT
NO. D-GN-13-003908**, **HONORABLE
ORLINDA NARANJO**, **JUDGE PRESIDING**

**MEMORANDUM OPINION**

Beverly Kearney brought suit against the University of Texas at Austin, her former employer, pursuant to the Texas Commission on Human Rights Act (TCHRA), alleging constructive discharge based on disparate treatment and retaliation. *See* Tex. Lab. Code §§ 21.051(1), .055. In this interlocutory appeal, the University challenges the trial court's denial of its plea to the jurisdiction on the grounds that Kearney failed to exhaust her administrative remedies and failed to assert a viable discrimination or retaliation claim. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8). For the reasons that follow, we affirm the trial court's order in part and reverse in part.

Page 2

**BACKGROUND**[1]

Kearney, who is African-American, was the head coach of the University's women's track and field team for approximately 21 years during which time she had much success and received considerable recognition. Kearney alleges that she has won more competitions than any other African-American coach in the history of all NCAA sports and at the time of her termination was the only African-American head coach in any sport in the history of the University. In October 2012, Kearney was told by the women's athletic director that a report had been made to the University that Kearney had engaged in a personal relationship with a former student athlete in approximately 2002. Kearney admitted to the relationship and was subsequently placed on administrative leave pending an investigation. After meeting with University attorneys in November 2012, she became concerned that she would be fired. On December 6, 2012, Kearney met with University attorneys and raised complaints alleging past incidents of race and sex discrimination for which she had not filed charges of discrimination. On December 28, 2012, Kearney alleges, University officials informed her that she was going to be fired because of the undisclosed relationship with the student athlete. On January 5, 2013, Kearney resigned in lieu of termination.

On March 8, 2013, Kearney filed a charge of discrimination with the Texas Workforce Commission (TWC).[2] *See* Tex. Lab. Code § 21.0015 (providing for transfer of duties

Page 3

under TCHRA from Human Rights Commission to civil rights division of TWC), .201 (providing that person claiming to be aggrieved by unlawful employment practice may file administrative complaint). She received her right-to-sue letter from TWC on October 30, 2013, and filed suit on November 14, 2013. *See id.* § 21.252 (complainant who receives notice that complaint is not dismissed or resolved is entitled to request right-to-sue letter from TWC); *Rice v. Russell-Stanley, L.P.*, 131 S.W.3d 510, 513 (Tex. App.—Waco 2004, pet. denied) (holding that plaintiff's entitlement to right-to-sue letter exhausts administrative remedies and ends exclusive jurisdiction of TWC). In her petition, Kearney alleged facts related to the claims of prior harassment and discrimination that she reported to University attorneys on December 6, 2012. She also alleged that she was informed of the report of her relationship with the student athlete, she was placed on administrative leave, and an investigation was conducted. She alleged that after she reported claims of prior race



and sex discrimination during the investigation, she was informed she would be fired and resigned in lieu of resignation. Kearney asserted that other University employees who were white males and who had been involved in relationships with students or direct subordinates had not been subjected to meaningful disciplinary action or termination. Kearney identified by name a former football coach and a former volleyball coach employed from 1997 to 2000, who Kearney alleges married his former student athlete. She also listed without names other coaches, current and former law school professors, current and former undergraduate professors, a department chairman, and a high level administrator. Kearney alleged that she was singled out as an African-American female and treated differently for having a relationship with a student when she was terminated. She asserted causes

Page 4

of action under sections 21.051 and 21.055 of the TCHRA for constructive discharge based on disparate treatment and retaliation. *See* Tex. Lab. Code §§ 21.051(1), .055.

The University filed a plea to the jurisdiction arguing that Kearney's claims of constructive discharge based on disparate treatment and retaliation were founded on "stale allegations" that had not been administratively exhausted and that her claim of retaliation also fails because the alleged adverse employment action occurred before any protected activity, making it impossible for Kearney to establish causation. The University's plea to the jurisdiction was based solely on legal arguments applied to the face of Kearney's petition, and the University offered no evidence. The trial court denied the plea, and the University filed this appeal.

**STANDARD OF REVIEW**

As a political subdivision of the state, the University is immune from suit unless the legislature has waived immunity. *See Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 512 (Tex. 2012); *College of Mainland v. Glover*, 436

S.W.3d 384, 391 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). One such waiver can be found under the TCHRA, which provides in relevant part that an employer may not, on the basis of race or sex, discharge an employee. *See* Tex. Lab. Code § 21.051; *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008) (*Garcia I*) (holding that "the TCHRA clearly and unambiguously waives immunity"). The TCHRA's waiver of immunity applies only in those suits in which the plaintiff actually alleges a violation within the scope of the statute. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012) (*Garcia II*); *Glover*, 436 S.W.3d at 391. Because sovereign

Page 5

immunity deprives a trial court of subject matter jurisdiction, it is properly asserted in a plea to the jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 223, 226 (Tex. 2004).

The University filed a plea to the jurisdiction arguing that Kearney had failed to allege facts that establish a prima facie case under the TCHRA. Thus, the University challenges only the sufficiency of Kearney's pleadings. The determination of whether the pleadings contain factual allegations affirmatively demonstrating the trial court's subject matter jurisdiction presents a question of law that we review de novo. *Id*. at 226. To make this determination, we look to the pleader's intent, construe the pleadings liberally in favor of jurisdiction, and accept the allegations in the pleadings as true. *Westbrook v. Penley*, 231 S.W.3d 389, 405 (Tex. 2007); *Miranda*, 133 S.W.3d at 226. Although a plaintiff has the burden to plead facts showing jurisdiction, she is not "required to marshal evidence and prove her claim to satisfy this jurisdictional hurdle." *Garcia II*, 372 S.W.3d at 637; *see City of El Paso v. Marquez*, 380 S.W.3d 335, 340 (Tex. App.—El Paso 2012, no pet.). "While a plaintiff must plead the elements of her statutory cause of action—here the basic facts that make up a prima facie case—so that the court can determine whether she has sufficiently alleged a TCHRA violation, she will only be required to



submit evidence if the defendant presents evidence negating one of those basic facts."[3] *Garcia II*, 372 S.W.3d at 637. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Miranda*, 133 S.W.3d at 227.

Page 6

## DISCUSSION

### Exhaustion of Remedies

In its first issue, the University contends that Kearney has not stated a prima facie case of disparate treatment or retaliation because she bases her claims on events for which she did not exhaust administrative remedies. Before filing suit in state court under the TCHRA, an employee must first exhaust her administrative remedies by filing a complaint with the TWC within 180 days of the alleged discriminatory act, and failure to do so is a jurisdictional defect. *See* Tex. Lab. Code § 21.202(a); *City of Waco v. Lopez*, 259 S.W.3d 147, 154 (Tex. 2008) (describing "unique and comprehensive provisions" established in Chapter 21 and concluding that noncompliance with TWC procedures "deprives courts of subject-matter jurisdiction" over employment discrimination disputes); *Lueck v. State*, 325 S.W.3d 752, 761-62 (Tex. App.—Austin 2010, pet. denied). The University cites Kearney's allegations of harassment and discrimination prior to the investigation that resulted in her termination and argues that she cannot sue for those acts because they occurred prior to September 9, 2012, which was 180 days before she filed suit. However, Kearney's petition refers to the arguably stale offensive acts not as causes of action, but rather in support of her current claims for constructive discharge based on disparate treatment and retaliation. Further, Kearney's counsel expressly stated at the hearing on the University's plea to the jurisdiction that "Kearney is . . . suing the University . . . solely for the constructive discharge that occurred between December 28, 2012 and January 5, 2013." Explaining that the allegations of prior acts were the same allegations

that Kearney communicated to University officials on December 6, 2012, prior to Kearney's termination on December 28, 2012, Kearney's counsel conceded that those prior acts are

Page 7

not actionable and serve merely as background facts in support of her current claims. Kearney repeats this position in her appellate brief.[4]

Both Kearney's disparate treatment and retaliation claims stem from her alleged constructive discharge, and the University does not dispute that Kearney filed a charge of discrimination within 180 days of the date of the alleged constructive discharge—December 28, 2012. The record does not support, and the University does not urge, that Kearney has failed to exhaust her administrative remedies as to the only claims she now asserts. We overrule the University's first issue.

### Retaliation Claim

In its second issue, the University argues that Kearney has failed to state a prima facie claim for retaliation because her own allegations negate one of the required elements of a retaliation claim. To state a prima facie case for retaliation, an employee must allege that (1) she engaged in

Page 8

an activity protected by Chapter 21 of the Labor Code, (2) the employer took adverse action against her, and (3) a causal connection exists between the employee's protected activity and the alleged adverse employment decision. Tex. Lab. Code § 21.055; *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 647 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Herbert v. City of Forest Hill*, 189 S.W.3d 369, 376 (Tex. App.—Fort Worth 2006, no pet.). Protected activities are listed in section 21.055 of the Labor Code and include (1) opposing a discriminatory practice, (2) making or filing a charge, (3) filing a complaint, or (4) testifying, assisting, or participating in any



manner in an investigation, proceeding, or hearing. Tex. Lab. Code § 21.055.

To establish causation, the employee must establish "a 'but for' causal nexus between the protected activity and the prohibited conduct." *Anderson*, 458 S.W.3d at 648. In other words, the plaintiff must prove that she would not have suffered an adverse employment action "but for" engaging in the protected activity. *Id.* (characterizing causation element as requiring plaintiff to show that absent protected activity, adverse employment action would not have happened when it did); *Navy v. College of the Mainland*, 407 S.W.3d 893, 901 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Martinez v. Daughters of Charity Health Servs.*, No. 03-05-00264-CV, 2006 Tex. App. LEXIS 10327, at *11-12 (Tex. App.—Austin Nov. 30, 2006, no pet.) (mem. op.); *see University of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (concluding that plaintiff making retaliation claim brought under Title VII must establish that protected activity was but-for cause of alleged adverse action by employer); *see also In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 308 (Tex. 2010) (orig. proceeding) (because one of the primary goals of the TCHRA is to coordinate state and federal employment discrimination law, we may look to analogous

Page 9

federal law as authority in interpreting the TCHRA). "Even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996).

The University contends that Kearney's pleadings negate causation. We agree. To support her disparate treatment claim, Kinney pleaded, and on appeal relies on, the allegation that the University singled her out and fired her for having a consensual relationship with a student athlete.[5] Having affirmatively asserted that the University

fired her for having a relationship with a student athlete, she cannot show a but-for causal connection between her complaints of prior discrimination and her alleged constructive discharge. *See Kingsaire, Inc. v. Melendez*, 477 S.W.3d 309, 313 (Tex. 2015) (if employee's termination was required by uniform enforcement

Page 10

of reasonable policy, it cannot be case that termination would have occurred when it did but for employee's assertion of compensation claim or other protected conduct); *Long*, 88 F.3d at 305 n.4. Even if Kearney had asserted her retaliation claim in the alternative, her alleged protected activity—reporting complaints of prior harassment and discrimination—occurred after she had been suspended and the investigation that ultimately led to her alleged constructive discharge had been initiated. Because the adverse employment action had already begun before Kearney raised her complaints of prior harassment and discrimination, even if her complaints were a substantial element leading to her constructive discharge, Kearney cannot establish that she would not have been fired but for her complaints. *See Long*, 88 F.3d at 305 n.4. Consequently, as a matter of law, Kearney cannot establish the required causation element of retaliation. *See id.*; *Anderson*, 458 S.W.3d at 648; *Navy*, 407 S.W.3d at 901.

Further, because Kearney's pleadings affirmatively negate causation as to her retaliation claim, they affirmatively negate jurisdiction as to that claim, and merely pleading more facts in support of her retaliation claim will not cure her pleading defects. *See Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 839-40 (Tex. 2007) (merely pleading more facts in support of breach of contract claim against university would not overcome university's immunity from breach of contract suit absent statutory waiver); *Miranda*, 133 S.W.3d at 227. Accordingly, Kearney need not be afforded an opportunity to amend her pleadings. *See Koseoglu*, 233 S.W.3d at 840 (pleader must be given opportunity to amend only



if it is possible to cure pleading defect); *Miranda*, 133 S.W.3d at 227. We sustain the University's second issue.

Page 11

**Disparate Treatment Claim**

In its reply brief, the University asserts for the first time that Kearney cannot establish one of the elements of disparate treatment. Because this argument challenges the trial court's jurisdiction, on interlocutory appeal, "we must address [this argument] regardless of whether [the University] raised [it] in the trial court." *See Glover*, 436 S.W.3d at 394; *see also Dallas Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 41 (Tex. 2013) (per curiam) (court of appeals erred when it concluded that it could not consider jurisdictional arguments raised for first time on appeal). To establish a prima facie case for disparate treatment, and thus to establish jurisdiction, Kearney must have pleaded that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she was terminated, and (4) she was treated less favorably than similarly situated members of the opposing class. *Garcia II*, 372 S.W.3d at 637 (to "satisfy [the] jurisdictional hurdle[,] . . . a plaintiff must plead elements of her statutory cause of action—here the basic facts that make up the prima facie case"); *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (setting out elements of disparate treatment claim). The University challenges only the fourth element—whether Kearney can show she was treated less favorably than similarly situated members of the opposing class. Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct. *Ysleta*, 177 S.W.3d at 917; *University of Tex. Med. Branch at Galveston v. Petteway*, 373 S.W.3d 785, 789 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The misconduct of the disciplined and undisciplined employees must be of "comparable seriousness" and "nearly identical," and the plaintiff and other employees must have

Page 12

"essentially comparable violation histories." *Ysleta*, 177 S.W.3d at 917-18; *Petteway*, 373 S.W.3d at 789.

The University contends that, as a matter of law, Kearney cannot show that she was treated less favorably than similarly situated members of the opposing class because the other employees she has cited were employed in different capacities by different departments with different supervisors and at different, i.e., much earlier, periods of time from Kearney. It also argues that her reference to the former volleyball coach regarding his alleged conduct between 1997 and 2000 is a "vague allusion" to a "far-flung incident[]" that cannot suffice as proof of a similarly situated individual during the relevant time period. As for the former football coach, the University argues that Kearney's conduct and that of the former football coach are not comparable because, in contrast with Kearney's ongoing relationship, the former football coach "was disciplined, but not fired, after a one-night stand with a UT student (who was not a student-athlete playing on his team and not under his supervision)." Consequently, the University contends, Kearney cannot show that the misconduct of the two coaches was of comparable seriousness or nearly identical. *See Ysleta*, 177 S.W.3d at 917-18. The University also argues that Kearney cannot show that she and the former football coach had essentially comparable violation histories, as required. *See Petteway*, 373 S.W.3d at 789.[6]

Page 13

We do not find the University's arguments persuasive. While it may appear from the face of Kearney's pleadings that some of the University employees alleged to be similarly situated or were employed in different capacities in different departments and under different supervisors from Kearney, we cannot determine from the pleadings alone whether "other coaches within the University's Athletic Department," in particular the former football coach—or for that



matter, the former volleyball coach, whose employment overlapped with Kearney's—were subject to different employment standards or ultimate supervisors from Kearney.[7] Nor can we determine from the pleadings whether the former football coach's or the former volleyball coach's conduct was of comparable seriousness or nearly identical to that of Kearney or whether Kearney and the former football coach or Kearney and the former volleyball coach had comparable violation histories.

Kearney alleged in her petition that she is an African-American woman, qualified for her former position, and that when she was terminated, she was treated less favorably than other coaches who were white males, in particular the former football coach and the former volleyball coach. She alleged that the former football coach and other coaches were involved with students or direct subordinates, that the former volleyball coach married his former student athlete, and that none of the white males was subjected to termination or even "meaningful disciplinary actions." Thus, looking to Kearney's intent, construing her pleadings liberally in favor of jurisdiction, and accepting

Page 14

the allegations in the pleadings as true, we conclude that Kearney has pleaded the elements of her statutory cause of action, i.e., the basic facts of a prima facie case, and has sufficiently alleged a TCHRA violation. *See Garcia II*, 372 S.W.3d at 637; *Westbrook*, 231 S.W.3d at 405; *Ysleta*, 177 S.W.3d at 917; *Miranda*, 133 S.W.3d at 226. She is not "required to marshal evidence to prove her claim to satisfy [the] jurisdiction hurdle" until the University presents evidence negating one of those basic facts. *See Garcia II*, 372 S.W.3d 637.

As reflected in the clerk's record and as explained in its opening brief, the University based its plea to the jurisdiction "solely on legal arguments applied to the Petition's face" and "reserve[d] the right to challenge Ms. Kearney's factual allegations and present evidence to the contrary at a later stage, if necessary." Although

the University now makes factual assertions that it contends show that the former football coach, the former volleyball coach, and the others are not employees who are similarly situated to Kearney, it offered no evidence in support of its plea to the jurisdiction. However, as our sister court has observed, an argument that employees alleged to have been treated more favorably than the plaintiff are not similarly situated to the plaintiff challenges the existence of jurisdictional facts. *See Glover*, 436 S.W.3d at 394. When a plea to the jurisdiction challenges the existence of jurisdictional facts, we may consider relevant evidence submitted by the parties and must do so when necessary to resolve the jurisdictional issue. *Miranda*, 133 S.W.3d at 227; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554-55 (Tex. 2000); *Good Shepherd Med. Ctr., Inc. v. State*, 306 S.W.3d 825, 831 (Tex. App.—Austin 2010, no pet).

Because the University produced no evidence in support of its plea to the jurisdiction and has asserted this challenge for the first time in its reply brief, there is no evidence in the record

Page 15

indicating that Kearney and the former football coach or Kearney and the former volleyball coach were not subject to similar standards and supervisors, that their conduct was not of comparable seriousness or nearly identical, or that they did not have comparable violation histories. Instead, the University asserts only *arguments* as to what the evidence *would* show had it offered any. However, the arguments of counsel are not evidence. *In re Doe 3*, 19 S.W.3d 300, 305 (Tex. 2000); *Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) ("Normally, an attorney's statements must be made under oath to constitute evidence."). Thus, the University asks us to determine jurisdictional facts in the absence of any record evidence whatsoever. Consequently, there is no evidence of the facts it now urges us to rely on in determining that Kearney cannot show she was treated less favorably than similarly situated employees. We cannot do so. *See Sabine Offshore Serv., Inc. v. City of Port Arthur*, 595

fastcase®
Smarter legal research.

S.W.2d 840, 841 (Tex.1979) (per curiam) (review limited to evidence properly in appellate record); *see also Carlton v. Trinity Universal Ins. Co.*, 32 S.W.3d 454, 458 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (parties cannot rely on matters outside record in making arguments to appellate court). We conclude that Kearney has pleaded a prima facie case of disparate treatment and that the University has not produced evidence to negate any of the elements of that claim. *See Ysleta*, 177 S.W.3d at 917-18; *Petteway*, 373 S.W.3d at 789.[8]

Page 16

## CONCLUSION

Because Kearney has affirmatively negated the required elements of her constructive discharge claim based on retaliation, we reverse the district court's denial of the University's plea to the jurisdiction as to the retaliation claim. We affirm the trial court's denial of the University's plea to the jurisdiction as to Kearney's claim of constructive discharge based on disparate treatment.

/s/_____
Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Bourland

Affirmed in Part; Reversed and Remanded in Part

Filed: May 3, 2016

--------

Footnotes:

[1.] Because the University's plea to the jurisdiction was based solely on legal arguments applied to the face of Kearney's petition, we take the factual background as set forth in the parties' pleadings and briefs.

[2.] Although the record before us does not contain a copy of the charge of discrimination, Kearney states that she alleged discrimination based on gender and race and retaliation, and the University does not dispute that statement.

[3.] Although "[t]here is no prima facie case requirement in the text of the TCHRA[,] . . . [t]he mechanics of the prima facie case . . . are products of caselaw . . . consistently applied to TCHRA cases by [the Texas Supreme Court]." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 638 (Tex. 2012) (*Garcia II*).

[4.] Relying on *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 113 (2002), the University argues Kearney cannot rely on "the 'background evidence' idea" to "save stale allegations like the exhausted claims in Ms. Kearney's Petition." However, as discussed, Kearney has judicially admitted that her prior claims are not actionable, *see Texas Dep't of Pub. Safety v. Stanley*, 34 S.W.3d 321, 322 (Tex. App.—Fort Worth 2000, no pet.) (statements made by counsel at hearing on behalf of client can be considered judicial admissions), and has expressly waived any such claims in her appellate brief. Further, although the U.S. Supreme Court in *Morgan* held that time-barred discrete acts cannot support a timely claim for hostile work environment, it also expressly stated that Title VII of the Civil Rights Act of 1964 and its subsequent amendments do not "bar an employee from using the prior acts as background evidence in support of a timely claim[,]" as Kearney does here. *Morgan*, 536 U.S. at 113; *see* Tex. Lab. Code § 21.001(1) (TCHRA was enacted to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments"); *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 308 (Tex. 2010) (orig. proceeding) (we may look to federal law interpreting analogous Title VII provisions as authority).

[5.] As discussed above, to make a prima facie showing of retaliation, the plaintiff must establish that (1) she engaged in an activity protected by Chapter 21 of the Labor Code, (2) the employer took adverse action against her, and (3) a causal connection exists between the employee's protected activity and the alleged adverse



employment decision. *See* Tex. Lab. Code § 21.055; *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 647 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Once the plaintiff meets this requirement, the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the adverse employment action. *Navy v. College of the Mainland*, 407 S.W.3d 893, 900 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The plaintiff then assumes the burden of proving that the stated reason was pretextual. *Id.*

Ordinarily, we would not reach the alternating burden-shifting analysis in reviewing a plea to the jurisdiction. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (if plaintiff establishes prima facie case and survives plea to jurisdiction, burden would then shift to employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection"). In this case, however, even assuming that Kearney met her initial burden by pleading that she was terminated in retaliation for raising complaints of discrimination, she also alleged that the reason for her termination was her undisclosed relationship with a student athlete. Thus, Kearney not only did not argue that the University's nondiscriminatory reason was pretextual, but alleged it herself and relies on it as a basis for her disparate treatment claim.

[6.] The University also appears to argue in a single sentence that Kearney cannot show that she was less favorably treated than the former football coach because "she herself left UT before it was clear what discipline she would receive." In addition, the University states in its reply brief that "[t]he fourth element [of a disparate treatment claim] is the only one critical to understanding UT's jurisdictional argument." To the extent the University attempts by this argument to challenge Kearney's allegation that she was terminated, the third element of a disparate treatment claim, the University has failed to fully brief the issue and has therefore waived it. *See* Tex. R. App. P. 38.1(i) (appellant's brief must contain clear and concise argument for contentions made with citation to authorities and record).

[7.] Although the University argues that the former volleyball coach's conduct and the University's response were too remote in time for him to be a similarly situated employee, it offers no authority indicating how close in time to a plaintiff's alleged adverse employment decision the allegedly more favorable decision must have been made. *See* Tex. R. App. P. 38.1(i) (appellant's brief must contain appropriate citations to authorities).

[8.] The cases the University cites in support of its argument are distinguishable in that the defendants in those cases produced evidence to negate the plaintiffs' claims that other employees were similarly situated. *See, e.g., Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (appeal from jury trial with evidence and testimony showing that conduct of other employees was not of comparable seriousness); *University of Tex. Med. Brand at Galveston v. Petteway*, 373 S.W.3d 785, 786, 789 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (reversing denial of plea to jurisdiction where defendant produced evidence that other employees did not have comparable violation histories); *Romo v. Texas Dep't of Transp.*, 48 S.W.3d 265, 272-73 (Tex. App.—San Antonio 2001, no pet.) (affirming summary judgment for defendant where plaintiff's evidence failed to show prima facie case because, unlike plaintiff, other employee was supervisor and where defendant offered undisputed testimony that plaintiff had less education and experience than other employee); *Grice v. Alamo Cmty. Coll. Dist.*, No. 04-12-00524-CV, 2013 Tex. App. LEXIS 4999, at *1, *14-15 (Tex. App.—San Antonio Apr. 24, 2013, no pet.) (mem. op.) (affirming summary judgment in favor of defendant where evidence showed plaintiff and other employees were not similarly situated with regard to supervisory responsibilities); *City of San Antonio ex rel. City Pub. Serv. Bd. v. Gonzalez*, No. 04-08-00829-CV, 2009 Tex. App. LEXIS 9701, at *8, *14-15 (Tex. App.—San Antonio Dec. 23, 2009, pet. denied) (mem. op.) (reversing judgment on jury verdict in favor of plaintiff where evidence established conduct of other employees was not of comparable seriousness); *see also Garcia II*, 372



S.W.3d at 642 (involving plea to jurisdiction in which defendant produced evidence negating one element of plaintiff's prima facie case); *College of Mainland v. Glover*, 436 S.W.3d 384, 390, 394 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (treating as plea to jurisdiction motion for summary judgment based on jurisdictional grounds and reversing denial where record evidence showed plaintiff's and other employees' circumstances were not nearly identical).

--------



Page 767

**6 S.W.3d 767 (Tex.App.-Houston[1st Dist.] 1999)**
**UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON; WILLIAM MILESKI, M.D.; AND MARTHA SHELVER, R.N., Appellants**
**V.**
**STEPHANIE HOHMAN, R.N. AND LISA LIPPERT, R.N., Appellees**
**NO. 01-98-01382-CV**
**In The Court of Appeals For The First District of Texas**
**November 24, 1999**

On Appeal from the 122nd District Court Galveston County, Texas, Trial Court Cause No. 97CV0005

Page 768

[Copyrighted Material Omitted]

Page 769

[Copyrighted Material Omitted]

Page 770

[Copyrighted Material Omitted]

Page 771

Panel consists of Justices Hedges, Andell, and Price.[*]

OPINION ON REHEARING

HEDGES, Justice.

On this day, the Court considered appellant's motion for rehearing. The motion is DENIED. However, we withdraw our opinion of August 31, 1999, and issue this opinion in its stead. Our judgment of August 31, 1999 remains unchanged.

University of Texas Medical Branch at Galveston (UTMB) brings this interlocutory appeal from the denial of its plea to the jurisdiction, based on sovereign immunity. William Mileski, M.D., and Martha Shelver, R.N., employees of UTMB, bring their interlocutory appeals from the trial court's denial of their motions for summary judgment, based on official immunity.[1]

BACKGROUND

Appellees, Stephanie Hohman and Lisa Lippert (the nurses), are registered nurses who worked in the emergency room at UTMB. Dr. Mileski was the chief of trauma and co-director of emergency services, and Shelver was the nurse manager for the emergency room nurses. Dr. Mileski was hired to upgrade emergency room procedures so UTMB would qualify as a level one trauma center.

In their petition, the nurses allege that, after Mileski took over the emergency room, they noticed a pattern of classifying patients as "trauma evaluation" patients, which resulted in the patients being "subjected to a myriad of painful, unwanted, and at times unnecessary procedures, to which the patients refused, resisted, and/or to which they unknowingly submitted based on false information that the procedure was necessary to preserve their health." The nurses voiced their concerns to the UTMB administration, the Texas Department of Health, the Board of Nurse Examiners, and the UTMB police. They contend that as a result of their reports, UTMB retaliated against them to such a degree that they were forced to resign.

The nurses then filed suit, alleging violations of the Whistleblower Act as well as certain other common-law torts.

PLEAS TO THE JURISDICTION

A. Standard of Review

When a lawsuit is barred by sovereign immunity, dismissal with prejudice for want of jurisdiction is proper. Liberty Mut. Ins. Co. v. Sharp, 874 S.W.2d 736, 739 (Tex. App.-Austin 1994, writ denied). "In deciding whether to grant



a plea to the jurisdiction, the trial court must look solely to the allegations in the petition." Id. Our task is not to determine whether the plaintiffs ultimately win or lose upon judicial review; rather, our task is to examine the petition, to take as true the facts pleaded, and to determine whether those facts support jurisdiction in the trial court. The allegations in those pleadings are to be

Page 772

construed in favor of the plaintiff. Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993).

B. Sovereign Immunity on Whistleblower Claims

In issue number one, UTMB contends that the trial court erred in denying its plea to the jurisdiction on the nurses' whistleblower claims. Specifically, UTMB contends that it is entitled to sovereign immunity on these claims because the nurses (1) suffered no "adverse personnel action" as that term is defined by the Whistleblower Act; (2) failed to bring their Whistleblower claims within the applicable statute of limitations; and (3) failed to exhaust their administrative remedies.

The Whistleblower Act contains a waiver of the state's sovereign immunity. TEX. GOV'T CODE ANN. 554.035 (Vernon Supp. 1999). Thus, the issue this Court must decide is whether the nurses' pleadings state a cause of action falling within the Whistleblower Act's waiver of sovereign immunity.

1. Is constructive discharge an "adverse personnel action" or "termination"?

UTMB first contends that the nurses' pleadings are inadequate to state a claim under the Whistleblower Act because the petition concedes that they resigned and were not fired.[2] UTMB argues that a "constructive discharge" is not an "adverse personnel action" as defined by the Whistleblower Act. We disagree.

The Whistleblower Act provides:

(a) A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

TEX. GOV'T CODE ANN. 554.002(a) (Vernon Supp. 1999) (emphasis added).

"Adverse personnel action" is defined as an "action that affects a public employee's compensation, promotion, demotion, transfer, work assignment, or performance evaluation." TEX. GOV'T CODE ANN. 554.001(3) (Vernon Supp. 1999).

We disagree with UTMB's analysis. The issue is not whether there was an

Page 773

"adverse personnel action." The issue is whether a constructive discharge is a "termination." We believe that it is.

In Nguyen v. Technical & Scientific Application, Inc., 981 S.W.2d 900, 901 (Tex. App.-Houston [1st Dist.] 1998, no pet.), this Court was asked to decide whether an employee who was constructively discharged, but not fired, had a Sabine Pilot[3] cause of action. We held that a constructive discharge was sufficient to fulfill the "firing" requirement of the Sabine Pilot exception, noting, "[w]e doubt the Texas Supreme Court intended to permit employers to avoid liability by coercing resignations from, rather than firing, their employees who refused to break the criminal law." Id. at 902.

Although the Whistleblower Act is a statutory cause of action for wrongful discharge, rather than a common-law exception to the employment-at-will doctrine, we nonetheless find the reasoning of Nguyen persuasive. The legislature could not have intended to provide a



cause of action to employees who were fired for reporting violations of the law, while at the same time excluding employees who were coerced into resigning.

"Constructive discharges" have been held to meet the termination or firing element in several other types of cases. See Junior v. Texaco, Inc., 688 F.2d 377, 378 n.3 (5th Cir. 1982) (constructive discharge is legal substitute for discharge element in discrimination cases under Title VII of Civil Rights Act of 1964); see also Passons v. University of Tex., 969 S.W.2d 560, 562 (Tex. App.-Austin 1998, no pet.) (constructive discharge meets discharge element of TEX. LAB. CODE ANN. 21.051 (Vernon 1996)); see also Davila v. Lockwood, 933 S.W.2d 628, 630 (Tex. App.-Corpus Christi 1996, no pet.) (assuming constructive discharge met discharge requirement under TEX. LAB. CODE ANN. 451.001 (Vernon 1996), which prohibits firing for filing worker's compensation claim).

We hold that by pleading that they were constructively discharged, the nurses have met the "termination" requirement of the Whistleblower Act. A question of fact remains for the jury to decide whether the nurses were, in fact, constructively discharged.

2. Statute of limitations

UTMB also argues that even if pleading a constructive discharge is sufficient under the Whistleblower Act, the nurses filed their petition outside the applicable statute of limitations, which provides:

Except as provided by Section 554.006, a public employee who seeks relief under this chapter must sue not later than the 90th day after the date on which the alleged violation of this chapter:

(1) occurred; or

(2) was discovered by the employee through reasonable diligence.

TEX. GOV'T CODE ANN. 554.005 (Vernon 1994).

UTMB argues that limitations began to run from the instant the nurses believed they were being retaliated against. Pointing to several discreet acts leading up to the nurses' resignations, UTMB contends that the nurses have filed their suit too late.[4] The nurses respond that their suits were timely because they were filed within 90 days of the date they were constructively discharged. We must decide what action is "the alleged violation" of the Whistleblower Act: the first of the alleged

Page 774

retaliatory acts or the constructive discharge.

Having held that constructive discharge is a "termination" under the Whistleblower Act, it follows that "the alleged violation" giving rise to the nurses cause of action is, necessarily, the constructive discharge itself. Therefore, the nurses were required to bring their suit within 90 days of the date they were allegedly constructively discharged.

A constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. Passons, 969 S.W.2d at 562; Davila, 933 S.W.2d at 630. In Davila, the court held that the plaintiff's claim for constructive discharge arose at the time that he tendered his resignation because, by that date, he had decided that "conditions were so intolerable that he felt compelled to resign." Id; see also Stroud v. VBFSB Holding Corp, 917 S.W.2d 75, 80-81 (Tex. App.-San Antonio 1996, writ denied) (Sabine Pilot cause of action alleging constructive discharge accrued when plaintiff tendered resignation).

The record in this case shows that Lippert tendered her resignation on October 23, 1996, which was to take effect November 6, 1996. Hohman tendered two letters of resignation, one dated October 28, 1996, and one dated November 1, 1996. Both provide an effective date of



November 15, 1996. The record does not show Lippert's last day of work, though presumably it was in November 1996; Hohman's last day of work was November 3, 1996.

Regardless of when the nurses actually left the employment of UTMB, we hold that their constructive discharge claims accrued on the dates they submitted their resignations. By those dates, they were aware that conditions had become intolerable and that they felt compelled to resign. Both nurses filed suit on January 6, 1997, within 90 days of the date they tendered their resignations. Thus, their Whistleblower claims are timely.

3. Exhaustion of Administrative Remedies

Finally, UTMB argues that the nurses cannot assert whistleblower claims because they did not initiate administrative appeal procedures. A public employee must initiate action under the grievance or appeal procedures of the employing state entity relating to suspension or termination of employment before suing under the Whistleblower Act. See TEX. GOV'T CODE ANN. 554.006(a) (Vernon Supp. 1999). The employee must invoke the applicable grievance or appeal procedures not later than the ninetieth day after the date on which the alleged violation occurred. See TEX. GOV'T CODE ANN. 554.006(b) (Vernon Supp. 1999). When a party sues under a statutory cause of action, the party must comply with the administrative prerequisites, which are jurisdictional. Gregg County v. Farrar, 933 S.W.2d 769, 777 (Tex. App.-Austin 1996, writ denied). Under the Whistleblower Act, the legislature intended that the governmental entity be afforded the opportunity to correct its errors by resolving disputes before facing litigation. Id. at 775.

On December 3, 1996, the nurses' attorney sent a letter to UTMB that informed UTMB of the nurses' constructive discharge claims, and provided in pertinent part:

I understand that UTMB's employment manual provides that "no remedy or corrective

[is] available under the grievance policy once an individual ceases to be a UTMB employee." Nonetheless, a copy of this letter is being sent to the UTMB official in charge of grievances in order to provide continuing notice of her grievance against UTMB and provide the University with an opportunity to respond and remedy the situation if it so desires. If you have any questions, please do not hesitate to call me.

No administrative remedial action was taken by UTMB.

Page 775

UTMB contends that this letter came too late. Specifically, UTMB points to several of the earlier alleged retaliatory acts, and contends that grievances should have been filed then.[5] However, as we stated in the previous section, the "alleged violation" in this case is not any one particular retaliatory act, but the constructive discharge itself. Thus, the nurses had 90 days from their constructive discharges (or, in this case, the date of their resignations) to initiate a grievance procedure. The December 3, 1996 letter to the UTMB official in charge of grievances fell within the 90 day period.

UTMB also argues that the letter was not a clear intent to invoke the grievance procedure. We disagree. When it is unclear whether the employer has a post-termination grievance procedure, or it is unclear what the procedure is, and the terminated employees timely notify the employer that they are invoking the grievance procedure, terminated employees have adequately implicated the grievance procedures. See Beiser v. Tomball Hosp. Auth., 902 S.W.2d 721, 724 (Tex. App.-Houston [1st Dist.] 1995, writ denied). In this case, the letter was sufficient to put UTMB on notice that the nurses were seeking some type of administrative relief in connection with their alleged constructive discharges.

We hold that the nurses timely and effectively initiated administrative remedies under the Whistleblower Act.



4. Conclusion

Because the nurses have (1) initiated a grievance and filed suit in a timely manner, and (2) properly pled a cause of action under the Whistleblower Act, the waiver of sovereign immunity in the Whistleblower Act applies. Thus, the trial court properly denied UTMB's plea to the jurisdiction on the nurses' whistleblower claims.

We overrule issue one.

C. Sovereign Immunity as to Claims under the Nurse Reporting Act

In issue three, UTMB contends that the trial court erred in denying its plea to the jurisdiction on Hohman's claim that she was retaliated against for making a report under the Nurse Reporting Act.[6] Specifically, UTMB contends that the Nurse Reporting Act does not contain a clear and unambiguous waiver of sovereign immunity. In issue four, defendant Shelver contends that, in her official capacity, she is also entitled to immunity on Hohman's claims under the Nurse Reporting Act. A suit against a government employee in her official capacity is, in all respects, a suit against the State; therefore, the employee sued in her official capacity is shielded by sovereign immunity. See Whitehead v. University of Tex. Health Sciences Ctr. San Antonio, 854 S.W.2d 175, 180 (Tex. App.-San Antonio 1993, no writ). Accordingly, we will discuss issues three and four together.

1. Does the Nurse Reporting Act Contain a Waiver of Sovereign Immunity?

The waiver of governmental immunity is a matter addressed to the Legislature. City of LaPorte v. Barfield, 898 S.W.2d 288, 291 (Tex. 1995). To waive the State's sovereign immunity, the Legislature must do so by clear and unambiguous language. Id.; Duhart v. State, 610 S.W.2d 740, 742 (Tex. 1980). The same rule applies to the waiver of immunity for other governmental entities. Barfield, 898 S.W.2d at 291. The issue the Court must decide is whether

the legislature has by clear and unambiguous language waived

Page 776

immunity for claims of retaliation under the Nurse Reporting Act.

The Nurse Reporting Act provides in pertinent part:

No person shall suspend, terminate, or otherwise discipline or discriminate against a person reporting, without malice, under [the Act]. A person has a cause of action against an individual, organization, agency, facility, or other person that suspends or terminates the employment of the person or otherwise disciplines or discriminates against the person for reporting under [the Act].

TEX. REV. CIV. STAT. ANN. art. 4525a, 11 (Vernon Supp. 1999) (emphasis added).

The nurses argue that by using the word "agency" in the statute, the Legislature manifested its clear intent to waive the State's sovereign immunity. We disagree.

In one section of the Nurse Reporting Act, the statute specifically imposes a duty on "state agencies" to report nurses who fail to conform to the minimum standards of acceptable nursing practice. See TEX. REV. CIV. STAT. ANN. art. 4525a, 4 (Vernon Supp. 1999). Another section of the Act imposes duties on "each hospital, health science center, nursing home, home health agency, other health-care facility, state agency, political subdivision, school of professional nursing, temporary nursing service, or person that employs, hires, or contracts for the services of registered nurses" to report the identity of nurses it disciplines or fires for chemical dependency problems. See TEX. REV. CIV. STAT. ANN. art. 4525a, 2(a), (b) (Vernon Supp. 1999) (emphasis added). Thus, in at least two sections of the Nurse Reporting Act, the legislature was careful to clearly reference "state agencies." In fact, section 2 makes a distinction between "state



agencies" and "home health agencies." However, section 11, which creates a cause of action for nurses who suffer retaliation, uses the generic term "agency." "Agency" is not defined by the Act.

Language in a statute is presumed to be selected and used with care, and every word or phrase in a statute is presumed to be intentionally used with a meaning and purpose. Chastain v. Koonce, 700 S.W.2d 579, 582 (Tex. 1985). Similarly, every word omitted from a statute must be presumed to have been excluded for a reason. Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 540 (Tex. 1981). Therefore, we must presume that the legislature intentionally omitted the modifying term "state" from the term "agency" in section 11 of the Nurse Reporting Act. Thus, we find no clear intent to provide a cause of action against "state agencies" for retaliation claims under the Nurse Reporting Act.

2. Conclusion

The term "agency" is used ambiguously in section 11; it could refer to "state agencies," "home health agencies," or both. We hold that there is no clear and unambiguous waiver of sovereign immunity in section 11 of the Nurse Reporting Act.[7]

The trial court erred by denying UTMB's plea to the jurisdiction on Hohman's claims under the Nurse Reporting Act. Furthermore, to the extent that Shelver was acting in her official capacity, she enjoys the same governmental immunity as UTMB on Hohman's claims under the Nurse Reporting Act. See Bagg v. University of Tex. Med. Branch at Galveston, 726

Page 777

S.W.2d 582, 586 (Tex. App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.).

We sustain issues three and four.

MOTIONS FOR SUMMARY JUDGMENT

The remaining issues concern the propriety of the trial court's denial of Dr. Mileski's and Nurse Shelver's motions for summary judgment, which are based on official immunity.

A. Standard of Review

Summary judgment is proper when a movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex.1995); Bangert v. Baylor College of Med., 881 S.W.2d 564, 566 (Tex. App.-Houston [1st Dist.] 1994, writ denied). In reviewing the summary judgment, we indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor. Randall's Food Mkts., Inc., 891 S.W.2d at 644; Bangert, 881 S.W.2d at 565-66. Defendants are entitled to summary judgment if they conclusively establish all elements of an affirmative defense as a matter of law. Roark v. Stallworth Oil & Gas, Inc., 813 S.W.2d 492, 495 (Tex. 1991); Bangert, 881 S.W.2d at 566.

B. Sovereign Immunity for Claims against Mileski and Shelver in their Official Capacities

In issues six and seven, Mileski and Shelver contend that the trial court erred by denying their motions for summary judgment on the nurses' claims against Mileski and Shelver in their official capacities of (1) wrongful discharge, (2) defamation, (3) intentional infliction of emotional distress, (4) conspiracy, and (5) invasion of privacy.

A suit against government employees in their official capacities is, in all respects, a suit against the State; thus, employees sued in their official capacities are shielded by sovereign immunity. See Whitehead, 854 S.W.2d at 180; Bagg, 726 S.W.2d at 586. Thus, the issue we must decide is whether UTMB has sovereign immunity from these claims. If it does, such immunity also protects Mileski and Shelver in actions brought against them in their official capacities.

1. Intentional Torts



Defamation, conspiracy, intentional infliction of emotional distress, and invasion of privacy are intentional torts. See Firestone Steel Prods. Co. v. Barajas, 927 S.W.2d 608, 617 (Tex. 1996) (civil conspiracy); Twyman v. Twyman, 855 S.W.2d 619, 621-22 (Tex. 1993) (intentional infliction of emotional distress); Billings v. Atkinson, 489 S.W.2d 858, 860-61 (Tex. 1973) (invasion of privacy); City of Hempstead v. Kmiec, 902 S.W.2d 118, 122 (Tex. App.-Houston [1st Dist.] 1995, no writ) (defamation).

The Texas Tort Claims Act provides that sovereign immunity exists for intentional torts. TEX. CIV. PRAC. & REM. CODE ANN. 101.057 (Vernon 1997). Therefore, UTMB, as a state agency, cannot be held liable for intentional torts of its employees. Similarly, Mileski and Shelver, in their official capacities, cannot be held liable for intentional torts.

### 2. Wrongful Discharge under Sabine Pilot

Under Sabine Pilot Service, Inc. v. Hauck, 687 S.W.2d 733 (Tex. 1985), employees fired for refusing to perform an illegal act may sue their employers for wrongful discharge. However, the Sabine Pilot exception to the doctrine of employment at will does not supercede the State's right to assert sovereign immunity. Carroll v. Black, 938 S.W.2d 134, 135 (Tex. App.-Waco 1996, writ denied.) Because no Sabine Pilot cause of action can be asserted against the State, government officials sued in their official capacities are similarly protected. See id. at 134.

Page 778

### 3. Conclusion

Because the State would be entitled to assert sovereign immunity to the nurses' claims of wrongful discharge, civil conspiracy, defamation, and intentional infliction of emotional distress, Mileski and Shelver, when sued in their official capacities, have the same immunity.

Accordingly, we sustain issues six and seven.

### C. Official Immunity for Claims against Mileski and Shelver in their Individual Capacities

In issues two, five, and eight, Mileski and Shelver contend that they are entitled to official immunity on the nurses' claims against them in their individual capacities. Specifically, in issues five and eight, Shelver contends that she is entitled to official immunity on (1) Hohman's claims against her under the Nurse Reporting Act and (2) Lippert's claims against her for invasion of privacy. In issue two, both Mileski and Shelver argue that they are entitled to official immunity on the nurses' claims for wrongful discharge, defamation, intentional infliction of emotional distress, and civil conspiracy.

To show entitlement to official immunity, a defendant must show that his or her action was (1) a discretionary function, (2) performed in good faith, and (3) within the scope of his authority. Kassen v. Hatley, 887 S.W.2d 4, 8-9 (Tex. 1994). Official immunity is an affirmative defense. City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). We must determine whether Mileski and Shelver conclusively established each element of the defense, and, if so, whether the nurses produced evidence raising a fact issue on any element of the defense. See Kassen, 887 S.W.2d at 8.

Because we conclude the issue of good faith is dispositive, we will address that element first. The test for good faith of a government official is whether, under the same or similar circumstances, reasonable government employees could have believed that their actions were lawful, based on the information they possessed at the time of the conduct. Chambers, 883 S.W.2d at 656; Murillo v. Vasquez, 949 S.W.2d 13, 16 (Tex. App.-San Antonio 1997, writ denied). If the defendants prove good faith as a matter of law, the burden of production shifts to the plaintiff to raise a fact question on the element. In order to controvert summary-judgment proof on the element of good faith, the plaintiffs must show that "no reasonable person in the defendant's position could have thought the facts were such



that they justified [the] defendant's acts." Chambers, 883 S.W.2d at 657.

1. Mileski

Mileski's affidavit provided the following evidence on the issue of official immunity:

7. I remember meeting Ms. Hohman at an ethics round table discussion in August 1996. I questioned her regarding some of the statements she made during the discussion, because based on her statements, it was my opinion that she appeared to have a conflict about performing some of the procedures required in the trauma setting. I did not impugn her skills as a nurse, because I had no knowledge of her skills and it is not my responsibility to evaluate nursing skills. I never attempted "to get rid of her" or made any statements to that effect to any intern, resident, or anyone else.

8. I did discuss with the Nurse Manager, Martha Shelver, what appeared to be Ms. Hohman's apparent conflict with her role in the crash room, as it was my goal to develop an efficient, skilled trauma team that would work well together to ensure that optimum quality of care was provided to every trauma patient.

9. Until she filed this lawsuit, I did not know Lisa [Lippert]. I never made any verbal or written statement about her, defamatory or otherwise.

Page 779

10. Any comments I made regarding Ms. Hohman were based on my personal observations and reports received from other doctors and on my good faith belief that my statements were true.

11. All actions taken in regard to Plaintiffs, if any, were taken within the course and scope of my employment, using my discretionary judgment, and in good faith.

12. At all times, I conducted myself as a reasonably prudent Chief of Trauma Services and Co-Director of Emergency Medicine.

Mileski's evidence suggests the actions allegedly taken against the nurses were not in retaliation for their complaints, but were in fact based on his good faith belief that they had conflicts in performing procedures required of an emergency room nurse. Mileski denied knowing or speaking about Lippert and denied ever threatening to "get rid of the nurses."

In their response, the nurses submitted the following evidence:

1. Nurse Hohman's affidavit, which provided: "UTMB management persons and their subordinates persisted in making statements to other UTMB employees attacking me and other nurses who made the reports. When Mileski threatened the nurses that had caused him trouble in the Spring, 1997, and threatened to get their licenses, I knew that he was referring to Ms. [Lippert] and I. Ms. [Lippert] and I publicly revealed our concerns and made official reports to the appropriate agencies. I was frightened when I learned about Dr. Mileski's threats to get my license because I believe he is capable of such malicious actions."

2. Nurse Lippert's affidavit, which provided: "When Dr. Mileski told a UTMB nurse in the Spring, 1997, that he was going to "get those bitches" that had caused trouble for him and/or get their licenses, I knew he was talking about Ms. Hohman and myself. I had been quoted in the newspaper and had filed suit against Dr. Mileski by that time. I was very frightened when I heard about Dr. Mileski's threats against me because I knew that he could, and was capable of, causing even more severe damage to my career than had already occurred while I was employed there."

3. Nurse Sharon Atwell's deposition, in which she testified: "Dr. Mileski threatened the licenses of the nurses that were causing trouble for him as he put it. He said that he was going to have their licenses."

Mileski's statement that his actions were taken in good faith was a conclusory statement



and may not be considered as summary judgment of good faith.[8] Thomas v.

Page 780

Collins, 960 S.W.2d 106, 113 (Tex. App.-Houston [1st Dist.] 1997, pet. denied). However, Dr. Mileski's summary judgment proof indicates that a reasonable official in Mileski's place could have believed that the actions against the nurses were justified because they had a conflict with performing procedures required of ER nurses. Thus, Dr. Mileski carried his summary judgment burden to show good faith.

The burden then shifted to the nurses to show that no reasonable person in Dr. Mileski's position could have believed that the circumstances justified the actions taken against them. To meet this burden, the nurses introduced summary judgment evidence to show that Mileski's actions were taken in retaliation for "causing trouble for him" by reporting what they believed to be criminal and ethical violations in the emergency room at UTMB. This evidence presents a question of fact for a jury to resolve on the issue of Dr. Mileski's good faith.

2. Shelver

In support of her motion for summary judgment, Shelver presented the following evidence on the element of "good faith."

11. I [Shelver] did not learn that any reports about allegations of patients' rights violations had been made to agencies outside of UTMB until I read about it in the media in late November 1996, weeks after the Plaintiffs were no longer working at UTMB. I had no knowledge of the assault complaint filed the UTMB police department prior to the initiation of this lawsuit.

12. I had no knowledge that a report had been made to the board of Nurse Examiners until this lawsuit was filed.

13. All actions taken in regard to the Plaintiffs were done in good faith, using my best judgment

as Nurse Manager responsible for supervising 90-100 nurses caring for emergency and trauma patients.

Shelver's evidence suggests that her actions could not have been in retaliation for reports filed by the nurses because she did not know about the reports until after the nurses quit.

The nurses filed the following evidence in response:

1. Hohman's affidavit, which provides: "I contacted the Texas Board of Nurse Examiners seeking information about the appropriate course of action. I also reported the incidents and pattern and practice of patient abuse and rights violations that I had observed to Ms. Kim Flores of the Board of Nurse Examiners. I told Shelver, Jackie Aoughsten (Shelver's assistant) in late August, 1996, and on separate occasions to Stephanie DeJohng (UTMB charge nurse), Lisa [Lippert], Sharon Atwell, Hollie Walker and other UTMB Emergency Room nurses that I had contacted and made a report to the Texas Board of Nurse Examiners. After I told Ms. Shelver about the report, I was retaliated against, including being placed on notice of suspension, changed work schedules, harassment, chart audits, monitoring and verbal harassment."

2. Lippert's affidavit, which provided: "I was subjected to retaliatory actions following my reports of patient abuse to UTMB Nursing Administration and the Texas Department of Health in August, 1996, all of which became so intolerable that I was forced to resign. I told Stephanie DeJohng, UTMB charge nurse, about the anonymous report to the Texas Department of Health shortly after I made the report in August, 1996. After I told Ms. DeJohng about my report to the Texas Dept. of Health in August, 1996, I was subjected to the following unwarranted and retaliatory actions,

Page 781

verbal reprimands, admonishments, and threats by Martha Shelver . . . ."



3. Lippert's affidavit also provided: "The fact that Stephanie Hohman had made a report to the Texas Board of Nurse Examiners was a matter of common knowledge in the Emergency Department. I was aware of it and Ms. Hohman and I did not even work on the same shift."

In contrast to Shelver's affidavit, the nurses' evidence suggests that Shelver did, in fact, know about the reports before the alleged acts of retaliation occurred. Accordingly, we hold that there is a fact question on the issue of Shelver's good faith.

Shelver also contends that Hohman's claim against her individually under the Nurse Reporting Act must fail because Hohman did not state a claim under the Act. Specifically, Shelver argues that Hohman never filed a written report, but only made an oral report to the board of nursing examiners.

However, in Clark v. Texas Home Health, Inc., 971 S.W.2d 435, 437 (Tex. 1998), the court held that a written report was not a prerequisite to receiving protection against retaliation under section 11 of the Nurse Reporting Act. Thus, Hohman did state a claim under the Nurse Reporting Act. Because we have already held that there was a question of fact regarding Shelver's good faith on this claim, summary judgment was not appropriate.

We overrule issues two, five, and eight.

CONCLUSION

Because we have held that the nurses properly pled a cause of action under the Whistleblower Act, and that the Act waives sovereign immunity from suit, we affirm the trial court's ruling denying the UTMB's plea to the jurisdiction on those claims. In light of our holding that the Nurse Reporting Act does not contain a waiver of sovereign immunity from suit, we dismiss those claims as they relate to UTMB or Shelver when sued in her official capacity. Because no cause of action for intentional torts will lie against the State, we dismiss those claims

as they relate to Mileski and Shelver in their official capacities. Finally, we reverse and remand all claims against Mileski and Shelver in their individual capacities because there is a question of fact on the element of good faith.

---------------

Notes:

*. The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. We have jurisdiction over UTMB's appeal pursuant to TEX. CIV. PRAC. & REM. CODE ANN. 51.014(a)(8) (Vernon Supp. 1999), which allows a governmental unit to appeal an order denying its plea to the jurisdiction. We have jurisdiction over Mileski's and Shelver's appeals pursuant to TEX. CIV. PRAC. & REM. CODE ANN. 51.014(a)(5) (Vernon Supp. 1999), which allows an individual who is an employee of the state to appeal the denial of a summary judgment based on an assertion of immunity.

2. The nurses' petition alleges retaliation in the following paragraphs:

Defendants retaliated against Plaintiffs for reporting the illegal acts and violations, and for refusing to participate and go along with the illegal acts. Forms of retaliation include, but are not limited to, threats or notices of suspension, reprimands, poor performance reviews inconsistent with performance, verbal harassment, threats, and failure to promote. Hohman and Gray [Lippert] repeatedly prepared and presented the appropriate management staff with "issues and concerns" reports, outlining inappropriate patient care treatment as discussed herein. Gray was harassed and intimidated on a daily basis, which included, but is not limited to, denial of lunch and restroom breaks, chastisement for going to the bathroom during a shift, false accusations of improper conduct, failure to appoint Gray as charge nurse thus denying her valuable experience, verbal harassment, threats, and withholding of evaluations thus holding up merit and promotion



raises. Plaintiffs were treated in a demeaning and threatening manner because they brought their complaints to the attention of management.

. . . .

Because of those reports and the nurses' actions in attempting to halt the illegal acts and the improperly instituted invasive and overly aggressive procedures, the nurses were subjected to retaliation such as reprimands, sudden work shift changes, written reprimands, frequent personal confrontations with management level personnel, attempts to discredit the nurses professionally, poor performance reviews, verbal harassment, threats and additional adverse employment conditions.

The illegal and unethical conduct and harassment continued despite their complaints until both Plaintiffs were forced to resign under the pressure of continued violations of patients' rights, constant harassment and personal attacks, the futility of the internal grievance process, severely detrimental work conditions, and mounting retaliation to which no reasonable person would continue to subject themselves.

3. Under Sabine Pilot Serv., Inc. v. Hauck, 687 S.W.2d 733, 734 (Tex. 1985), an employee fired for refusing to perform an illegal act can sue for wrongful discharge.

4. UTMB argues that Hohman's limitations began to run with the July 29, 1996 personnel evaluation, which means her suit should have been filed on or before October 28, 1996. UTMB argues that Lippert's limitations began to run on September 6, 1996, when she was reprimanded for being inattentive to a patient, which means that her suit should have been filed by December 5, 1996. Both nurses filed suit on January 6, 1997.

5. For instance, UTMB argues that Lippert never invoked the grievance procedure before resigning and, the only time Hohman filed a grievance from a notice of intent to suspend, she received the relief she requested.

6. See TEX. REV. CIV. STAT. ANN. art. 4525a (Vernon Supp. 1999).

7. For examples of clear and unambiguous waivers of sovereign immunity, see (1) the Texas Tort Claims Act, which states "[s]overeign immunity to suit is waived and abolished to the extent of liability created by this chapter." TEX. CIV. PRAC. & REM. CODE ANN. 101.025(a) (Vernon 1997) and (2) the Whistleblower Act, which states "a public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter. Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter." TEX. GOV'T CODE ANN. 554.035 (Vernon Supp. 1999).

8. Conceding that Mileski had limited, direct involvement with the nurses, they nonetheless alleged that he was responsible for the following acts of retaliation by his subordinates:

* verbal reprimands, admonishments, and threats

* derogatory comments attacking quality of their nursing care

* placed on notice of suspension

* given adverse performance review

* humiliated in front of peers by challenging their competence

* threatened with being "eliminated" by hospital official if continued reports were made

* singled out for monitoring of patients' charts

* unnecessary schedule changes

* false accusations of harming a patient

* written up and reprimanded for speaking out on patient violations

* nursing licenses placed in jeopardy

* transferred out of trauma to less challenging areas of work



* denied a grievance procedure

* designated as non-rehirable and denied pay by letter status

* performance review withheld

* denied possibility of promotion

* placed on "action plan" for alleged documentation deficiencies

* falsely accused in writing of improper conduct

* denied breaks during work hours

The acts of retaliation allegedly began in early 1996, shortly after Mileski assumed control of the emergency room and implemented new procedures, escalated in August 1996, after the nurses began reporting what they believed to be criminal and ethical violations of patients' rights, and culminated in the nurses' resignations in November 1996. The nurses allege that the retaliation continued even after their 1996 resignations when, in the spring 1997, Mileski threatened to "get their licenses."

---------------



**484 S.W.3d 440**

**Vicki Ward, Appellant**
**v.**
**Lamar University and Texas State University System, Appellees**

**NO. 14–14–00097–CV**

**Court of Appeals of Texas, Houston (14th Dist.).**

**Substitute Majority and Dissenting Opinions filed January 12, 2016**

Iain Gordon Simpson, Houston, TX, Larry Watts, Missouri City, TX, for Appellant.

Esteban Soto, Austin, TX, Eric L. Vinson, Austin, TX, for Appellees.

Panel consists of Chief Justice Frost and Justices Christopher and Busby

**SUBSTITUTE MAJORITY OPINION**

J. Brett Busby, Justice

We issued majority and dissenting opinions in this case on May 12, 2015. We affirmed the trial court's order of dismissal in part, reversed it in part, and remanded for further proceedings. Appellees subsequently filed a motion for rehearing, and appellant filed a response. These filings narrowed the scope of the issues before us and raised a new issue of mootness that requires further consideration. We therefore grant the motion, withdraw our previous opinions, and issue substitute opinions.

Appellant Vicki Ward sued appellees Lamar University and the Texas State University System for retaliating against her in violation of the Texas Whistleblower Act. Appellees filed a plea to the jurisdiction. Subsequently, Ward filed an amended petition, adding a claim for a declaratory judgment that appellees violated several sections of the Texas Constitution. After a hearing, the trial court issued an order dismissing Ward's claims under the Whistleblower Act based on the plea and dismissing her constitutional claims sua sponte.

In her first issue, Ward argues the trial court erred in dismissing her claims under the Whistleblower Act because her amended petition and testimony sufficed to defeat a plea to the jurisdiction. We hold the trial court erred in dismissing Ward's whistleblower claims against Lamar University because there is evidence that she met the Act's grievance requirement and that Lamar took an adverse personnel action against her. The court properly dismissed Ward's whistleblower claims against the Texas State University System, however, because there is no evidence it took such an action.

In her second issue, Ward asserts the trial court erred by dismissing her free speech retaliation claim against Lamar and the System under the Declaratory Judgments Act and the Texas Constitution because no basis existed for the court's dismissal. As to Lamar, we agree that the trial court erred in dismissing this claim sua sponte. With respect to the System, however, we hold that the claim was properly dismissed on the same ground as the whistleblower claims: lack of evidence of an adverse personnel action. We affirm in part, reverse in part, and remand the case for further proceedings.

[484 S.W.3d 444]

**BACKGROUND**

Appellant Vicki Ward filed a petition alleging that appellees had violated the Texas Whistleblower Act by taking adverse personnel action against her after she reported in good faith a violation of law to an appropriate law enforcement authority. Tex. Gov't Code Ann. §§ 554.001, *et seq*. Appellees filed a plea to the jurisdiction, seeking dismissal of Ward's claims. Ward then filed an amended petition, adding a second cause of action. Specifically, Ward's amended petition sought a declaratory judgment that appellees had violated Sections 3, 3a, 8, and 19 of Article One of the Texas Constitution.



To support her claims, Ward alleged the following facts in her amended petition. Ward worked as an Associate Vice President for Finance at Lamar University Beaumont. Lamar University is a part of the Texas State University System. Ward was responsible for Lamar's finance operations, including procurement. While reviewing payment requests, Ward noticed suspicious financial transactions within certain departments of Lamar. Ward reported her concerns to Lamar's Police Chief, Jason Goodrich. Over the next several months, an investigation was conducted. The investigation produced a report, co-authored by Ward, that documented the transactions. The report was forwarded to James Simmons, who was at that time President of Lamar.[1] Eventually, the report was leaked to a television station, and the station began running stories concerning the contents of the report.

Ward alleged that after the report was leaked, Simmons "indicated he was interested in hurting [her] as author of the report more than he was interested in correcting the corruption uncovered in the report." Ward lost the ability to approve and review procurement documents. When she asked Simmons about this limitation of her duties, he allegedly replied, "Stop looking at departments and their spending, [sic] you have caused enough trouble." Ward also alleged that she lost authority over her department. Priscilla Parsons was named Senior Associate Vice President of Finance. During a meeting, Simmons allegedly stated that Ward had no authority in the Finance Department.

Ward alleged that she then initiated an appeal to the Chancellor of the System as well as to Simmons and Dr. Cruse Melvin, whom Simmons had appointed as one of her superiors. No formal grievance or appeal policy was identified by any of the parties, either in their pleadings or at the hearing.

Ward subsequently received a phone call from Fernando Gomez, the Vice Chancellor of the System, informing her that her appeal had been received. During the conversation, he allegedly told her "she would have to go." Gomez said Ward

would be given a severance package to resign. He told her he was an attorney and could help "settle things" because Ward was not a "good fit." He further told her that she was an employee at will. Ward asked Gomez if he was threatening to fire her. He replied that he was only an attorney and could not fire anyone. He repeated his severance package proposal, and Ward again asked Gomez if he was threatening to fire her. He said "no" but reiterated that Ward was an employee at will. Gomez said, "Remember, I can help you. If not, I will call HR and they will send you a letter." Ward responded that she could not make a decision at that point

[484 S.W.3d 445]

and did not understand why she was being threatened because she was merely safeguarding Lamar. Gomez ended the conversation by saying, "Well, I will be sending you a letter and contacting HR." He then hung up. It is undisputed that Ward was not terminated following this conversation and remains employed by Lamar as Associate Vice President for Finance.

During a hearing on appellees' plea to the jurisdiction, Ward testified that her former procurement responsibility had allowed her to identify the malfeasance. She also testified that the number of people under her supervision had been reduced. Ward had overseen between 45 and 50 employees, but after the report was filed, approximately 15 people were removed from her supervision. Furthermore, Parsons ran meetings outside Ward's presence, and Ward now had to report to Parsons, whereas before Ward reported directly to the Vice President for Finance. Ward's job title remained the same, however, and her pay increased from $100,000 to $104,000.

Because the plea to the jurisdiction was filed before Ward's amended petition, it did not address Ward's constitutional claims. At the hearing on the plea, appellees' counsel declared that the court could dismiss the entirety of the complaint on its own motion for failing to allege a constitutional violation but offered to file another



plea addressing Ward's constitutional claims if the court desired. The court did not respond to this offer at the hearing, and no motion or plea seeking dismissal of those claims appears in the record. Following the hearing, the trial court issued an order dismissing Ward's claims under the Texas Constitution sua sponte and granting appellees' plea to the jurisdiction as to Ward's claims under the Texas Whistleblower Act. This appeal followed.[2]

## ANALYSIS

### I. The trial court erred in dismissing Ward's whistleblower claims against Lamar but properly dismissed those claims against the System.

#### A. Standard of review

In her first issue, Ward contends the trial court erred in dismissing her claims under the Texas Whistleblower Act because she presented both allegations and evidence sufficient to defeat appellees' plea to the jurisdiction. If a governmental unit has immunity from suit, a trial court lacks subject-matter jurisdiction over a suit against the unit. *City of Houston v. Ranjel,* 407 S.W.3d 880, 887 (Tex.App.—Houston [14th Dist.] 2013, no pet.). A challenge to a trial court's subject-matter jurisdiction may be asserted by a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004). We review a trial court's decision on a plea to the jurisdiction de novo. *State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002).

A plaintiff has the burden to allege facts demonstrating jurisdiction, and we construe the pleadings liberally in the plaintiff's favor. *Miranda,* 133 S.W.3d at 226. When the governmental unit challenges the existence of jurisdictional facts, and the parties submit evidence relevant to the jurisdictional challenge, we must consider that evidence when necessary to resolve the jurisdictional issues raised.

[484 S.W.3d 446]

*Ranjel,* 407 S.W.3d at 887. The court must take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Miranda,* 133 S.W.3d at 228. If the evidence raises a fact question on jurisdiction, the trial court cannot grant the plea, and the issue must be resolved by the trier of fact. *Id.* at 227–28. On the other hand, if the evidence is undisputed or fails to raise a fact question, the trial court must rule on the plea as a matter of law. *Id.* at 228. This standard generally mirrors that of a summary judgment. *Id.*

#### B. Applicable law

Both in the trial court and on appeal, Lamar and the System advance several arguments to support the dismissal of Ward's whistleblower claims.[3] First, they contend that Ward failed to initiate a grievance procedure before filing suit as required by the Whistleblower Act. On appeal, they submit an appeals policy and ask that we take judicial notice of it. Second, they contend Ward's identified personnel actions are not "materially adverse" as a matter of law. Third, they argue Ward's claims against the System fail because Lamar, not the System, was her employer during the relevant time period, and furthermore there is no evidence that the System took any adverse personnel action against Ward.

The Texas Whistleblower Act provides that a "state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." Tex. Gov't Code Ann. § 554.002(a) (West 2012). A "personnel action" is one that affects a public employee's compensation, promotion, demotion, transfer, work assignment, or performance evaluation. *Id.* § 554.001(3).

An adverse personnel action is one that "would be likely to dissuade a reasonable, similarly situated worker from making a report under the Act." *Montgomery County v. Park,* 246 S.W.3d 610,



614 (Tex.2007). The supreme court has explained that this objective materiality standard, which is derived from federal employment law, allows claims based on retaliatory actions "likely to deter" reporting of governmental violations of law while weeding out "petty slights" and "minor annoyances." *Id.* The standard also bars trivial claims resulting from a plaintiff's unusual subjective feelings, while allowing claims arising from the particular circumstances of the challenged action. *Id.* at 614–15. Nonexclusive factors to consider in determining materiality include whether the allegedly adverse personnel action negatively affected the employee's (1) prestige; (2) opportunity for advancement; (3) working conditions; (4) pay or income; or (5) ability to obtain outside employment. *Id.* at 615. The presence or absence of any of these factors is not dispositive. *Id.* The effects of a challenged action must be considered as a whole and in light of all the circumstances, and an act that would be immaterial in some situations is material in others. *Id.*

[484 S.W.3d 447]

The Act waives the employing entity's immunity from an employee's suit alleging a violation of the Act. Tex. Gov't Code Ann. § 554.0035. Before filing suit, however, the Act requires an employee to "initiate action under the grievance or appeal procedures of the employing state or local governmental entity relating to suspension or termination of employment or adverse personnel action." *Id.* § 554.006(a). The employee must initiate the grievance procedures within 90 days after the alleged violation occurred or was discovered by the employee through reasonable diligence. *Id.* § 554.006(b). This provision affords the governmental entity an opportunity to correct its errors by resolving disputes before facing litigation, as the expense of litigation is borne ultimately by the public. *Fort Bend Indep. Sch. Dist. v. Rivera,* 93 S.W.3d 315, 318 (Tex.App.— Houston [14th Dist.] 2002, no pet.).

An employee is not relieved of the requirement to initiate a grievance or appeal by the lack of a formal procedure. *Berry v. Bd. of Regents of Tex.*

*S. Univ.,* 116 S.W.3d 323, 325 (Tex.App.— Houston [14th Dist.] 2003, pet. denied). The Act, however, does not dictate what actions are required to "initiate" the appeals process. *Moore v. Univ. of Houston–Clear Lake,* 165 S.W.3d 97, 102 (Tex.App.— Houston [14th Dist.] 2005, no pet.) ; *see City of Austin v. Ender,* 30 S.W.3d 590, 594 (Tex.App.—Austin 2000, no pet.). The statute also does not require the use of particular words, nor does it require the employee to state that his grievance or appeal is based on the Whistleblower Act. *Moore,* 165 S.W.3d at 102 ; *Ender,* 30 S.W.3d at 594.

In the absence of a standard created by an employee manual detailing the required contents of a public employee's grievance or appeal, the notice given to an employer must provide fair notice that the employee desires to appeal the employer's personnel decision and fair notice of the decision made by the employer from which the employee desires to appeal. *Montgomery County Hosp. Dist. v. Smith,* 181 S.W.3d 844, 850 (Tex.App.—Beaumont 2005, no pet.). By being given such a notice, the employer will be aware that its employee has appealed from its disciplinary decision and will know which of its employment decisions are being made the subject of its appeal process. *Id.*

## C. There is a fact issue regarding whether Ward initiated a grievance as required by the Act.

To support their contention that Ward failed to initiate the required grievance or appeal procedures before filing suit, Lamar and the System first present a policy that they contend details the steps Ward was required to take in order to initiate a grievance. They argue that we may take judicial notice of the policy on appeal despite their failure to introduce the policy in the trial court in support of their plea to the jurisdiction. By its express terms, however, this alleged policy does not apply to administrative staff members such as Ward. Accordingly, we need not decide whether this inapplicable policy is a proper subject for judicial notice.



Appellees also point to an affidavit—filed with their plea—of Bertha Fregia, Lamar's Vice President for Human Resources, in which she states that Ward never filed a grievance or appeal. Appellees contend this assertion is uncontroverted evidence of the existence of a grievance procedure and Ward's failure to comply. But Ward's amended petition, which was filed after appellees' plea, asserts that she initiated an appeal to the Chancellor of the System, Simmons, and Dr. Cruse Melvin. Furthermore, Ward testified about her appeal and stated that in her appeal letter,

[484 S.W.3d 448]

which is not part of the record, she asked the Chancellor to intervene in Simmons' retaliatory acts. She argues that the complaints in her letter and the return phone call from System official Gomez suffice to fulfill the requirement to initiate an appeals process before filing suit.

The record lacks information regarding the relationship between the System and Lamar, so it is unclear whether addressing an appeal to the Chancellor of the System suffices to comply with the requirement that the employee provide notice to the employer. Given that Simmons—the subject of Ward's grievance—was president of Lamar, a letter to the System may have been the best informal avenue available to Ward to initiate a grievance. *See Upton County, Tex. v. Brown,* 960 S.W.2d 808, 813–14 (Tex.App.—El Paso 1997, no pet.) (holding in absence of formal procedure a county employee's phone call to the county commissioner sufficed to fulfill Whistleblower Act's requirement to initiate a grievance procedure before filing suit). In any event, appellees did not offer evidence that the Chancellor is an improper recipient of a grievance or appeal. Considering Ward's testimony regarding the letter to the System Chancellor and the phone call she received from a System official in response, we conclude there is some evidence that appellees had fair notice of Ward's desire to appeal her employer's personnel decision and fair notice of the decision made by the employer from

which the employee desires to appeal. *Smith,* 181 S.W.3d at 850.

As noted above, Ward contended that she also directed her appeal to Lamar's then-President Simmons and to Dr. Cruse Melvin, who was operating as her direct superior at Lamar. "To the extent the steps in such a [grievance or appeal] procedure are unclear, as in this case, an employee's request to ranking officials of the employer to invoke the procedure (*i.e.,* whatever it may be) can hardly be denied effect." *Berry,* 116 S.W.3d at 325. For these reasons, we conclude there is a fact issue regarding whether Ward initiated an appeal before filing suit, and therefore the plea cannot be sustained based on Ward's failure to satisfy the Act's grievance requirement.

**D. There is a fact issue regarding whether Lamar took materially adverse personnel action against Ward, but a lack of evidence that the System took such action.**

We next consider appellees' argument that the plea was properly granted because the personnel actions alleged by Ward are not materially adverse as a matter of law. In *City of El Paso v. Parsons,* a firefighter was transferred from his position at the training academy after he reported the fire chief's submission of false reports concerning employee continuing-education requirements. 353 S.W.3d 215, 221 (Tex.App.—El Paso 2011, no pet.). The firefighter lost his responsibility as training chief, and other firefighters were removed from his supervision. *Id.* He retained his job title, however, and received pay increases. *Id.* The court of appeals held the evidence legally sufficient for a jury to conclude the firefighter's transfer constituted an adverse personnel action. *Id.* at 228.

In her amended petition and testimony, Ward alleged that Lamar removed her procurement responsibility, 15 people from her supervision, and her authority over the department. While her pay and job title remained the same, as *Parsons* shows, such factors are not dispositive. *See also Harrison v. Corr. Corp. of Am.,* 476 Fed.Appx.



40, 45 (5th Cir.2012) (collecting Fifth Circuit cases acknowledging that lateral reassignment to a position with equal pay could amount to a materially adverse action

[484 S.W.3d 449]

in some circumstances); *Kessler v. Westchester County Dept. of Soc. Services,* 461 F.3d 199, 202, 210 (2d Cir.2006) (finding a fact issue where a transfer stripped employee of many of his earlier management responsibilities, even though the employee was never disciplined, suspended, or written up and his salary, benefits, and hours were not decreased). Moreover, she no longer reported directly to the Vice President for Finance; instead, she reported to the new Senior Associate Vice President, an individual with no previous finance experience. Such an action is some evidence that she lost job prestige. *See Gray v. City of Galveston,* No. 14–12–00183–CV, 2013 WL 2247386, at *9 (Tex.App.—Houston [14th Dist.] May 21, 2013, no pet.) (holding appellant's reassignment from a "command position" to an "investigative position," where he reported to an officer with a lower rank and no longer served as a "direct report" to the Chief of Police, supported a conclusion that appellant was transferred to a less prestigious position).

Moreover, Ward testified that she lost her procurement duties, which were the duties that had allowed her to discover the transactions she reported. Removing the very authority that allowed a whistleblower to find wrongdoing in the first place is some evidence of an action that would likely dissuade a reasonable, similarly situated worker from making a report under the Act. *See Park,* 246 S.W.3d at 614–15. Under the circumstances, taking all of Ward's allegations as true, we hold the pleadings and testimony were sufficient to raise a fact question as to whether she suffered adverse employment actions at the hands of Lamar. *Miranda,* 133 S.W.3d at 227–28. The trial court thus erred in dismissing Ward's whistleblower claims against Lamar.

With respect to the System, however, the only adverse employment actions Ward alleges are the implied threats of termination she received during the phone call with Gomez. Ward was never terminated, however. Unfulfilled threats to fire do not constitute actionable adverse employment decisions. *Elgaghil v. Tarrant County Junior Coll.,* 45 S.W.3d 133, 142–43 (Tex.App.—Fort Worth 2000, pet. denied) ; *see also Ajayi v. Aramark Bus. Servs., Inc.,* 336 F.3d 520, 531 (7th Cir.2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse.").[4] Accordingly, we hold the trial court properly dismissed Ward's whistleblower claim against the System. We therefore sustain Ward's first issue in part and overrule it in part.

**II. The trial court erred in dismissing sua sponte Ward's free speech retaliation claim against Lamar, but it properly dismissed that claim against the System.**

In her second issue, Ward contends the trial court erred in dismissing sua sponte her free speech retaliation claim under the Declaratory Judgments Act and the Texas Constitution because no ground existed for dismissal. As noted above, Ward amended her petition after Lamar and the System filed their plea to the jurisdiction. Ward's amended petition added allegations that, among other things, both Lamar and the System retaliated against her for exercising her right to free speech under the Texas Constitution. Invoking the Declaratory Judgments Act, Ward sought a declaration that appellees violated Article I, Section 8 of the Texas Constitution, as well

[484 S.W.3d 450]

as an injunction requiring appellees to restore her former job duties and refrain from violating her constitutional rights and retaliating against her. Ward also alleged that appellees violated Article I, Sections 3, 3a, and 19 of the Texas Constitution, which guarantee equal rights, equality based on sex, and due course of law.

The Texas Constitution's Bill of Rights includes the following provision:



Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Tex. Const. art. I, § 8. Because this provision expressly guarantees an affirmative right to speak, the supreme court has held that it provides greater rights than the First Amendment to the Constitution of the United States in the context of prior restraints on speech, though it has not extended that holding to other contexts. *Compare Davenport v. Garcia,* 834 S.W.2d 4, 8–9 (Tex.1992), *with Tex. Dep't of Transp. v. Barber,* 111 S.W.3d 86, 106 (Tex.2003), *and Commission for Lawyer Discipline v. Benton,* 980 S.W.2d 425, 434 (Tex.1998).

The trial court dismissed Ward's claims under the Declaratory Judgments Act and the Texas Constitution "[o]n its own motion," stating that Ward's petition "fail[s] to articulate facts which, if believed, would support such a claim." Ward argues that no legal grounds existed for the dismissal. We agree as to her free speech retaliation claim against Lamar but disagree as to her free speech retaliation claim against the System. On rehearing, Ward disavows any intention to seek reversal of the trial court's order dismissing her other constitutional claims. Accordingly, we do not address those claims.

## A. Ward's free speech retaliation claim is not moot.

Lamar and the System argue for the first time on rehearing that Ward's free speech retaliation claim under the Declaratory Judgments Act and the Texas Constitution became moot because she resigned her position at Lamar after the trial court's dismissal but before any party filed a brief in this case. None of the parties mentioned a resignation in their briefs, and no resignation is included in our record. Appellees attached a copy of a resignation letter to their motion for rehearing.

Although issues implicating our jurisdiction generally may not be waived by failing to raise them promptly, we take this opportunity to emphasize that such issues should always be brought to the court's attention at the earliest possible time. Any other practice would waste party and court resources and would create opportunities for unfairness and manipulation. No party should feel free to gamble on winning a favorable ruling on the merits while concealing a jurisdictional flaw or holding a jurisdictional trump card to play in the event of a loss. *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.01–3.04, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West Supp.2015) (Tex. State Bar R. art. X, § 9).

Ward argues that we may not consider the resignation letter because it is not in our record. But appellate courts have a duty to assess their own jurisdiction sua sponte,

[484 S.W.3d 451]

*M.O. Dental Lab v. Rape,* 139 S.W.3d 671, 673 (Tex.2004), and we may ascertain facts necessary to the exercise of our jurisdiction. Tex. Gov't Code § 22.220(c) (West Supp.2015) ("Each court of appeals may, on affidavit or otherwise, as the court may determine, ascertain the matters of fact that are necessary to the proper exercise of its jurisdiction."). Texas Rule of Appellate Procedure 10.2 provides the mechanism for ascertaining jurisdictional facts when—as here—they are not in the record and not within the court's knowledge in its official capacity. Under that rule, the attorney signing the motion may state the fact if it



is within his personal knowledge; otherwise, the motion "must be supported by affidavit or other satisfactory evidence." Tex. R.App. P. 10.2. Here, there is no indication that the attorney who filed appellees' motion for rehearing (as well as appellees' brief) had personal knowledge of Ward's resignation, and appellees' motion for rehearing includes no affidavit substantiating Ward's resignation or authenticating the letter.[5]

We need not decide whether appellees' failure to comply with Rule 10.2 dooms their mootness argument, however, because that argument fails even if the resignation letter is considered. Appellees argue that Ward's resignation moots her free speech retaliation claim seeking declaratory and injunctive relief because Ward's requested injunctive relief is no longer available. *See Robinson v. Alief Indep. Sch. Dist.,* 298 S.W.3d 321, 324 (Tex.App.—Houston [14th Dist.] 2009, pet. denied) ("The mootness doctrine precludes a court from rendering an advisory opinion in a case where there is no live controversy."). Ward counters that her declaratory claim is not moot because she sought attorney's fees, and a party need not prevail to recover attorney's fees under the Declaratory Judgments Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2015) ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.").

We agree that Ward's claim is not moot because she sought attorney's fees under the Declaratory Judgments Act. *See Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 642 (Tex.2005) (citing *Camarena v. Tex. Emp't Comm'n,* 754 S.W.2d 149, 151 (Tex.1988) ); *Hansen v. JP Morgan Chase Bank, N.A.,* 346 S.W.3d 769, 773–75 (Tex.App.—Dallas 2011, no pet.) ("[A] case under the Declaratory Judgments Act remains a live controversy, even if all requests for substantive declaratory relief become moot during the action's pendency, as long as a claim for attorneys' fees under the Act remains pending."); *Labrado v. County of El Paso,* 132 S.W.3d 581, 589–591 (Tex.App.—El Paso 2004, no pet.) ; *cf. Devon Energy Prod. Co. v. KCS Resources, LLC,*

450 S.W.3d 203, 218–223 (Tex.App.—Houston [14th Dist.] 2014, pet. denied) (holding a party could seek fees where trial court lacked jurisdiction over opposing party's declaratory claim from its inception).

In *Hallman,* the supreme court held that a declaratory judgment suit regarding an insurer's duty to defend did not become moot on appeal when the insurer provided the requested defense because there was still a live dispute over the insured's entitlement to attorney's fees under the Declaratory Judgments Act. 159 S.W.3d at 642–43. The trial court had ruled that the insurer had no duty to defend, and the

[484 S.W.3d 452]

supreme court explained that a different answer on that merits question would require a remand for the trial court to reconsider whether an award of fees to the insured was appropriate. *Id.* at 643. Similarly, the trial court dismissed Ward's free speech retaliation claim in this case, and Ward apparently resigned thereafter. If Ward is correct that this dismissal was erroneous, then further proceedings may show that an award of attorney's fees is appropriate under the Declaratory Judgments Act.[6] Accordingly, as in *Hallman,* we address the merits of the free speech retaliation dispute. *See id.*[7]

### B. Appellees offered no viable ground for dismissing Ward's free speech retaliation claim against Lamar.

Although the trial court stated the ground for its ruling dismissing Ward's free speech retaliation claim, we may consider in the interest of judicial economy other grounds for dismissal that were preserved for review.[8] As discussed in Part I of this opinion, one of the grounds for dismissal raised in appellees' plea was that Ward did not suffer an adverse employment action. Thus, we consider whether this ground could also provide a basis for dismissing Ward's free speech retaliation claim. *See City of Dallas v. Turley,* 316 S.W.3d 762, 774 (Tex.App.—Dallas 2010, pet. denied) (analyzing whether grounds raised in plea to



jurisdiction supported dismissal of claims added in amended petition filed after plea).

[484 S.W.3d 453]

In their briefs on appeal, both parties look to federal decisions addressing the elements of a First Amendment retaliation claim for guidance on the elements of Ward's free speech retaliation claim under the Texas Constitution. One of those federal elements is an adverse employment decision. *See, e.g., Juarez v. Aguilar,* 666 F.3d 325, 332 (5th Cir.2011). Because the parties have not argued that the elements of the claim differ under the Texas Constitution, we will analyze Ward's claim using the federal requirement of an adverse employment decision. *See Price v. Tex. Alcoholic Beverage Comm'n,* No. 01–12–1164–CV, 2014 WL 3408696, at *5 (Tex.App.—Houston [1st Dist.] July 10, 2014, pet. denied) (mem.op.).

As we explained in Part I, the pleadings and testimony are sufficient to raise a fact question regarding whether Ward suffered an adverse employment decision at the hands of Lamar, but Ward has not alleged any actionable adverse employment decision by the System. Accordingly, we affirm the trial court's dismissal of Ward's free speech retaliation claim against the System under the Declaratory Judgments Act and Article I, Section 8 of the Texas Constitution.

Because appellees' plea to the jurisdiction does not support dismissal of Ward's first amendment retaliation claim against Lamar, we next examine the trial court's stated non-jurisdictional reason for dismissing that claim. The trial court's order specifies that the dismissal of Ward's constitutional claims was for failure to plead facts supporting the claims.[9] But there was no motion or other procedural vehicle available to the trial court authorizing it to dismiss these claims, and neither the trial court nor appellees identify any authority for dismissing a claim sua sponte on this basis. *Cf.* Tex.R.App. P. 91a.1 (requiring motion to dismiss cause of action on the grounds that it has no basis in law or fact).

In the absence of such authority, courts should rely on the adversary system of justice, which depends on the parties to frame the issues for decision and assigns to courts the role of neutral arbiter of the matters that the parties present. *Greenlaw v. United States,* 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008).[10] One rationale for this system is that the parties and their counsel usually know far better than the courts what is best for them, so they are responsible for advancing the facts and arguments entitling them

[484 S.W.3d 454]

to relief. *Id.* at 244, 128 S.Ct. 2559.[11] Resolving disputes only on grounds raised by the parties also serves judicial economy,[12] keeps courts within their constitutionally assigned role as impartial and "neutral arbiter[s]," *id.* at 243, 128 S.Ct. 2559,[13] and enables courts to make well-informed decisions based on full adversary presentation and testing of the arguments on either side of the issue at hand.

The parties have not addressed—either in the trial court or on appeal—whether Texas courts recognize a claim under the Texas Constitution to enjoin an adverse employment action taken in retaliation for the exercise of free speech rights, nor have they addressed whether appellees are immune from suit on such a claim.[14] The trial court should have allowed the parties to develop these issues through the adversary process; it erred by dismissing Ward's free speech retaliation claim against Lamar without a legal basis for doing so. We sustain Ward's second issue in part and reverse the trial court's dismissal of her free speech retaliation claim against Lamar under the Declaratory Judgments Act and Article I, Section 8 of the Texas Constitution.

**CONCLUSION**

For the foregoing reasons, we affirm the trial court's dismissal of Ward's whistleblower claims and her free speech retaliation

[484 S.W.3d 455]



claim against the Texas State University System, reverse the trial court's dismissal of Ward's whistleblower claims and her free speech retaliation claim against Lamar University, and remand the case to the trial court for further proceedings consistent with this opinion.

(Frost, C.J., dissenting).

**SUBSTITUTE DISSENTING OPINION**

Kem Thompson Frost, Chief Justice

I respectfully dissent.

Appellant Vicki Ward filed various claims relating to her alleged employment at both appellee Lamar University and appellee Texas State University System (collectively the "Lamar Parties"). Shortly after perfecting this appeal, Ward resigned her employment. This resignation renders moot Ward's claims for injunctive and declaratory relief against the Lamar Parties based on alleged workplace retaliation against Ward for exercising her free-speech rights. Therefore, this court should vacate the trial court's judgment and dismiss this appeal as to these free-speech retaliation claims rather than addressing the merits of Ward's appeal as to these claims.

**Ward's resignation moots her claims for declaratory and injunctive relief regarding alleged retaliation against her for exercising her free-speech rights.**

In her live pleading in the trial court, Ward alleged both Lamar Parties employed her. Ward asserted various claims against the Lamar Parties, including claims under the Texas Whistleblower Act, and claims for declaratory and injunctive relief based on alleged adverse personnel actions by the Lamar Parties against Ward in retaliation for exercising her free-speech rights under the Texas Constitution.[1]

Less than two months after Ward perfected this appeal from the trial court's order dismissing all of her claims against the Lamar Parties, Ward resigned her employment. Nonetheless, neither Ward nor the Lamar Parties notified this court of Ward's resignation until seventeen months later, when the Lamar Parties moved for rehearing, after the parties had filed their appellate briefs and this court had issued its opinion on original submission. The Lamar Parties attached to their rehearing motion a copy of Ward's resignation letter. In response, Ward admits that this document is her letter of resignation. Yet, Ward asserts that this letter cannot serve as the basis of this court's decision because the resignation letter was not presented to the trial court and is not part of the clerk's record or reporter's record in this appeal. Ward's complaints lack merit because this court may consider matters not submitted to the trial court and not contained in the clerk's record or reporter's record for the purpose of determining whether this court has lost jurisdiction because an issue has become moot.[2] Though it would have been better for the Lamar Parties to have submitted an affidavit or other evidence

[484 S.W.3d 456]

establishing Ward's resignation, Ward has admitted that this document is her resignation letter, and based on this admission, this court may conclude that Ward has resigned and is no longer employed by the Lamar Parties.

Because Ward has resigned her employment, there is no longer any threat that Ward will suffer adverse personnel actions in retaliation for her exercise of her free-speech rights under the Texas Constitution. Unlike the remedies Ward seeks for her claims under the Texas Whistleblower Act, which contains a waiver of governmental immunity, Ward does not seek money damages based on the alleged adverse personnel actions in retaliation for Ward's exercising her free-speech rights. Rather, Ward seeks only declaratory and injunctive relief. Ward asserts that these claims are not moot because Ward sought attorney's fees under the Declaratory Judgments Act and this request for fees "breathes life" into her claims for declaratory and injunctive relief under *Allstate Insurance Company v. Hallman*.[3]



In *Hallman,* an insured and her insurer filed claims against each other seeking declaratory relief on the issue of whether the insurer had a duty to defend and indemnify the insured.[4] Both parties sought attorney's fees under the Declaratory Judgments Act.[5] On cross-motions for summary judgment, the trial court granted the insurer's motion, denied the insured's motion, denied each party's attorney's-fee request, and rendered a final judgment.[6] On appeal, the insured challenged the trial court's denial of her attorney's-fee request, and the court of appeals reversed the summary judgment, concluding that the trial court should have granted the insured's motion regarding the coverage issue and that the case should be remanded for the trial court to determine whether to grant the insured's request for attorney's fees.[7] While the case was pending in the Supreme Court of Texas, the coverage issues that were the subject of the declaratory relief became moot.[8] Nonetheless, the high court concluded that the appeal had not become moot because there remained a live controversy as to whether the insurer should be ordered to pay the insured's attorney's fees and because the high court needed to resolve the coverage issue to determine whether the case should be remanded to the trial court for reconsideration of the fee request, as the insured requested on appeal and as the court of appeals ordered.[9]

In Ward's case, the trial court did not rule on summary-judgment motions; instead, it granted the Lamar Parties' jurisdictional plea and dismissed all of Ward's claims. Ward first pleaded her claims for declaratory and injunctive relief two days before the trial court conducted a hearing on the Lamar Parties' plea to the jurisdiction and two days before the trial court rendered a final order dismissing all of Ward's claims. Within three months, Ward had resigned her employment, before any of the appellate briefs were filed in this case. Unlike the *Hallman* scenario, when Ward filed her appellate brief, she did not challenge the trial court's dismissal of her request for attorney's fees under the Declaratory Judgments Act. On this record, *Hallman* is not on point and

[484 S.W.3d 457]

Ward's request in the trial court for attorney's fees under the Declaratory Judgments Act does not preclude her claims for declaratory and injunctive relief regarding her free-speech rights from becoming moot.[10] Thus, Ward's claims against the Lamar Parties for declaratory and injunctive relief based on alleged free-speech retaliation have become moot.[11]

**The majority should not equate a failure to prove Ward's resignation with a potential remand under the *Hallman* case.**

The majority concludes that it need not decide whether the Lamar Parties have proved that Ward resigned her employment because any resignation by Ward would not moot the claims in question under the *Hallman* case.[12] Even if the *Hallman* case did apply, this court still would have to determine whether Ward resigned her employment because the scope of remand would be different as to Ward's claims against Lamar University. If Ward has not resigned or if the Lamar Parties have not sufficiently established this resignation, then, under the majority's analysis, this court should be reversing the trial

[484 S.W.3d 458]

court's order as to the claims against Lamar University for declaratory and injunctive relief based on alleged free-speech retaliation and remanding generally for further proceedings because neither the requests for declaratory and injunctive relief nor the related attorney's fee request would be moot.[13] On the other hand, if this court determines that Ward has resigned, even if *Hallman* applies, the only issue to be determined on remand would be whether the trial court would like to exercise its discretion to award attorney's fees under the Declaratory Judgments Act in light of the new circumstance that its dismissal of those claims has been determined on appeal to have been erroneous.[14] Therefore, this court should decide whether Ward has resigned her employment.[15]



According to the majority, Ward has not admitted that the document attached to the rehearing motion is her resignation letter.[16] Because the Lamar Parties have not proved up the resignation letter or otherwise submitted evidence of Ward's resignation, without such an admission, this court would have no basis to conclude that Ward resigned her employment.[17] In that event, under the majority's analysis, this court would be reversing the trial court's order as to the claims against Lamar University for declaratory and injunctive relief based on alleged free-speech retaliation and remanding generally for further proceedings on the merits because neither the requests for declaratory and injunctive relief nor the related attorney's-fee request would be moot.[18] According to the majority, even though Ward has not admitted that the document is her resignation letter, this court need not address whether the Lamar Parties have proved that Ward resigned because the outcome of the mootness inquiry is the same whether or not Ward is employed by the Lamar Parties.[19] Because the answer to the mootness inquiry differs depending on Ward's employment status, and because the majority concludes Ward has not admitted that the document is her resignation letter, this court must determine whether the Lamar Parties have proved that Ward has resigned her employment.[20]

**The majority should clarify what proceedings the trial court should conduct on remand regarding the free-speech-retaliation claims against Lamar University.**

The majority reverses the trial court's dismissal order as to the claims against Lamar University for declaratory and injunctive relief based on alleged free-speech retaliation and remands for further proceedings consistent with the majority opinion. The majority concludes that, under *Hallman,*"Ward's claim is not moot because she sought attorney's fees under the Declaratory Judgments Act" and because, if the trial court erred in dismissing Ward's free-speech retaliation claim, "then further proceedings may show that an award of attorney's fees is appropriate under the Declaratory Judgments Act."[21] But, even

under *Hallman,* the only further proceedings regarding this claim against Lamar University that are not moot is a remand for the trial court to determine whether to exercise its discretion to award attorney's fees under the Declaratory Judgments Act in light of the new circumstance that this court has determined the trial court erred in dismissing this claim.[22] Rather than recognize the limited nature of this remand, the majority holds that Ward's free-speech retaliation claim is not moot and generally remands for further proceedings on this claim against Lamar University. The majority thus incorrectly concludes that, under *Hallman,* because Ward requested attorney's fees under the Texas Declaratory Judgments Act, there remains a live controversy as to Ward's entitlement on remand to declaratory and injunctive relief against Lamar University based on alleged free-speech retaliation.[23]

In deciding cases, the appellate court has an obligation to the trial court and to the litigants to state clearly the action taken. When remanding for the trial court to undertake further consideration of the case, the appellate court should set forth what is expected. Yet, the majority takes the unusual posture that it need not specify what proceedings on remand would be consistent with the majority opinion. The reason the majority gives for not doing so is that the parties did not brief the

[484 S.W.3d 459]

issue.[24] This court's duty to render the correct judgment does not turn on the parties' briefing.[25] But, even if it did, the parties briefed the mootness issue, and answering this question is necessary to determine the mootness issue.[26]

Because the majority does not address what further proceedings the trial court should conduct, it may not be clear to the trial court whether this court has concluded that a live controversy remains as to whether, on remand, Ward is entitled to declaratory and injunctive relief against Lamar University based on alleged free-speech retaliation. The parties and the trial



court might have questions about what is expected based on today's decision:

> • May the trial court allow discovery on Ward's moot requests for declaratory and injunctive relief because the merits of these claims need to be determined so that the trial court may decide whether an award of attorney's fees under the Declaratory Judgments Act is appropriate?
>
> • May the trial court consider any summary-judgment motions filed regarding these moot requests?
>
> • May the trial court conduct a trial on any fact issues regarding these moot requests so that the court may determine whether an award of attorney's fees under the Declaratory Judgments Act is appropriate?

The majority's failure to address these matters leaves uncertainty as to how this court has resolved the mootness issue. The need for clarity and precision on this point comes into sharper focus when considering the potential costs and delays the lack of it might spawn. Speaking clearly now might curtail litigation expenses, conserve judicial resources, and enhance efficiency.

--------

Notes:

[1] Simmons is no longer President of Lamar, though he remains employed by Lamar as a tenured professor.

[2] Pursuant to its docket-equalization powers, the Supreme Court of Texas transferred this appeal from the Ninth Court of Appeals to this Court. *See* Tex. Gov't Code Ann. § 73.001 (West 2013). We must decide this case in accordance with the precedent of the Ninth Court of Appeals under principles of stare decisis if our decision

otherwise would have been inconsistent with that court's precedent. *See* Tex. R. App. P. 41.3

[3] Because the plea to the jurisdiction did not challenge other elements of a whistleblower claim, such as Ward's status a public employee who in good faith reported a violation of law, the status of Lamar and the System as governmental entities, or the existence of a causal link between the report of illegal conduct and the identified personnel actions (*see City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 67 (Tex.2000) ), we do not address those issues.

[4] Because Ward failed to allege an adverse employment action committed by the System, we need not consider appellees' argument that the Texas Whistleblower Act does not apply to the System because it was not the employing entity.

[5] Our dissenting colleague contends that we should consider the letter because Ward admits its authenticity in her response to appellees' motion for rehearing. But Ward's response states in part that the letter "purports to be Ward's resignation." Considering Ward's response as a whole, we disagree that it includes an unequivocal admission that the letter is authentic.

[6] Our dissenting colleague contends that we should be very specific regarding the nature of the proceedings to be conducted on remand, and she argues that those proceedings should have a particular scope. *Post,* at 457–58. But the parties have neither addressed this issue nor made any such arguments. Thus, for the same reasons discussed in Part II.B. below, we leave this issue for the trial court to resolve in the first instance in light of the parties' adversary presentation and testing and proper introduction of any relevant evidence.

[7] Our dissenting colleague contends that *Hallman* is not on point because Ward is not appealing the denial of a motion for summary judgment seeking attorneys' fees, and she cites our sister court's decision in *Tesco Corporation v. Steadfast Insurance Company,* No. 01–13–91–CV, ––– S.W.3d ––––, 2015 WL 456466 (Tex.App.—Houston [1st Dist.] Feb. 3, 2015, pet. filed). We



disagree that this factual difference provides a basis for distinguishing *Hallman* or any of the other cases cited above. In *Tesco,* the parties filed motions for summary judgment, but Tesco's motion was only partial and did not address the attorneys' fees it had requested in its petition. *Id.* at ––––, 2015 WL 456466 at *1. After the trial court granted its opponent's motion for summary judgment, Tesco did not attack the denial of attorney's fees in its appellate brief. *Id.* at ––––, 2015 WL 456466 at *4. For these reasons, the First Court held there was no live issue regarding attorney's fees. *Id.* In contrast, Ward had no opportunity to file a motion for summary judgment in this case because the trial court dismissed her free speech retaliation claim seeking declaratory and injunctive relief sua sponte on the pleadings. Ward's brief devotes an issue and an entire section of argument to attacking the dismissal of this claim, and we see no reason why this global challenge should not include a challenge to the dismissal of her request for attorney's fees based on this claim. *See* Tex. R. App. P. 38.1(f) ; *Perry v. Cohen,* 272 S.W.3d 585, 587 (Tex.2008).

[8] *Cf. Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996) (holding in summary judgment context that appellate court "may consider other grounds that the movant preserved for review and trial court did not rule on in the interest of judicial economy"); *City of Mont Belvieu v. Enter. Products Operating, LP,* 222 S.W.3d 515, 519 (Tex.App.—Houston [14th Dist.] 2007, no pet.) (limiting appellate review of order sustaining plea to jurisdiction to matters presented to trial court); *Britton v. Tex. Dep't of Crim. Justice,* 95 S.W.3d 676, 681 (Tex.App.— Houston [1st Dist.] 2002, no pet.) (looking to summary judgment practice for guidance in reviewing pleas to jurisdiction based on multiple grounds).

[9] Specifically, the trial court stated that the "claims under the Texas Constitution contained in the Amended Petition fail to articulate facts which, if believed, would support such a claim." In other words, the trial court concluded that Ward's petition failed to state a claim, which is

not the same as a failure of jurisdiction. *E.g., Dubai Petrol. Co. v. Kazi,* 12 S.W.3d 71, 75–77 (Tex.2000). The trial court did not say that the petition failed to allege facts demonstrating the court's subject-matter jurisdiction, nor did it say why any such failure could not be remedied by affording Ward an opportunity to amend. *Cf. Miranda,* 133 S.W.3d at 226–27.

[10] *See also United States v. Burke,* 504 U.S. 229, 246, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) (Scalia, J., concurring in the judgment) ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system from the inquisitorial one"); *McNeil v. Wisconsin,* 501 U.S. 171, 181 n. 2, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) ("What makes a system [of justice] adversarial rather than inquisitorial is ... the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties.").

[11] *See also Castro v. United States,* 540 U.S. 375, 386, 124 S.Ct. 786, 157 L.Ed.2d 778 (Scalia, J., concurring in part and concurring in judgment); *Dennis v. United States,* 384 U.S. 855, 875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) ("In our adversary system, it is enough for judges to judge. The determination of what may be useful to [a party] can properly and effectively be made only by an advocate").

[12] *See Martinez v. State,* 91 S.W.3d 331, 336 n. 12 (Tex.Crim.App.2002).

[13] *See also Greenlaw,* 554 U.S. at 244, 128 S.Ct. 2559 (" '[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for the cases to come to us, and when they do we normally decide only questions presented by the parties.' " (quoting *United States v. Samuels,* 808 F.2d 1298, 1301 (8th Cir.1987) (R. Arnold, J., concurring in denial of reh'g en banc)); *Smith v. Horn,* 120 F.3d 400, 409 (3d Cir.1997) (explaining that when courts decide cases on grounds they raise sua sponte, they "come



dangerously close to acting as advocates for [a party] rather than as impartial magistrates"). The Due Process Clause of the Federal Constitution and the Due Course of Law Clause of the Texas Constitution require judges to be neutral and detached. U.S. Const. amend. V ; Tex. Const. art. I, § 19 ; Tex. Const. art. I, § 13 ; *see Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 617–18, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ; *Earley v. State,* 855 S.W.2d 260, 262 (Tex.App.—Corpus Christi 1993, no pet.).

[14] We are aware that courts have allowed public employees to sue their employers for damages under 42 U.S.C. § 1983 when the employees suffer adverse employment consequences for exercising their First Amendment right to speak on matters of public concern. *E.g., Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ; *Baker v. Gregg County,* 33 S.W.3d 72, 79 (Tex.App.—Texarkana 2000, pet. dism'd). But Ward has not sued under section 1983, Texas has no comparable state statute, and there is no implied private right of action for damages arising under the free speech provision of the Texas Constitution. *See City of Beaumont v. Bouillion,* 896 S.W.2d 143, 147 (Tex.1995). The trial court and the parties have not addressed whether injunctive relief is available in this circumstance to remedy violations of the Texas Constitution, *cf. City of Elsa v. M.A.L.,* 226 S.W.3d 390, 392 (Tex.2007) (per curiam), or whether appellees' sovereign immunity is waived in this circumstance under the Declaratory Judgments Act. *Cf. City of El Paso v. Heinrich,* 284 S.W.3d 366, 372–73 (Tex.2009) ("[Under the Declaratory Judgments Act], the governmental entities themselves—as opposed to their officers in their official capacity—remain immune from suit."). We therefore do not decide those questions here.

[1] *See* Tex. Gov't Code Ann. § 554.001, *et seq.* (West 2012); Tex. Const. art. I, § 8 (West, Westlaw through 2015 R.S.) (providing that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press").

[2] Tex. Gov't Code § 22.220(c) (West Supp. 2015) ("Each court of appeals may, on affidavit or otherwise, as the court may determine, ascertain the matters of fact that are necessary to the proper exercise of its jurisdiction."); *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex.2000) ; *In re C.M.D.,* 287 S.W.3d 510, 513–14 (Tex.App.—Houston [14th Dist.] 2009, no pet.).

[3] *See* 159 S.W.3d 640, 642–43 (Tex.2005).

[4] *See id.* at 641.

[5] *See id.*

[6] *See id.* at 642.

[7] *See id.*

[8] *See id.*

[9] *See id.* at 642–43.

[10] *See Tesco Corp. v. Steadfast Ins. Co.,* No. 01–13–00091–CV, ––– S.W.3d ––––, ––––  – ––––, 2015 WL 456466, at *3–4 (Tex.App.—Houston [1st Dist.] Feb. 3, 2015, pet. filed) (mem. op.).

[11] *See id.*

[12] *See ante* at 451–52.

[13] As to the claims against the Texas State University System for declaratory and injunctive relief based on alleged adverse personnel actions in retaliation for Ward's exercise of her free-speech rights, the majority affirms the trial court's dismissal order.

[14] *See Hallman,* 159 S.W.3d at 642–43 ; *AVE, Inc. v. Comal County*, No. 03–05–00183–CV, 2008 WL 2065857, at *3–4 (Tex.App.—Austin May 14, 2008, no pet.) (holding that issues as to whether declaratory relief should be granted had become moot and would be dismissed for lack of jurisdiction, but that, under Hallman, the entire appeal was not moot because there still was a live controversy as to whether appellee was entitled to



recover attorney's fees under the Declaratory Judgments Act and therefore issues regarding attorney's fees were not moot and would be decided) (mem. op.).

[15] *See Hallman*, 159 S.W.3d at 642–43 ; *AVE, Inc.*, 2008 WL 2065857, at *3–4.

[16] *See ante* at 451, n. 5.

[17] *See id.* Given the jurisdictional nature of the mootness inquiry, the Lamar Parties still would be free to submit additional proof that Ward has resigned her employment in a subsequent filing in this appeal.

[18] *See Hallman*, 159 S.W.3d at 642–43 ; *AVE, Inc.*, 2008 WL 2065857, at *3–4.

[19] *See* 451–52.

[20] *See ante* at 451–52; *Hallman*, 159 S.W.3d at 642–43 ; *AVE, Inc.*, 2008 WL 2065857, at *3–4.

[21] *Ante* at 451–52;

[22] *See Hallman*, 159 S.W.3d at 642–43 ; *AVE, Inc.*, 2008 WL 2065857, at *3–4.

[23] *See AVE, Inc.*, 2008 WL 2065857, at *3–4.

[24] *See ante* at 451–52, n. 6.

[25] *See Garza v. Cantu*, 431 S.W.3d 96, 108–10 (Tex.App.—Houston [14th Dist.] 2013, pet. denied) (remanding case to the trial court for a new trial because that was the proper appellate disposition based on the appellant's meritorious issue, even though appellant did not brief or request a remand for a new trial).

[26] *See AVE, Inc.*, 2008 WL 2065857, at *3–4.

--------



**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Junkin
Bar No. 11058020
david@mcglothlinlaw.com
Envelope ID: 101299428
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appellee's Brief
Status as of 5/27/2025 5:14 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rachel L. Behrendt | | Rachel.Behrendt@oag.texas.gov | 5/27/2025 4:56:56 PM | SENT |
| Ariana Ines | | ariana.ines@oag.texas.gov | 5/27/2025 4:56:56 PM | SENT |